## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

IN RE:

SOUTHWEST GEORGIA ETHANOL, LLC,

Debtor.

CHAPTER 11

Case No. _____

---

## MOTION OF DEBTOR FOR ORDER AUTHORIZING DEBTOR'S CONTINUED PERFORMANCE OF ITS OPERATION AND MAINTENANCE AGREEMENT AND ITS SERVICES AGREEMENT WITH FIRST UNITED ETHANOL, LLC

COMES NOW, Southwest Georgia Ethanol, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), and hereby moves for entry of an order, pursuant to section 363 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code"), and Rule 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), authorizing the Debtor to continue to perform under two executory contracts dated as of December 6, 2007 with an affiliate of the Debtor, namely, First United Ethanol, LLC ("FUEL") until such time as the Debtor obtains an order authorizing the assumption or rejection of such executory contracts (the "Motion"). In support of the Motion, the Debtor relies upon and incorporates by reference the Declaration of Lawrence Kamp in Support of First Day Motions, filed concurrently herewith (the "Kamp Declaration"). In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

### JURISDICTION

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of this Chapter 11 case and

this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409. The predicates for the relief requested herein are section 363 of the Bankruptcy Code and Bankruptcy Rules 6004.

## BACKGROUND

2.      On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under the Bankruptcy Code. The Debtor is authorized to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

3.      No creditors' committee has been appointed by the United States Trustee in this Chapter 11 case. No trustee or examiner has been appointed in this Chapter 11 case.

4.      A description of the Debtor's business, the reasons for filing this Chapter 11 case, and the relief sought from this Court to allow for a smooth transition into operations under Chapter 11 are set forth in the Kamp Declaration filed with the Court.

## RELIEF REQUESTED

5.      By this Motion, the Debtor seeks entry of an order (the "Order"), pursuant to section 363 of the Bankruptcy Code, authorizing the Debtor to continue to perform two executory contracts with an affiliate of the Debtor, namely FUEL until such time as the Debtor obtains an order authorizing the assumption or rejection of such executory contracts.

## BASIS FOR RELIEF

**A.      The Debtor Should Be Authorized To Continue To Perform its Duties Under its Management Agreements with FUEL**

6.      On March 9, 2005, Mitchell County Research Group LLC ("MCRG") was formed as a Georgia limited liability company. MCRG funded a feasibility study for a 100 million gallon annual capacity ethanol plant in Mitchell County, Georgia. In September 2005, MCRG created a 13 member board and 20 member advisory board, and changed its name to First United Ethanol, LLC.

ATLANTA:5282367.1

7.    In the Spring of 2007, FUEL began construction of the Debtor's ethanol facility, at a projected cost of $185,000,000.  On June 8, 2007, FUEL completed an equity offering, having raised $74,010,000 from over 800 investors in a public offering registered with the Securities and Exchange Commission (the "SEC").  FUEL secured project financing with a senior credit facility in the aggregate principal amount of approximately $90,000,000, and a revolving line of credit in the aggregate principal amount of $11,000,000.

8.    In October 2007, FUEL refinanced its outstanding debt and in connection with the refinancing, FUEL created and organized the Debtor as a Georgia Limited Liability Company with two members.  The members of the Debtor are FUEL, its Class A Member, that holds one Class A unit and CT Corporation Staffing, Inc., its Class B Member, that holds one Class B unit. The Authorized Persons of the Debtor, as such term is defined in Section 6.5 of the Debtor's Operating Agreement, are the members of the Debtor's Management Committee, and they are Murray Campbell, Mark Glass and Rick Moss.  The Debtor's Chief Financial Officer is Lawrence Kamp who is also the Chief Financial Officer of FUEL.  The Debtor's Class A Member is entitled to 100% of any distributions by the Debtor.  FUEL transferred all of its property and assets to the Debtor in exchange for 100% of the equity interests in the Debtor. FUEL assigned to the Debtor all of its rights and obligations under its executory contracts with third parties relating to the operation of the ethanol facility with the express consent of such third parties.

9.    Additionally, the Debtor entered into that certain Operation and Maintenance Agreement with FUEL, dated December 6, 2007, a copy of which is attached hereto as Exhibit "A" (the "O&M Agreement"), as well as that certain Services Agreement with FUEL, dated December 6, 2007, a copy of which is attached hereto as Exhibit "B" (the "Services Agreement"

and together with the O&M Agreement, the "Management Agreements"), pursuant to which FUEL operates and manages all of the Debtor's property and assets.

10.    In October 2008, the Debtor commenced ethanol production operations. Pursuant to the terms of the Management Agreements, FUEL employs all of the full time personnel who work at the Debtor's facility.    Under the Management Agreements, the Debtor proposes an annual budget that contains the amount of funds the Debtor needs to transfer to FUEL in order to cover the costs of the wages, salaries, benefits and other costs associated with the facility workforce, which budget is approved by the Prepetition Lenders[1].    The Debtor proposes to continue to perform post-petition under the Management Agreements while it defers a decision on the assumption or rejection of such executory contracts.

11.    Both the Debtor and FUEL desire full disclosure of the contractual relationship between affiliates embodied in the Management Agreements.    The Debtor has not been able to fund completely the payroll and benefits amounts contained in the 2011 budget that was previously approved by the Debtor's senior secured creditors; however, because the approved budgeted amount contained funding for bonuses in November 2010, FUEL has been able to meet current payroll obligations by not paying any bonuses in 2010.    The Approved Budget[2] contains amounts for payroll and benefits that are consistent with the 2011 budget that was previously approved by the Debtor's senior secured creditors.    Furthermore, the Approved Budget also contains funds to pay, if needed, up to $100,000 for professional expenses including those

---

[1] The defined term "Prepetition Lenders" shall have the meaning ascribed to such term in the *Debtor's Motion for Entry of an Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing Pursuant To 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 363(e), 364(c), 364(d)(1), 364(e), And 507(b), and (B) Utilize Cash Collateral Of Prepetition Secured Parties, (II) Granting Adequate Protection To Secured Parties, (III) Scheduling a Final Hearing Pursuant To Bankruptcy Rules 4001(b) And 4001(c), And (IV) Granting Related Relief* (the "DIP Motion"), filed concurrently herewith.
[2] The defined term "Approved Budget" shall have the meaning ascribed to such term in the DIP Motion.

ATLANTA:5282367.1

related to FUEL's corporate counsel, which also provides SEC compliance counseling and for FUEL's local counsel for litigation matters should any arise.

12.     The services delineated in the Management Agreements are essential to the Debtor's continued ongoing business operation.   Important management, accounting, and operating functions are realized through the Management Agreements.  The provision of these services will facilitate the orderly and efficient reorganization of the Debtor's business and financial affairs. This decision is based on the Debtor's best business judgment.

13.     Section 363 of the Bankruptcy Code provides that transactions not in the ordinary course of business must be approved by court order.  Courts routinely have held that transactions should be approved under Section 363 of the Bankruptcy Code when they are supported by the sound business judgment of management. *See, e.g., In re Lionel Corp.*, 722 F.2d 1063 (2d Cir. 1983) (outlining requirements for the sale of assets under Section 363(b)); and *In re Continental Air Lines, Inc.*, 780 F.2d 1223, 1226 (5th Cir. 1986).

14.     The Debtor therefore requests authority to continue to perform its obligations and to receive the benefits of the Management Agreements as outlined herein.

15.     For the foregoing reasons, the Debtor believes that granting the relief requested herein is appropriate and in the best interest of its estate.

**B.      Bankruptcy Rule 6003 has Been Satisfied**

16.     The Debtor further submits that because the relief requested is necessary to avoid immediate and irreparable harm to the Debtor for the reasons set forth herein, Bankruptcy Rule 6003 has been satisfied.

17.     To successfully implement the foregoing, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay under Bankruptcy Rule 6004(h).

ATLANTA:5282367.1

### NOTICE

18.     No trustee, examiner, or creditors' committee has been appointed in this Chapter 11 case.  Notice of this Motion will be given to:  (a) the Office of the United States Trustee; (b) Jennifer C. Hagle, Esq., counsel to the Agents (as defined in the Kamp Declaration); and (c) all parties included on the Debtor's list of twenty (20) largest unsecured creditors.  The Debtor submits that, under the circumstances, no other or further notice is required.

### NO PRIOR REQUEST

19.     No previous request for the relief sought herein has been made to this or any other court.

### CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

This 1st day of February, 2011.

MCKENNA LONG & ALDRIDGE LLP

s/ J. Michael Levengood
Gary W. Marsh
Georgia Bar No. 471290
J. Michael Levengood
Georgia Bar No. 447934
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
404-527-4000 (phone)
404-527-4198 (fax)
gmarsh@mckennalong.com
mlevengood@mckennalong.com

*Proposed Counsel for Southwest Georgia Ethanol, LLC, Debtor in Possession*

ATLANTA:5282367.1

# EXHIBIT A

OPERATION AND MAINTENANCE AGREEMENT

BETWEEN

SOUTHWEST GEORGIA ETHANOL, LLC
A Georgia Limited Liability Company

AND

FIRST UNITED ETHANOL, LLC
A Georgia Limited Liability Company

Dated as of December 6, 2007

## OPERATION AND MAINTENANCE AGREEMENT

THIS OPERATION AND MAINTENANCE AGREEMENT (the "Agreement") is dated as of December 6, 2007 (the "Effective Date"), by and between Southwest Georgia Ethanol, LLC, a Georgia limited liability company ("Owner") and First United Ethanol, LLC, a Georgia limited liability company ("Operator"). Owner and Operator are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

### RECITALS

WHEREAS, Owner intends to construct and operate an approximately 100 million gallon per year ethanol production facility near Camilla, Georgia (the "Facility"); and

WHEREAS, Owner desires to engage Operator to provide operation and maintenance services at the Facility and Operator desires to perform such services.

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein, Parties agree as follows:

### ARTICLE I
### DEFINITIONS; INTERPRETATION

1.1     Defined Terms. Unless the context otherwise requires, the following capitalized terms used in this Agreement and in any exhibit or attachment hereto shall have the following respective meanings:

"AF Threshold" shall have the meaning set forth in Section 5.1.

"Affiliate" means, with respect to a Party, any corporation or other entity which, directly or indirectly, controls or is controlled by or is under common control with such Party. For the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with") means the power to direct or cause the direction of the management and policies of a Party, directly or indirectly, whether through ownership of voting securities or by contract or otherwise. Ownership of 50% or more of the voting securities of a corporation, limited liability company or other entity, either directly or indirectly, shall constitute control of such corporation or other entity.

"Agreement" shall have the meaning set forth in the preamble.

"Annual Budget" shall have the meaning set forth in Section 4.1.

"Approved Budget" shall have the meaning set forth in Section 4.1.

"Authorization To Proceed" shall have the meaning set forth in Section 2.2.

"Availability Factor" shall mean the percentage of time when the Facility is capable of or is producing ethanol.

"Business Day" means any day other than a Saturday, Sunday or a legal or bank holiday in Atlanta, Georgia.

"CIP" shall mean the system designed to permit process equipment to be sequentially water flushed, detergent washed, and chemically sterilized clean without disconnecting or dismantling, i.e., cleaned in place.

"Claims" shall have the meaning given such term in Section 9.2 (a) hereof.

"Commencement Date" shall have the meaning set forth in Section 2.2.

"Consumables" shall be the meaning set forth in Section 2.5(a)(iv) hereof.

"CPU" shall have the meaning set forth in Section 4.2(c).

"Customers" shall mean the ethanol purchasers, grain purchasers, distiller grain purchasers, ash purchasers, and any purchasers of other by-products of the ethanol production process.

"Delivery Services" shall mean any means by which grain and other commodities, electricity and gas are delivered to the Facility, including, but not limited to, roads, railroad lines, spurs and sidings, electric power lines and natural gas pipelines.

"Effective Date" shall have the meaning set forth in the preamble to this Agreement.

"EPC Agreements" shall mean the turnkey construction agreements dated as of November 15, 2006 between Operator and Fagen, Inc., and as assigned by Operator to Owner pursuant to the Financing Documents, relating to the design, construction, testing and starting up of the Facility as these agreements may be amended, supplemented or modified from time to time.

"Ethanol Sales Agreement" shall mean any agreement that may be entered into during the term of this Agreement for the purchase and sale of Ethanol from the Facility; including, but not limited to that certain Ethanol Marketing Contract dated as of December 29, 2006 by and between Operator and ECO Energy, Inc., and as assigned by Operator to Owner pursuant to the Financing Documents, as such agreement may be amended, supplemented or modified from time to time.

"Facility" shall have the meaning set forth in the Recitals to this Agreement.

"Financing Documents" shall mean those documents related to the debt financing and/or the refinancing for the development, construction, ownership, operation or maintenance of the Facility, or any portion thereof.

2

"Fixed Monthly Fee" shall have the meaning set forth in Section 4.2(b).

"Force Majeure" shall mean any circumstance beyond the reasonable control of the Party affected thereby if and to the extent the effects thereof could not have been prevented or avoided by such Party through the exercise of due diligence, including, but not limited to, acts of God, fire, flood, serious atmospheric disturbance, lightening, storm, typhoon, earthquake, soil erosion, subsidence, wash-out, or epidemics; war, battle, revolution, civil war, civil disturbances, insurrection, sabotage, acts of public enemies, terrorist acts, blockade, boycott, trade restriction, or embargo; strike, lockout, or other labor disputes; equipment breakdown; inability or delays in obtaining necessary governmental approvals not resulting from any action or inaction by such Party; and reductions, interruptions or the inability of a feedstock provider to provide natural gas, corn, manure or other feedstock due to *a force majeure*.

"Good Business Practices" means the then current practices, methods and acts, as changed from time-to-time, that are commonly used in the domestic ethanol production industry to perform or fulfill the activities contemplated herein, or any practices, methods or acts, that, in the exercise of reasonable judgment in light of the facts and risks known at the time, could have been expected to accomplish the desired result at a reasonable cost, under the circumstances, consistent with good business practices, reliability, safety and expedition; provided, however, that Good Business Practices is not intended to be limited to optimum practices, methods or acts to the exclusion of all others, but rather to be a range or possible practices, methods or acts taken or engaged in by entities in the domestic ethanol production industry. Whether any particular practice, method or act complies with Good Business Practices is to be judged in light of the facts known at the time such particular practice, method or act was performed or taken.

"Government Authority" and "Government Authorities" means any federal, state, county, municipal or local governmental entity in the State of Georgia or the United States of America having jurisdiction over (a) the construction, operation and maintenance of the Facility, (b) Owner or (c) this Agreement.

"Government Requirements" means any (i) constitution, charter, act, statute, law, ordinance, code, rule, regulation or order; (ii) any condition, specified standards or objective criteria contained in any applicable permit, approval, decision, determination or ruling of any Government Authority; or (iii) any other legislative, administrative or judicial action, final decree, judgment or order of any Government Authority; in each of the foregoing cases as in effect from time to time.

"Indemnified Parties" and "Indemnified Party" shall have the meaning set forth in Section 9.2(b).

"Indemnifying Party" shall have the meaning set forth in Section 9.2.

"Lender(s)" shall mean the senior lenders to Owner, or any trustee or agent acting on behalf of such senior lenders.

"O&M Services" shall have the meaning set forth in Section 2.1.

3

"Operator" shall have the meaning set forth in the preamble to this Agreement.

"Operator Event of Default" shall have the meaning set forth in Section 9.1(b).

"Operator Indemnified Parties" shall have the meaning set forth in Section 9.2(b).

"Owner" shall have the meaning set forth in the preamble to this Agreement.

"Owner Event of Default" shall have the meaning set forth in Section 9.1(a).

"Owner Indemnified Parties" shall have the meaning set forth in Section 9.2(a).

"Person" means any natural person, corporation, company, partnership, limited liability company, joint venture, trust, organization, association, sole proprietorship, government (or any agency, instrumentality or political subdivision thereof) or other juridical entity.

"Product(s)" shall mean any biomass or other product used in connection or associated with production of ethanol, including, but not limited to, corn, waste, sorghum and manure and all by-products associated with the production of ethanol, including, but not limited to, distillers grain and ash, as applicable.

"Reimbursable Cost(s)" shall mean all reasonable and actual, direct costs incurred by Operator and approved by Owner (as may be provided for hereunder) associated with Operator's performance of the O&M Services (other than labor costs of Operator's employees at the Facility and labor costs associated with necessary home office support as described in Schedule 2.1(g), both of which are included in Operator's Fixed Monthly Fee) not otherwise purchased on Owner's account as provided for herein.

"Senior Credit Agreement" means that certain Senior Credit Agreement dated as of November 20, 2007 by and between SWGB and the Lenders thereto.

"Site" shall mean that real property upon which the Facility is located.

"Substantial Completion" shall have the meaning ascribed to such term in the EPC Agreements.

"Substantial Completion Date" shall have the meaning ascribed to such term in the EPC Agreements.

"Substantial Subcontractor" means a subcontractor whose contract or contracts (in the aggregate) with Operator require payments by Operator of at least $10,000.

"Term" shall have the meaning set forth in Section 12.1.

"Turnkey Contractor" shall mean Fagen, Inc., a Minnesota Corporation.

4

"Year One" shall have the meaning set forth in Section 5.1.

1.2    "Include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

1.3    "Writing," "written" and comparable terms refer to printing, typing, including without limitation transmission by electronic mail, and other means of reproducing in a visible form.

1.4    Any agreement, instrument or Government Requirement defined or referred to herein means such agreement or instrument or Government Requirement as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Government Requirements) by succession of comparable successor Government Requirements and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

1.5    References to a Person are also to its successors and permitted assigns.

1.6    "Hereof," "herein," "hereunder," "thereof and comparable terms refer, unless otherwise expressly indicated, to the entire agreement or instrument in which such terms are used and not to any particular article, section or other subdivision thereof or attachment thereto. References in an instrument to "Article," "Section," or another subdivision or to an attachment are, unless the context otherwise requires, to an article, section, subsection or subdivision of or an attachment to such agreement or instrument.

1.7    Pronouns of whatever gender shall include natural Persons, corporations, limited liability companies, partnerships and associations of every kind and character. References to any gender include, unless the context otherwise requires, references to all genders.

1.8    The word "or" will have the disjunctive meaning represented by the phrase "and/or."

1.9    "Shall" and "will" have equal force and effect.

## ARTICLE II
## SERVICES TO BE PERFORMED BY OPERATOR

2.1    General. Operator shall perform the following services:

(a)    hiring and training of personnel;

(b)    assisting the Turnkey Contractor in connection with operation of Facility in preparation of Substantial Completion;

(c)    testing of the Facility, under the direction of the Turnkey Contractor, in

5

accordance with the EPC Agreements;

   (d) startup of the Facility, under the direction of the Turnkey Contractor;
   (e) coordinating and managing all activities required for Facility support and operation, including but not limited to, community interface, management of contracts, including contracts with Customers (provided, that such management of contracts is in support of the operation of the Facility and not otherwise provided pursuant to other services arrangements and/or agreements between the Parties), and other administrative services necessary to support and operate the Facility;

   (f) management of Delivery Services;

   (g) operation of the Facility, including necessary back office support as listed on Schedule 2.1(g); and

   (h) maintenance of the Facility.

The services performed by Operator in connection with the obligations set forth pursuant to this Section 2.1, together with all other services described in this Agreement, shall be referred to collectively herein as the "O&M Services". The O&M Services shall be performed on a seven days a week, twenty-four hours a day basis, as appropriate for the type of service involved.

2.2 Commencement of O&M Services. On or about the Effective Date of this Agreement, Owner shall provide Operator with written notice (the "Authorization to Proceed") instructing Operator to commence the O&M Services. Operator shall commence all such services, as applicable and as set forth herein, on the date set forth in the Authorization to Proceed (the "Commencement Date").

2.3 Personnel. (a) At all times during the Term of this Agreement, Operator shall provide qualified personnel, as needed, to operate and maintain the Facility; including, without limitation, personnel to fill each of the positions described on Exhibit A hereto.

   (b) Operator shall, at all times; maintain an updated list of all current on-Site personnel and shall provide such list to Owner upon Owner's reasonable request.

2.4 Additional Staffing, Startup and Testing. (a) After receiving Authorization to Proceed, Operator shall prepare a hiring schedule for the personnel identified on Exhibit A and submit such schedule to Owner for review. After review and written approval of the hiring schedule by Owner, Operator shall commence initial hiring of personnel. Operator shall adjust the hiring schedule, as requested by Owner in writing, in accordance with changes in the construction, start-up, and Substantial Completion Date, and shall obtain Owner's review and written approval of such changes.

   (b) All additional personnel hired in accordance with this Agreement prior to the Substantial Completion Date will assist in startup and testing of the Facility under the direction and supervision of the Turnkey Contractor and receive training from the Turnkey Contractor pursuant to this Agreement and the EPC Agreements. In addition to training with respect to

6

operation and maintenance of the Facility, appropriate personnel shall receive safety, emergency and medical training and cross training with local emergency response personnel and services, as applicable.

(c)    It is understood that Owner is obligated to pay for Operator's services during startup and testing as provided herein but that total supervision and direction of Operator's startup and testing activities shall be furnished by Turnkey Contractor who will have care, custody and control of the Facility prior to the Substantial Completion Date. Nothing contained in this Agreement is intended to relieve or discharge the Turnkey Contractor from and responsibility or liabilities under the EPC Contracts.

2.5    Procurement.  (a) After the Commencement Date, but no later than one-hundred and eighty (180) days prior to the Substantial Completion Date, Operator shall provide Owner with the following:

(i)    a list of recommended tools based on a review of the tool list (the "Tools");
(ii)    a list of spare parts based on a review of the spare part list (the "Spare Parts");
(iii)    a list of equipment associated with the operation and maintenance of the Facility (the "Equipment"), along with a life cycle cost/benefit analysis for all such Equipment; and
(iv)    a list of consumable, expendable and other materials and supplies needed in connection with the operation and maintenance of the Facility (the "Consumables").

(b)    Each such list shall be submitted to Owner in one or more increments and shall be modified or supplemented throughout the Term of this Agreement by written agreement of the Parties as necessary to permit the timely acquisition thereof. Operator shall purchase the items on each list upon written approval of Owner; *provided, however*, that Operator may purchase any such item if Owner fails to respond in writing within ten (10) Business Days after the receipt of any such applicable list. Any Tool, Spare Part, Equipment or Consumable purchased pursuant to this Section 2.5, shall be purchased by Operator to Owner's account as provided in Article IV or as a Reimbursable Cost.

(c)    Operator shall be responsible for the use, management, control, care and custody of all Tools, Spare Parts, Equipment and Consumables, and shall, at all times, maintain an accurate record of the Facility's inventory with respect to Tools, Spare Parts, and Consumables.

2.6    Tools.  Operator shall repair or replace as required, as a Reimbursable Cost or to the account of Owner, as provided in Article IV, Tools that deteriorate due to normal use. Operator shall periodically, and no less frequently than annually, review the Tools, and make recommendations to Owner for additional tools that would improve Facility operations.

2.7    Spare Parts.  Operator shall be responsible for establishing proper and effective on-Site warehousing (such warehousing facilities to be provided by Owner) and inventory controls for such Spare Parts. Operator shall purchase, from time to time, replacement Spare Parts to maintain inventory at levels deemed necessary or advisable by Operator to support Facility

7

requirements, as a Reimbursable Cost or to the account of Owner as provided for in Article IV. Subject to Owner's prior written approval, Operator shall purchase additional Spare Parts above and beyond normal inventory levels as deemed necessary or advisable by Operator, as a Reimbursable Cost or to the account of Owner as provided for in Article IV.

2.8 · **Equipment.** Operator shall periodically review the Equipment and make recommendations to Owner of modifications or additions to Equipment throughout the Term of this Agreement that would improve or enhance Facility operations. Operator shall, from time to time, repair or replace, as a Reimbursable Cost or to the account of Owner as provided for in Article IV, the Equipment as deemed necessary or advisable by Operator in connection with Facility operations. Operator shall, when approved in advance by Owner in writing, purchase and install additional Equipment as a Reimbursable Cost or to the account of Owner as provided for in Article IV.

2.9 **Consumables.** In addition to the initial list prepared in accordance with Section 2.5, Operator shall identify Consumables to Owner throughout the Term of this Agreement as necessary or advisable to permit the timely acquisition thereof. Such Consumables shall be purchased as Reimbursable Costs or to Owner's account as provided in Article IV.

2.10 **Purchased Parts, Labor and Services.** Operator shall, from time to time, identify and purchase as Reimbursable Costs or for the account of Owner as provided for in Article IV, parts other than Spare Parts and labor and services as necessary to perform the O&M Services, including but not limited to the labor and services identified in Exhibit B hereto; *provided, however,* that any maintenance or repair that can reasonably be performed by regular full time on-Site personnel will be performed by such qualified personnel, without additional compensation.

2.11 **Title.** Title to all Tools, Equipment, Spare Parts, Consumables, supplies and parts purchased by Operator for which Operator is directly reimbursed shall pass to Owner immediately upon payment therefore by Owner. Said Tools, Equipment, Spare Parts, Consumables, supplies and parts shall be and become the property of Owner upon payment by Owner free of all liens and encumbrances except as provided for in Section 2.15.

2.12 **Maintenance and Repairs.** Operator shall comply with procedures developed for maintenance and safety procedures and otherwise provide all maintenance and repair services necessary to keep the Facility in good working order in a manner consistent with Good Business Practices, to correct by appropriate measures any damage to or malfunction of the Facility, and provide all necessary information to and cooperate with Owner so that Owner may enforce or make warranty claims with respect to any repair or malfunction. Any parts utilized in performing operation and maintenance services shall be new or refurbished according to original manufacturer's recommendations. Operator shall assign to Owner the manufacturer's warranty on all parts Operator has purchased.

2.13 **Records.** Operator shall keep and maintain maintenance and operation records for the Facility and for the Equipment therein. Such records shall satisfy the requirements set forth in any Financing Documents and any requirements set forth in any customer agreements, as applicable, and shall include, without limitation: the logging of daily exception reports; daily Operator's logs; a

8

record of all maintenance and repairs performed; emissions and compliance reports; Equipment and instrument calibration records; fuel gas consumption records; steam production; water consumption, chemical consumption; distillers grain and ethanol production, grain consumption and delivery records, biomass consumption, and ash produced. All records shall be made available for examination by Owner and/or the Lenders upon reasonable notice during normal working hours and shall be kept current and up-to-date with any necessary revisions, corrections and changes.

2.14    Governmental, Regulatory And Safety Requirements. Operator shall operate and maintain the Facility and keep records relating thereto in compliance with all applicable Governmental Requirements. Operator shall also comply with all safety and other rules and regulations reasonably established by Owner with respect to the Facility, and with all safety requirements with respect to all other third party contracts to which the Owner is a party. During operations, Operator shall only use low sulfur denaturant to ensure that the ethanol produced at the Facility meets the Magellan Pipeline specifications for "E-Grade Denatured Fuel Ethanol". In the event that such requirements change during the Term hereof, and such changes require additional costs to Operator, such additional costs shall be mutually determined by Owner and Operator and reimbursed to Operator by Owner as Reimbursable Costs. In the event such changes require alteration to the Facility, Owner shall be directly responsible for all costs of such alterations.

2.15    Liens And Encumbrances. Operator shall keep all real property and all personal property and Equipment associated with or part of the Facility free and clear of all liens and encumbrances caused by an action or failure to act by Operator or any of its consultants, suppliers or subcontractors in the performance of its obligations under this Agreement, including, without limitation, failure by Operator to pay, when due, any bill or charge for labor or services performed or materials or equipment furnished for use in connection with this Agreement. Nothing contained herein shall require Operator to pay any claims for labor, materials or services which Operator, in good faith, disputes and which Operator, at its own expense, is currently and diligently contesting; *provided, however*, that Operator shall, not later than ten (10) days after notice of the filing of any claim of lien that is disputed or contested by Operator, post a surety bond sufficient to release said claim of lien.

2.16    Waste. Operator shall not allow any hazardous waste to accumulate on the Site in contravention of any applicable Government Requirement, any agreement, or the Financing Documents.

2.17    Permits. Operator shall be responsible for obtaining and maintaining all permits and licenses required to be in the name of Operator, necessary for the operations and maintenance of the Facility. Owner shall cooperate with Operator in obtaining and maintaining such permits and licenses and in preparing reports required thereunder.

2.18    Security. Operator shall develop and keep in place appropriate security procedures with respect to the Facility and the Site.

2.19    Standard of Conduct. Operator shall perform all O&M Services hereunder in accordance with Good Business Practices and as required by any Financing Documents and this Agreement,

9

## ARTICLE III
## SERVICES TO BE PERFORMED BY OWNER

3.1   Office Space, Equipment, And Administrative Services. Owner shall provide office and administrative space and equipment for Operator at the Facility sufficient for Operator to perform the O&M Services.

3.2   Approvals. Whenever action by Operator requires written approval by Owner, Owner shall provide such approval and/or timely objections thereof, as required hereunder. Unless otherwise stated herein, Operator shall provide such written approval, or a timely objection, no later than three (3) Business Days after the receipt of any request for such approval or such request shall be deemed to be approved.

3.3   Permits And Licenses. Owner shall be responsible for obtaining and maintaining all permits and licenses, required to be in the name of Owner, necessary for the operation and maintenance of the Facility. Operator shall cooperate with Owner in obtaining and maintaining such permits and licenses and in preparing reports required thereunder.

3.4   Manuals. Owner shall promptly deliver to Operator copies of operating and maintenance manuals for all Equipment installed in the Facility and any and all additional documents received from Turnkey Contractors under the EPC Agreements including, but not limited to, as-built drawings of the Facility, record books, vendor manuals and operations and maintenance manuals, as Owner deems necessary for Operator's successful operation of the Facility.

3.5   Training. Owner shall cause Turnkey Contractor to provide training to the employees of Operator in the start-up and operation of the Facility and any and all related machinery and Equipment as set forth in Section 2.4(b).

3.6   Payments. Owner shall, subject to the Financing Documents, make all payments to Operator required hereunder in accordance with Articles IV, V and VI of this Agreement.

3.7   Other. Owner shall:

(a)   provide, at its sole cost, all Products, Product transportation, utilities, natural gas, fuel, chemicals, and all other goods and services (other than those O&M Services specifically described herein) required in connection with the operation of the Facility;

(b)   pay all property or other taxes or fees related to the Facility or its activities (other than income or employment related taxes of the Operator or its employees); and

(c)   provide all necessary documents that Operator needs to perform the O&M Services.

3.8   Compliance with Laws. Owner shall, at all times, comply with all applicable laws,

10

ordinances, rules and regulations applicable to the Facility.

ARTICLE IV
COMPENSATION

4.1    Annual Budget.   (a) Operator shall prepare and submit to Owner, no later than July 1st of each year, a budget for the subsequent fiscal year of all indirect and direct costs and expenses anticipated to be incurred by Operator under this Agreement during that subsequent fiscal year, or part thereof, as the case may be (the "Annual Budget"). Owner shall review the Annual Budget and Owner and Operator shall mutually agree to any changes or modifications thereof. The Annual Budget and any changes or modifications thereto shall then be approved by Lender as provided for in the Financing Documents (the "Approved Budget").

(b)    Operator shall submit an initial Annual Budget to Owner not later than sixty (60) days prior to the Substantial Completion Date.

(c)    Operator's and Owner's fiscal year is from October 1st to September 30th of the subsequent calendar year.

4.2    Monthly Compensation.   (a) For the calendar months (including partial months as applicable) falling prior to the Substantial Completion Date, Owner shall pay Operator an amount equal to the corresponding payments for such month as set forth on Schedule 4.2 hereof, plus all Reimbursable Costs for such calendar month, provided that in no event shall the aggregate amounts paid pursuant to this Section 4.2(a) exceed the amounts set froth for such payments in the Construction Budget (as defined in the Senior Credit Agreement).

(b)    Starting on the Substantial Completion Date, Owner shall pay Operator a fixed fee (the "Fixed Monthly Fee") as agreed to by Owner and Operator, subject to the prior written consent of Lender. Owner and Operator shall begin discussions regarding the Fixed Monthly Fee no later than ninety (90) days prior to the expected Substantial Completion Date. The Fixed Monthly Fee and any changes or modifications, as applicable, shall be approved by Owner, subject to the prior written consent of Lender. The Fixed Monthly Fee shall be adjusted accordingly for any partial months as applicable and, in addition to the applicable Fixed Monthly Fee, Owner shall, subject to the Financing Documents, pay Operator an amount equal to all Reimbursable Costs incurred in such calendar month.

(c)    Beginning on the first full fiscal year after the second anniversary of the Substantial Completion Date, the Fixed Monthly Fee shall be adjusted annually, on January 1, for inflation, in proportion to the increase, if any, in the index figure of the Consumer Price Index Figure of the Bureau of Labor Statistics of the United States Department of Labor, U.S. City Average for All Urban Consumers (CPI-U) (the "CPU"), published during the December immediately preceding the January in which the adjustment is to be made as compared to the corresponding index figure published during the December, one year prior. If the CPU designated above shall no longer be published, then Operator shall designate another index most closely resembling such CPU, which is published by an agency of the Federal Government at

11

such time, shall be used as a substitute. If an index figure is not published during a month for which an index figure is required under this Section 4.2(c), the most recent index figure available shall be utilized for purposed of the applicable calculation.

4.3    Operator Procurement to Owner's Account. Operator may procure those items and services which are considered Reimbursable Costs and are included in the Approved Budget by issuing purchase orders to be paid directly by Owner on Owner's purchasing and requisition forms. Operator shall provide Owner with copies of all purchase orders. For purchase orders in excess of $10,000 or for any items not in the Approved Budget, Operator is required to receive written authorization from Owner's Representative prior to issuing purchase orders to be paid directly by Owner on Owner's purchasing and requisition forms.

## ARTICLE V
## ADDITIONAL PAYMENTS

5.1    Availability Factor Payments. If the average Availability Factor for the Facility for the first twelve full calendar months following the Conversion Date (as such term is defined in the Financing Documents) ("Year One") is equal or greater than ninety-six and seventy-one one-hundredths percent (96.71%) (the "AF Threshold"), then, no later than forty-five (45) days after the first anniversary of the start of Year One, Owner shall pay to Operator an amount equal to the sum of two percent (2%) of the Fixed Monthly Fee for each calendar month of Year One. Starting on the first calendar month after Year One, for each twelve (12) month period following Year One, if the average Availability Factor for the applicable preceding twelve (12) month period meets the AF Threshold, then Owner shall pay Operator a sum equal to two percent (2%) of the Fixed Monthly Fee for each month of the applicable twelve (12) month period, such amount to be calculated at the end of the last month of such twelve (12) month period and paid to Operator the following calendar month.

## ARTICLE VI
## PAYMENT

6.1    Payment of Monthly Compensation. All payments made to Operator pursuant to Section 4.2, as adjusted, shall be made on a calendar month basis. Operator shall submit its invoices on or before the fifth (5th) day of the calendar month following the calendar month during which services were provided or Reimbursable Costs were incurred. Owner shall pay the amount due to Operator on or before the twentieth (20th) day of the calendar month following the date the invoice is received by Owner or as otherwise provided for in the Financing Documents. Operator shall submit its billing together with copies of supporting invoices, vouchers, receipts, and such other evidence of payment as Owner shall reasonably require.

6.2    Payment Disputes. In the event of a dispute or question regarding any invoice submitted by Operator, (i) all amounts not disputed or in question shall be promptly paid as and when required by Section 6.1 and Section 6.2 above, (ii) an explanation of the dispute shall be promptly transmitted by Owner to Operator in writing, (iii) Owner and Operator shall immediately seek to resolve the dispute or question, and (iv) payment shall be made within ten (10) days of any remaining amount due when the dispute is resolved.

12

## ARTICLE VII
## COORDINATION AND ACCESS

7.1    Access.  Owner shall provide Operator and its employees, agents, and subcontractors with full and free access to the Facility at all times to perform its obligations under this Agreement. Operator, its employees, agents and subcontractors shall comply with all safety and other requirements established by Owner in connection with such access.

7.2    Coordination; Required Level of Performance.  Operator's personnel will interface with Owner.  Operator shall accept daily instructions from the Owner as to Facility requirements, subject to the design limits of the Facility.  In the event of any interruption of the operation of the Facility or in the event Operator is unable to operate the Facility so as to meet the requirements of Customers and/or Owner, Operator shall immediately notify Owner of the circumstance and shall exert its commercially reasonable efforts to restore the Facility to its required operating level, at Owner's cost, subject to Article VIII below, if applicable.

## ARTICLE VIII
## FORCE MAJEURE

8.1    Force Majeure.  Neither Party shall be liable to the other Party for any delay or failure to perform any provision or obligation of this Agreement, except the obligation to pay monies due, if such delay or failure is caused by Force Majeure.  If a Party claims Force Majeure pursuant to this Section 8.1, such Party shall give notice and reasonable details of the event to the other Party as soon as practicable including the claiming Party's best estimate of the duration of the Force Majeure.  The Parties shall make reasonable efforts to mitigate the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

## ARTICLE IX
## EVENTS OF DEFAULT; INDEMNIFICATION

9.1    Events of Default.

(a)    Owner Events of Default.  The occurrence of any one or more of the following events shall constitute an Owner event of default ("Owner Event of Default") under this Agreement:

(i)    Owner shall: (A) admit in writing its inability to pay its debts as such debts become due; (B) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator for itself or of all or a substantial part of its property; (C) make a general assignment for the benefit of its creditors; (D) commence a voluntary case applicable bankruptcy laws; (E) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts; (F) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition

13

filed against it in an Involuntary case under applicable bankruptcy laws; or (G) take any corporate action for the purpose of effecting any of the foregoing;

(ii)     (A) a proceeding or case shall be commenced against Owner, without the application or consent of Owner, in any court of competent jurisdiction, seeking: (1) its liquidation, reorganization, dissolution or winding-up or the composition or readjustment of its debts; (2) the appointment of a trustee, receiver, custodian, liquidator or the like of Owner or of all or any substantial part of its property; or (3) similar relief in respect of Owner under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and, in each case, such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days; or (B) an order for relief against Owner shall be entered by a court of competent jurisdiction in an Involuntary case under applicable bankruptcy laws;

(iii)    Owner shall be dissolved or cease to exist (as a matter of Government Requirement or otherwise) or proceedings shall be commenced by any person seeking the dissolution of Owner and such proceedings shall continue undismissed or unstayed for a period of thirty (30) or more days (or such shorter period of time which Owner has pursuant to Government Requirements to cause the dismissal of such proceeding or stay the effectiveness of any such order, judgment or decree);

(iv)     failure by Owner to pay Operator any amount hereunder by the due date therefore; provided, that Owner has received notice of such default and such default continues for three (3) Business Days thereafter; or

(v)      a default by Owner in the performance of any of its other material obligations under this Agreement after written notice by Operator; *provided* that, if the default is capable of being cured, Owner shall have thirty (30) days to cure such default after written notice of default received from Operator if it shall have promptly commenced and shall be diligently attempting to cure such default.

(b)      Operator Events of Default.  The occurrence of any one or more of the following events shall constitute an Operator Event of Default ("Operator Event of Default") under this Agreement:

(i)      Operator shall: (A) admit in writing its inability to pay its debts as such debts become due; (B) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator for itself or of all or a substantial part of its property; (C) make a general

14

assignment for the benefit of its creditors; (D) commence a voluntary case under applicable bankruptcy laws; (E) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts; (F) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under applicable bankruptcy laws; or (G) take any corporate action for the purpose of effecting any of the foregoing;

(ii)    (A) a proceeding or case shall be commenced against Operator, without the application or consent of Operator, in any court of competent jurisdiction, seeking: (1) its liquidation, reorganization, dissolution or winding-up or the composition or readjustment of its debts; (2) the appointment of a trustee, receiver, custodian, liquidator or the like of Operator or of all or any substantial part of its property; or (3) similar relief in respect of Operator under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and, in each case, such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days; or (B) an order for relief against Operator shall be entered by a court of competent jurisdiction in an involuntary case under applicable bankruptcy laws;

(iii)    Operator shall be dissolved or cease to exist (as a matter of Government Requirement or otherwise) or proceedings shall be commenced by any person seeking the dissolution of Operator and such proceedings shall continue undismissed or unstayed for a period of thirty (30) or more days (or such shorter period of time which Operator has pursuant to Government Requirements to cause the dismissal of such proceeding or stay the effectiveness of any such order, judgment or decree); or

(iv)    a default by Operator in the performance of any of its material obligations under this Agreement, after written notice by Owner; *provided* that, if the default is capable of being cured, Operator shall have thirty (30) days to cure such default after written notice of default received from Owner if it shall have promptly commenced and shall be diligently attempting to cure such default.

(c)    Owner Cure of Operator's Default.  In the event of a default by Operator as described in Section 9.1(b)(iv) and after the applicable cure period, Owner may, but shall not be required to, cure such default and may charge Operator any additional incremental costs incurred by Owner to cure such default.  The exercise by Owner of this right shall not waive any other rights of Owner hereunder or at law.

9.2    Indemnification.

15

(a)   Subject in all instances to the provisions of Article X, Operator (as an "Indemnifying Party") shall indemnify, defend and hold harmless Owner and each of its officers, directors, independent contractors, employees, and agents (the "Owner Indemnified Parties") from and against any and all claims, demands, suits, actions, liabilities, losses, damages, judgments, fines, penalties and legal or other expenses, whether in any instance arising under this Agreement or from a third party claim ("Claim(s)") that may arise from or in connection with the delivery of O&M Services and the performance of its obligations pursuant to this Agreement; *provided however* that the Indemnifying Party shall not be responsible for any such Claim to the extent that such Claim is the result of actions taken or omitted to be taken by such Owner Indemnified Party in bad faith or due to such Owner Indemnified Party's gross negligence or willful misconduct. If a Claim is asserted or action brought against an Owner Indemnified Party as to which such Owner Indemnified Party believes it is entitled to indemnification under this Section 9.2(a), Owner shall promptly notify Operator in writing of such Claim. Failure of Owner to give prompt notice as contemplated in the preceding sentence shall not absolve Operator of liability hereunder except to the extent Operator is actually prejudiced by such failure.

(b)   Subject in all instances to the provisions of Article X, Owner (as an "Indemnifying Party") shall indemnify, defend and hold harmless Operator, each of its Affiliates, and each of its and their officers, independent contractors, directors, employees, Lenders and agents (the "Operator Indemnified Parties") (the Owner Indemnified Parties and the Operator Indemnified Parties hereby also may be referred to as "Indemnified Parties" or an "Indemnified Party") from and against any and all Claims that may arise directly from or in connection with performance of its obligations under this Agreement; provided however that the Indemnifying Party shall not be responsible for any such Claim to the extent that such Claim is the result of actions taken or omitted to be taken by such Operator Indemnified Party in bad faith or due to such Operator Indemnified Party's gross negligence or willful misconduct. If a Claim is asserted or action brought against an Operator Indemnified Party as to which such Operator Indemnified Party believes it is entitled to indemnification under this Section 9.2(b), Operator shall promptly notify Owner in writing of such Claim. Failure of Operator to give prompt notice as contemplated in the preceding sentence shall not absolve Owner of liability hereunder except to the extent Owner is actually prejudiced by such failure.

(c)   The rights of indemnity under this Section 9.2 shall be the exclusive remedy of the Owner Indemnified Parties and the Operator Indemnified Parties, as the case may be, with respect to any Claim. The provisions of this Section 9.2(c) and Article X shall survive any termination of this Agreement until the second anniversary of such termination. The indemnification provisions of this Section 9.2 shall apply to the fullest extent permitted by law and must be asserted no later than the second anniversary of the termination of this Agreement. Notwithstanding any termination of this Agreement, the indemnification provisions of this Section 9.2 shall survive as to any Claim that is timely asserted until such Claim is finally resolved.

(d)   The applicable Indemnifying Party shall not be responsible for any settlement, compromise or consent in regard to any Claim without its prior written consent. Each Indemnifying Party agrees that, without prior written consent of the applicable Indemnified

16

Party, it will not settle, compromise or consent to the entry of any judgment, in whole or in part, in any commenced or threatened Claim in respect of which indemnification could be sought under Section 9.2 (whether or not such Indemnified Party is an actual or potential party to such Claim), unless such settlement, compromise or consent (i) includes an unconditional release of such Indemnified Party, from, and holds such Indemnified Party thereto harmless against, all liability arising out of such Claim, (ii) does not impose any actual or potential liability upon the applicable Indemnified Party, and (iii) the applicable parties thereto agree that the terms of such settlement remain confidential.

(c)   The Indemnifying Party shall, at its option, or if requested by the applicable Indemnified Party, assume the defense of any such Claim, including the employment of legal counsel reasonably satisfactory to the Indemnified Party. The Indemnified Party shall have the right to employ separate legal counsel in any such Claim and to participate in the defense thereof, but the fees and expenses of such legal counsel shall be at the expense of the Indemnified Party, unless (i) the Indemnifying Party shall have failed promptly to assume the defense thereof and employ counsel as provided hereinabove, or (ii) the named parties to any such Claim (including impleaded parties) include the Indemnified Party and the Indemnifying Party, and the Indemnified Party shall have been advised by legal counsel that there may be one or more legal defenses available to it that are different from or in addition to those available to the Indemnifying Party, provided that the Indemnifying Party shall not in any event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Claim, in addition to any local legal counsel.

**ARTICLE X**
**LIMITATIONS OF LIABILITY**

10.1   **LIMITATION ON LIABILITY.**   NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ANY OF ITS AFFILIATES, OFFICERS, MANAGERS, DIRECTORS, EMPLOYEES, REPRESENTATIVES OR AGENTS FOR ANY LOST PROFITS OR REVENUES, OR PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES UNDER, ARISING OUT OF, DUE TO OR IN CONNECTION WITH THIS AGREEMENT.

10.2   **NO WARRANTY.**   OPERATOR MAKES NO WARRANTIES, GUARANTEES OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO ANY SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

**ARTICLE XI**
**INDEPENDENT CONTRACTOR RELATIONSHIP**

11.1   Independent Contractor Status.   The Parties acknowledge and agree that Operator's relationship with Owner hereunder is and shall be that of an independent contractor, and under no circumstances shall either Party, or any of its independent contractors/employees or agents, be

17

deemed employees, partners, agents, or joint venturers of the other Party.

11.2    No Authority to Act.    Neither Party shall maintain, hold out, represent, state or imply to any other individual or entity that an employer/employee relationship exists between the Parties. Neither Party nor any of its independent contractors/employees or agents shall have any power or authority to bind, or enter into or modify, supplement or amend any agreement on behalf of, or otherwise create any debt or liability for or on behalf of, the other Party pursuant to this Agreement, and neither Operator nor any of its independent contractors/employees or agents shall have any power or authority to bind, or enter into or modify, supplement or amend any agreement on behalf of or otherwise create any debt or liability for or on behalf of Owner, except as permitted hereunder in connection with the performance of O&M Services by Operator.

## ARTICLE XII
## TERM AND TERMINATION

12.1    Term.    Subject to the other Sections of this Article XI, the term of this Agreement shall commence as of the Effective Date and shall continue until the ten year anniversary of the Effective Date (the "Term"); *provided, however,* that the Parties may together elect to extend the Term with respect to all or a portion of the O&M Services hereunder as the Parties may determine in writing.

12.2    Termination.    (a) Upon the occurrence and during the continuance of an Owner Event of Default or an Operator Event of Default, as the case may be, the non-defaulting Party may terminate this Agreement by giving the other Party written notice thereof; *provided, however,* that with respect to an Owner Event of Default, the Lender has not commenced to cure any such default pursuant to Section 16.3. Such termination shall be effective as of the deemed date of receipt of such notice.

(b)    Either Party shall have the right to terminate this Agreement upon the occurrence of (i) the sale of 100% of the equity interests in Operator, (ii) the sale of any of the equity interests in Owner, or (iii) the sale of all or substantially all of the assets of Owner. The Lenders shall have the right to terminate this Agreement if they have commenced the exercise of remedies following an event of default under the Financing Documents.

12.3    Termination Procedure.    Operator shall, in the event of termination, take all reasonable steps necessary to assure an orderly transfer of operation and maintenance responsibility to Owner or to Owner's designee including, without limitation, the delivery of all of the following to Owner or to any such designee:

(a)    All operation, maintenance, inventory or other records, manuals and procedures associated with the Facility;

(b)    All Tools, Consumables, Spare Parts and Equipment associated with the Facility; and

(c)    At the option of Owner or such designee, assignments to Owner or such designee,

18

in form reasonably satisfactory to Owner, of any agreements between Operator and third parties relating to the performance of the obligations of Operator under this Agreement.

12.4   Rights and Remedies in Law or Equity.   In the case of a material breach by either Party of its representations, warranties or obligations hereunder, in addition to, or in lieu of, the right to terminate this Agreement pursuant to Section 12.2 hereof, each Party shall have all other rights and remedies provided for in law or equity.

## ARTICLE XIII
## OPERATOR AND OWNER REPRESENTATIONS AND WARRANTIES

13.1   Representations and Warranties of Operator.   Operator represents and warrants, as of the date hereof, as follows:

(a)   It is a limited liability company duly organized, validly existing and in good standing under the laws of Georgia and is duly qualified to do business in and is in good standing in the State of Georgia;

(b)   It has taken all necessary company action to authorize the execution, delivery and performance of its obligations under this Agreement, which action has not been superseded or modified, and this Agreement constitutes the legal, valid and binding obligation of Operator, enforceable in accordance with its terms;

(c)   the execution, delivery and performance of this Agreement do not violate (i) its formation documents or any resolution of its management committee or other committees charged with the governance of its affairs, (ii) any agreement to which it or, to the best of its knowledge, any of its Affiliates is a party or (iii) any law, rule, regulation, order writ, judgment, injunction, decree or determination affecting Operator or any of its properties;

(d)   It has not filed any petition for relief under the bankruptcy laws of the United States of America, has not made nor is making an assignment for the benefit of creditors, initiated nor been the subject of any proceeding seeking to have a receiver or trustee appointed to liquidate or manage its affairs, and none of its properties is subject to the jurisdiction of any bankruptcy court of the United States of America or any receivership proceeding;

(e)   no litigation is pending or, to its knowledge, threatened which seeks to restrain it from performing its obligations hereunder or the adverse outcome of which would materially affect its business or its ability to perform its obligations hereunder; and

(f)   no authorization or approval or other action by, and notice to or filing with, any Government Authority is required for the due execution, delivery and performance by Operator of this Agreement which have not been obtained.

13.2   Representations and Warranties of Owner.   Owner represents and warrants, as of the date hereof, as follows:

19

(a)   It is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Georgia;

(b)   It has taken all necessary company action to authorize the execution, delivery and performance of its obligations under this Agreement, which action has not been superseded or modified, and this Agreement represents the valid and binding obligation of Owner, enforceable in accordance with its terms;

(c)   the execution, delivery and performance of this Agreement do not violate (i) its formation documents or any resolution of its management committee or other committees charged with the governance of its affairs, (ii) any agreement to which it is a party or (iii) any law, rule, regulation, order, it, judgment, injunction, decree or determination affecting Owner or any of its properties;

(d)   it has not filed any petition for relief under the bankruptcy laws of the United States of America, has not made nor is making an assignment for the benefit of creditors, has not initiated nor been the subject of any proceeding seeking to have a receiver or trustee appointed to liquidate or manage its affairs, and none of its properties is subject to the jurisdiction of any bankruptcy court of the United States of America or any receivership proceeding;

(e)   no litigation is pending or, to its knowledge, threatened which seeks to restrain the performance of its obligations hereunder or the adverse outcome of which could materially affect its business or its ability to perform its obligations hereunder; and

(f)   no authorization or approval or other action by, and notice to or filing with, any Government Authority is required for the due execution, delivery and performance by Owner of this Agreement which have not been obtained.

## ARTICLE XIV
## INSURANCE

14.1   Maintenance of Required Insurance.  Operator shall at all times throughout the Term of this Agreement carry and maintain or cause to be maintained insurance as required by that certain Senior Credit Agreement between the Owner, as Borrower, the Lenders referred to therein, WestLB AG, New York Branch, as administrative agent for the Lenders, WestLB AG, New York Branch as collateral agent for the Senior Secured Parties and WestLB AG, New York Branch, as sole lead arranger, bookrunner and syndication agent.  All insurance required under this Article 14 and the Senior Credit Agreement shall cover Operator and Owner and shall name the agent for Lender as an additional insured on all such policies.

14.2   Required Insurance for Subcontractors.  Operator shall provide that its subcontractors, if any, shall carry and maintain or cause to be maintained insurance coverage in the same amounts as required of Operator under said Senior Credit Agreement.

14.3   Endorsements.  Any insurance carried and maintained in accordance with this Article 14 shall be endorsed to provide the following:

20

(a)   Agent for Lender shall be named as additional insured with respect to all insurance carried pursuant, with the understanding that any obligation imposed upon Operator (including liability to pay premiums) shall be the sole obligation of Operator and not that of Lender;

(b)   . the interest of Owner and Lender shall not be invalidated by any action or inaction of Operator or any other Person and all policies shall insure Owner and Lender regardless of any breach or violation by Operator of any other Person of any warranties, declarations, or conditions in such policies;

(c)   Operator and insurer waive all rights of subrogation against Owner or Lender, any right of setoff and counterclaim and any other right to deduction due to outstanding premium, whether by attachment or otherwise;

(d)   such insurance shall be primary without right of contribution of any other insurance carried by or on behalf of Owner or Lender with respect to their interests as such in the Facility;

(e)   Inasmuch as such policies are written to cover more than one insured, all terms, conditions, insuring agreements and endorsements (other than limits of liability) shall operate in the same manner as if there were a separate policy covering each insured; and

(f)   If such insurance is canceled for any reason whatsoever, including nonpayment of premium, or any material change is made in the coverage that affects the interests of Owner or Lender, such cancellation or change shall not be effective as to Owner or Lender until thirty (30) days after receipt by Owner or Lender of written notice sent by registered mail from such insurer of such cancellation or change; *provided, however,* that such thirty (30) day period shall be reduced to ten (10) days in the case where cancellation results from the nonpayment of premiums.

14.4   <u>Certificates and Reports.</u>   (a) On or before the date hereof, and annually thereafter, Operator shall furnish Owner and Lender with approved certification of all required insurance hereunder. Such certification shall be executed by each insurer or by an authorized representative of each insurer. Such certification or notice, as the case may be, shall identify insurers, the type of insurance, the insurance limits and the policy term and shall specifically list the special endorsements listed above. Operator will furnish Owner and Lender with copies of all insurance policies, binders and cover notes or other evidence of such insurance relating to the Facility in the event of a Claim.

(b)   Concurrently with the furnishing of the certification referred to in Section 14.4(a) above, Operator will furnish Owner and Lender with a report of each insurer or insurance broker stating that all premiums then due from the Operator have been paid and that in the opinion of such insurer or insurance broker, the insurance then carried and maintained with respect to the Facility is in accordance with the terms of this Agreement. Furthermore, Operator will cause an insurer or insurance broker to advise Owner and Lender promptly in writing of any default in the payments of any premiums or any other act or omission on the part of Operator or any other person of which such broker has actual knowledge that might invalidate or render unenforceable, in whole or in part, any insurance provided hereunder. Owner or Lender may, at their sole

21

option, obtain such insurance if not obtained by Operator and, in such event, Operator shall reimburse Owner or Lender, as the case may be, upon demand for the cost thereof.

14.4   Owner Insurance.   (a) Owner shall maintain or caused to be maintained "All Risk" Property and Machinery Insurance covering physical loss or damage to the Facility, including, but not limited to, fire and extended coverage, collapse, flood, earthquake, and boiler and machinery, including electrical and mechanical breakdown. Such coverage shall be written on a replacement cost basis; however sublimits are acceptable for loss or damage by flood or earthquake. All deductibles or self insured retentions shall be the responsibility of the Owner. In connection with Owner's obligation to maintain property insurance, Operator agrees to (i) provide any information reasonably requested by Owner; (ii) comply with all reasonable requests of any such insurer and reasonably comply with all terms and conditions of the property insurance to the extent such terms are commercially reasonable; and (iii) advise Owner of any potential loss and cooperate with Owner to the extent reasonably necessary to settle any insurance claim.

(b)   The Owner, its insurer, and the Operator agree to waive all rights of subrogation against each other for damages cause by fire and/or other perils to the extent covered by the "All Risk" property and machinery insurance described above.

14.6   Payment of Premiums.   All premiums paid for the insurance coverages required under this Article 14 shall be deemed to be Reimbursable Costs payable by Owner to Operator.

## ARTICLE XV
## ASSIGNMENT

15.1   General Assignment.   Neither Operator nor Owner shall assign this Agreement or any portion hereof, or any of the rights or obligations hereunder, whether by operation of law or otherwise, without the prior written consent of the other Party other than to an Affiliate; *provided*, that in the case of an assignment by Owner to an Affiliate, such Affiliate must have a direct or indirect interest in the Facility.

15.2   Assignment to Lenders.   Operator hereby consents to the granting of a security interest in and an assignment by Owner of the Owner's rights and obligations under this Agreement to the Lenders and their successors, assigns and designees in connection with any financing or refinancing related to the development, construction, operation or maintenance of the Facility. In furtherance of the foregoing, Operator acknowledges that the Lenders may under certain circumstances assume the interests and rights of Owner under this Agreement.

## ARTICLE XVI
## LENDERS

16.1   Lenders.   Operator acknowledges that Owner will borrow certain funds from the Lenders for the construction of the Facility and that, as a condition to making loans to Owner, the Lenders may from time to time require certain documents from Operator and its subcontractors and vendors. In connection therewith, Operator agrees to furnish to the Lenders (including Lender's consultants), and to use reasonable efforts to cause its subcontractors and

22

vendors to furnish to the Lenders, such written information, certificates, copies of invoices and receipts, lien waivers (upon payment), affidavits and other like documents as the Lenders may reasonably request. Operator shall negotiate in good faith amendments to this Agreement as may be reasonably requested by the Lenders. In addition, Operator shall promptly execute any additional documentation as may be mutually agreed upon in form and substance that is reasonably requested by the Lenders, including, but not limited to, documents evidencing Operator's consent to assignment of this Agreement by Owner as security to the Lenders.

16.2   _Subordination of Liens._   Operator hereby subordinates any liens to which it may be entitled under applicable laws or under the provisions of this Agreement to any lien granted by Owner in favor of the Lenders, whether such lien in favor of the Lenders is created, attached or perfected prior to or after the lien in favor of Operator. In addition, Operator shall submit proof satisfactory to Owner that it has included in each subcontract entered into by it with a Substantial Subcontractor a requirement that any lien to which such Substantial Subcontractor may be entitled to thereunder or by applicable laws shall be subordinate and inferior to any lien granted in favor of the Lenders, whether such lien in favor of Lenders is created, attached or perfected prior to or after the lien in favor of such Substantial Subcontractor.

16.3   _Owner Default._   In the event of Owner's default under this Agreement, Operator agrees that the Lenders shall have the right to cure Owner's default and, in such event, Operator's duties and obligations under this Agreement shall be unaffected. In that regard, Operator agrees that the Lenders shall have (i) thirty (30) days from the date notice of default is delivered to the Lenders to cure such default if such default is the failure to pay amounts to Operator which are due and payable under the Agreement or (ii) not fewer than ninety (90) days to cure such default if the breach or default cannot be cured by the payment of money to Operator so long as the Lenders or their designee shall have commenced to cure the default within such ninety (90) day period and thereafter diligently pursue such cure to completion and continue to perform any monetary obligations under the Agreement and all other obligations under the Agreement are performed by Owner or the Lenders. If possession of the Facility is necessary to cure such breach or default, and the Lenders declare Owner in default and commence foreclosure proceedings, the Lenders will be allowed a reasonable period to complete such proceedings and the foregoing cure period shall be extended accordingly. If the Lenders are prohibited by any court order or proceedings from curing the default or from commencing or prosecuting foreclosure proceedings, the foregoing time periods shall be extended by the period of such prohibition but not beyond one-hundred and eighty (180) days from the date of delivery of the notice of default to the Lenders. Operator further agrees to perform its obligations hereunder for the benefit of the Lenders in the event of an exercise of remedies by the Lenders following Owner's default under this Agreement or under the Financing Documents, provided that the Lenders (or its assignee) shall have timely cured all defaults of Owner's obligations hereunder and shall have timely paid all amounts then due, including costs to cure. In such event, upon notice to Owner and Operator, the Lenders (or its assignee) shall have the rights and obligations of Owner under this Agreement, provided the Lenders shall have no personal liability to Operator for the performance of such obligations, and the sole recourse of Operator in seeking the enforcement of such obligations shall be to such parties' interest in the Facility.

23

16.4 . Third Party Beneficiary. Owner and Operator agree that the Lenders are intended to be a third party beneficiary of this Agreement. In that regard, Owner and Operator will not, without the prior written consent of the Lenders, amend or modify Article IV, Article XII, Article XV or Article XVI in any respect.

## ARTICLE XVII
## MISCELLANEOUS

17.1   Confidentiality. Each Party hereto agrees to maintain the confidentiality of this Agreement and all information acquired in the performance of this Agreement relating to the activities or operations of the other Party or of the Facility or any of the subsidiaries. Except as required by Government Requirement, each Party hereto agrees not to divulge any such information to any third-party without the express written consent of the other Party; *provided* that any Party may disclose such information to its Affiliates, partners, attorneys, accountants, agents, investors, shareholders or members, consultants, independent contractors, employees, owners or lenders who have agreed or are required by applicable Government Regulation to maintain the confidentiality of such information, or to applicable persons if any Party is required to disclose such Confidential Information pursuant to legal process; *provided further*, that this Section 17.1 shall not apply to:

    (a)    information furnished without restriction prior to the date hereof;

    (b)    information in the public domain; and
    (c)    information obtained from a third-party and not as a result of breach directly or indirectly of this Agreement.

The provisions of this Section 17.1 shall survive the termination of this Agreement for a period of three (3) years after the date of such termination.

17.2   Notices. Whenever this Agreement requires or permits any consent, approval, notice, request, statement or demand from one Party to another, the consent, approval, notice, request, statement or demand must be in writing to be effective (unless expressly provided for otherwise in this Agreement) and shall be deemed to be delivered and received by the Party to whom notice is sent (i) on the day delivery thereof is confirmed, if delivered by facsimile or electronic transmission; or (ii) five (5) Business Days following deposit in the mail, if delivered by United States mail, postage prepaid, certified or registered, addressed to the appropriate Party, at the address and/or facsimile numbers of such Party set forth below (or at such other address as such Party may designate by written notice to the other Party in accordance with this Section 17.2):

If to Operator:     First United Ethanol, LLC
                         4615 Back Nine Road
                         Pelham, Georgia 31779
                         Attn: General Counsel.
                         Telephone: 229-522-2822
                         Fax No.: 229-522-2824

If to Owner:       Southwest Georgia Ethanol, LLC
                         4615 Back Nine Road

24

Pelham, Georgia 31779
Attn: General Counsel
Telephone: 229-522-2822
Fax No.: 229-522-2824

17.3    Severability.  In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal, void or unenforceable in any respect under the laws of any jurisdiction, the validity, legality, and enforceability of the remaining provisions under the law of such jurisdiction, and the validity, legality, and enforceability of such provisions and any other provisions under the laws of any other jurisdiction, shall not in any way be affected or, impaired thereby.  In such event, the Parties shall use their commercially reasonable best efforts to reform this Agreement in order to give effect to the original intention of the Parties.

17.4    No Waiver.  Any failure of any Party to enforce any of the provisions of this Agreement or to require compliance with any of its provisions shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of any Party thereafter to enforce any and each such provision.  None of the provisions of this Agreement shall be considered waived by a Party (by course of dealing or otherwise) unless such waiver is in writing and signed by such Party.  No waiver shall be construed as a modification of any of the provisions of this Agreement or as a waiver of any default (present or future) hereunder or breach hereof, except as expressly stated in such waiver.

17.5    Entire Agreement; Amendments.  This Agreement sets forth all understandings between the Parties respecting the subject matter hereof, and any prior draft contracts, understandings, communications and representations, whether oral or written, relating to the subject matter hereof are replaced and superseded by this Agreement.  This Agreement may be amended only in writing executed by the Parties.

17.6    No Third Party Beneficiary.  This Agreement is for the exclusive benefit of the Parties and not for the benefit of any third-party, other than as provided for in Section 16.4.

17.7    Counterpart Execution.  This Agreement may be executed and delivered by the Parties in any number of counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same instrument.  This Agreement may be delivered by facsimile transmission.

17.8    Captions.    The captions and subheadings contained in this Agreement are for convenience and reference only and in no way define, describe, extend, or limit the scope or intent of this Agreement or the intent of any provision contained herein.

17.9    Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of Georgia, without regard to it conflict of law provisions.

17.10    Successors & Assigns.  This Agreement shall inure to the benefit of and shall be binding upon the parties hereto and upon their respective successors and assigns.

25

IN WITNESS WHEREOF, the Parties have executed this Agreement as of the date and year first above written.

SOUTHWEST GEORGIA ETHANOL, LLC

By:

Name: _LARRY KAUS_

Title: _CFO_          12/6/07

FIRST UNITED ETHANOL, LLC

By: _Anthony J Glass_

Name: _Anthony J Glass_

Title: _CEO_

26

### Schedule 2.1(g)

### Back Office Support

<u>Chief Executive Officer</u> - will oversee all areas of operation, strategic planning, contractual relations and financial reporting and planning.

<u>General Manager</u> – will have full local responsibility on the ongoing operations and maintenance requirements of the Facility.

<u>Chief Financial Officer</u> – will be responsible for developing and maintaining financial plan and operating reporting.   Maintain insurance coverage and banking relationships supporting debt service.

<u>Communication Manager/Admin Assistant</u>- will maintain information flow with Community, Equity holders, Board Members and Media and support CEO on a daily basis.

<u>Office Administrator</u> – will support the administrative, accounting and human resources functions of the Facility, including payrolls, benefits administration, accounts receivable and accounts payable.

<u>Security Guards</u> – will be responsible for site coverage at night and weekends when there is no construction activity.

**Schedule 4.2**

**Monthly Compensation prior to Substantial Completion Date**

**Camilla, Georgia – 100MMgpy Ethanol Production
Labor Pre-Commercial Operations**

100 MILLION GALLON FUEL ETHANOL
SOURCES AND USES OF FUNDS — COMMERCIAL

PRODUCTION PLAN - SCHEDULE 4.2

| | Nov-07 | Dec-07 | Jan-08 | Feb-08 | Mar-08 | Apr-08 | May-08 | Jun-08 | Jul-08 | Aug-08 | Sep-08 | Oct-08 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FUEL:** | | | | | | | | | | | | | |
| Admin Labor | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 50,000 | 75,568 | 99,833 | 164,083 | 180,843 | 133,643 | 1,008,953 |
| Production Labor | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 32,116 | 42,454 | 69,739 | 82,400 | 80,400 | 257,400 |
| Payroll Benefits | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | | | 82,729 | 82,598 | 82,598 | 351,507 |
| **PAYMENTS TO FUEL** | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 58,000 | 107,854 | 158,247 | 314,223 | 353,641 | 353,641 | 1,667,745 |
| | | | | | | | | | | | | | |
| **REIMBURSABLE EXPENSES** | | | | | | | | | | | | | |
| Advertising | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 500 | 50 | 2,083 | 2,533 |
| Bank Charges | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 180 | 650 |
| Dues and Subscriptions | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 501 | 500 | 772 | 6,222 |
| Security | | | | | | | | | | | 7,000 | 7,000 | 84,000 |
| Postage and Delivery | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 200 | 621 | 2,821 |
| Meetings | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 300 | 3,500 | 300 | 2,626 | 2,626 |
| Rent | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 800 | 3,500 | 2,025 | 26,125 |
| Office Supplies/Misc | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 800 | 1,500 | 800 | 9,600 |
| Office Market | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 800 | 391 | 800 | 800 | 3,612 |
| Telephone | 391 | 391 | 391 | 391 | 391 | 391 | 391 | 391 | 391 | 950 | 391 | 391 | 11,400 |
| Travel | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 950 | 5,000 | 950 | 5,100 | 60,000 |
| Professional Legal/Public Relations | 5,000 | 5,000 | 5,000 | 20,000 | 5,000 | 5,000 | 5,000 | 10,000 | 5,000 | 2,000 | 2,000 | 3,575 | 37,575 |
| | 5,000 | 5,000 | 5,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 22,301 | 23,351 | 23,577 | 276,588 |
| **Total** | 79,501 | 79,501 | 79,501 | 54,301 | 73,801 | 73,801 | 73,801 | 131,485 | 177,348 | 335,553 | 383,442 | 375,518 | 1,884,334 |

## EXHIBIT A

### First United Ethanol, LLC
### Site Personnel

Operator will provide the site management, supervisory, and hourly personnel required for the ongoing operations and maintenance requirements of the Facility as identified on the attached organization chart. Descriptions of the positions identified on the chart are provided in the following paragraphs.

Position Descriptions

I.   Facility General Manager

The Facility General Manager shall have full local responsibility for the ongoing, operations and maintenance requirements of the Facility as defined by this Agreement. Specific duties shall include:

1.   Coordination of all O&M activities with Owner and Customers.

2.   On-site administration of the applicable agreements between Owner, Customers, and Owner and Operator.

3.   Development and administration of Agreements with service providers.

4.   Identification of warranty claims.

5.   Safety compliance functions, including but not limited to site safety regulations and training, environmental testing, accident prevention and prevention training, incident reporting and documenting, and physical site compliance.

6.   The Facility General Manager shall have at least ten (10) years of industry or related experience in the management, operation and maintenance of ethanol producing facilities or similar types of facilities.

II.   Plant Production Manager

The Plant Production Manager shall be responsible for daily operations and production of the Facility. Specific duties shall include:

1.   Scheduling operating personnel.

2.   Planning and directing daily operations activities.
3.   Training and developing personnel.

4.   Providing immediate response to operational problems.

5.   Executing operating instructions as defined by the Facility General Manager.

6.   Identifying Facility improvements.

7.   Performing other activities necessary for the operation at the Facility.

The Plant Production Manager shall have at least five (5) years experience in the operation of ethanol production facilities or similar types of facilities, including at least two (2) years of first-line supervisory experience.

III.   Maintenance Manager

The Maintenance Supervisor shall be responsible for scheduled and unscheduled maintenance of the Facility. Specific duties shall include:

1.   Scheduling maintenance personnel.

2.   Planning and directing maintenance activities.

3.   Training and developing maintenance personnel.

4.   Executing maintenance instructions as defined by Facility General Manager.

5.   Providing immediate maintenance support for operational problems.

6.   Identifying Facility improvements.

7.   Developing and administering a maintenance management system and maintaining the maintenance records.

8.   Developing and administering Facility safety programs.

9.   Developing and administrating Facility QA programs.

10.   Performing other activities required for Facility maintenance.

11.   Ensuring an adequate inventory of spare parts, maintenance tools, and equipment.

IV.   Logistics Manager

Specific duties shall include:

1. Administrating grain, ethanol, distiller's grain, manure, inventory control, product receipt, and accounting procedures.

2. Administrating the logistics management system.

3. Coordination of product shipping and transportation.

4. Directing, developing, and training the receiving and shipping clerks.

V.   Laboratory Manager

Specific duties shall include:

1. Management of the Plant laboratory.

2. Analysis of the ethanol production process.

3. Developing testing procedures and their implementation.

VI.   Plant Engineer

Specific duties shall include:

1. Develop and implement engineering procedures for process control and facility improvement.

2. Monitor Plant operation and prepare production and environmental reports

VII.   Operator and Maintenance Staff

The operations staff will consist initially of five (5) crews of Operators.

These Operators will be responsible for the daily operations of the ethanol facility. The Operators will also provide craft technical support in one or more of these related fields: mechanical, electrical, or instrument and controls.

The five crews will work a rotating, 12-hour schedule. The fifth crew will be scheduled on day shift and conduct scheduled maintenance or other duties as assigned.

The maintenance staff will consist initially of Maintenance Technicians, Electrical Technicians, and Instrument and Control Technicians.

Employees will be assigned tasks, duties, and responsibilities for which they have been trained, certified by the appropriate management level, and which they can perform safely.

VIII.    Administrative Staff:

The administrative staff consists of the Office Administrator who will support the administrative, accounting and human resources functions at the facility.

The Office Administrator will perform as the plant accountant and prepare all plant financial and accounting reports required by the corporate offices and financing parties. The Office Administrator will be responsible for budget preparation and tracking, payroll, benefits administration, accounts receivable and accounts payable.

All site personnel shall be provided with additional Facility-specific formal training during the construction and start-up phases of the Facility. Such training requirements shall be identified during the construction phase of the Facility and compared with the training to be provided by the Turnkey Contractor. Any training requirements beyond that provided by the Turnkey Contractor shall be identified to Owner and, upon approval by Owner, arranged for and provided for by Operator. Associated costs will be billed directly to Owner or passed through to Owner as a Reimbursable Cost.

In the event that it becomes necessary to replace or add personnel, training and orientation shall be identified, developed and provided by Operator on an individual basis.

Operator currently anticipates that its headcount will be 55 persons.



Figure 6-1
FUEL Organization

EXHIBIT B

Purchased Parts, Purchased Labor and Services

1.    General Purchase Order Labor (used to supplement site labor force on a Facility basis)

2.    Water System Analysis & consultants

3.    Fuel Analysis

4.    Emissions Testing – RATA CEMs (one test per source per year)

5.    Boiler Maintenance, Inspection and Repairs (HRSG)

6.    Control System Service

7.    Switchgear Service and Repairs

8.    Motor, Compressor & Pump Service and Repairs

9.    Emissions Control Service

10.   Pressure Vessel Inspection and certification

11.   Rail Inspection and Repair

12.   Motor, Scale, and Device Certification and Calibration

13.   Hazardous Waste Removal

598173_1

**EXHIBIT B**

## SERVICES AGREEMENT

This **SERVICES AGREEMENT**, including all exhibits and schedules attached hereto (the "Agreement") is dated as of December 6, 2007, (the "Effective Date") by and between Southwest Georgia Ethanol, LLC, a Georgia limited liability company ("SWGE") and First United Ethanol, LLC, a Georgia limited liability company ("FUEL"). SWGE and FUEL are sometimes referred to herein individually as a "Party" and collectively as the "Parties".

## RECITALS

WHEREAS, SWGE plans to construct an ethanol production facility with an approximately 100 million gallon capacity on a denatured basis near Camilla, Georgia (the "Facility");

WHEREAS, SWGE is engaged in the development, equipping, financing, and administration of the Facility;

WHEREAS, SWGE desires to engage FUEL to provide, and FUEL desires to provide to SWGE, certain services in connection with the Facility including (a) the management of construction, fuel, grain, risk, insurance, regulatory, finance, accounting, tax matters and administration for SWGE; (b) the management and coordination of the marketing of ethanol and distillers grain; and (c) any other activities related or incidental thereto (collectively the "Services").

NOW, THEREFORE, in consideration of the premises and of the mutual agreements herein, the Parties agree as follows:

## ARTICLE 1
### DEFINITIONS; INTERPRETATION

1.1   **Defined Terms.** Unless the context otherwise requires, the following capitalized terms used in this Agreement and in any exhibit or attachment hereto shall have the following respective meanings:

"Affiliate" means, with respect to a Party, any Person which, directly or indirectly, controls or is controlled by or is under common control with such Party. For the purposes of this definition, "control" (including with correlative meanings, the terms "controlled by" and "under common control with") means the power to direct or cause the direction of the management and policies of a Party, directly or indirectly, whether through ownership of voting securities or by contract or otherwise. Ownership of 50% or more of the voting securities of a Person, either directly or indirectly, shall constitute control of such Person.

"Agent" has the meaning set forth in the Senior Credit Agreement.

"Agreement" has the meaning set forth in the preamble.

"Billing Rate" has the meaning given to that term in Section 3.1.

"Business Day" means any day other than a Saturday, Sunday or a legal holiday in Atlanta, Georgia.

"Claim" has the meaning given to that term in Section 6.2(a).

"CPU" has the meaning given to that term in Section 3.1.

"Default Rate" means for any date of calculation, the lesser of (a) the per annum rate of interest equal to the prime lending rate as may from time to time be published in *The Wall Street Journal* under "Money Rates" on such day (or if not published on such day on the most recent preceding day on which published), plus two percent (2%) and (b) the maximum rate permitted by applicable law.

"Effective Date" has the meaning given to that term in the preamble to this Agreement.

"Facility" has the meaning given to that term in the recitals to this Agreement.

"Financing Documents" means those documents related to the debt financing and/or the refinancing for the development, construction, ownership, operation or maintenance of the Facility, or any portion thereof.

"Force Majeure" means any circumstance beyond the reasonable control of the Party affected thereby if and to the extent the effects thereof could not have been prevented or avoided by such Party through the exercise of due diligence, including, acts of God, fire, flood, serious atmospheric disturbance, lightning, storm, tornado, earthquake, soil erosion, subsidence, wash-out, or epidemics; war, battle, revolution, riot, civil war, civil disturbances, insurrection, sabotage, acts of public enemies, terrorist acts, blockade, boycott, trade restriction, or embargo; strike, lockout, or other labor disputes, but only if either regional in scale or national by industry; equipment breakdown; inability or delays in obtaining necessary governmental approvals not resulting directly from any action of inaction of such Party; and reductions, interruptions or the inability of a feedstock provider to provide natural gas, corn, manure or other feedstock due to a force majeure.

"Good Business Practices" means the then current practices, methods and acts, as changed from time-to-time, that are commonly used in the domestic ethanol production industry to perform or fulfill the activities comprising the Services, or any practices, methods or acts, that, in the exercise of reasonable judgment in light of the facts and risks known at the time, could have been expected to accomplish the desired result at a reasonable cost, under the circumstances, consistent with good business practices, reliability, safety and expedition; provided, however, that Good Business Practices is not intended to be limited to optimum practices, methods or acts to the exclusion of all others, but rather to be a range of possible practices, methods or acts taken or engaged in by entities in the domestic ethanol production industry. Whether any particular practice, method or act complies with Good Business Practices is to be judged in light of the facts known at the time such particular practice, method or act was performed or taken.

2

"Government Authority" means any federal, state, county, municipal or local governmental entity in the State of Georgia or the United States of America having jurisdiction over (a) the construction, operation or maintenance of the Facility, (b) SWGE or (c) this Agreement.

"Government Requirements" means any (a) constitution, charter, act, statute, law, ordinance, code, rule, regulation or order; (b) any condition, specified standards or objective criteria contained in any applicable permit, approval, decision, determination or ruling of any Government Authority; or (c) any other legislative, administrative or judicial action, final decree, judgment or order of any Government Authority, in each of the foregoing cases as in effect from time to time.

"Grain" means No. 2 yellow corn or No. 2 grain sorghum.

"Indemnified Party" means a FUEL Indemnified Party or a SWGE Indemnified Party.

"Legal Department" shall have the meaning given to that term in Section 2.3.

"Lenders" means the senior lenders and interest rate hedge providers providing financing or refinancing to SWGE, in connection with the development, construction, ownership, operation, or maintenance of the Facility, or any trustee or agent acting on behalf of any of the foregoing.

"Month" means a month beginning at 0000 EST or EDT, as in effect, on the first day of such month and ending at 2400 EST or EDT, as in effect, on the last day of such month.

"Operation and Maintenance Agreement" means that certain Operation and Maintenance Agreement by and between FUEL and SWGE dated of even date herewith.

"Non-Defaulting Party" means FUEL in the event of a SWGE Event of Default and means SWGE in the event of a FUEL Event of Default.

"FUEL" has the meaning given to that term in the preamble to this Agreement.

"FUEL Event of Default" has the meaning set forth in Section 6.1(b).

"FUEL Indemnified Parties" has the meaning set forth in Section 6.2(b).

"FUEL Parties" has the meaning given to that term in Section 2.3.

"Person" means any natural person, corporation, company, partnership, limited liability company, joint venture, trust, organization, association, sole proprietorship, government (or any agency, instrumentality or political subdivision thereof) or other juridical entity.

"SWGE" has the meaning given in the preamble to this Agreement

3

"SWGE Event of Default" has the meaning given to that term in Section 6.1(a).

"SWGE Indemnified Parties" has the meaning given to that term in Section 6.2(a).

"SWGE Parties" has the meaning given to that term in Section 2.3.

"Representation" has the meaning set forth in Section 2.3.

"Senior Credit Agreement" means that certain Senior Credit Agreement dated as of November 20, 2007 by and between SWGE and the Lenders thereto.

"Substantial Subcontractor" means a subcontractor whose contract or contracts (in the aggregate) with Operator require payments by Operator of at least $10,000.

"Service Documents" has the meaning set forth in Section 4.2.

"Services" has the meaning given in the Recitals to this Agreement, as more fully set forth in Exhibit A attached hereto.

"Term" has the meaning given to that term in Section 11.1.

1.2     "Include," "includes" and "including" shall be deemed to be followed by "without limitation" whether or not they are in fact followed by such words or words of like import.

1.3     "Writing," "written" and comparable terms refer to printing, typing, including without limitation transmission by electronic mail, and other means of reproducing in a visible form.

1.4     Any agreement, instrument or Government Requirement defined or referred to herein means such agreement or instrument or Government Requirement as from time to time amended, modified or supplemented, including (in the case of agreements or instruments) by waiver or consent and (in the case of Government Requirements) by succession of comparable successor Government Requirements and includes (in the case of agreements or instruments) references to all attachments thereto and instruments incorporated therein.

1.5     References to a Person are also to its successors and permitted assigns.

1.6     "Hereof," "herein," "hereunder," "thereof" and comparable terms refer, unless otherwise expressly indicated, to this Agreement as a whole and not to any particular article, section or other subdivision hereof or attachment hereto.

1.7     Pronouns of whatever gender shall include natural Persons of every kind and character. References to any gender include, unless the context otherwise requires, references to all genders.

1.8     The word "or" will have the disjunctive meaning represented by the phrase

4

"and/or."

1.9    "Shall" and "will" have equal force and effect.

## ARTICLE 2
## PROVISION OF SERVICES

2.1    SWGE hereby appoints and retains FUEL to be the exclusive provider of the
Services to the Facility and SWGE during the Term, and FUEL agrees to be the exclusive
provider of the Services during the Term to the Facility and SWGE. All Services shall be
furnished by independent contractors, employees or third party subcontractors of FUEL or of any
of its Affiliates. FUEL shall devote such time in providing the Services as is reasonably
necessary to fulfill the performance thereof.

2.2    Notwithstanding anything in this Agreement to the contrary, the management and
business of the Facility and SWGE shall at all times be at the direction of SWGE and its
management, and shall at all times be in accordance with the provisions of the annual budget of
SWGE, as the case may be. FUEL shall have all such authority to act on behalf of SWGE as is
necessary to provide the Services and to fulfill its other obligations pursuant to this Agreement.
SWGE shall do and cause to be done all such acts and things within its power and authority as
may be necessary and desirable to enable FUEL promptly and efficiently to provide, or cause to
be provided, the Services and comply with its other obligations hereunder and shall not do or
permit anything which may prevent or restrict FUEL from such performance or compliance.

2.3    It is agreed and understood by SWGE and its officers, directors and employees,
and any of the successors or assigns of the foregoing (collectively the "SWGE Parties"), that the
legal department of FUEL or any of its Affiliates (the "Legal Department") may advise FUEL
in connection with FUEL's rendering of Services under this Agreement (the "Representation").
It is agreed and understood by the SWGE Parties that none of them is a client of the Legal
Department and that none of the Legal Department, FUEL or any of its Affiliates, or any officer,
director or employee of any of them (the "FUEL Parties") can or will provide any of the SWGE
Parties with legal advice or legal representation of any kind. It is also agreed and understood that
the Legal Department shall not serve as counsel to the SWGE Parties, and the SWGE Parties
shall not, under any circumstances or for any purpose, be deemed to be clients of the Legal
Department, nor shall any attorney-client relationship be deemed to exist between any of the
SWGE Parties and the Legal Department for any purpose (whether for purposes of conflicts of
interests or otherwise). SWGE, on its own behalf and on behalf of the other SWGE Parties,
agrees that each individual attorney member of the Legal Department shall be deemed an
individual beneficiary of this Section 2.3.

## ARTICLE 3
## COMPENSATION

3.1    FUEL shall be compensated for the Services pursuant to that certain Operation
and Maintenance Agreement by and between FUEL and SWGE of even date herewith. FUEL
shall be entitled to reimbursement for its direct out-of-pocket costs, including the direct out-of-

pocket costs of any outside third party services incurred in connection with its provision of Services hereunder (provided that, FUEL is not reimbursed for such costs under any other agreement). However, no payments shall be made to FUEL pursuant to this Article 3 unless such amounts are part of an Approved Budget, as defined in the Operation and Maintenance Agreement, for SWGE or unless the Agent under the Senior Credit Agreement consents to such payment.

3.2     Within thirty (30) days after the last day of each Month, FUEL shall prepare and submit to SWGE a statement setting forth all of FUEL's charges for the previous Month pursuant to Section 3.1 and, subject to Section 3.1 and SWGE's right to audit as provided in this Agreement, SWGE agrees to pay such charges pursuant to such invoice within ninety (90) days after the date of receipt by SWGE of the invoice.

3.3     SWGE will have the right, at its sole expense to audit the books and records of FUEL solely for the purpose of verifying the accuracy of payments made pursuant to Section 3.1. Such audits shall be made not more than once per year, on not less than fifteen (15) days' prior written notice, during regular business hours, by independent auditors reasonably acceptable to both Parties. If it is finally determined that any discrepancies exist in connection with the audit described in this Section 3.3, then the following action will be promptly taken to resolve the matter, as appropriate: (a) FUEL will promptly reimburse (within thirty (30) business days after receipt of written notice) SWGE for any overpayment made to FUEL together with interest at the Default Rate, compounded annually, or (b) FUEL will be promptly reimbursed (within thirty (30) business days after receipt of written notice) by SWGE for any underpayment of amounts due to FUEL together with interest at the Default Rate, compounded annually. Additionally, if it is finally determined pursuant to this Section 3.3 that discrepancies exist with respect to any calendar year that require a reimbursement by FUEL of an amount greater than 10% of the total amounts paid, received or retained by FUEL from SWGE under Section 3.1, in the aggregate, in respect of that year, then FUEL will reimburse (within ten (10) business days after receipt of written notice) SWGE for the cost of the audit, together with interest at the Default Rate, compounded annually.

3.4     Any amounts due and owing to FUEL under this Article 3 that are not paid by SWGE to FUEL within the required time period shall accrue interest thereafter at the Default Rate, compounded annually.

3.5     All payments made to FUEL hereunder shall be made to the account separately specified by FUEL in writing to SWGE.

## ARTICLE 4
## ACCESS TO PROPERTIES; DOCUMENTS AND RECORDS

4.1     SWGE shall provide FUEL such reasonable support as is necessary or appropriate to enable FUEL and FUEL's employees, independent contractors and third party subcontractors, to perform the Services. Without limiting the foregoing, FUEL and its employees, independent contractors and third party subcontractors who are to perform the Services shall have such access to the Facility and SWGE and to any and all real and personal property of the Facility and

SWGE as FUEL reasonably determines to be necessary for or in 'connection with the provision of any or all of the Services.

4.2    During the performance of the Services, FUEL shall maintain a set of accounts and records including all documents, correspondence, data, files, record layouts and codes, and any other evidence that shows and supports the performance of Services hereunder by FUEL (collectively "Service Documents"). The system of accounts to be used by FUEL shall be reasonably acceptable to SWGE and shall be in accordance with U.S. generally accepted accounting principles. All Service Documents shall become, when prepared, the property of SWGE.

4.3    All Service Documents shall, in each case, be subject to inspection, copying, and audit at all reasonable times and upon reasonable notice by SWGE and each of its respective authorized representatives.

4.4    Upon any expiration or termination of this Agreement, FUEL shall promptly deliver all Service Documents to SWGE, at SWGE's address indicated in Section 10.1 of this Agreement. FUEL shall be entitled to make and retain copies of all Service Documents subject to the confidentiality provisions set forth in Section 14.1 hereof.

## ARTICLE 5
### STANDARD OF CONDUCT AND FORCE MAJEURE

5.1    FUEL shall perform the Services in accordance with Good Business Practices.

5.2    Neither Party shall be liable to the other Party for any delay or failure to perform any provision or obligation of this Agreement, except the obligation to pay monies due, if such delay or failure is caused by Force Majeure. If a Party claims Force Majeure pursuant to this Section 5.2, such Party shall give notice and reasonable details of the event to the other Party as soon as practicable including the claiming Party's best estimate of the duration of the Force Majeure. The Parties shall make reasonable efforts to mitigate the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

## ARTICLE 6
### EVENTS OF DEFAULT; INDEMNIFICATION

6.1    Events of Default.

(a)    SWGE Events of Default. The occurrence of any one or more of the following events shall constitute a SWGE event of default ("SWGE Event of Default") under this Agreement:

(i)    SWGE shall: (A) admit in writing its inability to pay its debts as such debts become due; (B) apply for or consent to the appointment of, or the taking of possession by, a receiver, custodian, trustee or liquidator for itself or of all or a substantial part of its property; (C) make a general assignment for the benefit of

7

its creditors; (D) commence a voluntary case applicable bankruptcy laws; (E) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts; (F) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under applicable bankruptcy laws; or (G) take any limited liability company action for the purpose of effecting any of the foregoing;

(ii)    (A) a proceeding or case shall be commenced against SWGE without the application or consent of SWGE, in any court of competent jurisdiction, seeking: (1) its liquidation, reorganization, dissolution or winding-up or the composition or readjustment of its debts; (2) the appointment of a trustee, receiver, custodian, liquidator or the like of SWGE or of all or any substantial part of its property; or (3) similar relief in respect of SWGE under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and, in each case, such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days; or (B) an order for relief against SWGE shall be entered by a court of competent jurisdiction in an involuntary case under applicable bankruptcy laws;

(iii)    SWGE shall be dissolved or cease to exist (as a matter of Government Requirement or otherwise) or proceedings shall be commenced by any Person seeking the dissolution of SWGE and such proceedings shall continue undismissed or unstayed for a period of thirty (30) or more days (or such shorter period of time which SWGE has pursuant to Government Requirements to cause the dismissal of such proceeding or stay the effectiveness of any such order, judgment or decree);

(iv)    failure by SWGE to pay FUEL any amount hereunder by the due date therefor; provided that SWGE has received notice of such default and such default continues for three (3) Business Days thereafter; or

(v)    a default by SWGE in the performance of any of its other material obligations under this Agreement after written notice by FUEL; provided that, if the default is capable of being cured, SWGE shall have thirty (30) days to cure such default, and if it shall have promptly commenced and shall be diligently attempting to cure such default, shall have an additional thirty (30) days to cure such default.

(b)    FUEL Events of Default.  The occurrence of any one or more of the following events shall constitute a FUEL Event of Default ("FUEL Event of Default") under this Agreement:

(i)    FUEL shall: (A) admit in writing its inability to pay its debts as such debts become due; (B) apply for or consent to the appointment of, or the taking of

possession by, a receiver, custodian, trustee or liquidator for itself or of all or a substantial part of its property; (C) make a general assignment for the benefit of its creditors; (D) commence a voluntary case under applicable bankruptcy laws; (E) file a petition seeking to take advantage of any other law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or readjustment of debts; (F) fail to controvert in a timely and appropriate manner, or acquiesce in writing to, any petition filed against it in an involuntary case under applicable bankruptcy laws; or (G) take any limited liability company action for the purpose of effecting any of the foregoing;

(ii)    (A) a proceeding or case shall be commenced against FUEL, without the application or consent of FUEL, in any court of competent jurisdiction, seeking: (1) its liquidation, reorganization, dissolution or winding-up or the composition or readjustment of its debts; (2) the appointment of a trustee, receiver, custodian, liquidator or the like of FUEL or of all or any substantial part of its property; or (3) similar relief in respect of FUEL under any law relating to bankruptcy, insolvency, reorganization, winding-up, or composition or adjustment of debts, and, in each case, such proceeding or case shall continue undismissed, or an order, judgment or decree approving or ordering any of the foregoing shall be entered and continue unstayed and in effect, for a period of sixty (60) or more days; or (B) an order for relief against FUEL shall be entered by a court of competent jurisdiction in an involuntary case under applicable bankruptcy laws;

(iii)    FUEL shall be dissolved or cease to exist (as a matter of Government Requirement or otherwise) or proceedings shall be commenced by any Person seeking the dissolution of FUEL and such proceedings shall continue undismissed or unstayed for a period of thirty (30) or more days (or such shorter period of time which FUEL has pursuant to Government Requirements to cause the dismissal of such proceeding or stay the effectiveness of any such order, judgment or decree);

(iv)    a default by FUEL in the performance of any of its material obligations under this Agreement, after written notice by SWGE; provided that, if the default is capable of being cured, FUEL shall have thirty (30) days to cure such default after written notice of default received from SWGE; and if it shall have properly commenced and shall be diligently attempting to cure such default, shall have an additional thirty (30) days to cure such default.

6.2    Indemnifications.

(a)    Subject in all instances to the provisions of Article 7, FUEL shall indemnify, defend and hold harmless SWGE and its officers, directors, independent contractors, employees, Lenders and agents (the "SWGE Indemnified Party(ies)") from and against any and all claims, demands, suits, actions, liabilities, losses, damages, judgments, fines, penalties and legal or other expenses, whether in any instance arising under this Agreement or from a third party claim ("Claim") that may arise from or in connection with the delivery of Services and the performance of its obligations pursuant

9

to this Agreement; provided, however that FUEL shall not be responsible for any such Claim to the extent that such Claim is the result of actions taken or omitted to be taken by such SWGE Indemnified Party in bad faith or due to such SWGE Indemnified Party's gross negligence or willful misconduct. If a Claim is asserted or action brought against a SWGE Indemnified Party as to which such SWGE Indemnified Party believes it is entitled to indemnification under this Section 6.2(a), SWGE shall promptly notify FUEL in writing of such Claim. Failure of SWGE to give prompt notice as contemplated in the preceding sentence shall not absolve FUEL of liability hereunder except to the extent FUEL is actually prejudiced by such failure.

(b)     Subject in all instances to the provisions of Article 7 and the Financing Documents, SWGE shall indemnify, defend and hold harmless FUEL, each of its Affiliates, and each of its and their officers, independent contractors, directors, employees and agents (the "FUEL Indemnified Parties") from and against any and all Claims that may arise from or in connection with the performance of its obligations under this Agreement; provided, however that SWGE shall not be responsible for any such Claim to the extent that such Claim is the result of actions taken or omitted to be taken by such FUEL Indemnified Party in bad faith or due to such FUEL Indemnified Party's gross negligence or willful misconduct. If a Claim is asserted or action brought against a FUEL Indemnified Party as to which such FUEL Indemnified Party believes it is entitled to indemnification under this Section 6.2(b), FUEL shall promptly notify SWGE in writing of such Claim. Failure of FUEL to give prompt notice as contemplated in the preceding sentence shall not absolve SWGE of liability hereunder except to the extent SWGE is actually prejudiced by such failure.

(c)     The rights of indemnity under this Section 6.2 shall be the exclusive remedy of the SWGE Indemnified Parties and the FUEL Indemnified Parties, as the case may be, with respect to any Claim. The provisions of this Section 6.2(c) and Article 7 shall survive any termination of this Agreement until the second anniversary of such termination. The indemnification provisions of this Section 6.2 shall apply to the fullest extent permitted by law and must be asserted no later than the second anniversary of the termination of this Agreement.

(d)     The applicable Indemnifying Party shall not be responsible for any settlement, compromise or consent in regard to any Claim without its prior written consent. Each indemnifying Party agrees that, without prior written consent of the applicable Indemnified Party, it will not settle, compromise or consent to the entry of any judgment, in whole or in part, in any commenced or threatened Claim in respect of which indemnification could be sought under Section 6.2 (whether or not such Indemnified Party is an actual or potential party to such Claim), unless such settlement, compromise or consent (i) includes an unconditional release of such Indemnified Party, from, and holds such Indemnified Party thereto harmless against, all liability arising out of such Claim, (ii) does not impose any actual or potential liability upon the applicable Indemnified Party, and (iii) the applicable parties thereto agree that the terms of such settlement remain confidential.

10

(c)    The applicable Indemnifying Party shall, at its option, or if requested by the applicable Indemnified Party, assume the defense of any such Claim, including the employment of legal counsel reasonably satisfactory to the applicable Indemnified Party. Such Indemnified Party shall have the right to employ separate legal counsel in any such Claim and to participate in the defense thereof, but the fees and expenses of such legal counsel shall be at the expense of such Indemnified Party, unless (i) the Indemnifying Party shall have failed promptly to assume the defense thereof and employ counsel as provided hereinabove, or (ii) the named parties to any such Claim (including impleaded parties) include such Indemnified Party and the Indemnifying Party, and such Indemnified Party shall have been advised by legal counsel that there may be one or more legal defenses available to it that are different from or in addition to those available to the Indemnifying Party, provided that the Indemnifying Party shall not in any event be responsible hereunder for the fees and expenses of more than one firm of separate counsel in connection with any Claim, in addition to any local legal counsel.

## ARTICLE 7
### LIMITATIONS OF LIABILITY; NO WARRANTIES

7.1    Notwithstanding anything to the contrary contained in this Agreement:

(a)    The limitation of liability set forth in this Article 7 shall in no way limit the liability of SWGB for any amounts payable to FUEL pursuant to Article 3 hereof.

(b)    NOTWITHSTANDING ANY OTHER PROVISION OF THIS AGREEMENT, NEITHER PARTY SHALL BE LIABLE TO THE OTHER PARTY OR ANY OF ITS AFFILIATES, REPRESENTATIVES OR AGENTS FOR ANY LOST PROFITS OR REVENUES, OR PUNITIVE, INDIRECT OR CONSEQUENTIAL DAMAGES UNDER, ARISING OUT OF, DUE TO OR IN CONNECTION WITH THIS AGREEMENT.

7.2    FUEL MAKES NO WARRANTIES, GUARANTEES, OR REPRESENTATIONS OF ANY KIND, EITHER EXPRESS OR IMPLIED, STATUTORY OR OTHERWISE WITH RESPECT TO ANY SERVICES PROVIDED UNDER THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE.

## ARTICLE 8
### INDEPENDENT CONTRACTOR RELATIONSHIP

8.1    The Parties acknowledge and agree that FUEL's relationship with SWGB hereunder is and shall be that of an independent contractor, and under no circumstances shall either Party, or any of its employees, independent contractors or third party subcontractors be deemed employees, partners, agents, or joint venturers of the other Party.

8.2    Neither Party shall maintain, hold out, represent, state or imply to any other individual or entity that an employer/employee relationship exists between the Parties.

11

## ARTICLE 9
### REPRESENTATIONS AND WARRANTIES

9.1    Each Party represents and warrants to the other that (a) it is a limited liability company duly formed, validly existing and in good standing under the laws of the state of its formation and is in good standing in all other jurisdictions where necessary in light of the business and properties it conducts and owns and intends to conduct and own, and has full power, authority and legal right to incur the obligations provided for in this Agreement; (b) the execution, delivery and performance of this Agreement does not and will not (i) require any consent or approval of its members or directors, as applicable, which has not been obtained as of the date hereof, (ii) violate any provision of its limited liability company agreement or any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award presently in effect, (iii) result in a breach of or constitute a default under its limited liability company agreement or any indenture or loan or credit agreement or other material agreement, lease or instrument to which it is a party or by which it or its properties may be bound or affected, or (iv) result in, or require, the creation or imposition of any mortgage, deed of trust, pledge, lien, security interest or other charge or encumbrance of any nature upon or with respect to any of the properties now owned or hereafter acquired by it; and (c) upon execution and delivery hereof, this Agreement is a legal, valid and binding obligation enforceable against it in accordance with the terms hereof, except as the enforceability hereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other such laws affecting the rights of creditors generally and subject to general equitable principles.

## ARTICLE 10
### NOTICES

10.1    Notices.  Whenever this Agreement requires or permits any consent, approval, notice, request, statement or demand from one Party to the other, the consent, approval, notice, request, statement or demand must be in writing to be effective (unless expressly provided for otherwise in this Agreement) and shall be deemed to be delivered and received by the Party to whom notice is sent (i) on the day delivery thereof is confirmed, if delivered by facsimile or electronic transmission; or (ii) five (5) Business Days later, if delivered by United States mail, postage prepaid, certified or registered, addressed to the appropriate Party, at the address and/or facsimile numbers of such Party set forth below (or at such other address as such Party may designate by written notice to the other Party in accordance with this Section 10.1):

If to FUEL:          First United Ethanol, LLC
                     4615 Back Nine Road
                     Pelham, Georgia 31779
                     Attn: General Counsel
                     Telephone: 229-522-2822
                     Fax No.: 229-522-2824

If to SWGE:          Southwest Georgia Ethanol, LLC
                     4615 Back Nine Road
                     Pelham, Georgia 31779

Attn: General Counsel
Telephone: 229-522-2822
Fax No.: 229-522-2824

## ARTICLE 11
### TERM AND TERMINATION

11.1    Subject to the other Sections of this Article 11, the term of this Agreement shall commence as of the Effective Date and shall continue until the ten year anniversary of the Effective Date, unless earlier terminated pursuant to its terms and provisions (the "Term"); provided, however, that SWGE and FUEL may together elect to extend the Term with respect to all or a portion of the Services hereunder as the Parties may determine in writing.

11.2    Upon the occurrence and during the continuance of a SWGE Event of Default or a FUEL Event of Default, the Non-Defaulting Party may terminate this Agreement by giving the other Party written notice thereof; provided, however, that with respect to a SWGE Event of Default, the Lenders have not commenced to cure any such default pursuant to Section 13.3. Such termination shall be effective as of the deemed date of receipt of such notice.

11.3    Either party shall have the right to terminate this Agreement upon the occurrence of (i) the sale of 100% of the equity interests in FUEL, (ii) the sale of any of the equity interests in SWGE, or (iii) the sale of all or substantially all the assets of SWGE. The Lenders shall have the right to terminate this Agreement if they have commenced the exercise of remedies following an event of default under the Financing Documents.

## ARTICLE 12
### GOVERNING LAW

12.1    GOVERNING LAW.  THIS AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF GEORGIA, WITHOUT REGARD TO ITS CONFLICT OF LAW PROVISIONS.

## ARTICLE 13
### LENDERS

13.1    Lenders.  FUEL acknowledges that SWGE will borrow certain funds from the Lenders for the construction of the Facility and that, as a condition to making loans to SWGE, the Lenders may from time to time require certain documents from FUEL.  In connection therewith, FUEL agrees to furnish to the Lenders, and to use reasonable efforts to cause its subcontractors and vendors to furnish to the Lenders, such written information, certificates, copies of invoices and receipts, lien waivers (upon payment), affidavits and other like documents as the Lenders may reasonably request.  FUEL shall negotiate in good faith amendments to this Agreement as may be reasonably requested by the Lenders.  In addition, FUEL shall promptly execute any additional documentation as may be mutually agreed upon in form and substance that is reasonably requested by the Lenders, including but not limited to, documents evidencing FUEL's consent to assignment of this Agreement by SWGE as security to the Lenders.

13

13.2   <u>Subordination of Liens</u>.  FUEL hereby subordinates any liens to which it may be entitled under applicable laws or under the provisions of this Agreement to any lien granted by SWGE in favor of the Lenders, whether such lien in favor of the Lenders is created, attached or perfected prior to or after the lien in favor of FUEL.  In addition, FUEL shall submit proof satisfactory to SWGE that it has included in each subcontract entered into by it with a Substantial Subcontractor, as such term is defined in the Operation and Maintenance Agreement, a requirement that any lien to which such Substantial Subcontractor may be entitled to thereunder or by applicable laws shall be subordinate and inferior to any lien granted in favor of the Lenders, whether such lien in favor of Lenders is created, attached or perfected prior to or after the lien in favor of such Substantial Subcontractor.

13.3   <u>SWGE Default</u>.  In the event of SWGE's default under this Agreement, FUEL agrees that the Lenders shall have the right to cure SWGE's default and, in such event, FUEL's duties and obligations under this Agreement shall be unaffected.  In that regard, FUEL agrees that the Lenders shall have (i) thirty (30) days from the date notice of default is delivered to the Lenders to cure such default if such default is the failure to pay amounts to FUEL which are due and payable under the Agreement or (ii) not fewer than ninety (90) days to cure such default if the breach or default cannot be cured by the payment of money to FUEL so long as the Lenders or their designee shall have commenced to cure the default within such ninety (90) day period and thereafter diligently pursue such cure to completion and continue to perform any monetary obligations under the Agreement and all other obligations under the Agreement are performed by SWGE or the Lenders.  If possession of the Facility is necessary to cure such breach or default, and the Lenders declare SWGE in default and commence foreclosure proceedings, the Lenders will be allowed a reasonable period to complete such proceedings and the foregoing cure period shall be extended accordingly.  If the Lenders are prohibited by any court order or proceedings from curing the default or from commencing or prosecuting foreclosure proceedings, the foregoing time periods shall be extended by the period of such prohibition but not beyond one-hundred and eighty (180) days from the date of delivery of the notice of default to the Lenders.  FUEL further agrees to perform its obligations hereunder for the benefit of the Lenders in the event of an exercise of remedies by the Lenders following SWGE's default under this Agreement or under the Financing Documents, provided that the Lenders shall have timely cured all defaults of SWGE's obligations hereunder and shall have timely paid all amounts then due, including costs to cure.  In such event, upon notice to SWGE and FUEL, the Lenders shall have the rights and obligations of SWGE under this Agreement, provided the Lenders shall have no personal liability to FUEL for the performance of such obligations, and the sole recourse of FUEL in seeking the enforcement of such obligations shall be to such parties' interest in the Facility.

13.4   <u>Third Party Beneficiary</u>.  SWGE and FUEL agree that the Lenders are intended to be a third party beneficiary of this Agreement.  In that regard, SWGE and FUEL will not, without the prior written consent of the Lenders, amend or modify <u>Section 14.2</u>, <u>Article 3</u>, <u>Article 11</u> or <u>Article 13</u> in any respect.

<b>ARTICLE 14<br>MISCELLANEOUS</b>

14.1    Confidentiality.    Each Party agrees to maintain the confidentiality of this Agreement and all information acquired in the performance of this Agreement relating to the activities or operations of the other Party or of the Facility.    Except as required by any Government Requirement, each Party agrees not to divulge any such information to any third Person without the express written consent of the other Party; provided that any Party may disclose such information to its Affiliates, partners, attorneys, accountants, agents, investors, shareholders or members, consultants, independent contractors, employees, owners or lenders who have agreed or are required by applicable Government Requirement to maintain the confidentiality of such information, or to applicable Persons if any Party is required to disclose such Confidential Information pursuant to legal process; provided further, that this Section 14.1 shall not apply to:

(a)    information furnished without restriction prior to the date hereof;

(b)    information in the public domain; and

(c)    information obtained from a third-Person and not as a result of breach directly or indirectly of this Agreement.

The provisions of this Section 14.1 shall survive the termination of this Agreement for a period of three (3) years after the date of such termination

14.2    Assignment.    (a) This Agreement shall inure to the benefit of, and be binding upon, the successors and permitted assigns of the Parties.    Except as expressly permitted in this Agreement, neither Party shall assign this Agreement or any portion hereof, or any of the rights or obligations hereunder, whether by operation of law or otherwise, without the prior written consent of the other Party, which consent may be withheld in the sole discretion of the non-assigning Party, provided, however, that, without the consent of SWGE, (i) FUEL may assign this Agreement to an Affiliate of FUEL, and (ii) FUEL may engage agents, independent contractors or third party subcontractors to assist in providing the Services referenced in this Agreement.    Any attempted assignment in violation of this Section 14.2 shall be void and ineffective.

(b)    FUEL hereby consents to the granting of a security interest in and an assignment by SWGE of the SWGE's rights and obligations under this Agreement to the Lenders and their successors, assigns and designees in connection with any financing or refinancing related to the development, construction, operation or maintenance of the Facility.    In furtherance of the foregoing, FUEL acknowledges that the Lenders may under certain circumstances assume the interests and rights of SWGE under this Agreement.

14.3    Severability.    In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal, void or unenforceable in any respect under the laws of any jurisdiction, the validity, legality, and enforceability of the remaining provisions under the law of such jurisdiction, and the validity, legality, and enforceability of such provisions and any other provisions under the laws of any other jurisdiction, shall not in any way be affected or

15

impaired thereby. In such event, the Parties shall use their commercially reasonable best efforts to reform this Agreement in order to give effect to the original intention of the Parties.

14.4    No Waiver. Any failure of any Party to enforce any of the provisions of this Agreement or to require compliance with any of its provisions shall in no way affect the validity of this Agreement, or any part hereof, and shall not be deemed a waiver of the right of any Party thereafter to enforce any and each such provision. None of the provisions of this Agreement shall be considered waived by a Party (by course of dealing or otherwise) unless such waiver is in writing and signed by such Party. No waiver shall be construed as a modification of any of the provisions of this Agreement or as a waiver of any default (present or future) hereunder or breach hereof, except as expressly stated in such waiver.

14.5    Entire Agreement; Amendments. This Agreement sets forth all understandings between the Parties respecting the subject matter hereof, and any prior draft contracts, understandings, communications and representations, whether oral or written, relating to the subject matter hereof are replaced and superseded by this Agreement. This Agreement may be amended only in writing executed by SWGE and FUEL.

14.6    No Third Party Beneficiary. This Agreement is for the exclusive benefit of the Parties and not for the benefit of any third party, other than in connection with Article 6 and Article 13 hereof.

14.7    Counterpart Execution. This Agreement may be executed and delivered by the Parties in any number of counterparts, each of which when so executed and delivered shall be an original, but all such counterparts shall together constitute but one and the same agreement. This Agreement may be delivered by facsimile transmission.

14.8    Captions. The captions and subheadings contained in this Agreement are for convenience and reference only and in no way define, describe, extend, or limit the scope or intent of this Agreement or the intent of any provision contained herein.

16

**IN WITNESS WHEREOF,** the Parties have executed this Services Agreement as of the date and year first above written

**SOUTHWEST GEORGIA ETHANOL, LLC**

By: _____

Name: _____

Title: _____

12/6/07

**FIRST UNITED ETHANOL, LLC**

By: _____

Name: _____

Title: _____

17

## EXHIBIT "A"

### SERVICES

(i)   preparing and monitoring of all applicable and annual budgets and actual costs in regard to all Services;

(ii)   selecting, contracting for, supervising, managing and coordinating all engineers, architects, lawyers, accountants, financial advisors, investment bankers, agents, consultants, contractors, subcontractors, equipment vendors, operations and maintenance firms, and other vendors and suppliers and also perform services relating to all such functions directly through its own employees, independent contractors or third party agents;

(iii)   providing and maintaining all information and equipment necessary for provision of the Services hereunder;

(iv)   consulting and assisting in the arrangement and placement of all insurance coverage relating to SWGB or the Facility;

(iv)   arranging and negotiating for equity or debt financing or re-financing for the Facility and compliance with all contracts and agreements to which SWGB is a party relating thereto;

(v)   conducting and negotiating contracts and other arrangements pertaining to the Services, including without limitation contracts regarding fuel, Grain, ethanol, distillers grain, equipment, materials, construction services and asset management services;

(vii)   providing equipment, files, offices, computers, furnishings, copiers, fax machines, telephones and other audio and visual equipment and devices, training, data processing, and other office supplies and materials;

(viii)   providing accounting, budgeting, engineering, tax, legal (subject to Section 2.3 of this Agreement), investment consulting, public and industrial relations, human resources management, payroll, wage, health and benefit plans for the benefit of any applicable employees of SWGB, insurance consulting, business development, real estate, leasing, purchasing, trading and/or hedging transactions, obtaining permits, approvals or licenses and other services in connection with the Services and payroll, wage, health and benefit plans for any applicable employees of SWGB;

(ix)   preparing and maintaining records of accounts and of technical operations of the Facility and all reports, statements, data and information that may be required from time to time under applicable project documents, the Financing Documents or by any Governmental Authority;

(x)   opening and maintaining bank accounts and performing cash management functions in connection with the Services, including the payment of costs, expenses, rentals and taxes incurred in connection with the Services;

18

(xi)     preparing all federal, state and local tax returns of SWGE;

(xii)    provide construction management services including, supervision and management of the design, engineering and construction of the Facility;

(xiii)   obtaining and maintaining all governmental permits, licenses and approvals required in connection with the Facility;

(xiv)    obtaining and maintaining insurance as may be required under applicable project documents and Financing Documents related to the Facility and the Services;

(xv)     preparing periodic reports setting forth fuel consumption, Grain consumption, electrical production, operating costs and other matters as may be required under applicable project documents and Financing Documents related to the Facility;

(xvi)    overall asset management, annual operations auditing and reporting, performance and efficiency testing, review and reporting, inventory tracking and control systems, contract and asset administration and management services, warranty administration and all problem resolution activity including without limitation, litigation;

(xvii)   arranging for travel and living arrangements incurred by FUEL employees, independent contractors or third party agents or other personnel performing any Services hereunder; and

(xviii)  arranging for the provision of litigation services related to the Facility.

598171_1

**TRINITY INDUSTRIES LEASING COMPANY**
**RAILROAD CAR LEASE AGREEMENT**

This Agreement, made this 5th day of November, 2007, between Trinity Industries Leasing Company, a Delaware corporation, with its principal office at 2525 Stemmons Freeway, Dallas, Texas 75207, (hereinafter called "Lessor") and First United Ethanol, LLC, a Georgia limited liability company, with its principal office at 2 West Broad Street, Camilla, Georgia 31730 (hereinafter called "Lessee").

In consideration of the mutual terms and conditions hereinafter set forth, the parties hereto hereby agree as follows:

## ARTICLE 1: LEASE AGREEMENT

Lessor agrees to lease to Lessee, and Lessee agrees to lease from Lessor, the cars shown on each Rider hereto and such additional Riders as may be added from time to time (each such Rider and together with this Agreement shall be collectively referred to as the "Lease") by agreement of the parties and signed by their duly authorized representative (all such cars being hereinafter referred to as the "cars"). Each Rider shall set forth a brief description of the car or cars covered thereby, including such facts as the number of cars, the AAR or DOT specifications, rental charges, term throughout which the car or cars shall remain in Lessee's service and such other information as may be desired by both parties. Lessor and Lessee agree that each Rider hereto shall constitute a separate Lease which incorporates the terms of this Agreement. Each Rider shall be severable from any other cars or riders relating to this Agreement and shall become a separate lease which is separately transferable for all purposes. It is the intent of all parties to this Agreement to characterize this Agreement as a true lease.

## ARTICLE 2: DELIVERY

Lessor agrees to deliver each car to Lessee, freight charges collect, in the yard of the delivering line at the point specified by the Lessee, and Lessee agrees to accept such delivery. The obligations of the Lessor to deliver the cars shall be excused, and Lessor shall not be liable, for any causes beyond the reasonable control of Lessor (including, but not limited to, delays caused by fire, labor difficulties, delays of carriers and materials suppliers, governmental authority, late delivery by the manufacturer of the cars or late delivery by a prior lessee) and, in the event of a delay in such delivery, Lessor shall deliver the cars to Lessee as soon as reasonably possible thereafter.

## ARTICLE 3: CONDITION OF CARS - ACCEPTANCE

All cars delivered under this Lease shall be in satisfactory condition for movement in the normal interchange of rail traffic and shall otherwise comply with the description and specifications contained in the applicable Rider; but Lessee shall be solely responsible for determining that cars are in proper condition for loading and shipment, except for those responsibilities which, under applicable law, have been assumed by the railroads. Lessee shall inspect the cars promptly after they are delivered and shall notify Lessor in writing within five days after delivery of its rejection of any car, and the specific reasons for such rejection. Failure by the Lessee to inspect the cars within five days after delivery, and/or the successful loading of any car by Lessee, shall constitute acceptance of such car or cars, as the case may be, by Lessee and shall be conclusive evidence of the fit and suitable condition of such car or cars. At Lessor's request, Lessee shall deliver to Lessor an executed Certificate of Acceptance in the form of Exhibit A with respect to all cars.

If Lessee rejects any car, Lessor shall have the right to have the rejected car inspected by an inspector acceptable to both Lessor and Lessee. The cost of such inspection will be paid by Lessor if the cause for rejection is affirmed by the inspector, otherwise such cost will be borne by Lessee. The Lessee shall be deemed to have accepted any car for which the inspector determines that good cause for rejection did not exist. The decision of the inspector shall be final and binding upon the parties.

Lessee's acceptance, however affected, shall be deemed effective as of the delivery date and the monthly rentals as hereinafter set forth shall accrue from the delivery date. Such acceptance shall conclusively establish that such cars conform to the applicable standards set forth in the Rider(s) and the Interchange Rules.

1

**PROPOSED ORDER**

**UNITED STATES BANKRUPTCY COURT**
**MIDDLE DISTRICT OF GEORGIA**
**ALBANY DIVISION**

IN RE:

SOUTHWEST GEORGIA ETHANOL, LLC,

CHAPTER 11

Case No. _____

Debtor.

**ORDER AUTHORIZING DEBTOR'S CONTINUED PERFORMANCE OF ITS**
**OPERATION AND MAINTENANCE AGREEMENT AND ITS SERVICES**
**AGREEMENT WITH**
**FIRST UNITED ETHANOL, LLC**

Upon the motion (the "Motion")[1] of the Debtor for an order, pursuant to section 363 of

the Bankruptcy Code, authorizing the Debtor to continue to perform under two executory

contracts dated as of December 6, 2007 with an affiliate of the Debtor, namely, First United

Ethanol, LLC ("FUEL") until such time as the Debtor obtains an order authorizing the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion.

ATLANTA:5282367.1

assumption or rejection of such executory contracts and upon the Kamp Declaration; and due and sufficient notice of the Motion having been given under the particular circumstances; and it appearing that no other or further notice need be provided; and it appearing that the relief requested by the Motion is in the best interests of the Debtor's estate, its creditors, and other parties in interest; and after due deliberation thereon; and sufficient cause appearing therefor, it is hereby

**ORDERED, ADJUDGED, AND DECREED THAT:**

1.      The Motion is GRANTED.

2.      The Debtor is authorized to continue performing under the Management Agreements consistent with its past practices until such time as the Debtor obtains an order authorizing the assumption or rejection of such executory contracts.

3.      The Debtor shall maintain records of all transfers to FUEL so that all transfers and transactions shall be adequately and promptly documented in, and ascertainable from, the Debtor's books and records, to the same extent as maintained prior to the commencement of this Chapter 11 case.

4.      The Debtor's performance under the Management Agreements shall not constitute an assumption of the Management Agreements under section 365 of the Bankruptcy Code, or an agreement by the Debtor to assume them, nor otherwise preclude the Debtor from seeking the Court's authority to reject the Management Agreements.

5.      The requirements of Bankruptcy Rule 6004(a) are waived.

6.      Notwithstanding Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon entry hereof.

7.      The requirements set forth in Bankruptcy Rule 6003(b) are satisfied by the contents of the Motion.

ATLANTA:5282367.1

8.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order

9.      The Debtor shall, within three (3) business days hereof, serve a copy of this Order on all parties that received notice of the Motion, as well as all parties that have appeared in this Chapter 11 case and requested notice since the Debtor filed the Motion, and file a certificate of service evidencing such service.

10.      Notwithstanding anything to the contrary in this Order, the relief herein is granted solely to the extent that it is consistent with the *Interim Order (I) Authorizing the Debtor to (A) Obtain Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 363(e), 364(c), 364(d)(1), 364(e), and 507(b) and (B) Utilize Cash Collateral of Prepetition Secured Parties, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rules 4001(b) and 4001(c), and (IV) Granting Related Relief* (the "Interim Order") and the Final Order (as defined in the Interim Order) with respect thereto, as applicable, and solely to the extent any payment authorized by this Order is provided for in the Approved Budget (as defined in the Interim Order or the Final Order, as applicable).

**- End of Document -**

ATLANTA:5282367.1

**Prepared and Presented by:**

MCKENNA LONG & ALDRIDGE LLP

s/ J. Michael Levengood
Gary W. Marsh
Georgia Bar No. 471290
J. Michael Levengood
Georgia Bar No. 447934
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
404-527-4000 (phone)
404-527-4198 (fax)
gmarsh@mckennalong.com
mlevengood@mckennalong.com

*Proposed Counsel for Southwest Georgia
Ethanol, LLC, Debtor in Possession*

ATLANTA:5282367.1