# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

| | |
|---|---|
| IN RE:<br><br>SOUTHWEST GEORGIA ETHANOL, LLC,<br><br><br>Debtor. | CHAPTER 11<br><br>Case No. _____ |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(C), 363(D), 363(E), 364(C), 364(D)(1), 364(E), AND 507(B), AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED PARTIES, (II) GRANTING ADEQUATE PROTECTION TO SECURED PARTIES, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(B) AND 4001(C), AND (IV) GRANTING RELATED RELIEF**

COMES NOW, Southwest Georgia Ethanol, LLC, the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Debtor"), and hereby moves (this "Motion") pursuant to sections 105, 361, 362, 363(c), 363(d), 363(e), 364(c), 364(d)(1), 364(e) and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532, as amended (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the entry of the proposed interim order (the "Interim Order") and the proposed final order (the "Final Order" and, together with the Interim Order, the "DIP Orders"), (I) authorizing the Debtor to (A) obtain post-petition financing (the "DIP Facility") consisting of a super priority non-amortizing revolving credit facility (the "DIP Revolving Loans") in an aggregate principal amount not to exceed $10 million (the "DIP Revolving Commitment"), of which up to $5 million shall be available upon entry of the Interim Order (the "DIP Revolving Interim Commitment"), subject to the terms and conditions of the

DIP Loan Documents (as defined below), with WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "DIP Agent") for itself and a syndicate of financial institutions (the "DIP Lenders" and Amarillo National Bank ("DIP Accounts Bank") and, together with the DIP Agent and the DIP Lenders, the "DIP Secured Parties"), pursuant to the terms of the Interim Order and that certain Debtor-in-Possession Credit Agreement, by and among the Debtor, the DIP Agent and the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement," and together with any related documents and instruments delivered pursuant to or in connection therewith (including the "Financing Documents"[1] referenced therein), the "DIP Loan Documents"), as generally summarized by the Debtor-In-Possession Credit Facility Term Sheet, attached hereto as Exhibit A (the "DIP Term Sheet") and (B) use cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code ("Cash Collateral"), on the terms and conditions set forth in the Interim Order; (II) granting adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") granted to and for the benefit of the Debtor's prepetition senior secured lenders, including WestLB, as prepetition Interest Rate Protection Provider (such lenders in such capacities, the "Prepetition Lenders") under that certain Credit Agreement, dated as of November 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Prepetition Credit Agreement"), among the Debtor, the Prepetition Lenders, WestLB, as administrative agent (in such capacity and in the capacity of collateral agent under the security documents for the Prepetition Obligations (as defined herein) on behalf of the Prepetition Lenders, the "Prepetition Agent") and as a Prepetition Lender, securing the

---

[1] As defined in the DIP Credit Agreement.

Debtor's obligations (the "Prepetition Obligations") under the Prepetition Credit Agreement, the Prepetition Security Documents (as defined below) and all collateral and ancillary documents executed or delivered in connection therewith (the "Prepetition Facility Documents"), as more fully set forth in the Interim Order;  (III) scheduling of a final hearing (the "Final Hearing") on the Motion no later than February 28, 2011 to consider entry of a Final Order authorizing the borrowings under the DIP Loan Documents on a final basis and approve the form of notice procedures with respect thereto; and (IV) granting related relief, including the modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit (a) the Debtor, (b) the DIP Secured Parties, and (c) the Prepetition Agent, the Prepetition Lenders and Amarillo National Bank, as prepetition Accounts Bank ("Prepetition Accounts Bank" and, together with the Prepetition Agent and the Prepetition Lenders, the "Prepetition Secured Parties") to implement the terms of the Interim Order.  In support of this Motion, the Debtor relies upon, and incorporates by reference herein, the Declaration of Lawrence Kamp in Support of First Day Motions (the "Kamp Declaration"), filed concurrently herewith.  In further support of the Motion, the Debtor, by and through its undersigned counsel, respectfully represents:

### Bankruptcy Rule 4001 Concise Statement[2]

1.      Pending the Final Hearing, the financing, use of Cash Collateral, grant of adequate protection and other related relief will be implemented on an interim basis pursuant to the terms of the proposed Interim Order and the DIP Credit Agreement governing the terms and conditions of the DIP Facility.

---

[2]      All capitalized terms used herein but not otherwise defined, shall have the meanings ascribed to them in the DIP Credit Agreement or the Interim Order, as applicable.

ATLANTA:5282361.2

2.     Material provisions of the DIP Facility are set out in the following sections of the

DIP Credit Agreement and/or the proposed Interim Order:[3]

    (a)    Borrower. Southwest Georgia Ethanol, LLC (the "Borrower").

    (b)    Borrowings. The DIP Facility shall consist of a revolving credit facility to be made available to the Borrower in the aggregate maximum principal amount of $10 million, which facility may include a letter of credit subfacility.

        The DIP Revolving Interim Commitment shall be made available during the period from the date of entry of the Interim Order through the date of entry of the Final Order approving the DIP Facility and the balance of the DIP Revolving Commitment shall be available after entry of the Final Order.

        DIP Credit Agreement Sections 2.01 and 2.06; Interim Order ¶ (1).

    (c)    DIP Lender(s). Any person who shall become a lender under the DIP Facility (collectively, the "DIP Lenders").

    (d)    DIP Agent. WestLB, in such capacity as DIP agent (the "DIP Agent").

    (e)    Operating Budget. There shall be an operating budget, subject to the approval of the DIP Agent and the DIP Lenders, consisting of the Borrower' estimated projected cash flow position on a rolling 13-week basis (the "Approved Budget"), commencing as of the Closing Date. Upon approval of the DIP Agent and the DIP Lenders of the Approved Budget, any subsequent changes to the Approved Budget may be made only on approval of the DIP Agent and the DIP Lenders holding a majority of the outstanding DIP Revolving Loans and DIP Commitments (other than Defaulting Lenders (as defined below), the "Required DIP Lenders"). The Borrower will be allowed a 10% variance on the aggregate amounts set forth in the Approved Budget. The Approved Budget shall include monthly reimbursement of the reasonable fees and expenses of the professionals of the DIP Agent, the DIP Lenders and the Prepetition Agent.

        DIP Credit Agreement Section 7.01(k); Interim Order ¶ D.

---

[3]     The summaries and descriptions of the terms and conditions of the DIP Credit Agreement and Interim Order set forth in this Motion are intended solely for informational purposes to provide the Court and parties in interest with an overview of the significant terms thereof and should only be relied upon as such. The summaries and descriptions are qualified in their entirety by the DIP Credit Agreement and the Interim Order. In the event there is a conflict between this Motion and the DIP Credit Agreement or the Interim Order, the DIP Credit Agreement or the Interim Order, as applicable, shall control in all respects.

ATLANTA:5282361.2

(f)    <u>Additional Debt and Liens</u>. The Interim Order and the Final Order shall contain provisions prohibiting the Borrower from incurring any other indebtedness (i) which ranks *pari passu* with or senior to the DIP Revolving Loans or (ii) in connection with which the Borrower grants a first or second priority lien under section 364 of the Bankruptcy Code.

DIP Credit Agreement Sections 2.14 and 7.02(u); Interim Order ¶¶ 21.

(g)    <u>Mandatory Prepayments</u>. The Borrower will be required to prepay certain amounts under the DIP Facility upon receipt of (i) Project Document Termination Payments; (ii) Condemnation Proceeds; (iii) Insurance Proceeds; and (iv) Net Cash Proceeds of Dispositions. Unless agreed to otherwise by the Required DIP Lenders, mandatory prepayments of principal outstanding under the DIP Facility shall permanently reduce the DIP Revolving Commitments.

Mandatory prepayments shall be applied, <u>first</u>, to the payment of all costs, fees, expenses and indemnities then due and payable to the DIP Secured Parties (including attorneys' and professionals' fees); <u>second</u>, to the payment of any accrued and unpaid interest due and payable on the DIP Revolving Loans *pro rata* among the DIP Lenders (other than any DIP Lender that has defaulted on its obligations to advance DIP Revolving Loans (a "<u>Defaulting Lender</u>")) with respect to their respective outstanding principal amounts; <u>third</u>, to the repayment of principal of DIP Revolving Loans (and permanent reduction of the DIP Revolving Commitment associated therewith) *pro rata* among the DIP Lenders (other than the Defaulting Lenders) with respect to their respective outstanding principal amounts until repaid in full; <u>fourth</u>, to the payment of all accrued and unpaid interest then due and payable on the DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; <u>fifth</u>, to the payment of principal of DIP Revolving Loans *pro rata* among the Defaulting Lenders based on its respective outstanding principal amounts on the date of such prepayment; and, if a letter of credit subfacility is made available under the DIP facility, <u>sixth</u>, to be held as cash collateral up to an amount equal to the maximum aggregate amount available to be drawn under letters of credit issued under the DIP Revolving Commitment to secure the repayment of any DIP Revolving Loans that may result from a draw on any such letter of credit.

DIP Credit Agreement Section 3.08.

(h)    <u>Interest Rate and Default Rate</u>. Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Revolving Loans at a rate equal to LIBOR + 9% per annum. LIBOR shall be defined as the greater of (i) 4% per annum and (ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average

ATLANTA:5282361.2

British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars for a period of one month and shall contain appropriate protection to ensure that such rate is not less than a DIP Lender's cost of funds.

The default rate will be the then applicable interest rate plus 2.0% per annum.

DIP Credit Agreement Sections 3.02, 3.03 and 3.04; Interim Order 5.

(i)    <u>Maturity</u>.  The Borrower shall repay any outstanding advances and loans under the DIP Facility in full in immediately available funds on the Maturity Date, to be defined as the earliest of (i) six (6) months after the Closing Date; (ii) the acceleration of all or any portion of the obligations under the DIP Facility; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order shall have been entered and become effective prior thereto; (iv) conversion of any of the Chapter 11 case (defined below) to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; (v) dismissal of any of the Chapter 11 case unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; and (vi) the effective date of any Borrower's plan of reorganization confirmed in the Chapter 11 case.

DIP Credit Agreement Section 2.10 and definition of "<u>Maturity Date</u>".

(j)    <u>Events of Default</u>.  The DIP Facility includes Events of Default customary for DIP loan transactions and investments of a similar size and nature, including, but not limited to:

- The use of proceeds inconsistent with the Approved Budget;

- The payment of claims existing prior to the Petition Date or prior to a confirmed plan of reorganization (other than as set forth in the Approved Budget or payment is approved by the DIP Agent and authorized by an order of the Bankruptcy Court);

- The Operation & Maintenance Agreement and/or the Services Agreement shall be terminated because of a breach by First United Ethanol, LLC, a Georgia limited liability company, and not replaced with an arrangement satisfactory to the DIP Agent and the Required DIP Lenders;

- Dismissal or conversion to Chapter 7 of the Chapter 11 case without the written consent of the DIP Agent and the DIP Lenders or the appointment of a trustee or examiner in the Chapter 11 case

6

with any powers to operate or manage the financial affairs of the Borrower;

- The entry of a final order that, in the sole determination of the DIP Agent and the DIP Lenders, in any way modifies, stays, reverses, or vacates the DIP Orders or the DIP Facility in the Chapter 11 case in a manner adverse to the DIP Agent and the DIP Lenders without the written consent of the DIP Agent and the Required DIP Lenders or either of the DIP Orders or the DIP Facility ceases to be in full force and effect;

- The entry of the Interim Order shall not have occurred within 10 days after the Petition Date;

- The entry of the Final Order shall not have occurred within 30 days after the date of entry of the Interim Order;

- The Borrower petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility;

- The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lenders on the assets of the Borrower (other than the Carve-Out);

- The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Borrower;

- The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations (defined below) under the DIP Facility on or before the effective date of such plan;

- The Borrower violates or breaches any DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any violation or breach of any DIP Order in the Chapter 11 case in a manner adverse to the DIP Agent or the DIP Lenders in the sole determination of the DIP Agent and the DIP Lenders;

- (A) The Borrower engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Prepetition Obligations or the liens on or security interests in the assets of the Borrower securing the DIP Facility or the Prepetition Obligations, including, without limitation, seeking to equitably subordinate or avoid the liens securing the Prepetition Obligations, or (B) the Borrower engages in or supports any

7

investigation or its assertion of any claim or cause of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, it shall not constitute an Event of Default if the Borrower provides basic loan information with respect to the Prepetition Obligations to a party in interest or is compelled to provide information by an order of the Bankruptcy Court and provides prior written notice to the DIP Agent and the DIP Lenders of the intention or requirement to do so;

- Any person shall seek a determination under Section 506(a) of the Bankruptcy Code (a "Section 506(a) Determination") with respect to the Prepetition Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lenders;

- The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the collateral securing the DIP Facility;

- The use of Cash Collateral other than as expressly contemplated by the DIP Orders and the Approved Budget prior to the indefeasible payment in full of the DIP Obligations and termination of the DIP Revolving Commitments thereunder;

- The consummation of the sale of any material portion of the Borrower' assets unless consented to by the DIP Agent and the Required DIP Lenders; and

- Breach of any covenants or representations and warranties in the DIP Loan Documents or the DIP Orders, including, without limitation, failure to make any Mandatory Prepayments.

DIP Credit Agreement Section 8.01.

(k)     Liens. All obligations of the Borrower under and with respect to the DIP Facility (the "DIP Obligations") shall at all times, subject to the Carve-Out, (i) subject to Section 364(d)(1) of the Bankruptcy Code, be secured by a fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected priming security interest in and Lien upon the Collateral (as such term is defined in the Prepetition Credit Agreement) and (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a fully perfected first priority, valid, binding, enforceable, non-avoidable and automatically perfected security interest in and Lien upon the Collateral (other than Collateral referenced in clause (i)) whether created, existing or acquired prior or subsequent to the commencement of the Chapter 11 case. Such Liens (the "DIP Liens"), and the priorities accorded to the DIP Obligations, shall have the priority

8

and senior secured status afforded by Sections 364(c) and 364(d)(l) of the Bankruptcy Code, all as more fully set forth in the Interim Order and the Final Order.

The DIP Liens on Collateral of the Borrower will not be subject to challenge and will attach and become valid and perfected upon entry of the Interim Order without any requirement of any further action by the DIP Agent. Other than the DIP Liens, the Collateral will be free and clear of all Liens, claims and encumbrances other than Permitted Liens.

The DIP Obligations will enjoy super-priority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 328, 331, 503(b), 506(c) (Section 5.06(c) being subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provision of the Bankruptcy Code, subject to the Carve-Out.

As used in the DIP Credit Agreement, the term "Carve-Out" shall mean (i) the aggregate amount of any unpaid fees, costs and expenses set forth in the Initial DIP Budget incurred on or prior to the Carve-Out Date by the professionals retained by the Borrower or any professionals retained by the Committee (collectively, the "Professionals") to the extent allowed by an order of the Bankruptcy Court, plus (ii) those fees, costs and expenses incurred by the Professionals after the Carve-Out Date and subsequently allowed by order of the Bankruptcy Court and in compliance with the Initial DIP Budget in an amount not to exceed $75,000 in the aggregate, plus (iii) fees required to be paid to the Clerk of the Bankruptcy Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930; provided, that following the Carve-Out Date, any amounts paid to the Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis.

"Carve-Out Date" means the earlier of (i) the date on which the Borrower receives a notice of an Event of Default and (ii) the Maturity Date.

No portion of the proceeds of the Loans, the Collateral or the Carve-Out shall be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the Prepetition Obligations, or the Liens on the assets of the Borrower securing the DIP Facility or the Prepetition Obligations or (ii) assert any claim against the DIP Agent, the DIP Lenders or the Prepetition Secured Parties; provided, however, that (a) the proceeds of the Loans may be used to seek a Section 506(a) Determination and (b) up to $15,000 of the proceeds of the Loans may be used by the Committee to investigate potential claims arising out of, or in connection with, the Prepetition Credit Agreement or the security interests and liens securing the Prepetition Obligations. The Carve-Out shall be reduced by an amount equal to all proceeds of the Loans used pursuant to the foregoing proviso.

ATLANTA:5282361.2

DIP Credit Agreement Sections 2.09, 2.11 and 7.01(g)(ii) and definitions of Carve-Out and Carve-Out Date; Interim Order in 9, 10, 13, 14.

(l)    <u>Adequate Protection</u>.  As adequate protection to the Prepetition Lenders for any diminution in the value of its interests in the Borrower' property resulting from (i) the priming liens granted in favor of the DIP Agent and the DIP Lenders under the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of the Borrower' property (including any Cash Collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

- The Prepetition Lenders will, subject to the terms of any DIP Order, maintain any of its liens in existence on the Petition Date (the "<u>Prepetition Liens</u>") on the DIP Collateral, which liens shall be junior and subordinate to the DIP Liens and the Carve-Out;

- The Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted replacement liens on, and security interests in, all of the DIP Collateral, which replacement liens shall be subject only to (1) the liens on, and security interests in, the DIP Collateral granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, (2) any Permitted Liens (as defined in the Prepetition Credit Agreement) and (3) the Carve-Out;

- Pursuant to Section 507(b) of the Bankruptcy Code, the Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Borrower (the "<u>507(b) Claim</u>"), subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, and (2) the Carve-Out; and

- As additional adequate protection, the Borrower shall reimburse the Prepetition Lenders on a monthly basis for the reasonable professional fees and expenses of the Prepetition Agent otherwise permitted under the Prepetition Credit Agreement arising (i) before the Petition Date and (ii) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; <u>provided</u>, <u>however</u>, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations.

ATLANTA:5282361.2

Notwithstanding the foregoing, the Prepetition Agent and the Prepetition Lenders shall be granted adequate protection as provided herein to the extent the Prepetition Liens are valid, enforceable, perfected and non-avoidable.

Interim Order ¶¶ 11.

(m)     Fees.  The Borrower will pay the following fees on account of the DIP Facility:

- Facility Fee.  A fee of 2.0% of the DIP Revolving Commitment payable to the DIP Lenders on the Closing Date.

- Structuring Fee.  A fee of 1.0% of the DIP Revolving Commitment payable to the DIP Agent on the Closing Date.

- Unused Commitment Fee.  A fee on the unused portion of the DIP Revolving Commitment of 2.0% per annum, payable monthly.

- All reasonable out-of-pocket fees, costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders (including, without limitation, reasonable out-of-pocket prepetition and postpetition fees, costs, expenses and disbursements of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders) to be payable by the Borrower under the DIP Facility on demand whether or not the transactions contemplated hereby are consummated; provided, however, the Borrower shall only be required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in the Interim Order.

DIP Credit Agreement Sections 3.11, 10.06.

3.      The provisions described in Bankruptcy Rule 4001(b)(1)(B)(i)-(iv) are set forth at the following sections of the Interim Order:

(a)     *Name of Each Entity with Interest in Cash Collateral.*  Interim Order pp. 2-3; ¶ C.

(b)     *Purposes of Use of Cash Collateral.*  Interim Order ¶ H.

(c)     *Material Terms, Including Duration, of Use of Cash Collateral.*  Interim Order ¶¶ D, H.

ATLANTA:5282361.2

(d)     *Liens, Cash Payments, or Other Adequate Protection to Be Provided to Each Entity with Interest in Cash Collateral.* Interim Order ¶¶ 11, 12.

4.     In addition, the provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set out at the following sections of the DIP Credit Agreement and the Interim Order:

(a)     *Grant of Priority or a Lien on Property of the Estate.* DIP Credit Agreement Sections 2.08; 2.11; Interim Order ¶¶ 9, 10.

(b)     *Adequate Protection or Priority for a Claim that Arose Before the Commencement of the Case.* Interim Order ¶ 11.

(c)     *Determination of the Validity, Enforceability, Priority, or Amount of a Claim that Arose Before the Commencement of the Case.* Interim Order ¶ C.

(d)     *Waiver or Modification of the Automatic Stay.* DIP Credit Agreement Sections 2.11(c), 8.02(a); Interim Order ¶ 24.

(e)     *Waiver or Modification of Authority to File a Plan, Seek an Extension of Time in which the Debtor has the Exclusive Right to File a Plan, Requests Use of Cash Collateral, or Requests Authority to Obtain Credit.* N/A.

(f)     *Establishment of Deadlines for Filing a Plan, for Approval of a Disclosure Statement, for a Hearing on Confirmation, or for Entry of a Confirmation Order.* N/A.

(g)     *Waiver or Modification of Applicability of Non Bankruptcy Law Relating to the Perfection of a Lien on Property of the Estate, or on the Foreclosure or Other Enforcement of the Lien.* DIP Credit Agreement Section 2.08(b); Interim Order ¶ 23.

(h)     *Release, Waiver, or Limitation on any Claim or Cause of Action Belonging to the Estate.* DIP Credit Agreement Sections 2.13; Interim Order in ¶33.

(i)     *Indemnification of Any Entity.* DIP Credit Agreement Sections 4.07(c), 10.08, 10.11(f); Interim Order ¶¶ 6, 18.

(j)     *Release, Waiver or Limitation on Rights under Section 506(c).* DIP Credit Agreement Section 8.01(r)(vii); Interim Order ¶ 19.

(k)     *Liens Granted on Claims Arising Under Chapter 5.* N/A.

ATLANTA:5282361.2

## JURISDICTION AND VENUE

5.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## BACKGROUND

6.      On the date hereof (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtor is authorized to operate its business as a debtor-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

7.      No creditors' committee has been appointed by the United States Trustee in this Chapter 11 case.  No trustee or examiner has been appointed in this Chapter 11 case.

8.      A description of the Debtor's business, the reasons for filing this Chapter 11 case, and the relief sought from this Court to allow for a smooth transition into operations under Chapter 11 are set forth in the Kamp Declaration filed with the Court.

## RELIEF REQUESTED

9.      By this Motion, the Debtor requests the authority to enter into the DIP Facility with the DIP Lenders, pursuant to the terms of this Motion, the DIP Orders, and the DIP Credit Agreement.

10.     Pending entry of the Final Order, the Debtor requests that the Court authorize the Debtor, on an interim basis, to (i) borrow up to $10 million pursuant to the terms and conditions of the DIP Facility, (ii) use Cash Collateral as provided in the Interim Order, and (iii) provide adequate protection in favor of the Prepetition Lenders as described herein and in the Interim Order.  Moreover, the Debtor requests that the Court approve the proposed notice of the Final Hearing and the adequacy of the proposed service thereof, and schedule the Final Hearing.

ATLANTA:5282361.2

### Debtor's Proposed Postpetition Financing

**Immediate Need for Postpetition Financing**

11.     The Debtor lacks sufficient unencumbered funds with which to operate and maintain its business and assets during the pendency of this Chapter 11 case. As described more fully in the Kamp Declaration, the Debtor's ability to satisfy critical operating expenses is essential to the Debtor's ability to maintain its asset values. Accordingly, the Debtor has an immediate need for debtor-in-possession financing and the use of Cash Collateral as set forth more fully herein.

**Background of the DIP Facility**

12.     To provide the Debtor with the funding necessary to fulfill its administrative and operational obligations throughout the duration of this Chapter 11 case, the Debtor requires a postpetition lending facility. In exploring its options, the Debtor recognized that the obligations owed to the Prepetition Lenders are secured by all of its assets, and therefore, (i) the liens of these prepetition secured creditors would have to be primed to obtain postpetition financing, (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of the Prepetition Lenders, or (iii) postpetition financing would have to be extended on an unsecured basis. The Prepetition Lenders advised the Debtor's representatives that they would not consent to be primed by another lender group, therefore borrowing from another lender or lending group that required security senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In view of these circumstances, the DIP Lenders were willing to extend postpetition financing and thus prime their own prepetition security interests. Ultimately, the Debtor concluded that the DIP Credit Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Credit Agreement permits the

14

Debtor to secure the postpetition financing required for its reorganization without having to prime the Prepetition Credit Agreement through an extended, contested hearing.

13.     A comparison of the DIP Lenders' proposal to the postpetition facilities obtained by the debtor in the VeraSun, Aventine Renewable Energy and Pacific Ethanol Chapter 11 cases from the United States Bankruptcy Court for the District of Delaware shows substantial similarities, particularly with respect to pricing and fees.

14.     Importantly, the DIP Credit Agreement provides that the Debtor may draw funds immediately (on an interim basis) to meet its administrative and operational obligations during this Chapter 11 case. Finally, because the DIP Lenders are comprised principally of the parties to the Prepetition Credit Agreement, they have a substantial base of knowledge with respect to the Debtor's business and assets that provide significant benefits, including, but not limited to, the speed with which they would be able to close the proposed DIP Facility. Consequently, the Debtor determined that the DIP Lenders' proposed postpetition financing is the best financing option available under the circumstances.

15.     The Debtor and the DIP Lenders engaged in vigorous and extensive arms'-length negotiations with respect to the terms and conditions of the DIP Credit Agreement. Indeed, the Debtor estimates that over fifty (50) hours were spent in face-to-face meetings and conference calls and hundreds of e-mails and other forms of communications were directed between the parties.

**Use of the DIP Facility**

16.     Pursuant to the DIP Credit Agreement, the Debtor may use the proceeds of the DIP Facility to pay the transaction costs related to the closing of the DIP Facility and, thereafter, to finance the Chapter 11 case and for other general corporate purposes pursuant to the Approved Budget to be attached to the DIP Orders.

ATLANTA:5282361.2

17.     Each of the proposed uses of the DIP Facility confers a direct benefit upon the Debtor and its estate.  Among other things, the DIP Facility allows the Debtor to finance the ordinary costs of its operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.

### Highlighted Provisions of the DIP Facility

18.     The Debtor highlights the following provisions:

(a)     ***Binding the Estate to Validity, Perfection, or Amount of Secured Creditor's Prepetition Lien.***  Interim Order ¶¶ C, 33.

(b)     ***Waiver of Rights of Estate Under Section 506(c) as to the Final Order.***  Interim Order ¶ 19.

(c)     ***Granting Liens Solely on Debtor's Section 544, 545, 546, 547, 548, and 549 Claims and Causes of Action.***  N/A.

(d)     ***Using Postpetition Loans from Prepetition Secured Creditor to Pay Part or All of Secured Creditor's Prepetition Debt.***  DIP Credit Agreement Section 2.02; Interim Order ¶ 4.

19.     The provisions of the DIP Credit Agreement were extensively negotiated.  The DIP Credit Agreement enables the Debtor to obtain the financing necessary to maintain its operations, pursue reorganization, and maximize the value of its estate.

### Proposed Adequate Protection and Use of Cash Collateral

20.     In order to address its working capital needs and fund its reorganization efforts, the Debtor also requires the use of Cash Collateral of the Prepetition Lenders.  Coupled with the proceeds of the DIP Facility, the use of Cash Collateral will provide the Debtor with necessary additional capital to operate its business, maximize value, and successfully reorganize under chapter 11.

21.     The Prepetition Lenders have consented to the Debtor's use of Cash Collateral in the ordinary course of business, subject to the Adequate Protection Liens and limited payments

ATLANTA:5282361.2

discussed below and the other terms and conditions set forth in the Interim Order. The Debtor will demonstrate at the Final Hearing that the proposed adequate protection discussed below satisfies the requirements of sections 363(e) and 364(d)(1)(B) of the Bankruptcy Code.

22.    The Prepetition Lenders are entitled, pursuant to sections 361 and 363(e) of the Bankruptcy Code, to adequate protection. As adequate protection, the Prepetition Lenders shall be granted liens to secure the Prepetition Lenders' claim for any diminution of the value in the Prepetition Collateral or its interests in the Prepetition Collateral under the Prepetition Credit Agreement, to the extent that there is a diminution in the value of its interests in the Prepetition Collateral from and after the Petition Date resulting from (i) the use of such collateral and cash constituting proceeds of such collateral, (ii) the imposition of the DIP Liens, and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code (the "Adequate Protection Liens").

23.    The Adequate Protection Liens shall be (i) subject and subordinate only to (i) the DIP Liens, (ii) the Permitted Liens (as defined in the Interim Order) and (iii) the Carve-Out. The Adequate Protection Liens are and shall be valid, perfected, allowed, enforceable, unavoidable and not subject to challenge, dispute or subordination, at the time and date of the entry of the Interim Order (subject to the investigation rights of any Committee appointed in this Chapter 11 case, as outlined in paragraph 14 of the Interim Order). The Prepetition Agent may, without any further consent of any party, are authorized and directed to take, execute and deliver such instruments (in each case without representation or warranty of any kind) to enable the Prepetition Agent to further validate, perfect, preserve and enforce the Adequate Protection Liens, and to provide additional evidence of perfection.

ATLANTA:5282361.2

24.    In addition to the Adequate Protection Liens, the Debtor proposes to grant and/or pay the Prepetition Lenders the following as adequate protection (i) a Section 507(b) Claim, (ii) the Debtor shall reimburse the Prepetition Lenders on a monthly basis for the reasonable professional fees and expenses of the Prepetition Agent and as otherwise permitted under the Prepetition Credit Agreement arising (a) before the Petition Date and (b) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; provided, however, that if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations; and (iii) such additional adequate protection, as set forth above and in the Interim Order.

25.    The foregoing claims are to be granted and the payments are to be made to the Prepetition Lenders because, among other things, the Debtor will continue to use Cash Collateral and other Prepetition Collateral in the Debtor's ongoing business and operating facilities until the entry of the Final Order.  Such payments are also being made for the purpose of, among other things, protecting the Prepetition Lenders' claims, obligations, and collateral interests from such use and the potential depreciation and deterioration of Cash Collateral and Prepetition Collateral as a result of such use and as consideration for the Prepetition Lenders' consent to the use of such collateral under the terms of the Interim Order.

## The DIP Facility Should Be Authorized

26.    Approval of the DIP Credit Agreement will provide the Debtor with immediate and ongoing access to borrowing availability to pay the Debtor's current and ongoing operating expenses, [including postpetition wages and salaries (through FUEL)] and utility and vendor costs.  Unless these expenditures are made, the Debtor would be forced to cease operations,

ATLANTA:5282361.2

which would result in irreparable harm to its business and going concern value and would jeopardize the Debtor's ability to reorganize. The Debtor's reorganization depends in large part on maintaining and/or restoring customer and employee confidence and maintaining the operation of its business as it restructures. Accordingly, the Debtor has an immediate need to access the DIP Facility and to use Cash Collateral in order to, among other things, permit the orderly operation of its business by timely procuring and paying vendors, providing customer care and paying the employees at its facility, thereby maximizing recoveries for the Debtor's stakeholders. The Debtor believes that such financing and use of Cash Collateral will enable it to stabilize operations and ultimately, in conjunction with a reorganization, restore its profitability. Accordingly, the timely approval of the relief requested herein is imperative.

27.    Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in section 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d) of the Bankruptcy Code allows a debtor to obtain credit secured by a senior or equal lien on property of the estate that is subject to a lien, provided that (i) the debtor is unable to obtain such credit otherwise, and (ii) there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted. 11 U.S.C. § 364(d).

28.    The Debtor's liquidity needs can be satisfied only if the Debtor is immediately authorized to obtain the postpetition financing set forth herein. The Debtor has been unable to

ATLANTA:5282361.2

(A) procure sufficient financing (i) in the form of unsecured credit allowable under section 503(b)(1), (ii) as an administrative expense under section 364(a) or (b), (iii) in exchange for the grant of a super-priority administrative expense claim pursuant to section 364(c)(1), (iv) without granting priming liens pursuant to section 364(d), and (B) obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.  Therefore, the Debtor proposes to obtain the financing set forth in the DIP Credit Agreement by providing, *inter alia*, super-priority claims, security interests, and liens pursuant to sections 364(c)(1), (2), (3) and (d) of the Bankruptcy Code.

29.    Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Debtor negotiated the DIP Facility with the DIP Lenders extensively and at arms-length.  Bankruptcy courts routinely defer to the debtor's business judgment on most business decisions, including the decision to borrow money.  See, e.g., Group of Institutional Investors v. Chicago, Mil., St. P., & Pac. R.R. Co., 318 U.S. 523, 550 (1943); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985) ("Business judgments should be left to the board room and not to this Court."); In re Lifeguard Indus., Inc., 37 B.R. 3, 17 (Bankr. S.D. Ohio 1983) (same).  "More exacting scrutiny would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1311 (5th Cir. 1985).  Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.  See, e.g., Bray v. Shenandoah Fed. Say. & Loan Ass'n (In re Snowshoe

ATLANTA:5282361.2

Co.), 789 F.2d 1085, 1088 (4th Cir. 1986); In re Ames Dep't Stores, Inc., 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("[C]ases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest."). See also In re Funding Sys. Asset Mgmt. Corp., 72 B.R. 87, 88 (Bankr. W.D. Pa. 1987); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981); In re Simasko Prod. Co., 47 B.R. 444, 449 (D. Colo. 1985).

30.   Furthermore, section 364(d) does not require that a debtor seek alternative financing from every possible lender; rather, the debtor simply must demonstrate sufficient efforts to obtain financing without the need to grant a senior lien. In re Snowshoe Co., 789 F.2d 1085, 1088 (demonstrating that credit was unavailable absent the senior lien by establishment of unsuccessful contact with other financial institutions in the geographic area); In re 495 Cent. Park Ave. Corp., 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (debtor testified to numerous failed attempts to procure financing from various sources, explaining that "most lend money only in return for a senior secured position"); In re Aqua Assocs., 123 B.R. 192, 196 (Bankr. E.D. Pa. 1991) (debtor adequately established that some degree of priming loan was necessary if Debtor was to obtain funding). It is well established that the appropriateness of a proposed post-petition financing facility must be considered in light of current market conditions. See, e.g., In re Lyondell Chem. Co., No. 09-10023, Transcript of Record at 734-35:24-1 (Bankr. S.D.N.Y. Mar. 5, 2009) (recognizing "the terms that are now available for DIP facilities in the current economic environment aren't as desirable" as they have been in the past); In re Snowshoe Co., Inc., 789 F.2d 1085, 1088 (4th Cir. 1986) (noting that a debtor is not required to seek credit

ATLANTA:5282361.2

from every possible lender before determining such credit is available). Indeed, where there are few lenders likely to be able and willing to extend the necessary credit to the debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct . . . an exhaustive search for financing." See, e.g., In re Sky Valley, Inc., 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988), aff'd, 99 B.R. 117 (N.D. Ga. 1989).

31.     Substantially all of the Debtor's assets are encumbered and, despite the diligent efforts of the Debtor, the Debtor has been unable to procure the required funding absent granting the proposed super-priority claims and priming liens. The Debtor has negotiated the best terms available to obtain funding it needs to maintain sufficient liquidity to preserve its assets over the course of this Chapter 11 case. The Debtor submits that the circumstances of this Chapter 11 case requires the Debtor to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of its sound business judgment.

32.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented, independent parties in good faith and at arms' length. Accordingly, the DIP Lenders and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

### The Use of Cash Collateral Should Be Approved

33.     Under section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(a) each entity that has an interest in such cash collateral consents; or (b) the court, after notice and a hearing, authorizes such use in accordance with the provisions of this section." 11 U.S.C. § 363(c)(2). The Debtor requires the use of Cash Collateral to fund its day-to-day operations. Indeed, absent such relief, the Debtor's business would be brought to an immediate halt, with damaging consequences for the Debtor and its estate and creditors. The interests of the Prepetition Lenders in Cash Collateral will be protected by the adequate

22

protection set forth above. The Prepetition Lenders have consented to the use of Cash Collateral on the terms set forth herein and in the Interim Order. Accordingly, the Debtor's request to use Cash Collateral in the operation of its business and administration of the Chapter 11 case should be approved.

### The Proposed Adequate Protection Should Be Authorized

34.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that has an interest in property used . . . or proposed to be used by a debtor in possession, the court . . . shall prohibit or condition such use . . . as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. 11 U.S.C. § 361. What constitutes adequate protection must be decided on a case-by-case basis. See MNBank Dallas, N.A. v. O'Conner (In re O'Connor), 808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472 (8th Cir. 1985); In re Shaw Indus., Inc., 300 B.R. 861, 865 (Bankr. W.D. Pa. 2003). The focus of the requirement is to protect a secured creditor from diminution in the value of its interest in the particular collateral during the period of use. See In re Swedeland Dev. Group, Inc., 16 F.3d 552, 554 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

35.    The Prepetition Lenders have agreed to the Debtor's use of Cash Collateral and the Debtor's entry into the DIP Credit Agreement in consideration for the adequate protection provided to them under the DIP Credit Agreement. Moreover, the liens and other protections offered to the Prepetition Lenders will, taken together, sufficiently protect its interest in any collateral taken as security under the Prepetition Credit Agreement. Accordingly, the adequate

ATLANTA:5282361.2

protection proposed here is fair and reasonable and sufficient to satisfy the requirements of sections 363(c)(2) and (e) of the Bankruptcy Code.

### The Automatic Stay Should Be Modified on a Limited Basis

36.     The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to (i) grant the security interests, liens, and super-priority claims described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens; (ii) permit the DIP Lenders to exercise, upon the occurrence and during the continuance of an Event of Default and after three (3) business days' notice thereof, all rights and remedies under the DIP Credit Agreement; and (iii) implement the terms of the proposed DIP Orders.

37.     Stay modifications of this kind are ordinary and standard features of postpetition debtor financing facilities and, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

### Interim Approval Should Be Granted

38.     Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fifteen (15) days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

39.     Pursuant to Bankruptcy Rule 4001(b) and (c), the Debtor requests that the Court conduct an expedited preliminary hearing on this Motion and (a) authorize the Debtor to use Cash Collateral; (b) authorize the Borrower to borrow up to $5 million under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing

ATLANTA:5282361.2

operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the Debtor's estate and all parties in interest; and (c) schedule the Final Hearing.

40.    The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility will provide necessary assurance that the Debtor will be able to meet its near-term obligations. Failure to meet these obligations likely would have a long-term negative impact on the value of the Debtor's business, to the detriment of all parties in interest. Furthermore, the lack of an interim facility would result in accelerated cash demands on the Debtor. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its reorganization efforts.

## The Debtor Satisfies Bankruptcy Rule 6003

41.    Bankruptcy Rule 6003 provides that to the extent relief is necessary to avoid immediate and irreparable harm, a bankruptcy court may approve a motion to "pay all or part of a claim that arose before the filing of the petition" prior to twenty (20) days after the commencement date. Fed. R. Bankr. P. 6003. As described above and in the Kamp Declaration, the Debtor's business operations depend on the DIP Facility. The Debtor submits that the relief requested in this Motion is necessary to avoid immediate and irreparable harm to the Debtor, as described herein, and that Bankruptcy Rule 6003 has been satisfied.

## Waiver of Bankruptcy Rules 6004(a) and (h)

42.    To implement the foregoing successfully, the Debtor seeks a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen-day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h).

ATLANTA:5282361.2

## Notice

43.     No trustee, examiner, or creditors' committee has been appointed in this Chapter 11 case.  Notice of this Motion will be given to:  (a) the Office of the United States Trustee; (b) Jennifer C. Hagle, Esq., counsel to the Prepetition Agent and the DIP Agent; and (c) all parties included on the Debtor's list of twenty (20) largest unsecured creditors.  The Debtor submits that, under the circumstances, no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter the Interim Order, substantially in the form annexed hereto, granting the relief requested in the Motion and such other and further relief as may be just and proper.

This 1st day of February, 2011.

MCKENNA LONG & ALDRIDGE LLP

s/ J. Michael Levengood
Gary W. Marsh
Georgia Bar No. 471290
J. Michael Levengood
Georgia Bar No. 447934
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
404-527-4000 (phone)
404-527-4198 (fax)
gmarsh@mckennalong.com
mlevengood@mckennalong.com

*Proposed Counsel for Southwest Georgia Ethanol, LLC, Debtor in Possession*

ATLANTA:5282361.2

# EXHIBIT A

## DIP Term Sheet

CONFIDENTIAL - FOR DISCUSSION PURPOSES ONLY– NOT A COMMITMENT TO LEND

_____

## TERM SHEET

### Southwest Georgia Ethanol, LLC

### Debtor-in-Possession Credit Facility

*The terms and conditions summarized below are intended as a summary outline of a financing commitment which is conditioned in all respects upon completion of due diligence, negotiation of definitive documentation and final credit approval and do not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive documentation.  No DIP Lender (as defined herein) is under any obligation to make a loan or make any commitment to lend and any such commitment would be subject to, among other conditions, such DIP Lender obtaining any necessary authorizations and approvals and negotiation and execution of definitive documentation in form and substance satisfactory to such DIP Lender.  This document is delivered to you with the understanding that neither it nor its substance shall be disclosed to any third party, except as permitted in the "Confidentiality" section below. Any provision of financial accommodations under such debtor-in-possession credit facility shall be further subject to the terms and conditions and Bankruptcy Court approval, as set forth below.*

*Capitalized terms not defined herein shall have the meaning ascribed to such terms in the Senior Credit Agreement dated as of November 20, 2007 (as amended, supplemented or otherwise modified from time to time, the "Prepetition Credit Agreement"), among Southwest Georgia Ethanol, LLC, as borrower, WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "Prepetition Agent"), WestLB AG, New York Branch, as sole lead arranger, bookrunner and syndication agent, and the lenders signatory thereto (the "Prepetition Lenders").*

## I.    General Terms

| | |
|---|---|
| **Borrower:** | Southwest Georgia Ethanol, LLC, which will be a debtor and debtor-in-possession (in such capacity, the "Borrower") in a case to be commenced in the United States Bankruptcy Court for the Middle District of Georgia (the "Bankruptcy Court") under chapter 11 ("Chapter 11") of Title 11 of the United States Code (the "Bankruptcy Code"). The case of the Borrower is referred to as the "Chapter 11 Case", and the date the case is commenced is referred to as the "Petition Date". |
| **DIP Lender(s):** | Any person who shall become a lender under the DIP Facility, as defined below (collectively, the "DIP Lenders"). |
| **DIP Agent:** | WestLB, in such capacity as the DIP Agent. |
| **DIP Facility:** | The total senior secured first priority DIP revolving credit facility (the "DIP Facility") with loans to be advanced and made available to the Borrower (the "Advances") under a revolving credit facility (the "DIP Revolving Loans") in the aggregate maximum principal amount of $10.0 million (the "Revolving Commitments" or "DIP Commitments"). |
| | An amount of approximately $5.0 million (the "Interim Advance") of DIP Revolving Loans, approved by the Bankruptcy Court in the interim order, which order shall be acceptable to the DIP Agent and the DIP Lenders |

(the "Interim Order"), shall be made available from and after the date of entry of the Interim Order by the Bankruptcy Court and the balance of the Revolving Commitments shall be made available from and after the date of entry of the final order, which order shall be acceptable to the DIP Agent and the DIP Lenders (the "Final Order" and together with the Interim Order, the "DIP Orders") by the Bankruptcy Court approving the DIP Facility. Pending the entry of the Final Order, the DIP Agent and the DIP Lenders shall be afforded all of the protections contained in the Interim Order. The DIP Orders shall also provide that the Borrower will be able to use cash collateral in accordance with the DIP Budget.

The DIP Commitment of each DIP Lender as of the entry date of the Interim Order will be set forth on Annex I hereto.

| | |
|---|---|
| **Letters of Credit** | [TBD] |
| **Use of Proceeds:** | To fund (i) operating expenses, limited capital expenditures and other amounts for general corporate and ordinary course purposes of the Borrower, all in accordance with the DIP Budget (as defined below), (ii) current interest and fees on the DIP Facility, and (iii) such other administrative payments contemplated by the DIP Budget, including the budgeted professional fees, as may be authorized and subsequently approved by the DIP Agent and the Required DIP Lenders (as defined below) under the DIP Orders or subsequent order of the Bankruptcy Court (it being understood that the initial DIP Budget must be approved by the DIP Agent and the DIP Lenders). |

No portion of the DIP Facility, the DIP Collateral (as defined below), including any cash collateral, or the Carve-Out (as defined below) is to be used to (i) challenge the validity, perfection, priority, extent or enforceability of the DIP Facility, the obligations under the Prepetition Credit Agreement (the "Prepetition Obligations"), or the liens on or security interests in the assets of the Borrower securing the DIP Facility or the Prepetition Obligations or (ii) assert any other claims against the DIP Agent, the DIP Lenders, the Prepetition Lenders, or the Prepetition Agent; provided, however, nothing herein shall be deemed to limit the use of the Advances in respect of any determination under Section 506(a) of the Bankruptcy Code (a "Section 506(a) Determination"); provided, however, that the Committee (as defined below) shall have the investigation rights as described in the proviso of the last paragraph of the "Security" section below.

| | |
|---|---|
| **Operating Budget:** | The operating budget, subject to the approval of the DIP Agent and the DIP Lenders, to consist of the Borrower's estimated projected cash flow position on a rolling 13-week basis (the "DIP Budget"), commencing as of the Closing Date (as defined below). Upon approval of the DIP Agent and the DIP Lenders of the DIP Budget, any subsequent changes to the DIP Budget may be made only on approval of the Required DIP Lenders. The Borrower will be allowed a 10% variance on the aggregate amounts set forth in the DIP Budget, subject to a 10% variance on the amount set forth in the line item for capital expenditures in the DIP Budget, in each case measured on a rolling four-week basis; provided, however, that the Borrower shall be permitted to carry forward professional fee amounts not |

spent in the relevant budgeted period to future periods. The DIP Budget shall include monthly reimbursement of the reasonable fees and expenses of the professionals of the DIP Agent and the DIP Lenders and the Prepetition Agent.

**Maturity:** The Borrower shall repay any outstanding Advances and loans under the DIP Facility in full in immediately available funds on the Maturity Date, to be defined as the earliest of (i) six (6) months after the Closing Date (as defined below); (ii) the date of acceleration of any outstanding Extensions of Credit (as defined below) under the DIP Facility; (iii) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order shall have been entered and become effective prior thereto; (iv) conversion of the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code ("Chapter 7") unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; (v) dismissal of the Chapter 11 Case unless otherwise consented to in writing by the DIP Agent and the DIP Lenders; and (vi) the effective date of the Borrower's plan of reorganization confirmed in the Chapter 11 Case. The DIP Orders shall provide that the Maturity Date may be extended upon the consent in writing of the DIP Agent and the DIP Lenders by stipulated order, without the need for further notice and a hearing.

**Interest:** Interest shall be payable monthly in arrears in cash on the outstanding amount of the DIP Revolving Loans on the first business day of each month at a rate equal to LIBOR + 9% per annum. LIBOR shall be defined as the greater of (i) 4% per annum and (ii) the offered rate on the applicable page of the Telerate screen (or any successor thereto) that displays an average British Bankers Association Interest Rate Settlement Rate for deposits in U.S. Dollars and shall contain appropriate protection to ensure that such rate is not less than a DIP Lender's cost of funds.

**Default Interest:** Upon the occurrence and during the continuance of any event of default under the DIP Facility and at the election of the Required DIP Lenders, interest to be payable on all outstanding principal or any other obligation under the DIP Facility at 2.0% above the then applicable interest rate.

**Closing Date:** A date on or before February 8, 2011 upon which all conditions precedent have been satisfied (the "Closing Date").

**Facility Fee:** A fee of 2.0% of the Revolving Commitment payable to the DIP Lenders on the Closing Date.

**Structuring Fee:** A fee of 1.0% of the Revolving Commitment payable to the DIP Agent on the Closing Date.

**Unused Commitment Fee:** A fee on the unused portion of the Revolving Commitment of 2.0% per annum, payable monthly.

## II.    Additional Terms

**Mandatory Prepayments:** Mandatory prepayments (including, but not limited to, net proceeds from Section 363 asset sales of the Borrower's assets outside of the ordinary course of business, if any, approved by the DIP Agent and

the Required DIP Lenders and authorized by the Bankruptcy Court and insurance proceeds received by the Borrower as a result of any casualty event) shall be used to prepay all amounts outstanding under the DIP Facility. Unless agreed to otherwise by the Required DIP Lenders, mandatory prepayments of principal outstanding under the DIP Facility shall permanently reduce the DIP Commitment.

Mandatory prepayments shall be applied, first to the payment of all costs, fees, expenses and indemnities then due and payable to the DIP Lenders (including attorneys' and professionals' fees); second, to the payment of any accrued and unpaid interest due and payable on the DIP Revolving Loans *pro rata* among the DIP Lenders (other than any DIP Lender that has defaulted on its obligations to advance DIP Revolving Loans (a "Defaulting Lender")) with respect to their respective outstanding principal amounts; third, to the repayment of principal of DIP Revolving Loans (and permanent reduction of the Revolving Commitments associated therewith) *pro rata* among the DIP Lenders (other than any Defaulting Lender) with respect to their respective outstanding principal amounts until repaid in full; fourth, to the payment of all accrued and unpaid interest then due and payable on the DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment; and fifth, to the payment of principal of the DIP Revolving Loans *pro rata* among the Defaulting Lenders based on their respective outstanding principal amounts on the date of such prepayment.

**Security:**

All obligations of the Borrower under and with respect to the DIP Facility (the "DIP Obligations") to enjoy superpriority administrative expense status under Section 364(c)(1) with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 328, 330, 331, 503(b), 506(c) (Section 506(c) being subject to entry of the Final Order), 507(a), 507(b), 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject to the Carve-Out.

To secure all of the DIP Obligations, the DIP Agent, for the benefit of the DIP Lenders, to receive, pursuant to Sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code, the DIP Orders and the definitive DIP Facility loan documents, senior, first priority, valid, enforceable, and fully perfected security interests in and liens upon all prepetition and postpetition assets of the Borrower, whether now existing or hereafter acquired or arising (collectively, the "DIP Collateral"). The DIP Collateral shall include any and all rents, issues, products, offspring, proceeds and profits generated by any item of DIP Collateral, without the necessity of any further action of any kind or nature by the DIP Lenders or the DIP Agent in order to claim or perfect such rents, issues, products, offspring, proceeds and/or profits.

Senior, first priority liens and security interests with respect to DIP Collateral (the "DIP Liens") will not be subject to challenge and will attach and become valid and perfected upon entry of the Interim

Order without any further action by the DIP Agent or the DIP Lenders. The DIP Collateral will be free and clear of other liens, claims and encumbrances, except valid, perfected, enforceable and unavoidable liens in existence as of the Petition Date, if any, and any other Permitted Liens.

As used in this Term Sheet, "Carve-Out" shall mean the sum of (i) the aggregate amount of any budgeted, accrued but unpaid, professional fees and expenses incurred on or prior to the Carve-Out Date (as defined below) of the Borrower and of any Unsecured Creditors' Committee appointed in the Chapter 11 Case ("Committee"), which fees and expenses are allowed by the Bankruptcy Court and in compliance with the DIP Budget, plus (ii) those professional fees and expenses of the Borrower and any Committee incurred after the Carve-Out Date and subsequently allowed by the Bankruptcy Court and in compliance with the DIP Budget in an amount not to exceed $75,000 in the aggregate, plus (iii) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the United States Trustee pursuant to 28 U.S.C. § 1930. Prior to the Carve-Out Date, subject to entry of an appropriate interim fee order of the Bankruptcy Court (in form and substance acceptable to the DIP Agent and the Required DIP Lenders), the Borrower shall be permitted to use cash collateral and Advances under the DIP Facility to pay compensation and reimbursement of expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code in accordance with the DIP Budget, and the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of expenses paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the occurrence of the Carve-Out Date; provided, however that following the Carve-Out Date, any amounts paid to professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis.

"Carve-Out Date" means the date that is the earlier of (i) the Borrower's receipt of a notice of an Event of Default under the DIP Facility and (ii) the Maturity Date.

Neither the Advances under the DIP Facility nor the Carve-Out may be used to challenge the amount, validity, perfection, priority or enforceability of, or assert any defense, counterclaim or offset to the DIP Facility or the Prepetition Credit Agreement, or the security interests and liens securing the DIP Obligations or the Prepetition Obligations with respect thereto or otherwise to litigate against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, the foregoing shall not apply to any Advances or Carve-Out that are used for purposes of seeking a Section 506(a) Determination. Notwithstanding the foregoing, any Committee may spend up to an aggregate maximum of $15,000 under the DIP Facility and the Carve-Out to investigate potential claims arising out of, or in connection with, the Prepetition Credit Agreement or the security interests and liens securing the Prepetition

Obligations.

**Restriction on Other Indebtedness:** The Interim Order and the Final Order shall contain provisions prohibiting the Borrower from incurring any other indebtedness (x) which ranks *pari passu* with or senior to the DIP Revolving Loans or (y) in connection with which the Borrower grants a first or second priority lien under section 364 of the Bankruptcy Code.

**Adequate Protection:** As adequate protection to the Prepetition Lenders for any diminution in the value of their interests in the Borrower's property resulting from (i) the priming liens granted in favor of the DIP Agent and the DIP Lenders under the DIP Facility pursuant to section 364(d)(1) of the Bankruptcy Code, (ii) the use, sale or lease of the Borrower's property (including any cash collateral) pursuant to section 363(c) of the Bankruptcy Code and (iii) the imposition of the automatic stay pursuant to section 362(a) of the Bankruptcy Code:

(a) The Prepetition Lenders will, subject to the terms of any DIP Order, maintain any of their liens in existence on the Petition Date (the "Prepetition Liens") on the DIP Collateral, which liens shall be junior and subordinate to the DIP Liens and the Carve-Out;

(b) The Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted replacement liens on, and security interests in, all of the DIP Collateral, which replacement liens shall be subject only to (1) the liens on, and security interests in, the DIP Collateral granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, (2) any Permitted Liens and (3) the Carve-Out;

(c) Pursuant to Section 507(b) of the Bankruptcy Code, the Prepetition Agent, on behalf of the Prepetition Lenders, shall be granted an administrative claim with priority over all administrative expense claims and unsecured claims against the Borrower (the "507(b) Claim"), subject only to (1) the super-priority claims granted to the DIP Agent and the DIP Lenders under the DIP Facility and the DIP Orders, as the case may be, and (2) the Carve-Out; and

(d) As additional adequate protection, the Borrower shall reimburse the Prepetition Lenders on a monthly basis upon receipt of an invoice for the reasonable professional fees and expenses of the Prepetition Agent otherwise permitted under the Prepetition Credit Agreement arising (i) before the Petition Date and (ii) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to the DIP Orders; provided, however, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations.

Notwithstanding the foregoing, the Prepetition Agent and the Prepetition Lenders shall be granted adequate protection as provided

herein to the extent the Prepetition Liens are valid, enforceable, perfected and non-avoidable.

**Representations and Warranties:**

The documentation for the DIP Facility and related collateral matters shall contain such representations and warranties as are customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement (it being understood that such agreement is, and the documentation for the DIP Facility will be, typical for "project finance" transactions for completed projects).

**Financial Covenants:**

Professional fees (other than fees and expenses of the advisors and consultants working on behalf of the DIP Agent and the DIP Lenders) in any period of time measured from the Petition Date not to exceed the amounts set forth in the line item entitled "Total Professional Fees & Administrative Expenses" (excluding "Legal Advisors – DIP Lenders" and "Financial Advisors – DIP Lenders") for such period of time in the DIP Budget by more than $250,000.

Amounts disbursed pursuant to the category in the DIP Budget entitled "Capital Expenditures" in any four-week budget period not to exceed the amounts set forth in such line item for such budget period in the then applicable DIP Budget by more than ten percent (10%).

Others TBD.

**Negative Covenants:**

The documentation for the DIP Facility shall contain negative covenants of the Borrower customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement.

**Affirmative Covenants:**

The documentation for the DIP Facility shall include affirmative covenants of the Borrower, customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement, including, but not limited to, covenants requiring the Borrower:

1.  To provide, or cause to be provided, to the DIP Agent, a weekly line-by-line variance report comparing actual cash receipts and disbursements to amounts projected in the DIP Budget and a weekly reconciliation report which compares the actual cash flow results (receipts and disbursements) against the prior week's cash flow projections (receipts and disbursements), indicating the cumulative percentage variance, if any, of actual results versus projections for such week as set forth therein, together with management's explanation for such variance;

2.  To comply at all times with the DIP Budget (subject to expense variances no greater than 10% in the aggregate and on the amount set forth in the line item for capital expenditures in the DIP Budget, in each case measured on a rolling four-week basis); and

3.      To maintain its existence and take all necessary and appropriate actions to preserve all assets of the Borrower (except as contemplated by the documentation for the DIP Facility).

**Events of Default:**    The DIP Facility shall include Events of Default customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement, including, but not limited to:

1.      The use of proceeds inconsistent with the DIP Budget;

2.      The payment of claims existing prior to the Petition Date or prior to a confirmed plan of reorganization (other than as set forth in the DIP Budget or payment is approved by the DIP Agent and authorized by an order of the Bankruptcy Court);

3.      The Operation & Maintenance Agreement and/or the Services Agreement shall be terminated because of a breach by FUEL and not replaced with an arrangement satisfactory to the DIP Agent and Required DIP Lenders;

4.      Dismissal or conversion to Chapter 7 of the Chapter 11 Case without the written consent of the DIP Agent and the DIP Lenders or the appointment of a trustee or examiner in the Chapter 11 Case with any powers to operate or manage the financial affairs of the Borrower without the written consent of the DIP Agent and the Required DIP Lenders;

5.      The entry of a final order that, in the sole determination of the DIP Agent and the DIP Lenders, in any way modifies, stays, reverses, or vacates the DIP Orders or the DIP Facility in each case in a manner adverse to the DIP Agent and the DIP Lenders without the written consent of the DIP Agent and the DIP Lenders or either of the DIP Orders or the DIP Facility ceases to be in full force and effect;

6.      The entry of the Interim Order shall not have occurred within 10 days after the Petition Date;

7.      The entry of the Final Order shall not have occurred within 30 days after the date of entry of the Interim Order;

8.      The Borrower petitions the Bankruptcy Court to obtain additional financing *pari passu* or senior to the DIP Facility;

9.      The entry of an order granting any other super-priority claim or lien equal or superior to that granted to the DIP Agent or the DIP Lenders on the assets of the Borrower (other than the Carve-Out);

10.     The entry of an order granting relief from the automatic stay so as to allow a third party to proceed against any material assets of the Borrower;

11.     The entry of any order of the Bankruptcy Court confirming any plan of reorganization that does not contain a provision

for termination of the DIP Facility and repayment in full in cash of all of the DIP Obligations under the DIP Facility on or before the effective date of such plan;

12. The Borrower violates or breaches any DIP Order or files any pleadings seeking, joining in, or otherwise consenting to any violation or breach of any DIP Order in each case in a manner adverse to the DIP Agent and/or the DIP Lenders in the sole determination of the DIP Agent and the DIP Lenders;

13. (A) The Borrower engages in or supports any challenge to the validity, perfection, priority, extent or enforceability of the DIP Facility or the Prepetition Obligations or the liens on or security interests in the assets of the Borrower securing the DIP Facility or the Prepetition Obligations, including, without limitation, seeking to equitably subordinate or avoid the Prepetition Liens, or (B) the Borrower engages in or supports any investigation or its assertion of any claims or causes of action (or supporting the assertion of the same) against the DIP Agent, the DIP Lenders, the Prepetition Agent or the Prepetition Lenders; provided, however, it shall not constitute an Event of Default if the Borrower provides basic loan information with respect to the Prepetition Obligations or reasonably requested information relating to the DIP Facility, in each case to a party in interest or is compelled to provide information by an order of the Bankruptcy Court and provides prior written notice to the DIP Agent and the DIP Lenders of the intention or requirement to do so;

14. Any person shall seek a Section 506(a) Determination with respect to the Prepetition Obligations that is unacceptable to the Prepetition Agent and the Prepetition Lenders;

15. The allowance of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the DIP Collateral;

16. The use of cash collateral other than as expressly contemplated by the DIP Orders and the DIP Budget prior to the indefeasible payment in full of the DIP Obligations and termination of the DIP Commitments thereunder;

17. The consummation of the sale of any material portion of the Borrower's assets unless consented to by the DIP Agent and the Required DIP Lenders; and

18. Breach of any covenant or representation and warranty in the DIP financing documents or the DIP Orders, including, without limitation, failure to make any Mandatory Prepayments.

**Remedies On Default:**    The DIP Orders and the DIP Facility loan documentation to provide that, upon the occurrence and during the continuation of an Event of

Default under the DIP Facility, the DIP Agent, at the direction of the Required DIP Lenders, shall have customary remedies, including, without limitation, the automatic stay under section 362 of the Bankruptcy Code shall be deemed automatically terminated without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to: (i) declare the principal of and accrued interest on the outstanding borrowings to be immediately due and payable, (ii) accelerate the DIP Obligations and terminate, as applicable, any further commitment to lend to the Borrower, and (iii) charge the default rate of interest on the DIP Facility.

In addition, upon three business days' written notice (the "Notice Period") to the Borrower and counsel to any Committee and the Office of the U.S. Trustee, the automatic stay shall be deemed automatically terminated, without further order of the Bankruptcy Court and without the need for filing any motion for relief from the automatic stay or any other pleading, to permit the DIP Agent to realize on all DIP Collateral and to exercise any and all remedies under the DIP Orders and the DIP Facility with respect to the DIP Collateral or any part thereof and to set off or seize amounts in any accounts maintained with or under the control of the DIP Agent or any DIP Lender; provided, however, during the Notice Period, Borrower and/or any Committee may seek relief from the Bankruptcy Court to re-impose or continue the automatic stay; provided, further, in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto being whether, in fact, an Event of Default has occurred and is continuing.

| | |
|---|---|
| **Voting:** | Matters requiring the approval of the DIP Lenders, including amendments and waivers of the definitive DIP credit documentation, will require the approval of the DIP Lenders holding, in the aggregate, [greater than 50% of the outstanding loan exposure (balances and commitments) under the DIP Facility (the "Required DIP Lenders"), subject to exceptions to be set forth in the definitive DIP credit documentation; provided, however, that if a single DIP Lender holds greater than 50% of the outstanding loan exposure (balances and commitments) then the Required DIP Lenders shall mean such DIP Lender plus one additional DIP Lender.[1] |
| **Assignments:** | Restrictions on assignments, if any, TBD. |

III. **Other Terms**

| | |
|---|---|
| **Conditions Precedent:** | The closing and the making of any Interim Advance shall be subject to various conditions precedent customary for DIP loan transactions and investments of a similar size and nature consistent with the Prepetition Credit Agreement, including but not limited to: |

---

[1] The definition of "Required Lenders" is subject to further review and modification based upon the relative Revolving Commitments of the DIP Lenders upon final allocation by the DIP Agent.

1. Satisfactory completion of legal and collateral due diligence and transaction structuring, including due diligence concerning the Borrower's bankruptcy process and the receipt of all required court approvals for the DIP Facility;

2. Execution of definitive agreements, instruments, and documents related to the DIP Facility (including, without limitation, the Interim Order), each satisfactory in form and substance to the DIP Lenders in their sole and absolute discretion, including a satisfactory cash management system consistent with the existing cash management system and subject to the existing tri-party account control agreements;

3. Delivery of the DIP Budget approved by the DIP Lenders and to be attached to the Interim Order and the Final Order entered by the Bankruptcy Court;

4. Entry of the Interim Order by the Bankruptcy Court, after notice given and a hearing conducted in accordance with Rule 4001(c) of the Federal Rules of Bankruptcy Procedure (and any applicable local bankruptcy rules), authorizing and approving the transactions contemplated by the documents evidencing the DIP Facility and finding that the DIP Lenders are extending credit to the Borrower in good faith within the meaning of Bankruptcy Code section 364(e) and containing the terms provided in the Section entitled "DIP Orders" herein;

5. All of the "first day orders" shall have been entered at the commencement of the Borrower's Chapter 11 Case and shall be in form and substance reasonably satisfactory to the DIP Agent.

6. Reimbursement in full in cash of the reasonable fees, costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders for which the Borrower has received an invoice; and

7. No litigation commenced which has not been stayed by the Bankruptcy Court and which, if successful, would have a material adverse impact on the Borrower, its business or ability to repay the DIP Facility, or which would challenge the transactions under consideration.

8. The Operations & Maintenance Agreement and Services Agreement between FUEL and the Borrower shall be operative and in each case, in a form acceptable to the DIP Agent.

The documents evidencing the DIP Facility shall contain the following conditions precedent to each Advance (collectively, "Extensions of Credit"):

(i) No Default or Event of Default shall have occurred and be continuing;

(ii) Representations and warranties shall be true and correct as of the date of each Extension of Credit;

(iii) (A) The Interim Order shall be in full force and effect or (B)

11    *Southwest Georgia Ethanol DIP Credit Facility*
*Term Sheet 1/28/2011*

if (x) the date of such requested Extension of Credit is more than 30 days after the Closing Date or (y) the amount of such requested Extension of Credit, together with the amount of all Extensions of Credit then outstanding, shall exceed the maximum amount authorized pursuant to the Interim Order, the Final Order shall have been entered, which Final Order shall be in form and substance satisfactory to the DIP Agent and the DIP Lenders, and shall be in full force and effect and shall not have been appealed, stayed, reversed, vacated or otherwise modified in a manner adverse to the DIP Agent and the DIP Lenders;

(iv)    Receipt by the DIP Agent and the DIP Lenders of a borrowing request in the form to be set out in the documents evidencing the DIP Facility executed by the Borrower. The Borrower's request for each Extension of Credit shall constitute a representation and warranty that the conditions to the making of such Extension of Credit shall have been satisfied; and

(v)    Payment of all fees and other amounts then due and payable for which the Borrower has received an invoice.

**DIP Orders:**    The DIP Orders shall be in form and substance reasonably acceptable in all respects to the DIP Agent and the DIP Lenders and to include, without limitation, provisions (i) approving in all respects the definitive documentation evidencing the DIP Facility, and authorizing and directing the Borrower to execute and become bound by such definitive documentation; (ii) modifying the automatic stay to the extent necessary to permit or effectuate the terms of the DIP Orders and documents evidencing the DIP Facility, including, without limitation, to permit the creation and perfection of the DIP Liens on the DIP Collateral; (iii) providing for the automatic relief of such stay to permit the enforcement of the DIP Agent's and the DIP Lenders' remedies under the DIP Facility, subject to the right of the Borrower and/or any Committee to re-impose or continue the automatic stay; (iv) permitting the Borrower to use cash collateral in accordance with the DIP Budget; and (iv) providing that the Borrower acknowledge (a) the validity and enforceability of the Prepetition Obligations, without defense, offset or counterclaim of any kind, (b) the validity, perfection and priority of the liens securing the Prepetition Obligations, and that the Borrower waive any right to challenge or contest such claims and liens and (c) that it has no valid claims or causes of action, whether based in contract, tort or otherwise against the Prepetition Agent or any Prepetition Lender with respect to the Prepetition Credit Agreement or the related documents or transactions.

**Expenses:**    All reasonable out-of-pocket fees, costs and expenses of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders (including, without limitation, reasonable out-of-pocket prepetition and postpetition fees, costs, expenses and disbursements of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders) to be payable by the Borrower under the DIP Facility on demand whether or not the transactions contemplated hereby are consummated; provided, however, the Borrower shall only be

required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in the Interim Order.

**Termination:**    Upon the occurrence of an Event of Default, the DIP Agent, upon the direction of the Required DIP Lenders, may terminate the DIP Commitments, declare the DIP Obligations to be immediately due and payable and exercise all rights and remedies under the documents evidencing the DIP Facility and the DIP Orders, as applicable.

**Indemnification:**    The Borrower shall agree to indemnify and hold harmless the DIP Agent and the DIP Lenders and each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct. In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Borrower, any of their respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

**Confidentiality:**    Except as required by law or in connection with the implementation of this Term Sheet, the terms hereof will be kept strictly confidential by the Borrower and may only be disclosed to the Borrower's affiliates, legal counsel, financial advisors, financing sources and consultants who have been informed of, and agree to abide by, the confidentiality of this Term Sheet. To the extent that any disclosure becomes legally required, the DIP Agent shall be notified promptly and before the required disclosure is made.

**Governing Law:**    New York law except as governed by the Bankruptcy Code.

**Miscellaneous:**    This summary of terms and conditions does not purport to summarize all of the conditions, covenants, representations, warranties and other provisions which would be contained in definitive credit documentation for the DIP Facility contemplated hereby, all of which shall be acceptable to the DIP Agent and the DIP Lenders.

<u>ANNEX I</u>

**Commitments**

| DIP LENDER | DIP LOAN COMMITMENT |
|---|---|
| | $ |
| | $ |
| Total | $ |

# EXHIBIT B

## <u>Proposed Interim Order</u>

# UNITED STATES BANKRUPTCY COURT
# FOR THE MIDDLE DISTRICT OF GEORGIA

| | |
|---|---|
| In re: | Chapter 11 |
| SOUTHWEST GEORGIA ETHANOL, LLC,[1] | Case No. 11-_____ (_____) |
| Debtor. | |

## INTERIM ORDER (I) AUTHORIZING THE DEBTOR TO (A) OBTAIN POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363(c), 363(d), 363(e), 364(c), 364(d)(1), 364(e), AND 507(b) AND (B) UTILIZE CASH COLLATERAL OF PREPETITION SECURED PARTIES, (II) GRANTING ADEQUATE PROTECTION TO PREPETITION SECURED PARTIES, (III) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULES 4001(b) AND 4001(c), AND (IV) GRANTING RELATED RELIEF

This matter is before the Court on the motion dated February 1, 2011 (the "Motion")[2] of Southwest Georgia Ethanol, LLC as debtor-in-possession (the "Debtor") in the above-referenced chapter 11 case (the "Chapter 11 Case"), for entry of an interim order (this "Interim Order") and a final order (the "Final Order"), under sections 105, 361, 362, 363(c),

---

[1]    The Debtor is Southwest Georgia Ethanol, LLC (Tax ID No. 20-2497196), with a mailing address of 4615 Back Nine Road, Pelham, GA 31779.

[2]    All defined terms shall have the meaning ascribed to them in the Motion or the DIP Loan Documents (as defined below) unless otherwise defined herein, irrespective of whether the DIP Credit Agreement (as defined below) is in effect.

363(d), 363(e), 364(c), 364(d)(1), 364(e), and 507(b) of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), seeking, among other things:

(1)    authorization for the Debtor to obtain post-petition financing (the "DIP Facility") consisting of a super priority non-amortizing revolving credit facility (the "DIP Revolving Loans") in an aggregate principal amount not to exceed $10 million (the "DIP Revolving Commitment"), of which up to $5 million shall be available upon entry of this Interim Order (the "DIP Revolving Interim Commitment"), subject to the terms and conditions of the DIP Loan Documents (as defined below), with WestLB AG, New York Branch ("WestLB"), as administrative agent and collateral agent (collectively, the "DIP Agent") for itself and a syndicate of financial institutions (the "DIP Lenders" and together with Amarillo National Bank ("DIP Accounts Bank") and the DIP Agent, the "DIP Secured Parties"), pursuant to the terms of this Interim Order and that certain Debtor-in-Possession Credit Agreement, by and among the Debtor, the DIP Agent and the DIP Lenders (as the same may be amended, restated, supplemented or otherwise modified from time to time pursuant to the terms thereof, the "DIP Credit Agreement," and together with any related documents and instruments delivered pursuant to or in connection therewith (including the "Financing Documents" referenced therein), the "DIP Loan Documents"), as generally summarized by the Debtor-In-Possession Credit Facility Term Sheet, attached hereto as Exhibit A (the "DIP Term Sheet");

(2)    authorization for the Debtor to execute and enter into the DIP Loan Documents (which shall be in form and substance acceptable to the DIP Agent and the

2

DIP Lenders) and to perform such other and further acts as may be required in connection with the DIP Loan Documents;

(3)      authorization for the Debtor to grant, subject to the Carve-Out (as defined below) (i) first priority security interests and liens (including liens pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code and limited priming liens pursuant to section 364(d) of the Bankruptcy Code) to the DIP Agent, for itself and the benefit of the DIP Lenders, to secure all obligations of the Debtor under and with respect to the DIP Facility (collectively, the "DIP Obligations"), and (ii) superpriority claims (including a superpriority administrative claim pursuant to section 364(c)(1) of the Bankruptcy Code) to the DIP Agent and the DIP Lenders, with respect to the DIP Obligations, as more fully set forth in this Interim Order;

(4)      authorization for the Debtor's use of cash collateral, as such term is defined in section 363(a) of the Bankruptcy Code (as so defined, "Cash Collateral"), on the terms and conditions set forth in this Interim Order;

(5)      authorization to provide adequate protection of the liens and security interests (such liens and security interests, the "Prepetition Liens") granted to and for the benefit of the prepetition senior secured lenders, including WestLB, as prepetition Interest Rate Protection Provider (such lenders in such capacities, the "Prepetition Lenders") under that certain Credit Agreement, dated as of November 20, 2007 (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, the "Prepetition Credit Agreement"), among the Debtor, the Prepetition Lenders, WestLB, as administrative agent (in such capacity and in the capacity of collateral agent under the security documents for the Prepetition Obligations

3

(as defined herein) on behalf of the Prepetition Lenders, the "Prepetition Agent") and as a Prepetition Lender, securing the Debtor's obligations (the "Prepetition Obligations") under the Prepetition Credit Agreement, the Prepetition Security Documents (as defined below) and all collateral and ancillary documents executed or delivered in connection therewith (the "Prepetition Facility Documents"), as more fully set forth in this Interim Order;

(6)   an emergency interim hearing (the "Interim Hearing") on the Motion for this Court to consider entry of this Interim Order, which, among other things, (i) authorizes the Debtor, on an interim basis, to obtain from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $10 million (of which $5 million shall be available as interim advances upon the entry of this Interim Order) in DIP Revolving Commitments, pursuant to the terms of, and on the conditions contained in, the DIP Credit Agreement and this Interim Order; (ii) authorizes the Debtor's use of Cash Collateral; and (iii) grants the adequate protection described herein;

(7)   the scheduling of a final hearing (the "Final Hearing") on the Motion no later than [_____], 2011 to consider entry of a Final Order authorizing the borrowings under the DIP Loan Documents on a final basis and approve the form of notice procedures with respect thereto; and

(8)   modification of the automatic stay imposed under section 362 of the Bankruptcy Code to the extent necessary to permit (a) the Debtor, (b) the DIP Secured Parties, and (c) the Prepetition Agent, the Prepetition Lenders and Amarillo National Bank, as prepetition Accounts Bank ("Prepetition Accounts Bank" and, together

4

with the Prepetition Agent and the Prepetition Lenders, the "Prepetition Secured Parties")
to implement the terms of this Interim Order.

This Court having found that, under the circumstances, due and sufficient notice
of the Motion and the Interim Hearing was provided by the Debtor as set forth in Paragraph L
below, and having held the Interim Hearing on February __, 2011 after considering all the
pleadings filed with this Court; and having overruled any unresolved objections to the relief
requested in the Motion; and upon the record made by the Debtor at the Interim Hearing and the
Affidavit of Lawrence Kamp, in Support of First Day Motions, and after due deliberation and
consideration and good and sufficient cause appearing therefore:

## THE COURT HEREBY FINDS AND CONCLUDES AS FOLLOWS:

A.    Filing of Petition. On February 1, 2011 (the "Petition Date"), the Debtor
filed a voluntary petition (the "Petition") with this Court commencing a case under chapter 11 of
the Bankruptcy Code. The Debtor is continuing to operate its respective business and manage its
respective property as a debtor-in-possession pursuant to sections 1107 and 1108 of the
Bankruptcy Code. No trustee or examiner has been appointed in this Chapter 11 Case. No
Committee (as defined below) has yet been appointed in the Chapter 11 Case.

B.    Jurisdiction; Venue. This Court has subject matter jurisdiction to consider
this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28
U.S.C. § 157(b). The statutory predicates for the relief sought herein are sections 105, 361, 362,
363, 364 and 507 of the Bankruptcy Code and Bankruptcy Rules 2002, 4001(b) and 9014.
Venue of the Chapter 11 Case and the Motion in this District is proper pursuant to 28 U.S.C. §§
1408 and 1409.

LA1 1989875v.6

C.    The Debtor's Stipulations. Subject to the limitations thereon described below in Paragraph 14, the Debtor hereby agrees and stipulates that (collectively, the stipulations contained below are referred to as the "Debtor's Stipulations"):

(i)    as of the Petition Date, the Debtor was truly and justly indebted and liable to the Prepetition Lenders pursuant to the Prepetition Facility Documents in the aggregate principal amount of not less than $105,299,991.00, plus accrued and unpaid interest with respect thereto and any additional fees, costs and expenses as provided under the Prepetition Facility Documents (the "Prepetition Indebtedness")[3];

(ii)    pursuant to certain security agreements, blocked account, lockbox and pledged account control agreements, mortgages, deeds of trust, assignments, and other collateral documents and agreements (as amended, restated, supplemented or otherwise modified from time to time and in effect on the date hereof, collectively, the "Prepetition Security Documents"), and the other Prepetition Facility Documents, the Debtor granted to and/or for the benefit of the Prepetition Secured Parties a first priority valid, perfected and enforceable security interest in and lien upon that certain ethanol production facility located in Mitchell County, Georgia and certain other real and personal property of the Debtor (the "Prepetition Collateral"); and

(iii)    (a) the Prepetition Obligations constitute legal, valid and binding Obligations (as defined in the Prepetition Credit Agreement) of the Debtor; (b) no offsets, defenses or counterclaims to the Prepetition Obligations exist; (c) no portion of the Prepetition Obligations is subject to avoidance, disallowance, reduction or subordination pursuant to the

---

[3] First United Ethanol Limited ("FUEL"), the parent holding company for the Debtor, is not included as a Borrower or Guarantor under the Prepetition Facility Documents but has provided a pledge of its ownership interest in the Debtor pursuant to the terms of the Prepetition Facility Documents. FUEL is not a debtor in these proceedings.

Bankruptcy Code or applicable non-bankruptcy law; (d) the Prepetition Facility Documents are valid and enforceable by the Prepetition Secured Parties against the Debtor; (e) the Prepetition Liens constitute valid, binding, enforceable and perfected liens in and to the Prepetition Collateral, having the priority set forth in the Prepetition Facility Documents and subject only to the liens described in the Prepetition Facility Documents[4], and the Prepetition Liens are not subject to avoidance, reduction, disallowance, disgorgement, counterclaim, surcharge or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (f) the Prepetition Obligations constitute allowed secured claims against the Debtor's estate; and (g) no claim of or cause of action held by the Debtor exists against the Prepetition Secured Parties or their agents, whether arising under applicable state or federal law (including, without limitation, any recharacterization, subordination, avoidance or other claims arising under or pursuant to sections 105, 510 or 542 through 553 of the Bankruptcy Code), or whether arising under or in connection with any of the Prepetition Facility Documents (or the transactions contemplated thereunder), the Prepetition Obligations or the Prepetition Liens, including without limitation, any right to assert any disgorgement or recovery.

        D.      <u>Budget for the DIP Facility</u>.  Attached hereto as <u>Exhibit B</u> is a rolling 13-week cashflow budget setting forth all projected cash receipts and cash disbursements (by line item) on a weekly basis for the time period from the week ending February 5, 2011 through and including the week ending July 30, 2011 (the "<u>Initial Approved Budget</u>").  The Initial Approved Budget may be modified or supplemented from time to time by additional budgets (covering any

---

[4] The Prepetition Liens are only subject to the liens described in the Prepetition Facility Documents (the "<u>Permitted Prior Liens</u>") only to the extent such Permitted Prior Liens are legal, valid, enforceable liens and security interests that are perfected prior to the Petition Date (or perfected after the Petition Date to the extent permitted by section 546(b) of the Bankruptcy Code), which are not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law and which are senior in priority to the Prepetition Liens under applicable law and after giving effect to any applicable subordination or intercreditor agreements.

7

time period covered by a prior budget or covering additional time periods) prepared by the Debtor, without subsequent notice to or order of the Court (each such additional budget, a "Supplemental Approved Budget" and together with the Initial Approved Budget, the "Approved Budget"). The Initial Approved Budget is an integral part of this Interim Order and has been relied upon by the DIP Agent and the DIP Lenders in deciding to agree to this Interim Order, to provide the DIP Facility and to permit the use of Cash Collateral. The Debtor represents and warrants to the DIP Agent, the DIP Lenders and this Court that the Initial Approved Budget includes and contains the Debtor's best estimate of all operational receipts and all operational disbursements, fees, costs and other expenses that will be payable, incurred and/or accrued by the Debtor during the period covered by the Initial Approved Budget and that such operational disbursements, fees, costs and other expenses will be timely paid in the ordinary course of business pursuant to and in accordance with the Initial Approved Budget unless such operational disbursements, fees, costs and other expenses are not incurred or otherwise payable. The Debtor shall be permitted a variance between the aggregate actual cash receipts and disbursements and the amounts projected in the Approved Budget of 10% in the aggregate (with an additional 10% line-item variance test of Capital Expenditure disbursements made in any four-week budget period), measured on a rolling four-week basis (the "Variance Covenant").

       E.     Immediate Need for Funding. Based upon the pleadings and proceedings of record in the Chapter 11 Case, the Debtor does not have sufficient available sources of working capital and financing to carry on the operation of its business without the DIP Facility. As a result of the Debtor's financial condition, the use of Cash Collateral alone would be insufficient to meet the Debtor's immediate postpetition liquidity needs. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, pay its employees,

8

purchase and supply new inventory and otherwise finance its operations is essential to the Debtor's continued viability.   In addition, (i) the Debtor's critical need for financing is immediate; (ii) in the absence of the DIP Facility, the continued maintenance and limited operation of the Debtor's business would not be possible and serious and irreparable harm to the Debtor and its estate would occur; and (iii) the preservation, maintenance and enhancement of the going concern value of the Debtor is of the utmost significance and importance to a successful reorganization of the Debtor.

      F.    <u>No Alternate Financing</u>.  The Debtor is unable to obtain sufficient interim and long-term financing from sources other than from the DIP Lenders on terms more favorable than under the DIP Facility and the DIP Loan Documents, and is not able to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code. The Debtor is also unable to obtain secured credit allowable under sections 364(c)(1), 364(c)(2) and 364(c)(3) of the Bankruptcy Code for the purposes set forth in the DIP  Credit Agreement without the Debtor granting to the DIP Agent on behalf of the DIP Lenders, subject to the Carve-Out as provided herein, (i) the DIP Superpriority Claims (as defined below) and (ii) the DIP Liens (as defined below) in the DIP Collateral (as defined below), as provided herein and in the DIP Loan Documents.

      G.    <u>Reasonable; Good Faith</u>.  Based upon the pleadings and proceedings of record in the Chapter 11 Case, (i) the terms and conditions of the DIP Facility are fair and reasonable, reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duty and are supported by reasonably equivalent value and fair consideration, (ii) the DIP Facility has been negotiated in good faith and at arm's length among the Debtor and the DIP Secured Parties and (iii) any credit extended, loans made and other financial accommodations

9

extended to the Debtor by the DIP Lenders have been extended, issued or made, as the case may be, in "good faith" within the meaning of section 364(e) and 363(m) of the Bankruptcy Code.

H.    Use of Cash Collateral.  An immediate and critical need exists for the Debtor to use Cash Collateral (in addition to the DIP Facility) to continue to operate its business in the ordinary course, pay wages and professional fees in connection with the Chapter 11 Case, maintain business relationships with vendors, suppliers and customers, make capital expenditures, make adequate protection payments and generally conduct its business affairs so as to avoid immediate and irreparable harm to its estate and the value of its assets.

I.    Consent.  The consent of the DIP Lenders and the requisite Prepetition Lenders to the DIP Facility and the  DIP Lenders' and requisite Prepetition Lenders' permission to use Cash Collateral is expressly limited to the DIP Facility and the use of Cash Collateral solely on the terms and conditions set forth in this Interim Order.  Nothing in this Interim Order, including, without limitation, any of the provisions herein with respect to adequate protection, shall constitute, or be deemed to constitute, a finding that the interest of the Prepetition Secured Parties are or will be adequately protected with respect to the financing contemplated by the DIP Facility, any additional financing, or any non-consensual use of Cash Collateral.  The DIP Agent and the DIP Lenders have indicated a willingness to provide the DIP Facility, but solely on the terms and conditions set forth in this Interim Order and in the DIP Loan Documents.

J.    Adequate Protection.  The adequate protection provided to the Prepetition Secured Parties for any diminution in the value of such parties' respective interest in the Prepetition Collateral from and after the Petition Date, including, without limitation, from the DIP Facility and use of Cash Collateral, pursuant to the provisions of this Interim Order, is consistent with and authorized by the Bankruptcy Code and is offered by the Debtor to protect

such parties' interests in the Prepetition Collateral in accordance with sections 361, 362 and 363 of the Bankruptcy Code. The adequate protection provided herein and other benefits and privileges contained herein are necessary in order to obtain the foregoing consents and agreements and the non-objection of such parties and to facilitate the Debtor's ability to continue its business operations because of the need for the DIP Facility.

K.    Non-Objection or Non-Impairment.    The security interests and liens granted hereunder to (a) the DIP Agent for itself and the benefit of DIP Lenders, under section 364(c) and (d) of the Bankruptcy Code, and (b) the Prepetition Agent for itself and the benefit of the Prepetition Lenders, under sections 105, 361, and 363 of the Bankruptcy Code, are appropriate because, among other things: (x) the Prepetition Agent and the requisite Prepetition Secured Lenders have not objected to the security interests and priming liens granted to the DIP Agent for itself and the benefit of the DIP Lenders pursuant to this Interim Order, (y) the holders of Permitted Prior Liens, to the extent they are legal, valid, binding, continuing, enforceable and fully perfected, are not being impaired by this Interim Order, and (z) to the extent any security interest or lien is junior to the Prepetition Liens, such holder is not entitled to adequate protection pursuant to section 361 of the Bankruptcy Code.

L.    Notice.    Notice of the Interim Hearing and the entry of this Interim Order has been provided to: (i) the 20 largest unsecured creditors, as listed and filed with the Petition; (ii) the Office of the United States Trustee for the District of Georgia (the "U.S. Trustee"); (iii) the Securities and Exchange Commission; (iv) counsel to the DIP Agent; (v) counsel to the Prepetition Agent; (vi) the Internal Revenue Service; and (vii) any other parties requesting such notice (collectively, the "Notice Parties"). Requisite notice of the Motion and the relief

LA1 1989875v.6

requested thereby and this Interim Order has been provided in accordance with Bankruptcy Rule 4001, and no other notice need be provided for entry of this Interim Order.

   M. <u>Good Cause Shown; Best Interest</u>.  The Debtor has requested immediate entry of this Interim Order pursuant to Bankruptcy Rules 4001(b)(2) and 4001(c)(2).  Absent entry of this Interim Order, the Debtor's business, property and estate will be immediately and irreparably harmed.  This Court concludes that good cause has been shown and that entry of this Interim Order is in the best interest of the Debtor's estate and creditors as its implementation will, among other things, allow for the continued operation of the Debtor's existing business and enhance the Debtor's prospects for a successful reorganization.

   N. <u>No Liability to Third Parties</u>.  The Debtor stipulates and the Court finds that in making decisions to advance loans to the Debtor, in administering any loans, in permitting the Debtor to use Cash Collateral, in accepting the Interim Approved Budget or any future Supplemental Approved Budget or in taking any other action permitted by this Interim Order or the DIP Loan Documents, none of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall be deemed to be in control of the operations of the Debtor or to be acting as a "responsible person" or "owner or operator" with respect to the operation or management of the Debtor.

   Based on the foregoing, and upon the record made before this Court at the Interim Hearing, and good and sufficient cause appearing therefore,

   **IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

   1. <u>Approval of Interim Order</u>.  The Motion is approved on the terms and conditions set forth in this Interim Order.  Any objections that have not previously been

12

withdrawn are hereby overruled. This Interim Order shall become effective immediately upon its entry.

2. **Approval of DIP Loan Documents; Authority Thereunder.** The Debtor is hereby authorized, on an interim basis, to enter into the DIP Loan Documents, including the DIP Credit Agreement, and such additional documents, instruments and agreements as may be required or requested by the DIP Agent and the DIP Lenders to implement the terms or effectuate the purposes of this Interim Order. The terms and conditions of the DIP Loan Documents are hereby approved and (i) the Debtor is authorized to comply with and perform all of the terms and conditions contained therein, and (ii) the Debtor is directed to repay amounts borrowed, together with interest and premiums (as applicable) thereon and any other outstanding DIP Obligations to the DIP Agent and the DIP Lenders in accordance with and subject to the terms and conditions set forth in the DIP Loan Documents and this Interim Order.

3. **Authorization to Borrow/Use of Cash Collateral.** Upon finalizing and executing the DIP Credit Agreement and the other DIP Loan Documents, the Debtor is immediately authorized to borrow from the DIP Lenders under the DIP Facility up to an aggregate principal amount not to exceed $10 million (with up to $5 million available upon the entry of this Interim Order) under the DIP Revolving Loans, subject to the terms and conditions of the DIP Loan Documents, provided, however, that if the DIP Agent and/or any DIP Lender in its sole discretion advances funds in excess of these limitations or any other limitations or restrictions set forth herein, such advances shall constitute DIP Obligations and shall be entitled to the benefits of the DIP Loan Documents and this Interim Order. The Debtor is authorized to use the proceeds of the DIP Revolving Loans and Cash Collateral as provided in the DIP Credit Agreement during the period from the Petition Date through and including the 35th day

13

thereafter (the "Interim Period"), provided, that any proposed DIP Revolving Loan or use of Cash Collateral is consistent with the terms of the DIP Loan Documents, the Approved Budget and this Interim Order. Absent entry of the Final Order, the Debtor shall no longer be authorized to use Cash Collateral at the expiration of the Interim Period.

4.    Payment of Adequate Protection.   Upon finalizing and executing the DIP Credit Agreement and the other DIP Loan Documents, the Debtor is authorized to use the proceeds of the DIP Revolving Loans, in part, to make certain limited adequate protection payments to the Prepetition Lenders in accordance with the terms and conditions of the DIP Credit Agreement, the Approved Budget and this Interim Order (including Paragraph 11 of this Interim Order); provided, however, that the Debtor shall only be required to pay to the Prepetition Agent and the Prepetition Lenders such amounts that have accrued and are outstanding on or prior to the Petition Date, except as otherwise permitted in Paragraph 11(i).

5.    Interest on DIP Loans.   The rate of interest to be charged for the DIP Revolving Loans and other extensions of credit to the Debtor pursuant to the DIP Credit Agreement shall be the rates set forth in the DIP Credit Agreement and shall be payable at the times set forth in the DIP Credit Agreement.

6.    Payment of DIP Fees and Expenses.   Subject to and in accordance with the Approved Budget, the Debtor is hereby authorized and directed to pay as provided in the DIP Credit Agreement all reasonable fees, costs, expenses and other amounts payable under the terms of the DIP Loan Documents and all other reasonable, out-of-pocket costs and expenses of the DIP Agent and the DIP Lenders in accordance with the terms of the DIP Loan Documents (including, without limitation, the reasonable, out-of-pocket prepetition and postpetition fees, costs and expenses of legal counsel, financial advisors and third-party appraisers, advisors and

14

consultants advising the DIP Agent and the DIP Lenders). None of such fees, costs and expenses shall be subject to Court approval or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In addition, the Debtor is hereby authorized and directed to indemnify the DIP Agent and the DIP Lenders (and each of their respective directors, officers, employees, agents, representatives, attorneys, consultants, advisors and controlling persons) against any liability arising in connection with the DIP Loan Documents, to the extent set forth in the DIP Loan Documents. All such unpaid fees, costs and expenses and indemnities of the DIP Agent and the DIP Lenders shall be secured by the DIP Collateral (as defined below) and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the DIP Loan Documents.

7.      _Validity of the DIP Loan Documents_. Upon execution and delivery of the DIP Loan Documents, the DIP Loan Documents shall constitute, and are hereby deemed to be the legal, valid and binding obligations of the Debtor, enforceable against the Debtor, its estate, and any successor thereto in accordance with the terms of the DIP Loan Documents and this Interim Order. Any DIP Revolving Loan advanced under the DIP Credit Agreement until the Final Hearing will be made only to fund the Debtor's working capital and general corporate needs, in each case in the ordinary course of business to the extent permitted under the DIP Credit Agreement, and to pay such other amounts as are required or permitted to be paid pursuant to the DIP Credit Agreement, this Interim Order and any other order of this Court, all subject to and in accordance with the Approved Budget, subject to compliance with the Variance Covenant. No obligation, payment, transfer or grant of security under the DIP Loan Documents or this Interim Order shall be stayed, restrained, voided, voidable or recoverable under the

Bankruptcy Code or under any applicable non-bankruptcy law, or subject to any defense, reduction, setoff, recoupment or counterclaim.

8.      Perfection in the Debtor's Cash.    From the Petition Date until the DIP Obligations have been paid in full in cash, all cash receipts, Cash Collateral and all proceeds from the sale or other disposition of the DIP Collateral (as defined below) or Prepetition Collateral and all other proceeds of such collateral of any kind which is now or shall come into the possession or control of the Debtor, or to which the Debtor is now or shall become entitled, shall be promptly deposited only into accounts upon which the Prepetition Agent has perfected Prepetition Liens and such collections and proceeds shall remain subject to all of the security interests and liens of the DIP Agent, for itself and on behalf of the DIP Lenders (subject to any further order of the Court) and shall be treated in accordance with this Interim Order.  Subject to the Carve-Out and other provisions of this Interim Order, all financial institutions in which the Debtor's accounts are located are authorized and directed to comply with any request of the DIP Agent to turn over to the DIP Agent all funds therein without offset or deduction of any kind to the extent necessary to pay the outstanding indebtedness in full under the DIP Facility, and the Debtor is authorized and directed to enter into such blocked account agreements with cash dominion with the DIP Agent and such financial institutions as the DIP Agent may require.

9.      DIP Superpriority Claims.    In accordance with Bankruptcy Code sections 364(c)(1) and 364(d), the DIP Obligations shall constitute superpriority administrative expense claims (the "DIP Superpriority Claims") against the Debtor with priority in payment over any and all administrative expenses, adequate protection claims, diminution claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b)

LA1 1989875v.6

of the Bankruptcy Code, and over any and all administrative expenses or other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114 or otherwise, including those resulting from the conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other non-consensual lien, levy or attachment; provided, however, that the DIP Superpriority Claims shall be subject to the Carve-Out (as defined below).

10.    DIP Liens. As security for the DIP Obligations, the DIP Agent, for itself and on behalf of the DIP Lenders, is hereby granted as of the Petition Date (without the necessity of the execution by the Debtor or the filing or recordation of mortgages, security agreements, lock box or control agreements, financing statements, or any other instruments or otherwise) valid, binding and fully perfected, security interests in, and liens upon (the "DIP Liens"), all present and after-acquired property of the Debtor of any nature whatsoever, including, without limitation, all cash and cash equivalents contained in any account maintained by the Debtor, but excluding all rights, claims and other causes of action of the Debtor's estate and any other avoidance actions under chapter 5 of the Bankruptcy Code and the proceeds thereof and property received thereby whether by judgment, settlement or otherwise (collectively with all proceeds and products of any or all of the foregoing, the "DIP Collateral"), subject only to the Permitted Liens (as defined in the DIP Credit Agreement) and payment of the Carve-Out, which shall consist of:

(a)    First Lien on Cash Balances and Unencumbered Property. Pursuant to section 364(c)(2) of the Bankruptcy Code, a continuing, enforceable, first priority,

fully-perfected lien and security interest upon all of the Debtor's right, title and interest in, to and under all DIP Collateral that is not otherwise encumbered by a validly perfected security interest or lien on the Petition Date as permitted by the Prepetition Credit Agreement (collectively, the "Unencumbered Property").

   (b) <u>Liens Junior to Certain Other Liens</u>.  Pursuant to section 364(c)(3) of the Bankruptcy Code, a junior, perfected lien and security interest (other than as set forth in clause (c) below) upon  all of the Debtor's right, title and interest in, to and under all DIP Collateral which is subject to (i) any validly perfected security interest or lien in existence as of the Petition Date that is not subject to section 552(a) of the Bankruptcy Code, or (ii) any valid security interest or lien perfected (but not granted) after the Petition Date (to the extent such perfection in respect of a pre-Petition Date claim is expressly permitted under the Bankruptcy Code) that is not subject to section 552(a) of the Bankruptcy Code.

   (c) <u>Liens Priming Prepetition Secured Parties' Liens</u>.  Pursuant to section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected lien and security interest upon all of the Debtor's right, title and interest in, to and under the DIP Collateral, subject only to a valid perfected lien that is a Permitted Lien (as defined in the DIP Credit Agreement) and expressly permitted in the DIP Credit Agreement to be senior to the DIP Liens granted to the DIP Agent, for itself and on behalf of the DIP Lenders in this Interim Order to secure the DIP Obligations.  Such security interest shall be senior to and prime the Prepetition Liens and the Adequate Protection Liens (as defined below), but shall be junior to any valid, perfected, enforceable and unavoidable security interests and liens of other parties, if any, on such property existing immediately prior to the Petition Date otherwise permitted by the Prepetition Credit Agreement.

(d)　　Liens Senior to Certain Other Liens.　The DIP Liens and the Adequate Protection Liens (as defined below) shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtor and its estate under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date including, without limitation, any liens or security interests granted in favor of any federal, state, municipal or other governmental unit, commission, board or court for any liability of the Debtor, or (iii) any intercompany or affiliate lien of the Debtor.

11.　　Prepetition Credit Facility Adequate Protection.　As adequate protection for the interests of the Prepetition Secured Parties on account of the Prepetition Liens as a result of (a) the provisions of this Interim Order granting first priority and/or priming liens on such Prepetition Collateral to the DIP Agent, for itself and on behalf of the DIP Lenders; (b) authorizing the use of Cash Collateral; (c) the imposition of the automatic stay pursuant to section 362 of the Bankruptcy Code; or (d) otherwise, pursuant to sections 361, 363(c) and 364(d)(1) of the Bankruptcy Code, the Prepetition Secured Parties are hereby granted, solely to the extent of the diminution in value of the Prepetition Liens in the Prepetition Collateral from and after the Petition Date, the following (collectively, the "Adequate Protection Obligations"):

(i)　　Fees and Expenses.　Subject to and in accordance with the Approved Budget, the Prepetition Agent, on behalf of the Prepetition Secured Parties, is hereby granted payments in cash from the Debtor on a current basis of all reasonable out-of-pocket fees, costs and expenses payable to the Prepetition Agent under the Prepetition Credit Agreement as in effect on the Petition Date, including but not limited to, the reasonable fees and disbursements of counsel, financial and other third party advisors, appraisers and consultants for the Prepetition Agent promptly upon receipt of invoices therefor (subject in all respects to applicable privilege

19

or work product doctrines), without the necessity of filing motions or fee applications or complying with any operative interim fee procedures as may be in effect in the Chapter 11 Case, including such amounts arising (A) before the Petition Date and (B) after the Petition Date to the extent such amounts arise in connection with the enforcement of the protections granted to the Prepetition Lenders pursuant to this Interim Order; provided, however, if and to the extent that any payment(s) is challenged by a party in interest under section 506(b) of the Bankruptcy Code and ultimately not allowed under such provision, such payment(s) may be recharacterized as a payment of principal on the Prepetition Obligations;

(ii)    Adequate Protection Liens.  The Prepetition Agent, on behalf of the Prepetition Secured Parties, is hereby granted valid, enforceable, unavoidable and fully perfected replacement liens and security interests, subject to the Carve-Out and the Permitted Liens, in the collateral of the same nature and type as the Prepetition Collateral, on the same basis and in the same relative priority as the Prepetition Liens, which, with respect to the Prepetition Collateral and the DIP Collateral, shall be junior in all respects to the DIP Liens (the "Adequate Protection Liens").  The Adequate Protection Liens shall be deemed to be legal, valid, binding, enforceable, perfected liens, not subject to subordination or avoidance, for all purposes in the Chapter 11 Case.  Except as otherwise set forth in this Paragraph 11 or otherwise in this Interim Order, the Adequate Protection Liens shall not be subordinated or be made *pari passu* with any other lien under section 364(d) of the Bankruptcy Code or otherwise.  The Adequate Protection Liens shall be deemed to be perfected automatically upon the entry of this Interim Order, without the necessity of filing of any UCC-1 financing statement, state or federal notice, mortgage or other similar instrument or document in any state or public record or office and without the necessity of taking possession or control of any DIP Collateral.  The Adequate

20

Protection Liens shall not be subject to sections 506(c) (subject to the entry of the Final Order), 510, 549, or 550 of the Bankruptcy Code.

(iii)    503 and 507 Claims.    The Prepetition Agent, on behalf of the Prepetition Secured Parties, is hereby granted, subject to the payment of the Carve-Out, superpriority administrative expense claims (the "Prepetition Superpriority Claims") under sections 503 and 507 of the Bankruptcy Code against the Debtor's estate to the extent that the Adequate Protection Liens do not adequately protect against the diminution in value of the Prepetition Liens, which Prepetition Superpriority Claims, if any, shall have priority in payment over any and all administrative expenses of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Bankruptcy Code sections 105, 326, 328, 330, 331, 364, 365, 503(a), 503(b), 506(c) (subject to the entry of the Final Order), 507(a), 507(b), 546(c), 546(d), 726, 1113 and 1114, or otherwise and including those resulting from the conversion of the Chapter 11 Case pursuant to section 1112 of the Bankruptcy Code; provided that at all times while such claim is in full force and effect pursuant to this Interim Order, the Prepetition Superpriority Claims shall be junior in all respects to the DIP Superpriority Claims;

(iv)    Monitoring of Collateral.    The Prepetition Agent shall be permitted to retain expert consultants and financial advisors at the expense of the Debtor, which consultants and advisors shall be given reasonable access for purposes of monitoring the business of the Debtor and the value of the DIP Collateral; and

(v)    Financial Reporting.    The Debtor shall provide the Prepetition Agent with financial and other reporting as described in the Prepetition Credit Agreement;

provided, however, that this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, the rights of the Prepetition Agent and the Prepetition Lenders to seek additional forms of adequate protection at any time.

12.    No Waiver of Prepetition Credit Agreement Provisions; Reservation of Rights. Except as otherwise specifically provided in this Interim Order, nothing contained in this Interim Order shall be deemed a waiver or constitute a consent to the modification of any provision contained in the Prepetition Credit Agreement by the Prepetition Agent or the Prepetition Lenders, including, but not limited to, the incurrence or issuance of any indebtedness by the Debtor, the incurrence of any lien in connection therewith or the making of any payment by the Debtor. Under the circumstances and given that the above-described adequate protection is consistent with the Bankruptcy Code, including section 506(b) thereof, the Court finds that the adequate protection provided herein is reasonable and sufficient to protect the interests of the Prepetition Secured Parties. Notwithstanding anything herein to the contrary, the entry of this Interim Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly: (a) the right of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to seek any other or supplemental relief in respect of the Debtor, including the right to seek additional adequate protection, or (b) any of the rights of any of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right to (i) request modification of the automatic stay of section 362 of the Bankruptcy Code, (ii) request dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a case under chapter 7, or appointment or election of a chapter 11 trustee or examiner with expanded powers, or (iii) propose, subject to the provisions of section 1121 of the Bankruptcy Code, a chapter 11 plan.

13.    Carve-Out. Upon the occurrence of the earlier of (the "Carve-Out Event") (i) an Event of Default (as such term is defined in the DIP Credit Agreement) and continuance thereof and (ii) the Maturity Date (as defined in the DIP Credit Agreement), to the extent unencumbered funds are not available to pay administrative expenses in full, the DIP Liens, the DIP Superpriority Claims, the Prepetition Superpriority Claims, the Adequate Protection Liens, and the Prepetition Liens, shall be subject to the payment of (x) the aggregate amount of any budgeted and unpaid fees, costs and expenses that were accrued or incurred prior to the Carve-Out Event by the professionals retained by the Debtor or any professional retained by any official unsecured creditors' committee ("Committee") (collectively, the "Professionals") to the extent allowed by an order of this Court, plus (y) those fees, costs and expenses incurred by the Professionals after the Carve-Out Event and subsequently allowed by order of this Court and in compliance with the Approved Budget in an amount not to exceed $75,000 in the aggregate, plus (z) fees required to be paid to the Clerk of the Court and to the U.S. Trustee pursuant to 28 U.S.C. § 1930 incurred through a date no later than 90 days following a Carveout Event (unless extended by the DIP Lenders) (collectively, the "Carve-Out"); provided, further, that following a Carve-Out Event any amounts paid to Professionals by any means will reduce the Carve-Out on a dollar-for-dollar basis; and provided, further, that no portion of the Carve-Out, the DIP Facility, the DIP Collateral, the Prepetition Collateral or Cash Collateral shall include, apply to, or be available for any fees, costs or expenses incurred by any party, including the Debtor or any Committee, in connection with (i) the initiation of, prosecution of, or joinder in any claim, cause of action, adversary proceeding, or other litigation against any of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, including, without limitation, (a) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any

defense, counterclaim, or offset to the DIP Obligations, the DIP Superpriority Claims or security interests and liens of the DIP Secured Parties in respect thereof, (b) challenging the amount, validity, extent, perfection, priority, or enforceability of, or asserting any defense, counterclaim, or offset to the Prepetition Obligations, the Prepetition Superpriority Claims or security interests and liens of the Prepetition Secured Parties in respect thereof, or (c) challenging any Adequate Protection Obligation, Adequate Protection Liens, or Adequate Protection Claims, or (ii) asserting or joining in any claim or cause of action, including, without limitation, claims or actions to hinder or delay the DIP Agent's or the other DIP Lenders' assertion, enforcement or realization on the DIP Collateral in accordance with the DIP Loan Documents or this Interim Order; provided, further, however, that no more than $15,000 of the proceeds of the DIP Facility or any proceeds of the DIP Collateral may be used to fund a reasonable investigation by any Committee into the existence of any cause of action or other type of litigation against the Prepetition Secured Parties with respect to the Prepetition Obligations.  Notwithstanding the foregoing, so long as a Carve-Out Event has not occurred: (i) the Debtor shall be permitted to pay, subject to and in accordance with the Approved Budget, administrative expenses allowed and payable under sections 330 and 331 of the Bankruptcy Code, as the same may become due and payable; and (ii) such payments shall not be applied to reduce the Carve-Out (to the extent such payments are ultimately permitted by the Court).  Nothing contained herein is intended to constitute, nor should be construed as consent to, the allowance of any Professional's fees, costs or expenses by any party and shall not affect the right of the Debtor, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders, any Committee, the U.S. Trustee, or any other party-in-interest to object to the allowance and payment or any amounts incurred or requested.

LAI 1989875v.6

Except as otherwise expressly provided herein with respect to the Carve-Out, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders shall not, under any circumstance, be responsible for the direct payment or reimbursement of any fee or disbursement of any Professional in connection with the Chapter 11 Case (or any successor case), and nothing in this Interim Order shall be construed to obligate any such party in any way, to pay compensation to or to reimburse expenses of any Professional, or to ensure that the Debtor has sufficient funds to pay such compensation or reimbursement. Notwithstanding anything to the contrary herein, to the extent there are available any unencumbered assets, such assets shall be used to first fund the Carve-Out.

14.    <u>Investigation Rights</u>. Any Committee shall have a maximum of sixty (60) days from the date of its appointment, but in no event later than seventy-five (75) days from the Petition Date, and in the event no Committee is appointed, all non-debtor parties-in-interest (including a trustee, if appointed or elected prior to the Investigation Termination Date, as defined herein) shall have seventy-five (75) days from the Petition Date (the "<u>Investigation Termination Date</u>") to investigate the validity, perfection and enforceability of the Prepetition Liens and the Prepetition Obligations, or to assert any other claim or cause of action against the Prepetition Secured Parties. If any Committee, or any non-debtor party-in-interest hereafter vested with authority by this Court, determines that there may be a challenge to the Prepetition Secured Parties by the Investigation Termination Date, then upon three (3) days' written notice to the Debtor and the Prepetition Secured Parties, such Committee or other non-debtor party-in-interest hereafter vested with authority by this Court shall be permitted to file and prosecute an objection or claim related thereto (each, a "<u>Challenge</u>"), and shall have only until the Investigation Termination Date to file such objection or otherwise initiate an appropriate action

on behalf of the Debtor's estate setting forth the basis of any such Challenge, claim or cause of action. If a Challenge is not filed on or before the Investigation Termination Date: (a) the Debtor's Stipulations, shall be immediately and irrevocably binding on the Debtor, any Committee and all parties-in-interest and any and all successors-in-interest to any of the foregoing, without further action by any party or this Court, and any Committee and any other party-in-interest and any and all successors-in-interest to any of the foregoing, shall thereafter be forever barred from bringing any Challenge; (b) the Prepetition Liens shall be deemed to constitute valid, binding, enforceable and perfected liens and security interests not subject to avoidance or disallowance pursuant to the Bankruptcy Code or applicable non-bankruptcy law; (c) the Prepetition Indebtedness shall be deemed a finally allowed claim for all purposes in the Chapter 11 Case and any subsequent chapter 7 case, in no less than the amount set forth in Paragraph C and shall not be subject to challenge by any party-in-interest as to validity, priority or otherwise; and (d) the Debtor shall be deemed to have released, waived and discharged the Prepetition Secured Parties (whether in their prepetition or postpetition capacity), together with their respective officers, directors, employees, agents, attorneys, professionals, affiliates, subsidiaries, assigns and/or successors, from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, the Prepetition Obligations. The Prepetition Agent shall cooperate in all reasonable requests for information in order to assist any Committee in its investigation under this Paragraph 14. Notwithstanding anything to the contrary herein: (y) if any such Challenge is timely commenced, the Debtor's Stipulations shall nonetheless remain binding on all parties-in-interest and preclusive except to the extent that such stipulations are expressly and successfully challenged in such Challenge; and (z) the Prepetition Secured Parties reserve all of their rights to contest, on any ground, any Challenge.

LA1 1989875v.6

15.   <u>Protection of the DIP Lenders' Rights</u>.  So long as there are any DIP Revolving Loans or other amounts outstanding under the DIP Loan Documents, the DIP Lenders have any DIP Revolving Commitment under the DIP Credit Agreement or any other DIP Obligations are outstanding, the Prepetition Secured Parties (i) shall not take any action to foreclose upon or recover in connection with their respective liens and security interests, other agreements, or operation of law of this Interim Order, or otherwise exercise remedies against any DIP Collateral, except to the extent authorized by an order of this Court, (ii) shall be deemed to have consented to any release of DIP Collateral authorized under the DIP Loan Documents, (iii) shall not file any further financing statements, trademark filings, copyright filings, patent filings, mortgages, notices of lien or similar instruments, enter into any control agreement, or otherwise take any action to perfect their security interests in the DIP Collateral unless, solely as to this clause (iii), the DIP Agent files financing statements or other documents to perfect the liens granted pursuant to this Interim Order, or as may be required by applicable state law to continue the perfection of valid and unavoidable liens or security interests as of the Petition Date and (iv) not seek to terminate or modify the use of Cash Collateral.

16.   <u>Asset Dispositions</u>.  The Debtor shall immediately pay, or cause to be paid to, the DIP Agent for application to the DIP Obligations, to the extent required by and in the order set forth in the DIP Credit Agreement, all of the proceeds of any sale, lease or other disposition of any DIP Collateral outside of the ordinary course of business (an "<u>Asset Disposition</u>") and shall comply with all other provisions in the DIP Loan Documents and this Interim Order in connection with any such Asset Disposition.  Except to the extent otherwise expressly provided in the DIP Loan Documents, the Debtor shall not sell or otherwise dispose of any DIP Collateral outside the ordinary course of business without the prior written consent of

27

the DIP Agent and the number and/or percentage of DIP Lenders required pursuant to the DIP Credit Agreement and order of the Court after notice and a hearing. The rights of the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders to credit bid all or any portion of their Indebtedness (whether pursuant to a plan of reorganization or liquidation, a sale of assets under Section 363 or otherwise) in connection with any proposed Asset Disposition of DIP Collateral (other than the sale of the Debtor's inventory in the ordinary course of Debtors' business) shall be preserved throughout the Chapter 11 Case and the closing of such sale. All proceeds of any Asset Disposition shall be applied in accordance with the terms and conditions of the DIP Credit Agreement.

17.     Cash Management. The order approving the Debtor's cash management system (the "Cash Management Order") shall be consistent with this Interim Order and the Debtor shall at all times maintain the cash management system set forth in the Cash Management Order. Any material modification to the Debtor's cash management system shall be subject to the prior written consent of the DIP Agent and the Prepetition Agent.

18.     Further Assurances. The Debtor shall execute and deliver to the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders all such agreements, financing statements, instruments and other documents as the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders may reasonably request to evidence, confirm, validate or perfect the DIP Liens or the Adequate Protection Liens granted pursuant hereto. Further, the Debtor is authorized and directed to do and perform all acts, to make, execute and deliver all instruments and documents (including, without limitation, the execution of additional security agreements, pledge agreements, control agreements, mortgages and financing statements), and shall pay fees and expenses that may be required or necessary for the Debtor's

performance under the DIP Loan Documents, including, without limitation, (i) the execution of the DIP Loan Documents and (ii) the payment of the fees, costs and other expenses described in the DIP Loan Documents as such become due.  None of the reasonable attorneys', financial advisers' and accountants' fees and disbursements incurred by the DIP Agent and the DIP Lenders and reimbursable by the Debtor shall be subject to the approval of this Court or the U.S. Trustee guidelines, and no recipient of any such payment shall be required to file with respect thereto any interim or final fee application with this Court. In addition, the Debtor is hereby authorized and directed to indemnify the DIP Agent and the DIP Lenders against any liability arising in connection with the DIP Loan Documents to the extent provided in the DIP Loan Documents.  All such fees, expenses and indemnities of the DIP Agent and the DIP Lenders shall constitute DIP Obligations and shall be secured by the DIP Liens and afforded all of the priorities and protections afforded to the DIP Obligations under this Interim Order and the other DIP Loan Documents.

19.    <u>506(c) Waiver / Equities of the Case</u>.  Upon the entry of the Final Order, the Debtor shall irrevocably waive and shall be prohibited from asserting any surcharge claim, under section 506(c) of the Bankruptcy Code or otherwise, for any costs and expenses incurred in connection with the preservation, protection or enhancement of, or realization by the DIP Secured Parties upon the DIP Collateral or the Prepetition Secured Parties upon the Prepetition Collateral (as applicable).  Upon entry of the Final Order, the Prepetition Secured Parties shall be entitled to all of the rights and benefits of section 552(b) of the Bankruptcy Code, and no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, may be charged against proceeds, product, offspring or profits from any of the DIP Collateral or

LA1 1989875v.6

the Prepetition Collateral under section 552(b) of the Bankruptcy Code. In no event shall the DIP Secured Parties and the Prepetition Secured Parties be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to the DIP Collateral or the Prepetition Collateral (as applicable).

20.    No Creation of any Fiduciary Duty.    In consenting to the Debtor's use of Cash Collateral under the terms set forth herein or in taking any other action related to this Interim Order, the DIP Secured Parties and the Prepetition Secured Parties shall not owe any fiduciary duty to the Debtor, its creditors or its estate. The relationship of the DIP Secured Parties and the Prepetition Secured Parties with the Debtor shall not constitute or be deemed to constitute a joint venture or partnership with the Debtor.

21.    Restrictions on Granting Post-Petition Liens. Other than the Carve-Out, or as otherwise provided in this Interim Order, no claim having a priority superior or *pari passu* with those granted by this Interim Order to the DIP Secured Parties and the Prepetition Secured Parties shall be granted or permitted by any order of this Court heretofore or hereafter entered in the Chapter 11 Case, while (i) any portion of the DIP Facility (or refinancing thereof), any DIP Revolving Loan or any other DIP Facility Obligations are outstanding or (ii) the DIP Lenders have any DIP Revolving Commitment under the DIP Credit Agreement. Except as expressly permitted by the DIP Loan Documents, the Debtor will not, at any time during the Chapter 11 Case, grant mortgages, security interests or liens in the DIP Collateral (or any portion thereof) to any other parties pursuant to section 364(d) of the Bankruptcy Code or otherwise.

22.    Return of Inventory. The Debtor shall not, without the consent of the DIP Secured Parties and the Prepetition Secured Parties: (i) enter into any agreement to return any inventory to any of their creditors for application against any prepetition indebtedness under

LA1 1989875v.6

section 546(h) of the Bankruptcy Code; or (ii) consent to any creditor taking any set-off against any of its prepetition indebtedness based upon any such return pursuant to section 553(b)(1) of the Bankruptcy Code or otherwise.

23.    <u>Automatic Effectiveness of Liens</u>.   The DIP Liens and the Adequate Protection Liens shall not be subject to challenge (except as contemplated by Paragraph 14 herein) and shall attach and become valid, perfected, enforceable, non-avoidable and effective by operation of law as of the Petition Date without any further action by the Debtor, the DIP Agent, the DIP Lenders, the Prepetition Agent and the Prepetition Lenders and without the necessity of execution by the Debtor, or the filing or recordation, of any financing statement, security agreement, vehicle lien application, mortgage, filing with the U.S. Patent and Trademark Office or the Library of Congress, or any other document or the taking of any other action.   All DIP Collateral shall be free and clear of other liens, claims and encumbrances, except as provided in the DIP Loan Documents and this Interim Order.   If the DIP Agent or the Prepetition Agent hereafter requests that the Debtor execute and deliver to the DIP Agent or the Prepetition Agent financing statements, security agreements, collateral assignments, mortgages, or other instruments and documents considered by such agent to be reasonably necessary or desirable to further evidence the perfection of the DIP Liens or the Adequate Protection Liens, as applicable, the Debtor is hereby authorized and directed to execute and deliver such financing statements, security agreements, mortgages, collateral assignments, instruments, and documents, and the DIP Agent or the Prepetition Agent is hereby authorized to file or record such documents in its discretion without seeking modification of the automatic stay under section 362 of the Bankruptcy Code, in which event all such documents shall be deemed to have been filed or recorded as of the Petition Date.

31

24. <u>Automatic Stay</u>. As provided herein, subject only to the provisions of the DIP Credit Agreement and without further order from this Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit the DIP Secured Parties to exercise, upon the occurrence and during the continuance of any Event of Default, all rights and remedies provided for in the DIP Loan Documents, and to take any or all of the following actions, so long as the DIP Agent has provided three (3) business days prior written notice to the Debtor, its bankruptcy counsel, counsel to any Committee and the U.S. Trustee as provided for in Section 8.02(b) of the DIP Credit Agreement: (a) immediately terminate the Debtor's use of Cash Collateral and cease making any advance under the DIP Revolving Loans to the Debtor; (b) declare all DIP Obligations to be immediately due and payable; (c) charge the default rate of interest provided for under the DIP Credit Agreement; (d) freeze monies or balances in the Debtor's accounts; (e) immediately set off any and all amounts in accounts maintained by the Debtor with the DIP Agent or any of the DIP Lenders against the DIP Obligations, or otherwise enforce rights against the DIP Collateral in the possession of any of the DIP Lenders for application toward the DIP Obligations; and (f) take any other action or exercise any other right or remedy permitted under this Interim Order, the DIP Loan Documents or applicable law to effect the repayment of the DIP Obligations. Following the giving of written notice by the DIP Agent of the occurrence of an Event of Default, the Debtor and any Committee in the Chapter 11 Case shall be entitled to an emergency hearing before this court solely for the purpose of contesting whether an Event of Default has occurred. Upon entry of this Interim Order, no party-in-interest shall have the right to contest the enforcement of the remedies set forth in this Interim Order and the DIP Loan Documents on any basis other than an assertion that no Event of Default has occurred, and, except with respect to such an assertion, no

LA1 1989875v.6

party-in-interest shall have the right to enjoin any such enforcement under section 105 of the Bankruptcy Code or otherwise, or to seek any injunctive relief inconsistent with the provisions of this Interim Order or the DIP Loan Documents. The rights and remedies of the DIP Secured Parties specified herein are cumulative and not exclusive of any right or remedy that the DIP Secured Parties may have under the DIP Loan Documents or otherwise. The Debtor (and any subsequently appointed trustee) shall cooperate fully with the DIP Secured Parties in their exercise of rights and remedies, whether against the DIP Collateral or otherwise, including, without limitation, by assuming and assigning to the DIP Agent at the DIP Agent's request any DIP Collateral consisting of an executory contract or unexpired lease. This Court shall retain exclusive jurisdiction to hear and resolve any disputes and enter any orders required by the provisions of this paragraph and relating to the application, re-imposition or continuance of the automatic stay as provided hereunder.

25.    _No Waiver by Failure to Seek Relief._ The failure of any of the DIP Secured Parties and the Prepetition Secured Parties to seek relief or otherwise exercise their rights and remedies under this Interim Order or applicable law, as the case may be, shall not constitute a waiver of any right hereunder, thereunder, or otherwise of the applicable DIP Secured Party or Prepetition Secured Party.

26.    _Proofs of Claim._ Notwithstanding the entry of an order establishing a bar date in the Chapter 11 Case, the Prepetition Agent and the Prepetition Lenders will not be required to file proofs of claim in the Chapter 11 Case with respect to any obligation under the Prepetition Facility Documents or any other claim or lien granted hereunder or created hereby. The Prepetition Agent, for itself and the benefit of the Prepetition Lenders, is hereby authorized and entitled, in its sole discretion, but not required, to file (and amend and/or supplement, as it

33

sees fit) aggregate proofs of claim in the Chapter 11 Case on behalf of the Prepetition Lenders in respect of the Prepetition Indebtedness. Any proof of claim so filed shall be deemed to be in addition and not in lieu of any other proof of claim that may be filed by any of the Prepetition Secured Parties. Any order entered by the Court in relation to the establishment of a bar date in the Chapter 11 Case will so provide.

27.    Binding Effect. The provisions of this Interim Order shall be binding upon and inure to the benefit of the DIP Secured Parties, the Prepetition Secured Parties, the Debtor, any Committee appointed in the Chapter 11 Case, and their respective successors and assigns (including any chapter 7 or chapter 11 trustee hereinafter appointed or elected for the estate of the Debtor, an examiner appointed pursuant to section 1104 of the Bankruptcy Code or any other fiduciary appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor). To the extent permitted by applicable law, this Interim Order shall bind any trustee hereafter appointed for the Debtor's estate, whether in the Chapter 11 Case or in the event of the conversion of the Chapter 11 Case to a liquidation under chapter 7 of the Bankruptcy Code. Such binding effect is an integral part of this Interim Order.

28.    Survival. The provisions of this Interim Order and any action taken pursuant hereto shall survive the entry of any order: (i) confirming any plan of reorganization in the Chapter 11 Case (and, to the extent not satisfied in full in cash, the DIP Obligations shall not be discharged by the entry of any such order, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor having hereby waived such discharge); (ii) converting the Chapter 11 Case to a chapter 7 case; or (iii) dismissing the Chapter 11 Case, and the terms and provisions of this Interim Order as well as the DIP Superpriority Claims and the DIP Liens in the DIP Collateral granted pursuant to this Interim Order and the DIP Loan Documents (and with respect to the

34

entry of any order as set forth in (ii) or (iii) herein, the Adequate Protection Liens and the Prepetition Superpriority Claims) shall continue in full force and effect notwithstanding the entry of any such order. Such claims and liens shall maintain their priority as provided by this Interim Order and the DIP Loan Documents, and to the maximum extent permitted by law, until all of the DIP Obligations are indefeasibly paid in full and discharged. In no event shall any plan of reorganization be allowed to alter the terms of repayment of any of the DIP Obligations from those set forth in the DIP Loan Documents.

29.    Modifications of the DIP Loan Documents.    The Debtor and the DIP Secured Parties are hereby authorized to implement, in accordance with the terms of the DIP Loan Documents, any non-material modifications (including without limitation, any change in the number or composition of the DIP Lenders) of the DIP Loan Documents without further Order of this Court, or any other modification to the DIP Loan Documents (including, without limitation, approval of any Supplemental Approved Budget or extension of the Maturity Date of the DIP Facility); provided, however, that notice of any material modification or amendment to the DIP Loan Documents shall be provided to counsel to any Committee, to the U.S. Trustee, and the Prepetition Agent, each of whom shall have three (3) days from the date of such notice within which to object in writing to such modification or amendment. If any Committee or the U.S. Trustee timely objects to any material modification or amendment to the DIP Loan Documents, such modification or amendment shall only be permitted pursuant to an order of this Court.

30.    No Third Party Rights.    Except as explicitly provided for herein (including in respect of the Carve-Out), this Interim Order does not create any right for the benefit of any third party, creditor, equity holder or any direct, indirect, or incidental beneficiary.

35

31.    <u>Insurance Policies</u>.  Upon entry of this Interim Order, the DIP Agent for itself and the benefit of the DIP Lenders, shall be, and shall be deemed to be, without any further action or notice, named as additional insured and loss payee, as applicable, on each insurance policy maintained by the Debtor which in any way relates to the DIP Collateral.  The Debtor is authorized and directed to take any action necessary to have the DIP Agent, on behalf of itself and the DIP Lenders, be added as an additional insured and loss payee on each insurance policy.

32.    <u>Restriction on Use of the DIP Lenders' Funds</u>.  The Debtor shall not be permitted to use the proceeds of the DIP Revolving Loans: (a) for the payment of interest and principal with respect to any indebtedness that is subordinated to the DIP Facility except as expressly set forth herein, (b) to finance in any way any adversary action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type relating to or in connection with the DIP Loan Documents, including, without limitation, any Challenges to the Prepetition Obligations, or the validity, perfection, priority, or enforceability of any Prepetition Lien securing such claims or any payment made thereunder, (c) to finance in any way any action, suit, arbitration, proceeding, application, motion, other litigation, examination or investigation of any type adverse to the interests of the DIP Agent and the DIP Lenders or their rights and remedies under the DIP Credit Agreement, the other DIP Loan Documents, this Interim Order or the Final Order without the prior written consent of the DIP Agent, (d) to make any distribution under a plan of reorganization in the Chapter 11 Case, and (e) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the DIP Agent.  Notwithstanding anything herein to the contrary, for so long as the Debtor is authorized to use Cash Collateral with the consent of the Prepetition Lenders, no Cash Collateral of the Prepetition Lenders may be

36

used directly or indirectly by the Debtor, any Committee or any other person or entity to object

to or contest in any manner the Prepetition Obligations or the Prepetition Liens, or to assert or

prosecute any actions, claims or causes of action against any of the Prepetition Secured Parties

without the consent of the applicable Prepetition Secured Party.

      33.    Release of Claims and Defenses.  Subject to Paragraph 14, the Debtor

hereby releases and discharges the DIP Secured Parties and the Prepetition Secured Parties,

together with their respective affiliates, agents, attorneys, officers, directors and employees

(collectively, the "Released Parties"), from any and all claims and causes of action arising out of,

based upon or related to, in whole or in part, any of the Prepetition Facility Documents or the

DIP Loan Documents, any aspect of the prepetition relationship between the Debtor, on the one

hand, and any or all of the Released Parties, on the other hand, relating to any of the Prepetition

Facility Documents or the DIP Loan Documents or any transaction contemplated thereby or any

other acts or omissions by any or all of the Released Parties in connection with any of the

Prepetition Facility Documents or the DIP Loan Documents or their prepetition relationship with

the Debtor or any Affiliate thereof relating to any of the Prepetition Facility Documents or the

DIP Facility or any transaction contemplated thereby, including, without limitation, any claims

or defenses as to the extent, validity, priority, or enforceability of the Prepetition Liens or the

Prepetition Obligations, any claims or defenses under chapter 5 of the Bankruptcy Code or any

other causes of action (collectively, the "Claims and Defenses").

      34.    Subsequent Reversal.  If any or all of the provisions of this Interim Order

are hereafter reversed, modified, vacated or stayed, such reversal, modification, vacation or stay

shall not affect the (i) validity of any DIP Obligation, or Adequate Protection Obligation owing

to the DIP Secured Parties and the Prepetition Secured Parties, as applicable, incurred prior to

37

the actual receipt by the DIP Agent or the Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, or (ii) validity or enforceability of any claim, lien, security interest or priority authorized or created hereby or pursuant to the DIP Loan Documents with respect to any DIP Obligation, or Adequate Protection Obligation owing to the DIP Secured Parties and the Prepetition Secured Parties. Notwithstanding any such reversal, modification, vacation or stay, any use of Cash Collateral or the incurrence of DIP Obligations, or Adequate Protection Obligations owing to the Prepetition Secured Parties by the Debtor prior to the actual receipt by the DIP Agent or the Prepetition Agent, as applicable, of written notice of the effective date of such reversal, modification, vacation or stay, shall be governed in all respects by the provisions of this Interim Order, and the DIP Secured Parties shall be entitled to all of the rights, remedies, protections and benefits granted under section 364(e) and 363(m) of the Bankruptcy Code, this Interim Order, and the DIP Loan Documents with respect to all uses of Cash Collateral and the incurrence of any DIP Obligation owing to the DIP Secured Parties and Adequate Protection Obligation owing to the Prepetition Secured Parties.

35.    <u>Effect of Dismissal of the Chapter 11 Case</u>. If the Chapter 11 Case is dismissed or converted, then neither the entry of this Interim Order nor the dismissal or conversion of this Chapter 11 Case shall affect the rights of the DIP Secured Parties or the Prepetition Secured Parties under their respective DIP Loan Documents, Prepetition Facility Documents or this Interim Order, and all of the respective rights and remedies thereunder of the DIP Secured Parties and the Prepetition Secured Parties shall remain in full force and effect as if the Chapter 11 Case had not been dismissed or converted. If an order dismissing the Chapter 11 Case is at any time entered, such order shall provide (in accordance with Sections 105 and 349 of

38

the Bankruptcy Code) that: (i) the DIP Liens and the DIP Superpriority Claims granted to and conferred upon the DIP Agent and the DIP Lenders and the protections afforded to the DIP Agent and the DIP Lenders pursuant to this Interim Order and the DIP Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all DIP Obligations shall have been paid and satisfied in full (and that such DIP Liens, DIP Superpriority Claims and other protections shall, notwithstanding such dismissal, remain binding on all interested parties); (ii) those primed or unprimed (as the case may be) Prepetition Liens, Adequate Protection Liens and Prepetition Superpriority Claims granted to and conferred upon the Prepetition Secured Parties shall continue in full force and effect and shall maintain their priorities as provided in this Interim Order until all Prepetition Indebtedness shall have been paid and satisfied in full (and that such Prepetition Superpriority Claims shall, notwithstanding such dismissal, remain binding on all interested parties); (iii) this Court shall retain jurisdiction, notwithstanding such dismissal, for the purpose of enforcing the DIP Liens, the Prepetition Liens, the DIP Superpriority Claims and the Prepetition Superpriority Claims referred to herein; and (iv) the effectiveness of any order dismissing the Chapter 11 Case shall not occur until sixty (60) days after it is entered in order to give the DIP Agent and the Prepetition Agent the opportunity to perfect their respective security interests and liens in the collateral under non-bankruptcy law, including, without limitation, the filing or recording of financing statements, mortgages, deeds of trust, security deeds, leasehold mortgages, notices of lien or similar instruments in any jurisdiction (including trademark, copyright, tradename or patent assignment filings with the United States Patent and Trademark Office, Copyright Office or any similar United States entity) and the procurement of waivers from any landlord, tenant, mortgagee, bailee or warehouseman and consents from any licensor or similar party-in-interest.

39

36. _Findings of Fact and Conclusions of Law._ This Interim Order constitutes, where applicable, findings of fact and conclusions of law and shall take effect and be fully enforceable immediately upon the execution thereof.

37. _Waiver of Bankruptcy Rules 6003(b), 6004(a) and 6004(h)._ The 21 day provision of Bankruptcy Rule 6003(b), the notice requirements of Bankruptcy Rule 6004(a) and the 14 day stay of 6004(h) are hereby waived.

38. _Choice of Law; Jurisdiction._ The DIP Facility and the DIP Loan Documents (and the rights and obligations of the parties thereto) shall be governed by, and construed and interpreted in accordance with, the laws of the State of New York, including, without limitation, Sections 5-1401 and 5-1402 of the New York General Obligations Law, and, to the extent applicable, the Bankruptcy Code. The Court shall have and will retain exclusive jurisdiction with respect to any and all disputes or matters under, or arising out of or in connection with, either this Interim Order, the DIP Facility or the DIP Loan Documents.

39. _Authorized Signatories._ The signature of any Authorized Officer (as defined in the Debtor's corporate resolutions filed with the Petition) or the Debtor's attorneys, appearing on any one or more of the DIP Loan Documents shall be sufficient to bind the Debtor. No board of directors or other approval shall be necessary.

40. _Order Effective._ This Interim Order shall be effective as of the date of the signature by the Court.

41. _No Requirement to Accept Title to Collateral._ The DIP Agent and the Prepetition Agent shall not be obligated to accept title to any portion of the Prepetition Collateral or the DIP Collateral in payment of the indebtedness owed to such party by the Debtor, in lieu of payment in cash or cash equivalents, nor shall any of the DIP Secured Parties or the Prepetition

40

Secured Parties be obligated to accept payment in cash or cash equivalents that is encumbered by any interest of any person or entity other than the DIP Secured Parties and the Prepetition Secured Parties.

42.      _Controlling Effect of Interim Order_.  To the extent any provision of this Interim Order conflicts with any provision of the Motion, any prepetition agreement or any DIP Document, the provisions of this Interim Order shall control.

43.      _Final Hearing_.  A final hearing on the Motion shall be heard before this Court on [_____], 2011 at _____ [ ].m. in Courtroom _____ at the United States Bankruptcy Court, [_____], [_____], GA [_____].

Dated: February __, 2011.

**- End of Document -**