## UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

IN RE:

SOUTHWEST GEORGIA ETHANOL, LLC,

Debtor.

CHAPTER 11

Case No. _____

## DECLARATION OF LAWRENCE KAMP IN SUPPORT OF FIRST DAY MOTIONS

I, Lawrence Kamp, hereby state and declare as follows:

1.      I am the Chief Financial Officer of Southwest Georgia Ethanol, LLC, debtor in the above-captioned Chapter 11 case, as debtor and debtor-in-possession (the "Debtor"). I am generally familiar with the day-to-day operations, business and financial affairs and books and records of the Debtor.

2.      On February 1, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the Middle District of Georgia, Albany Division.

3.      To enable the Debtor to minimize the adverse effects of the commencement of this Chapter 11 case on its business, the Debtor has requested various types of relief in a number of applications and motions (collectively the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations to preserve value for the Debtor, its stakeholders and parties in interest. Each First Day Motion is crucial to the Debtor's reorganization efforts.

4.    I make this Declaration in support of the First Day Motions. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion. The facts set forth in this Declaration are personally known to me, and, if called as a witness, I could and would testify thereto.

## I.    BACKGROUND

**A.   The Debtor's Business**

5.    The Debtor owns and operates an ethanol production facility located on 267 acres in Mitchell County, Georgia, producing approximately 100 million gallons of ethanol annually. The Debtor's consolidated financial statements reflect $168,892,332 in revenue for the fiscal year ending September 30, 2010, and reflect, as of December 31, 2010, assets of approximately $164,702,843 and liabilities of approximately $134,132,366.

6.    On March 9, 2005, Mitchell County Research Group LLC ("MCRG") formed as a Georgia limited liability company. MCRG funded a feasibility study for a 100 million gallon annual capacity ethanol plant in Mitchell County, Georgia. In September 2005, MCRG created a 13 member board and 20 member advisory board, and changed its name to First United Ethanol, LLC ("FUEL").

7.    In the Spring of 2007, FUEL began construction of the Debtor's ethanol facility, at a projected cost of $185,000,000. On June 8, 2007, FUEL completed an equity offering, having raised $74,010,000 from over 800 investors in a public offering registered with the Securities and Exchange Commission (the "SEC"). FUEL secured project financing with a senior credit facility in the aggregate principal amount of approximately $90,000,000, and a revolving line of credit in the aggregate principal amount of $11,000,000.

8.    As more fully described in section I.B. below, in October 2007, FUEL refinanced its outstanding debt. In connection with the refinancing, FUEL created and organized the Debtor

as a Georgia Limited Liability Company with two members. The members of the Debtor are FUEL, its Class A Member, that holds one Class A unit and CT Corporation Staffing, Inc., its Class B Member, that holds one Class B unit. The Authorized Persons of the Debtor, as such term is defined in Section 6.5 of the Debtor's Operating Agreement, are the members of the Debtor's Management Committee, and they are Murray Campbell, Mark Glass and Rick Moss. I am the Debtor's Chief Financial Officer. The Debtor's Class A Member is entitled to 100% of any distributions by the Debtor. FUEL transferred all of its property and assets to the Debtor in exchange for 100% of the equity interests in the Debtor. FUEL assigned to the Debtor all of its rights and obligations under its executory contracts with third parties relating to the operation of the ethanol facility with the express consent of such third parties.

9.     The Debtor entered into that certain Operation and Maintenance Agreement with FUEL, dated December 6, 2007 (the "O&M Agreement"), as well as that certain Services Agreement with FUEL, dated December 6, 2007 (the "Services Agreement")(collectively, the "Management Agreements"), pursuant to which FUEL operates and manages all of the Debtor's property and assets.

10.    In October 2008, the Debtor commenced ethanol production operations. Pursuant to the terms of the Management Agreements, FUEL employs all of the full time personnel who work at the Debtor's facility. Under the Management Agreements, the Debtor proposes an annual budget that contains the amount of funds the Debtor needs to transfer to FUEL in order to cover the costs of the wages, salaries, benefits and other costs associated with the facility workforce, which budget is approved by the Prepetition Lenders. The Debtor proposes to continue to perform postpetition under the Management Agreements while it defers a decision on the assumption or rejection of such executory contracts.

11.    Ethanol is ethyl alcohol, a fuel component made primarily from corn and various other grains, which can be used as (i) an octane enhancer in fuels; (ii) an oxygenated fuel additive for the purpose of reducing ozone and carbon monoxide vehicle emissions; and (iii) a non-petroleum-based gasoline substitute. The ethanol produced by the Debtor is primarily used for blending with unleaded gasoline and other fuel products. The principal purchasers of ethanol are generally wholesale gasoline marketers or blenders. For the fiscal year ending September 30, 2010, the Debtor derived approximately 80% of its total revenue from the sale of ethanol.

12.    The Debtor markets and distributes all of the ethanol it produces through a third party ethanol marketing agreement with Eco-Energy, Inc. ("Eco"). Under the agreement, the Debtor pays Eco a fee of $0.01 per net gallon of ethanol sold for distribution via railcar, and $0.012 per net gallon of ethanol sold for distribution via truck. The Debtor's agreement with Eco expires in October 2012. Under the agreement, Eco is responsible for all transportation arrangements for the distribution of the Debtor's produced ethanol.

13.    A principal co-product of the ethanol production process is distillers grains, a high protein, high-energy animal feed supplement the Debtor primarily markets to the dairy, poultry and beef industries. Ethanol processing creates three forms of distillers grains, which take three forms: (i) Distillers Wet Grains ("DWS"), (ii) Distillers Modified Wet Grains ("DMWS") and (iii) Distillers Dried Grains with Solubles ("DDGS"). DWS are processed corn mash that contains approximately 70% moisture. DWS have a shelf life of approximately three days and are sold only to farms within the immediate vicinity of the Debtor's ethanol plant. DMWS are DWS that have been dried to approximately 50% moisture. DMWS have a slightly longer shelf life of approximately ten days, and are often sold to nearby markets. DDGS are DWS that have been dried to approximately 12% moisture. DDGS have a much longer shelf life and may be

ATLANTA:5282360.1

sold and shipped to any market regardless of its vicinity to the Debtor's ethanol plant. Currently, 77% of the distillers grains produced by the Debtor are sold as DDGS, and 23% of the distillers grains produced by the Debtor are sold as DWS. In 2010, the Debtor derived approximately 20% of its total revenue from the sale of distillers grains

14.     The Debtor has an agreement with Palmetto Grain Brokerage ("Palmetto Grain"), an unrelated third party, to supply grain to the Debtor. Under the agreement, the Debtor pays Palmetto Grain $.0025 per bushel of grain supplied. In addition, the Debtor pays Palmetto Grain $0.01 per bushel for non-brokered corn purchases. For the fiscal year ending September 30, 2010, the Debtor paid Palmetto Grain approximately $115,000 under this agreement.

15.     Carbon dioxide is an additional co-product of the ethanol production process. On September 1, 2010, Airgas Carbonic, Inc. ("Airgas") commenced operations at a carbon dioxide facility it constructed adjacent to the Debtor's facility. Pursuant to the Debtor's agreement with Airgas, the carbon dioxide facility will purify, liquefy, refine and store carbon dioxide produced as a co-product of the Debtor's ethanol production process. Less than 1% of the Debtor's total revenue was derived from the sale of carbon dioxide during 2010, and the Debtor anticipates that revenue derived from the sale of carbon dioxide will remain at less than 1% of the Debtor's total revenue going forward.

16.     Corn is the principal raw material required for the Debtor's operations. To produce 100 million gallons of ethanol per year, the Debtor processes approximately 36 million bushels of corn, or approximately 100,000 bushels per day. Accordingly, the success of the Debtor's operation is highly dependent on the availability and price of corn. By purchasing corn from local producers during the local harvest, the Debtor is able to save freight expense compared to corn delivered to the Debtor's facility by rail from the midwestern United States. A

ATLANTA:5282360.1

portion of the Debtor's freight savings, however, is offset by the premium that local corn suppliers can charge during certain times of the year. The Debtor actively manages its corn purchasing to avoid long distance freight charges and local premiums wherever possible.

**B.    Existing Debt Facilities**

**(1)    Senior Debt**

17.    The Debtor is the borrower under that certain Senior Credit Agreement dated as of November 20, 2007 (as amended, restated, supplemented, or otherwise modified from time to time the "Loan Agreement"), by and among the Debtor and the following eight secured lenders: AgCountry Farm Credit Services, FCLA; AgFirst Farm Credit Bank; Bank of Camilla; CoBank, ACB; Farm Credit Bank of Texas; Northwest Farm Credit Services, PCA; Planters and Citizens Bank and WestLB AG, New York Branch (individually "WestLB", and in its capacity as administrative agent and collateral agent, the "Prepetition Agent") (collectively, the "Bank Group"). The following lenders participate with AgFirst Farm Credit Bank with respect to its commitment in the Loan Agreement: SWGA Farm Credit; Carolina Farm Credit;  Colonial Farm Credit; Mid Atlantic Farm Credit; AgCredit; SouthWest Florida FC; Cape Fear Farm Credit; Farm Credit Service of GF; Puerto Rico Farm Credit; Farm Credit of the Virginias; Arbor One Farm Credit; Ag Georgia Farm Credit; Chattanooga Farm Credit; and Jackson Purchase FC.

18.    The Loan Agreement provided for (1) a construction loan facility in an aggregate principal amount of up to $100,000,000, which, on February 20, 2009, converted to a term loan with a maturity date of February 20, 2015; and (2) a working capital loan in an aggregate principal amount of up to $15,000,000, with an original maturity date of February 20, 2010, which original maturity date was extended to February 20, 2011. The primary purposes of the Loan Agreement were to finance the construction, commissioning, operation and maintenance of the Debtor's ethanol plant, and to provide working capital to fund the operations and

ATLANTA:5282360.1

maintenance of the plant.

19.    The Debtor's obligations under the Loan Agreement are secured by a first-priority security interest in all of the Debtor's assets, as well as FUEL's equity interest in the Debtor.  As further security for the Debtor's obligations under the Loan Agreement, the Debtor entered into an Accounts Agreement dated as of November 20, 2007 among the Debtor, Amarillo National Bank, as the accounts bank and securities intermediary, and the Prepetition Agent (the "Accounts Agreement").    Among other things, the Accounts Agreement establishes certain special, segregated project accounts and establishes procedures for the deposits and withdrawals of funds into these accounts.  Substantially all cash of the Debtor is required to be deposited into the project accounts subject to security interests to secure obligations in connection with the Loan Agreement.  Funds are released from the project accounts in accordance with the terms of the Accounts Agreement.

20.    On June 7, 2010, the Debtor executed the sixth amendment to the Loan Agreement and the fourth amendment to the accounts agreement.  Pursuant to such amended agreements, the Debtor was required to pay penalty fees if the Debtor had a working capital deficit (as defined in the sixth amendment) of $9,000,000 or more as of September 30, 2010, and $7,000,000 or more as of December 31, 2010.  Subsequent to December 31, 2010, the working capital deficit threshold was set at $7,000,000 for the term of the loan.  The Debtor did not meet the working capital deficit threshold on either September 30, 2010 or December 31, 2010 and as a result, penalty fees of approximately $1,375,000 per quarter have been charged to interest expense and are included in the Debtor's consolidated balance sheet.

21.    As of the Petition Date, the aggregate outstanding principal and accrued interest under the Loan Agreement is $92,301,386.30 with regard to the term loan portion of the facility

ATLANTA:5282360.1

and $14,758,018.36 with regard to the revolving line of credit.

    (2)    **Subordinated Debt**

        (i)    <u>Mitchell County Development Authority Note</u>

22.    By virtue of that certain Omnibus Assignment and Amendment Agreement by and among the Debtor, FUEL, the Mitchell County Development Authority, Southwest Georgia Farm Credit and Wachovia Bank, N.A., dated December 5, 2007, the Debtor is party to a subordinated debt financing arrangement pursuant to which the Mitchell County Development Authority issued $10,000,000 of revenue bonds that were placed with Wachovia Bank. The Debtor signed a promissory note collateralized by the Debtor's assets, and the proceeds were placed in a bond trustee account with Regions Bank. The interest rate for this note is 7.5%. The subordinated debt is a 15 year note with annual principal payments each December due to the bond holders in 2010 of $635,000, in 2011 of $530,000, in 2012 of $570,000, in 2013 of $615,000, in 2014 of $660,000 and $6,240,000 thereafter. The Debtor is required to maintain a debt service reserve with the bond trustee of at least $1,180,000. This note is subordinated to the Loan Agreement pursuant to an Amended and Restated Subordinated Agreement dated as of November 5, 2007, the terms of which prohibit the Debtor from making any debt service payments on this note if amounts due and owing pursuant to the Loan Agreement have not been paid. The Debtor classifies the funds held in the bond trustee account as non-current restricted cash and cash equivalents in the Debtor's consolidated balance sheet.

23.    As of the Petition Date, the outstanding balance owing under the Mitchell County Development Authority note is $8,615,000.

        (ii)    <u>Subordinated Fagen Note</u>

24.    On June 30, 2009, the Debtor entered into a subordinated promissory note agreement with Fagen, Inc. with respect to $3,977,545 owing for the remaining design-build

ATLANTA:5282360.1

contract balance for the construction of the Debtor's facility. The note bears interest at 4% through June 30, 2010 and 8% thereafter through maturity on June 30, 2011. Interest is payable quarterly. The first principal payment of $500,000 was due as of September 30, 2009, along with an annual principal payment of $1,738,772 due June 30, 2010. The final payment of $1,738,772 is due June 30, 2011. This note is subordinated to the Loan Agreement pursuant to a Subordination Agreement dated as of June 30, 2009, the terms of which prohibit the Debtor from making any debt service payments on this note if amounts due and owing pursuant to the Loan Agreement have not been paid.

25.    As of the Petition Date, the outstanding principal balance owing under the Fagen, Inc. note is $3,977,544.83, plus $323,000 in accrued interest through January 31, 2011.

(iii)    Other Notes Payable

26.    The Debtor financed the acquisition of certain equipment through two identical notes payable to John Deere Credit. The notes are secured by the subject items of equipment. The notes mature in August 2012, and bear annual interest at a rate of 5.3%.

27.    As of the Petition Date, the total outstanding balance owing under the John Deere Credit notes is $113,525.80.

(iv)    Leases

28.    The Debtor leases operating machinery under a lease agreement with De Lage Landen. The lease expires in 2013. The leased assets have a capitalized cost of $157,664 included in property and equipment as of September 30, 2010. As of the Petition Date, the total outstanding balance owing to De Lage Landen is $86,427.64.

29.    The Debtor is party to a contract for electric service and an excess facilities charge agreement with Georgia Power Company ("Georgia Power"). During the term of the contract, the Debtor pays monthly charges calculated in accordance with the applicable rules,

    ATLANTA:5282360.1

regulations and rate schedules. Pursuant to the facilities charge agreement, Georgia Power has installed facilities on the Debtor's premises. The Debtor agreed to compensate Georgia Power over a three-year period for the cost of approximately $2,058,000 to install the facilities, of which $874,066.37 remains outstanding as of the Petition Date. The Debtor also compensates Georgia Power for the allocated costs of operating and maintaining the facilities, for which the Debtor pays ongoing annual facilities charges of $95,000.

30.     The Debtor consumes approximately 3,400,000 Million British Thermal Units (BTUs) of natural gas annually, the cost of which constitutes approximately 10% of the Debtor's annual total production cost. The Debtor uses natural gas to produce process steam and to dry the Debtor's distillers grain products. The Debtor is party to a Natural Gas Facilities Agreement with the City of Camilla for a high pressure gas main to serve the plant and purchase natural gas from the City of Camilla. The City of Camilla owns and operates the gas main and leases its usage to the Debtor. The agreement calls for a monthly facilities charge, in addition to the normal consumption charges, equal to the cost of the installation of the gas main over an 80 month period beginning June 2009 and requiring principal and interest payments of approximately $43,000 each month. The Debtor has accounted for the facilities lease charges as a capital lease.

**Additional Accounts Payable and Accrued Expenses.**

31.     In addition to the foregoing outstanding obligations, as of the Petition Date, the Debtor has accounts payable and other accrued expenses owing in the approximate amount of $8,466,875.81.

**C.     Events Leading to Chapter 11**

32.     The Debtor's profitability and liquidity have been materially reduced by unfavorable fluctuations in commodity prices for ethanol and corn, the Debtor's principal

product and raw material ingredient, respectively. Ethanol and corn prices have been highly volatile in recent years, and are beyond the Debtor's control. Ethanol and corn prices are not directly related to each other, meaning that ethanol prices do not necessarily rise when corn prices rise.

33.    During the period from 2006-2010, ethanol prices ranged from a low of $1.53 in 2010 to a high of $3.63 in 2006. During the same period, corn prices ranged from a low of $2.19 in 2006 to a high of $7.25 in 2008. The traditional measure of ethanol profitability is called the "crush margin" and is defined as the price of a gallon of ethanol less the price of .357 bushels of corn (the amount of corn it takes to produce one gallon of ethanol). The crush margin has ranged from a low of $0.13 in 2010 to a high of $2.73 in 2006. The decline in the profit margins in the ethanol production industry can be seen by tracking the average crush margin over the last five years. In 2006, the average crush margin was $1.58 per gallon. In 2007, $0.66; in 2008, $0.34; in 2009, $0.39 and in 2010, $0.30. This reduction in profitability has resulted in financial problems at numerous ethanol producers across the nation and has led to a large number of bankruptcies.

34.    The increased cost of corn has negatively impacted the Debtor's liquidity because overall corn purchases have been a greater proportion of the working capital line than originally anticipated. The Debtor therefore has attempted to conserve working capital by limiting the amount of corn purchased in advance and stored onsite. As a result, the Debtor depends on the timely delivery of corn to match its ethanol production schedules. Although the Debtor purchases substantial amounts of corn from local corn producers during certain times of the year when local corn is competitively priced, the Debtor purchases the majority of its corn from corn suppliers located in the Midwestern United States, delivered via rail cars. In 2010, because of

many instances of unanticipated rail car delays, the Debtor purchased corn from local vendors at substantial premiums to ensure continued plant operations. Buying corn at premium materially reduced profit margins. On several occasions, the Debtor was forced to stop production either because of liquidity constraints which limited its ability to purchase corn or because of corn delivery issues.

35.    The Debtor has experienced a series of operational difficulties since it commenced ethanol production in October 2008, including numerous production stoppages that the Debtor attributes to construction and design problems, which production delays have further reduced the Debtor's liquidity. Specifically, because of design flaws in the plant, an explosion at the plant halted operation for more than a week. Moreover, because the plant did not dissipate heat sufficiently during summer months, output in 2010 was reduced. The Debtor has taken steps to remedy such operational difficulties, and the Debtor does not expect to suffer similar production delays going forward.

36.    The Debtor's reduced liquidity has diminished its ability to service its secured debt. The Debtor's working capital loan matures on February 20, 2011, and the Debtor believes that it will be unable to satisfy its obligations on that date. The Debtor has been unable to refinance its debt obligations either through its existing secured lenders under the Loan Agreement or through third party lenders. The Debtor believes that it would be unable to continue operations without a working capital line equivalent to or greater than the line currently in place. Ultimately, the combination of unfavorable fluctuations in commodity prices of corn and ethanol, operational difficulties due to working capital restrictions and events beyond the Debtor's control, the Debtor's projected inability to satisfy its working capital debt maturity, and the Debtor's inability to restructure its overall debt obligations have precipitated its need to seek

ATLANTA:5282360.1

to reorganize under Chapter 11 of the Bankruptcy Code.

37.     The Debtor's current financial condition supports its filing for protection and seeking to reorganize under Chapter 11 of the Bankruptcy Code. During the Debtor's fiscal year ended September 30, 2010, the Debtor incurred a net loss of approximately $2,200,000. For the last quarter of 2010, ending December 31, 2010, the Debtor incurred a net loss of $2,020,839.

### Restructuring Initiatives and Outlook for the Future

38.     The Debtor's goal in bankruptcy is to propose and obtain confirmation by the Bankruptcy Court a plan of reorganization pursuant to which the Debtor will emerge from bankruptcy as a reorganized company with a restructured capital structure permitting continued sustainable ongoing business operations for the benefit of its stakeholders and parties in interest. The Debtor has secured additional financing from certain of its Prepetition Lenders under the Loan Agreement in connection with its bankruptcy filing.

39.     Without such additional financing, the Debtor believes that its operations will cease in the immediate near term, resulting in significant loss of value to all of its stakeholders and parties in interest. With such additional financing in place, however, the Debtor believes that it can institute improved operations and better manage commodity pricing risks. Specifically, the additional working capital will permit the Debtor to increase advance purchasing of corn to reduce its dependence on timely rail car deliveries of raw materials. The Debtor also plans to seek to amend its Approved Budget (as defined below), in the event the Debtor experiences a budget surplus, to deploy additional working capital to purchase hedge positions on corn and ethanol commodity prices, a strategy that the Debtor successfully used in the past until a lack of working capital precluded its ability to do so. The DIP Lenders have not agreed to such amendment. The Debtor also believes that its continued improvements in the

13

operation of the plant will result in production increases in the near term. Consistent with these plans, the Debtor has presented a twenty-six week budget cash projection to its DIP Lenders.

40.     During the Chapter 11 process, the Debtor intends to continue normal operations as it completes its operational and financial restructuring for the benefit of its creditors and all other parties in interest.

## II.    FIRST DAY MOTIONS AND APPLICATIONS

41.     Concurrently with the filing of its Chapter 11 petition, the Debtor is filing certain applications, motions, and proposed orders (the "First Day Orders"). The Debtor requests that each of the First Day Orders described below be entered, as each constitutes a critical element in achieving the successful rehabilitation and restructuring of the Debtor for the benefit of all parties in interest.

### D.    Motion to Approve Debtor in Possession Financing and Use of Cash Collateral

42.     The Debtor lacks sufficient unencumbered funds with which to operate and maintain its business and assets during the pendency of this Chapter 11 case. The Debtor's ability to satisfy critical operating expenses is essential to the Debtor's ability to maintain its asset values. Accordingly, the Debtor has an immediate need for debtor-in-possession financing and the use of cash collateral.

43.     To provide the Debtor with the funding necessary to fulfill its administrative and operational obligations throughout the duration of the Chapter 11 case, the Debtor requires a postpetition lending facility. In exploring its options, the Debtor recognized that the obligations owed to the Prepetition Lenders are secured by all of its assets, and therefore, (i) the liens of these prepetition secured creditors would have to be primed to obtain postpetition financing, (ii) the Debtor would have to find a postpetition lender willing to extend credit that would be junior to the liens of these prepetition secured creditors, or (iii) postpetition financing would have to be

extended on an unsecured basis. The Prepetition Lenders advised the Debtor's representatives that they would not consent to be primed by another lender group, therefore borrowing from another lender or lending group that required security senior to that of the Prepetition Lenders likely could only be accomplished through an extended, contested hearing on whether the requirements of section 364(d) of the Bankruptcy Code had been satisfied. In view of these circumstances, the DIP Lenders were willing to extend postpetition financing and thus prime their own prepetition security interests.

44.    Ultimately, the Debtor concluded that the DIP Credit Agreement proposed by the DIP Lenders is desirable because, among other things, the DIP Credit Agreement permits the Debtor to secure the postpetition financing required for its reorganization without having to prime the senior credit facility through an extended, contested hearing. In addition, a comparison of the DIP Lenders' proposal to the postpetition facility obtained by the debtor in the VeraSun, Aventine Renewable Energy and Pacific Ethanol Chapter 11 cases from the United States Bankruptcy Court for the District of Delaware shows substantial similarities, particularly with respect to pricing and fees.

45.    Importantly, the DIP Credit Agreement provides that the Debtor may draw funds immediately (on an interim basis) to meet its administrative and operational obligations during this Chapter 11 case. There shall be an operating budget, subject to the approval of the DIP Agent and the DIP Lenders, consisting of the Borrower' estimated projected cash flow position on a rolling 13-week basis (the "Approved Budget"), commencing as of the Closing Date. Finally, because the DIP Lenders are comprised of certain of the parties to the senior credit facility, they have a substantial base of knowledge with respect to the Debtor's business and assets that provide significant benefits, including, but not limited to, the speed with which they

ATLANTA:5282360.1

would be able to close the proposed DIP Facility. Consequently, the Debtor determined that the DIP Lenders' proposed postpetition financing is the best financing option available under the circumstances.

46.     Each of the proposed uses of the DIP Facility confers a direct benefit upon the Debtor and its estate. Among other things, the DIP Facility allows the Debtor to finance the ordinary costs of its operations, maintain business relationships with vendors, suppliers and customers, make payroll, and satisfy other working capital and operational needs.

47.     The Debtor's failure to pay such vendors and employees would surely cause such parties to cease provision of such goods and services to the severe, and possibly fatal, detriment of the Debtor's bankruptcy estate.

48.     Accordingly, the Debtor has filed a motion seeking approval of certain debtor in possession financing and the use of cash collateral. In order to continue to operate its business in an orderly fashion and to avoid immediate and irreparable harm to its business, it is necessary for the Debtor to immediately obtain this relief. The Debtor otherwise does not have sufficient available sources of working capital and financing to carry on the operation of its business.

49.     I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and critical to the Debtor's reorganization effort.

**E.     Motion for Authorization to Continue Using Existing Centralized Cash Management System and Maintain Existing Bank Accounts**

50.     The Debtor requests, pursuant to sections 105 and 363 of the Bankruptcy Code and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure, (a) the continued maintenance and use of the Debtor's existing cash management system, (b) the continued maintenance and use of the Debtor's existing bank accounts, (c) the continued use of existing

ATLANTA:5282360.1

business forms and checks, and (d) a waiver, on an interim basis, of investment and deposit requirements.

51.     Before the commencement of this Chapter 11 case, the Debtor used independent cash management systems to collect, transfer and disburse funds generated by its operations and to accurately record all such transactions as they are made (collectively, the "Cash Management System") in the ordinary course of business.

52.     The Cash Management System consists primarily of three (3) active bank accounts utilized by the Debtor through which the Debtor is able to manage cash receipts and disbursements (collectively, the "Bank Accounts").   A schedule of the Bank Accounts maintained by the Debtor, including the names and addresses of the institutions, the general purpose of the Bank Accounts, and the Bank Account numbers, is attached as Exhibit A to the cash management motion.

53.     The Debtor's three active Bank Accounts are held at Amarillo National Bank (Account Nos. xxx982, xxx992, and xxx976).   These three accounts are comprised of an operating account, a revenue account and a debt service reserve account, each of which is required to be maintained pursuant to the Debtor's senior credit facility.   Pursuant to the Management Agreements between the Debtor and FUEL, FUEL handles the Debtor's disbursements and receipts from the Bank Accounts.

54.     The Debtor's Cash Management System allows for (a) overall corporate control of funds, (b) cash availability when and where needed by the Debtor, and (c) the reduction of administrative costs through a method of coordinating funds collection and movement.   The Debtor's smooth transition into, and out of, Chapter 11 depends on its ability to maintain these Bank Accounts and operate this Cash Management System without interruption.   The Cash

Management System allows the Debtor to manage all of its cash flow needs and includes the necessary accounting controls to enable the tracing of funds through the system to ensure that all transactions are adequately documented and readily ascertainable. The Debtor will continue to maintain detailed records reflecting all transfers of funds. The cash management procedures utilized by the Debtor constitute ordinary, usual and essential business practices and are similar to those used by other major corporate enterprises.

55.    In the ordinary course of business, the Debtor uses the Cash Management System to efficiently collect, transfer, and disburse funds generated by its business operations. The Debtor's Cash Management System constitutes an ordinary course, essential business practice providing significant benefits to the Debtor. Any disruption of the Cash Management System could have a severe and adverse impact upon the Debtor's reorganization efforts.

56.    Also, the Debtor's operations would be severely harmed by the disruption, confusion, delay, and cost that would most certainly result from rigid compliance with the U.S. Trustee's "Operating Guidelines and Reporting Requirements For Debtor in Possession and Trustees" (the "Guidelines"), which may require, as of the Petition Date, the closure of the Debtor's prepetition bank accounts, the opening of new accounts, and the immediate printing of new checks with the full name of the relevant debtor in possession exactly as it appears on the voluntary petition as well as a "Debtor in Possession" and case number designation.

57.    The relief requested in this motion is vital to ensuring the Debtor's seamless transition into bankruptcy. Authorizing the Debtor to maintain its Cash Management System, as modified, will avoid many of the possible disruptions and distractions that could divert the Debtor's attention from more pressing matters during the initial days of the Chapter 11 case.

58.    The Debtor represents that if the relief requested in this Motion is granted, it will

ATLANTA:5282360.1

not pay, and each of the Banks at which the Bank Accounts are maintained, will be directed not to pay, any debts incurred by the Debtor before the Petition Date other than as authorized by this Court. The Debtor will continue to work closely with the Banks that maintain the Bank Accounts against which checks are drawn in order to ensure that appropriate procedures are in place so that checks issued before the Petition Date on account of obligations of the Debtor, but presented after the Petition Date, will not be honored absent approval from this Court. Accordingly, in order to avoid delays in payments to administrative creditors, to ensure as smooth a transition into Chapter 11 as possible with minimal disruption, and to aid the Debtor's efforts to complete this Chapter 11 case successfully and rapidly, the Debtor should be permitted to continue to maintain its existing Bank Accounts, notwithstanding the fact that the Bank Accounts are not at banks designated as approved depositories in the Middle District of Georgia by the United States Trustee.

59.    I believe that the relief requested in the cash management motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization effort.

**F.    Application for Order Authorizing Retention and Employment of McKenna Long & Aldridge LLP, as Bankruptcy Counsel for Debtor in Possession**

60.    The Debtor has selected the firm of McKenna Long & Aldridge LLP ("McKenna") as its bankruptcy counsel because of the firm's recognized expertise in the field of business reorganizations under Chapter 11 of the Bankruptcy Code, as well as in other areas of law related to this Chapter 11 case.

61.    McKenna has the necessary background to deal effectively with many of the potential legal issues and problems that may arise in the context of the Debtor's Chapter 11 case. The Debtor believes that McKenna is both well qualified and uniquely able to represent it in this

ATLANTA:5282360.1

Chapter 11 case in a most efficient and timely manner.

62.    McKenna has performed legal work for the Debtor in the preparation and filing of the Chapter 11 petition. McKenna has not performed any legal services for the Debtor in the past other than legal services in connection with the preparation for this bankruptcy proceeding.

63.    McKenna received three retainer payments from the Debtor totaling $136,039 (inclusive of a payment of $1,039 for the Chapter 11 filing fee) for work to be done with respect to this Chapter 11 case, against which McKenna has applied $129,056.62. Accordingly, McKenna currently holds a balance of $6,982.38 as an advance payment for services to be rendered and expenses to be incurred in connection with its representation of the Debtor. McKenna has not been paid any other compensation by the Debtor.

64.    I believe that the continued representation of the Debtor by McKenna, as its bankruptcy counsel is critical to the success of the Debtor's Chapter 11 case.

65.    Accordingly, I believe that McKenna is well qualified to render such services and, based on the Declaration of J. Michael Levengood in support of McKenna's retention, I do not believe that McKenna holds any disqualifying interest adverse to the Debtor or the Debtor's estate in matters upon which the law firm is to be engaged by the Debtor.

**G.    Application for Order Authorizing Retention and Employment of Morgan Keegan & Company, Inc., as its Investment Banker and Financial Advisor**

66.    In recognition of its need for sound restructuring advice, the Debtor sought to retain a firm with substantial experience in the reorganization and restructuring of companies in financial distress. As a result of the expertise and successful history of Morgan Keegan & Company, Inc. ("Morgan Keegan") in providing investment banking and financial advisory services to other companies in financially complex, troubled situations, the Debtor selected Morgan Keegan as its investment banker and financial advisor.

ATLANTA:5282360.1

67.     Morgan Keegan has the necessary background to deal effectively with many of the potential issues and problems that may arise in the context of the Debtor's Chapter 11 case. The Debtor believes that Morgan Keegan is both well qualified and uniquely able to represent it in this Chapter 11 case in a most efficient and timely manner.

68.     Morgan Keegan has performed certain services for the Debtor in the past, including certain placement services in connection with the Debtor's senior credit facility as well as ongoing advisory services in connection with amendments to the Debtor's senior credit facility.

69.     The services to be rendered by Morgan Keegan to the Debtor are not intended to be duplicative in any manner with the services performed or to be performed by any other professionals retained by the Debtor. Morgan Keegan will undertake every reasonable effort to avoid duplication of its services with those services provided by other professionals. Moreover, Morgan Keegan will work closely with the Debtor and the Debtor's counsel in providing financial advice for the Debtor.

70.     I believe that the continued representation of the Debtor by Morgan Keegan pursuant to the terms of the Engagement Letter is critical to the success of the Debtor's Chapter 11 case because Morgan Keegan has become uniquely familiar with the Debtor's business, financial affairs, and financial structure.

71.     I believe that Morgan Keegan is well qualified to render such services and, I do not believe that Morgan Keegan holds any disqualifying interest adverse to the Debtor or the Debtor's estate in matters upon which the firm is to be engaged by the Debtor.

**H.      Application for Order Authorizing Retention and Employment of Epiq Bankruptcy Solutions, LLC, as Claims, Balloting and Noticing Agent**

72.     Although the Debtor has not yet filed its schedules of assets and liabilities, it

ATLANTA:5282360.1

anticipates that there will be over one thousand entities that the Debtor will be required to serve with various notices, pleadings, and other documents filed in this Chapter 11 case. Considering the number of anticipated claimants and parties in interest and the nature of the Debtor's business, the Debtor believes that the appointment of Epiq Bankruptcy Solutions, LLC ("Epiq") as claims, noticing, and balloting agent for the Debtor will expedite the distribution of notices, relieve the Clerk's office of the administrative burden of processing such notices, and permit the Debtor to focus on its reorganization efforts.

73.    In addition, in connection with any plan or reorganization proposed by the Debtor, the Debtor has determined that it will require the services of Epiq with respect to the mailing of the Debtor's disclosure statement, plan, and ballots and in maintaining and tallying ballots in connection with the voting on such plan.

74.    Epiq has not performed any services for the Debtor in the past other than services in connection with this restructuring.

75.    Epiq received a retainer from the Debtor in the amount of $22,500.00 for work to be done with respect to this Chapter 11 case, against which Epiq has applied $20,700.00. Accordingly, Epiq currently holds a balance of $1,800.00 as an advance payment for services to be rendered and expenses to be incurred in connection with its retention by the Debtor. Epiq has not been paid any other compensation by the Debtor.

76.    The services to be rendered by Epiq to the Debtor are not intended to be duplicative in any manner with the services performed or to be performed by any other professionals retained by the Debtor. Epiq will undertake every reasonable effort to avoid duplication of its services with those services provided by other professionals.

77.    Accordingly, I believe that Epiq is well qualified to render such services and, I do

ATLANTA:5282360.1

not believe that Epiq holds any disqualifying interest adverse to the Debtor or the Debtor's estate in matters upon which the firm is to be engaged by the Debtor.

## I.   Change Venue to Macon

78.     The Debtor requests entry of an order, pursuant to Local Rule 1014-2, authorizing the change of divisional venue from the Albany Division to the Macon Division of the United States Bankruptcy Court for the Middle District of Georgia.

79.     The Debtor has hired McKenna as its bankruptcy counsel (by separate filing made contemporaneously herewith, the Debtor seeks approval of McKenna's retention). McKenna's offices are located in Atlanta, Georgia, approximately three hours from Albany, Georgia by car.

80.     The Prepetition Agent has retained legal counsel located outside the State of Georgia. The Debtor anticipates that certain of its Prepetition Lenders will also provide the Debtor with debtor-in-possession financing during this Chapter 11 case, and WestLB will act as agent under such debtor-in-possession facility (the "DIP Agent" and together with the Prepetition Agent, the "Agents"). The Debtor anticipates that counsel for the Agents frequently will travel to argue matters before this Court. The Debtor anticipates that the Agents' counsel will fly into Atlanta, Georgia, and then drive to any such hearings.

81.     The Debtor has hired Morgan Keegan as its investment banker and financial advisor (by separate filing made contemporaneously herewith, the Debtor seeks approval of Morgan Keegan's retention). Morgan Keegan has offices located in Atlanta, Georgia, and certain of the Morgan Keegan professionals who will work on this matter are located outside the State of Georgia and intend to fly into Atlanta, Georgia, and then drive to Court hearings.

82.     The judicial offices of the Macon Division are located substantially closer to Atlanta, Georgia than are the judicial offices of the Albany Division; accordingly, the costs for the Debtor's legal counsel and investment banker, as well as the Agents' counsel (whose fees

ATLANTA:5282360.1

and expenses the Debtor anticipates it will be required to pay), to travel to the Macon Division would be materially less than the costs to travel to the Albany division. Therefore, the Debtor believes that the estate will save material costs if this Chapter 11 case is heard in the Macon Division, which cost savings will benefit the Debtor, its estate, and all creditors and parties in interest.

83.    Moreover, because the judicial offices of the Macon Division are centrally located between Atlanta, Georgia and the Debtor's location in Pelham, Georgia, none of the Debtor's creditors would be substantially prejudiced by this Chapter 11 case being heard in the Macon Division. To the extent that any such creditors are, in fact, prejudiced by this Chapter 11 case being heard in the Macon Division, any such prejudice is substantially outweighed by the overall benefit to the Debtor and all of its parties in interest due to the substantial cost savings anticipated by the move to a more convenient forum.

84.    In addition, the Debtor is informed and believes that the Bankruptcy Judge that the Debtor anticipates will preside over this Chapter 11 case conducts hearings more frequently in the Macon Division than in the Albany Division. Given the anticipated active nature of this Chapter 11 case, the Debtor respectfully submits that changing the divisional venue of this Chapter 11 case to the Macon Division is consistent with the Court's more frequent hearing dates in Macon, thus conserving judicial resources.

85.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

## J.    Motion to Authorize Payment of Prepetition Shipping, Delivery and Warehousing Charges

86.    The Debtor seeks entry of an order authorizing, but not requiring it, to pay

ATLANTA:5282360.1

prepetition shipping and delivery charges (the "Shipping Charges") and storage charges (the "Warehouse Charges" and together with the Shipping Charges, the "Shipping and Warehouse Charges") to third party railroad, trucking, container forwarders and other shippers (the "Shippers") and terminal operators (the "Warehousemen") that the Debtor determines, in the exercise of its business judgment, are necessary, appropriate and are in accordance with the Approved Budget. The Debtor estimates that the prepetition Shipping and Warehouse Charges to be paid pursuant to this Motion are approximately $2 million.

87.    The Debtor also seeks entry of an order confirming that the Shippers and Warehousemen will have administrative expense priority claims under section 503(b) of the Bankruptcy Code for those undisputed obligations arising from prepetition purchases of goods delivered, received and accepted by the Debtor after the Petition Date, including goods in transit on or after the Petition Date.

88.    In the normal course of its business, the Debtor incurs fees to certain Shippers and Warehousemen for delivery and storage of ethanol and its co-products for its customers and for the delivery of corn and other production material to the Debtor's plant. In the ordinary course of business, Shippers and Warehousemen invoice the Debtor for services previously rendered. At any given time, Shippers are transporting ethanol and its co-products from the Debtor's facility, Shippers are transporting raw materials to the Debtor's facility, and Warehousemen are storing materials in storage terminals awaiting delivery.

89.    The services provided by the Shippers are critical to the Debtor's day to day operations, as the Debtor depends upon the Shippers for timely, consistent deliveries of ethanol to its customers and corn and other materials to its plant. Similarly, the storage of ethanol

ATLANTA:5282360.1

by Warehousemen, pending distribution to the Debtor's customers, is essential to the Debtor's business operations.

90.    In return for receiving prompt payment on account of obligations arising with respect to any Shipping and Warehouse Charges, the Shippers and Warehousemen, through the endorsement of any check for payment or other written acknowledgment in respect of such Shipping and Warehouse Charges, shall be deemed to have agreed to continue supplying shipping and/or storage services to the Debtor at prevailing market prices in accordance with the most favorable terms and conditions (including payment terms) pursuant to historical practices in effect between such Shippers and Warehousemen and the Debtor in the twelve months prior to the Petition Date, or such other terms and conditions as are agreed to by the Debtor and the applicable Shipper or Warehouseman.

91.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**K.    Motion to Authorize Payments to Suppliers of Goods Within 20 Days Prior to the Commencement of this Chapter 11 Case and to Confirm Administrative Expense Status**

92.    The Debtor seeks, pursuant to sections 105 and 503(b) of the Bankruptcy Code, an order (i) confirming grant of administrative expense status to obligations arising from prepetition delivery of goods received by the Debtor within 20 days of the commencement date of this Chapter 11 case, (ii) confirming grant of administrative expense status to obligations arising from postpetition delivery of goods, supplies, products and materials, and (iii) authorizing, but not directing, the Debtor to pay such obligations in the ordinary course of business and in accordance with the DIP Loan Documents.

93.    In the ordinary operation of the Debtor's business, the Debtor requires certain

ATLANTA:5282360.1

goods, such as corn, chemical substances, natural gas, denaturants (e.g. unleaded gasoline or liquid natural gas), as well as other substances (collectively, the "Goods") to produce ethanol and its co-products. In connection with the purchase of these Goods, the Debtor also requires services (the "Services") from the assorted subcontractors, suppliers, and vendors, including farmers and local grain elevators, chemical suppliers, gasoline suppliers, and natural gas suppliers that supply Goods to the Debtor (the "Vendors"). Prior to the commencement of this Chapter 11 case, the Debtor placed orders with certain Vendors for Goods. Certain of these Vendors delivered Goods to the Debtor within 20 days of the filing date of this Chapter 11 case (the "20-Day Goods"). The Debtor estimates that approximately $3,100,000 in respect of such 20-Day Goods will become due and payable during the next thirty (30) days.

94.    Because the Debtor relies so heavily on the delivery of the Goods for the Debtor's production of ethanol and distiller grains, timely delivery of the Goods is critical. Many Vendors may not be sophisticated in the complexities of Chapter 11 cases and may require additional confirmation that payment for Goods and Services provided will occur in a timely manner. Should one of these Vendors decide not to deliver Goods during the course of this Chapter 11 case out of fear that it will not be paid, it would be difficult to replace such Vendors in the short term and consequently, the Debtor may have to shut down, or reduce production at its manufacturing plant. This, in turn, could cause a disruption of shipments to customers, resulting in irreparable harm to the Debtor and its estate. If the Debtor does not timely pay the Vendors and maintain its goodwill, the Debtor's relationship with the Vendors could be damaged and its business relationships could be undermined, thus, jeopardizing a successful reorganization.

95.    The Vendors' claims relating to the 20-Day Goods are administrative expenses. The Debtor ordered the Goods prepetition, and the Vendors delivered the Goods to the Debtor

ATLANTA:5282360.1

within 20 days of the commencement date of this Chapter 11 case. The Debtor has not paid for the 20-Day Goods as of the Petition Date. The Debtor believes that it must pay the claims of the Vendors with respect to the 20-Day Goods, or the Vendors may refuse to continue to do business with the Debtor. For example, many of the providers of corn are local farmers who, during the next month will be making decisions regarding crop rotation, and the Debtor relies on them to plant corn that the Debtor will purchase for delivery at maturity this summer. If the Debtor does not pay these farmers for the 20-Day Goods, then they may choose not to plant corn, to the detriment of the Debtor and parties in interest in this Chapter 11 case.

96.     The Debtor is not seeking to change the amounts owed to the Vendors or the priority in which creditors are paid in this Chapter 11 case. Rather, the Debtor is only seeking to process payments, in its discretion, to the Vendors' claims because those claims, as they related to the 20-Day Goods, are afforded administrative expense status by the Bankruptcy Code.

97.     In return for receiving prompt payment on account of obligations arising with respect to any 20-Day Goods, the Vendors, through the endorsement of any check for payment in respect of such 20-Day Goods, shall be deemed to have agreed to continue supplying Goods and related Services to the Debtor at prevailing market prices in accordance with the terms and conditions (including payment terms) pursuant to historical practices in effect between such Vendor and the Debtor in the twelve months prior to the Petition Date, or such other terms and conditions as are agreed to by the Debtor and the applicable Vendor. Specifically, by their endorsement of any check for payment in respect of such 20-Day Goods, Vendors that agreed prior to the Petition Date to deliver Goods and related Services to the Debtor during calendar year in 2011 shall be deemed to have agreed to supply such Goods and related Services to the Debtor on the same terms as previously agreed. The Debtor reserves all of its rights, specifically

28                                                  ATLANTA:5282360.1

including the right to pursue all remedies with respect to the non-performance or breach by any Vendor of any outstanding obligation owing to the Debtor pursuant to outstanding executory contracts or otherwise.

98.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**L.    Motion to Prohibit Utility Companies from Altering or Discontinuing Service on Account of Prepetition Invoices, Approving the Adequate Assurance of Postpetition Payment to be Provided to the Utility Companies, and Establishing Procedures for Resolving any Subsequent Requests by the Utility Companies for Additional Adequate Assurance of Payment**

99.    As of the Petition Date, four principal Utility Companies provide Utility Services to the Debtor at its facility: Georgia Power Company ("Georgia Power") for provision of electricity, the City of Camilla for provision of natural gas, AT&T for the provision of telecommunication services, and Verizon Wireless for the provision of telecommunication services. The Utility Companies service the Debtor's ethanol plant as well as the Debtor's administrative offices and any other facility supporting its operations. Prior to the Petition Date, the Debtor had a consistent history of making timely payment for its Utility Services. However, due to the timing of the filing of this Chapter 11 case in relationship to the Utility Companies' billing cycles, and the Debtor's financial situation leading to the filing of this Chapter 11 case, certain utility costs may have been invoiced to the Debtor for which payment is currently due but has not been paid. In addition, the Debtor may have incurred utility costs for services provided since the end of the last billing cycle that have not been invoiced to the Debtor.

100.    The services provided by the Utility Companies are crucial to the continued operations of the Debtor. If the Utility Companies refuse or discontinue service, even for a brief period, the Debtor's could be forced to cease operations.

ATLANTA:5282360.1

101.    By this motion, the Debtor preserves the protections that the Utility Companies have under the Bankruptcy Code, while affording the Debtor an opportunity to provide and negotiate adequate protection without facing the threat of imminent termination of Utility Services.   In particular, the Debtor requests approval of certain procedures that balance the protections afforded the Utility Companies under section 366 of the Bankruptcy Code and the Debtor's need for continuous and uninterrupted Utility Services.

102.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**M.    Motion to Establish Procedures for the Provision of Notice and Service**

103.    The Debtor seeks entry of an order authorizing the Debtor to limit notice of most contested matters to interested parties contained on a master service list and otherwise regulating the manner and form of notice and service of papers in this Chapter 11 case.

104.    Hundreds of creditors and other parties in interest may be entitled to receive notice of various proceedings in the Debtor's Chapter 11 case, including certain matters described in Bankruptcy Rule 2002.  Providing notice of all pleadings and papers filed in this Chapter 11 case to each of these parties is unnecessary and would impose burdensome and costly photocopying and postage expenses on the Debtor's estate.

105.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts

**N.    Motion to Continue to Perform under Two Executory Contracts With an Affiliate of the Debtor, namely, First United Ethanol, LLC ("FUEL")**

106.    The Debtor entered into the Management Agreements pursuant to which FUEL

operates and manages all of the Debtor's property and assets. The Debtor seeks authority to continue to perform under the Management Agreements until such time as the Debtor obtains an order authorizing the assumption or rejection of such executory contracts.

107.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**O.    Motion of the Debtor To Pay Prepetition State Withholding and Agriculture Payments**

108.    The Debtor, in the ordinary course of its business, withholds corn check off fees from certain of its purchases of corn, which fees are payable to the Georgia Agricultural Commodity Commission for Corn, as well as fees in order to sell its distillers grains in the states of Georgia, Alabama and Florida (collectively, the "State Agriculture Payments"). The Debtor remits payment for the State Agriculture Payments with the returns for each Authority's reporting period, as well as in the Debtor's ordinary course of business with respect to the Debtor's corn purchases and sales of distillers grains.

109.    Specifically, the Debtor withholds $0.01 from the purchase price of each bushel of corn the Debtor purchases, and pays such withheld amounts to the Georgia Agricultural Commodity Commission for Corn in the ordinary course of the Debtor's business. The Debtor also remits sums to the states of Georgia, Alabama and Florida in connection with the Debtor's rights to sell distillers grains in those states.

110.    The Debtor regularly pays these State Agriculture Payments, and may have sent checks for State Agriculture Payments that may not have been presented or cleared as of the Petition Date. The Debtor also seeks authorization for its banks to honor prepetition checks and wires issued by the Debtor to the Authorities in payment of prepetition State Agriculture

31

Payments that, as of the Petition Date, have not cleared. Accordingly, the Debtor seeks authority to pay the State Agriculture Payments as they come due.

111.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**P.    Motion To Establish Procedures For Monthly Compensation and Reimbursement of Expenses of Professionals**

112.    The Debtor requests the entry of an order establishing procedures by which each professional retained by the Debtor or any official committee appointed in this Chapter 11 case under Sections 327 and 1103 of the Bankruptcy Code may obtain monthly payment of its fees and expenses, subject to review and adjustment in connection with regular fee applications filed with the Court.

113.    Concurrent with this filing, the Debtor seeks approval of its employment, under Section 327 of the Bankruptcy Code, of several professionals in this Chapter 11 case: McKenna as legal bankruptcy counsel; Morgan Keegan as its investment banker and financial advisor; and Epiq as its claims, noticing, and balloting agent. The Debtor anticipates that it may need to retain other professionals as this Chapter 11 case progresses. The Debtor also anticipates that any official committee, including an official committee of unsecured creditors (the "Committee"), if formed, will need to retain professionals in this Chapter 11 case under Section 1103 of the Bankruptcy Code.

114.    The Debtor believes that the relief requested in this Motion will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees incurred in this Chapter 11 case more effectively.

115.    I believe that the relief requested in this motion is in the best interests of the

ATLANTA:5282360.1

Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

**Q.    Motion to Establish Critical Vendor Payment Procedures**

116.    In its day-to-day operations, the Debtor heavily relies on many suppliers and service providers.  Like many large manufacturing companies, the Debtor relies on vendors such as the manufacturers and servicers of equipment for its factories and the suppliers of the custom-made packaging materials it uses to ship products to its customers.

117.    The Debtor believes that the goods and services supplied by certain of its vendors are critical to its operations in that its business could not continue to operate without access to such goods and services.  As of the Petition Date, many of the vendors deemed critical by the Debtor have outstanding claims against the Debtor arising from prepetition deliveries of goods and prepetition performance of services.  The Debtor anticipates it will be able to continue to transact with a majority of the vendors on which its day-to-day business operations depend despite nonpayment by the Debtor of such vendors' prepetition claims.  Nonpayment of the prepetition claims of certain of the Debtor's vendors, however, creates a significant risk of disruption to the Debtor's operations.  Thus, the Debtor anticipates there will be instances in which payment of the prepetition claims of certain vendors will benefit all creditors because such payment will allow the Debtor's business to avoid a likely loss, or to gain a likely economic advantage, disproportionate to the amount of such vendors' prepetition claims.

118.    Accordingly, the Debtor requests that the Court establish Critical Vendor Payment Procedures by which the Debtor may pay certain Critical Vendors.  In exchange for payment by the Debtor of any Critical Vendor Claim, the Debtor intends to require such Critical Vendor to agree to transact with the Debtor, for such duration of time as agreed between the Debtor and such Critical Vendor on Customary Trade Terms, unless otherwise agreed by the

ATLANTA:5282360.1

Debtor and the Critical Vendor.

119.    I believe that the relief requested in this motion is in the best interests of the Debtor's estate and creditors and is both necessary and appropriate to the efficient administration of this Chapter 11 case and the Debtor's reorganization efforts.

## CONCLUSION

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

*[signature follows]*

ATLANTA:5282360.1

Respectfully submitted this 1st day of February, 2011.

Name:   Lawrence Kamp
Title:    Chief Financial Officer to the Debtor

ATLANTA:5282360.1