# UNITED STATES BANKRUPTCY COURT
## MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

In re:

**Southwest Georgia Ethanol, LLC** *dba*
**Southwest Georgia Ethanol, LLC,**
**a FUEL Company,**

                    **Debtor.**

**FEIN 26-1353633**

**Case No. 11-10145 – JDW**

**Chapter 11**

---

## DISCLOSURE STATEMENT FOR DEBTOR'S PLAN OF REORGANIZATION UNDER CHAPTER 11 OF THE BANKRUPTCY CODE DATED AUGUST 26, 2011

Dated: August 26, 2011
Atlanta, Georgia

MCKENNA LONG & ALDRIDGE LLP
Gary W. Marsh
Georgia Bar No. 471290
gmarsh@mckennalong.com
J. Michael Levengood
Georgia Bar No. 447934
mlevengood@mckennalong.com
Bryan E. Bates
Georgia Bar No. 140856
bbates@mckennalong.com
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
Telephone (404) 527-4000
Facsimile  (404) 527-4198

COUNSEL FOR THE DEBTOR IN POSSESSION

THIS IS NOT A SOLICITATION OF ACCEPTANCE OF THE PLAN. ACCEPTANCES MAY NOT BE SOLICITED UNTIL THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT.

# TABLE OF CONTENTS

I.      INTRODUCTION ............................................................................. 1

        A.      PURPOSE OF THIS DOCUMENT ........................................... 1

        B.      SUMMARY OF THE PLAN ...................................................... 1

        C.      VOTING AND CONFIRMATION PROCEDURES ............................. 5

                1.      Holders of Claims Entitled to Vote ................................ 6

                2.      Voting Instructions and Voting Deadline ...................... 7

                3.      Who to Contact for More Information ........................... 8

                4.      Acceptance or Rejection of the Plan ............................. 8

        D.      CONFIRMATION HEARING ................................................... 9

        E.      RECOMMENDATION .............................................................. 9

        F.      COMMITTEE'S STATEMENT REGARDING THE PLAN .................. 9

II.     OVERVIEW OF THE PLAN ...................................................... 9

III.    OVERVIEW OF CHAPTER 11 .......................................................... 12

IV.     FORMATION, BUSINESS, DEBT STRUCTURE, AND OTHER PRE-
        PETITION OBLIGATIONS OF THE DEBTOR ................................. 12

        A.      FORMATION AND HISTORY OF THE DEBTOR ............................ 12

        B.      THE BUSINESS ...................................................................... 16

                1.      The Debtor's Products and Production Process ........................... 16

        C.      DEBTOR'S PRE-PETITION CAPITAL STRUCTURE ....................... 19

                1.      Secured Financing ........................................................ 19

                2.      Unsecured Debt ........................................................... 20

                3.      Equity Interests in the Debtor .................................... 20

        D.      DEBTOR'S MANAGEMENT TEAM .................................... 20

V.      EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER
        11 CASE .......................................................................................... 21

VI.     THE CHAPTER 11 CASE ................................................................. 21

        A.      SIGNIFICANT "FIRST DAY" MOTIONS ........................... 21

                1.      DIP Credit Facility and Use of Pre-Petition Secured
                        Lenders' Cash Collateral ............................................. 22

                2.      Payment of 503(b)(9) and Critical Vendor Claims ..................... 22

        B.      COMMITTEE OF UNSECURED CREDITORS .................... 23

        C.      EXECUTORY CONTRACTS AND LEASES ....................... 23

ATLANTA:5326255.1

| | D. | CLAIMS PROCESS | 23 |
| | E. | STIPULATION WITH BANK GROUP AND UNSECURED COMMITTEE | 23 |
| | F. | EXTENSION OF THE DEBTOR'S EXCLUSIVE PERIODS | 24 |
| | G. | THE FUEL OPERATING AGREEMENTS | 24 |
| | H. | THE DEBTOR'S MARKETING EFFORTS | 24 |
| VII. | | SUMMARY OF THE PLAN | 25 |
| | A. | INTRODUCTION | 25 |
| | B. | CLASSIFICATION OF CLAIMS AND INTERESTS | 25 |
| | | 1. Introduction | 25 |
| | | 2. Treatment Of Administrative and Priority Claims, and Classification of Claims And Equity Interests Under The Plan | 25 |
| | | 3. Unclassified — Administrative Claims | 27 |
| | | 4. Unclassified — DIP Facility Claims | 28 |
| | | 5. Unclassified — Professional Fee Claims | 28 |
| | | 6. Unclassified — Priority Tax Claims | 29 |
| | | 7. Class 1 – Senior Secured Lender Claims | 29 |
| | | 8. Class 2 – Bond Claim | 30 |
| | | 9. Class 3 – Fagen Claim | 31 |
| | | 10. Class 4 – Other Secured Claims | 32 |
| | | 11. Class 5 – General Unsecured Claims | 32 |
| | | 12. Class 6 – Convenience Claims | 33 |
| | | 13. Class 7 – Equity Interest Of Class A Member (FUEL) | 33 |
| | | 14. Class 8 – Equity Interest Of Class B Member (CT Corporation Staffing) | 34 |
| | C. | PROVISIONS REGARDING UNCLASSIFIED PRIORITY CLAIMS | 34 |
| VIII. | | MEANS FOR IMPLEMENTATION OF THE PLAN AND EFFECTS OF CONFIRMATION | 34 |
| | A. | NEW LLC AGREEMENT | 34 |
| | B. | ISSUANCE OF NEW MEMBERSHIP INTERESTS | 35 |
| | C. | Listing of New Membership Interests | 37 |
| | D. | TERMINATION OF THE DIP FACILITY | 38 |

ATLANTA:5326255.1

| | E. | EXIT FINANCING ................................................................. 38 |
|---|---|---|
| | F. | EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS ...... 39 |
| | G. | CANCELLATION OF EXISTING SECURITIES ................................. 39 |
| | H. | EXEMPTION FROM TRANSFER TAXES ........................................... 40 |
| | I. | EXEMPTION FROM SECURITIES LAWS ......................................... 40 |
| | J. | NEW BOARD OF MANAGERS ........................................................... 40 |
| | K. | OFFICERS ........................................................................................... 41 |
| | L. | EMPLOYMENT AGREEMENTS ....................................................... 41 |
| | M. | OBJECTIONS TO CLAIMS AND ESTIMATION OF CLAIMS .......... 41 |
| | | 1. Administrative Claims Bar Date .................................................. 41 |
| | | 2. Objections to Claims and Administrative Claims ........................ 42 |
| | | 3. Estimation of Claims .................................................................... 42 |
| | | 4. No Payments on Account of Disputed Claims ............................ 43 |
| | N. | ESTABLISHMENT OF THE LITIGATION TRUST ........................... 43 |
| IX. | | OTHER PLAN PROVISIONS ............................................................ 46 |
| | A. | BINDING EFFECT ............................................................................. 46 |
| | B. | RETENTION OF JURISDICTION ........................................................ 47 |
| | C. | DISSOLUTION OF THE COMMITTEE ............................................... 49 |
| | D. | MODIFICATIONS TO PROPOSED PLAN .......................................... 49 |
| | E. | U.S. TRUSTEE FEES AND REPORTS ................................................ 49 |
| | F. | SUBSTANTIAL CONSUMMATION .................................................... 49 |
| | G. | POST-EFFECTIVE DATE FEES AND EXPENSES ............................. 50 |
| | H. | POST-EFFECTIVE DATE NOTICE LIMITED ..................................... 50 |
| | I. | PLAN SUPPLEMENT .......................................................................... 50 |
| | J. | GOVERNING LAW ............................................................................. 50 |
| | K. | COMPUTATION OF TIME .................................................................. 51 |
| | L. | NOTICES ............................................................................................. 51 |
| X. | | PROVISIONS REGARDING DISTRIBUTIONS ................................ 52 |
| | A. | DISTRIBUTIONS ONLY ON TIMELY-FILED, ALLOWED CLAIMS ............................................................................................. 52 |
| | B. | DATE OF DISTRIBUTIONS ................................................................ 52 |
| | C. | INTEREST ON CLAIMS ...................................................................... 52 |

| | D. | MEANS OF PAYMENT | 52 |
|---|---|---|---|
| | E. | ROUNDING | 53 |
| | F. | NO CASH PAYMENTS OF $50 OR LESS ON ACCOUNT OF ALLOWED CLAIMS IN CLASS 5 PRIOR TO FINAL DISTRIBUTION DATE | 53 |
| | G. | UNCLAIMED PROPERTY | 53 |
| | H. | TAXES | 54 |
| | I. | ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST | 54 |
| XI. | | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 54 |
| | A. | REJECTION OF CONTRACTS AND LEASES | 54 |
| | B. | CURE OF DEFAULTS, REJECTION DAMAGES, AND AMENDMENT OF SCHEDULE | 55 |
| | C. | SURVIVAL OF CERTAIN CORPORATE INDEMNITIES | 55 |
| XII. | | CONDITIONS PRECEDENT TO THE EFFECTIVE DATE | 56 |
| XIII. | | CERTAIN EFFECTS OF CONFIRMATION | 57 |
| | A. | VESTING OF THE DEBTOR'S ASSETS | 57 |
| | B. | DISCHARGE OF DEBTOR, DISCHARGE OF CLAIMS, AND TERMINATION OF INTERESTS | 57 |
| | C. | INJUNCTIONS | 57 |
| | D. | RELEASE | 58 |
| | E. | TERMS OF INJUNCTIONS AND STAYS | 58 |
| | F. | EXCULPATION | 58 |
| | G. | CAUSES OF ACTIONS PRESERVED | 59 |
| XIV. | | VALUE OF REORGANIZED DEBTOR | 60 |
| | A. | COMPARABLE PUBLIC COMPANY ANALYSIS | 61 |
| | B. | PRECEDENT TRANSACTIONS ANALYSIS | 61 |
| | C. | DISCOUNTED CASH FLOW APPROACH | 62 |
| XV. | | CERTAIN RISK FACTORS TO BE CONSIDERED | 64 |
| | A. | PROJECTED FINANCIAL INFORMATION | 64 |
| | B. | RISKS RELATED TO THE DEBTOR'S BUSINESS AND OPERATIONS | 64 |
| | | 1. Availability and Prices of Commodities | 64 |

| | 2. | Operations of the Debtor's Facility | 65 |
|---|---|---|---|
| | 3. | Impact of Demand for Gasoline on Ethanol Sales | 65 |
| | 4. | Future Supply and Demand of Ethanol | 66 |
| | 5. | Regulatory Environment; Taxes and Tariffs | 66 |
| | 6. | Health, Safety and Environmental Laws | 66 |
| | 7. | Competitive Environment | 67 |
| | 8. | Consumer and Industry Opposition to Ethanol | 67 |
| C. | | ABILITY TO REFINANCE CERTAIN INDEBTEDNESS AND RESTRICTIONS IMPOSED BY INDEBTEDNESS | 68 |
| D. | | CERTAIN BANKRUPTCY LAW CONSIDERATIONS | 68 |
| | 1. | Risk of Non-Confirmation of the Plan | 68 |
| | 2. | Risk of Non-Occurrence of the Effective Date | 68 |
| E. | | CERTAIN RISKS RELATING TO THE EQUITY SECURITIES ISSUED UNDER THE PLAN | 69 |
| | 1. | Preferred Units | 69 |
| | 2. | Common Units | 69 |
| F. | | CERTAIN TAX RISKS | 69 |
| XVI. | | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN | 70 |
| A. | | TAX CONSEQUENCES TO THE DEBTOR | 71 |
| | 1. | Cancellation of Indebtedness Income | 72 |
| | 2. | Transfer of Litigation Trust Assets to the Litigation Trust | 76 |
| B. | | TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN CLAIMS | 76 |
| | 1. | Distributions in Discharge of Accrued Interest | 76 |
| | 2. | Definition of Security | 77 |
| | 3. | Market Discount | 77 |
| | 4. | Character of Gain or Loss | 78 |
| | 5. | Holders of Class 1 - Pre-Petition Senior Secured Lender Claims | 78 |
| | 6. | Holder of the Class 2 Bond Claim | 80 |
| | 7. | Holder of the Class 3 Fagen Claim | 80 |
| | 8. | Holders of Class 5 General Unsecured Claims | 81 |
| | 9. | Holders of Class 6 Convenience Claims | 81 |

ATLANTA:5326255.1

C.      TAX CONSEQUENCES OF OWNERSHIP OF NEW PREFERRED UNITS AND NEW CLASS B UNITS ........................... 82

D.      TAX CONSEQUENCES TO HOLDERS OF INTERESTS ................... 84

    1.      Holder of Class 7 – Equity Interest of Class A Member (FUEL) ........................................................................................ 84

    2.      Holder of Class 8 – Equity Interest of Class B Member (CT Corporation Staffing) ................................................................. 87

E.      INFORMATION REPORTING AND BACKUP WITHHOLDING ..... 87

F.      PROFESSIONAL TAX ASSISTANCE .................................................. 87

G.      RESERVATION OF RIGHTS ............................................................... 88

H.      TAX TREATMENT OF THE LITIGATION TRUST AND BENEFICIAL INTEREST HOLDERS ................................................... 88

    1.      Gain or Loss Recognition ........................................................... 88

    2.      Classification of the Litigation Trust .......................................... 89

    3.      General Tax Reporting by the Litigation Trust and Beneficiaries ................................................................................ 89

I.      SENIOR SECURED LENDERS' POSITION REGARDING TAX TREATMENT ....................................................................................... 91

J.      SENIOR SECURED LENDERS POSITION REGARDING TAX CONSEQUENCES TO THE DEBTOR .................................................. 92

    1.      Current Structure ........................................................................ 92

    2.      Cancellation of Indebtedness Income ......................................... 93

    3.      Transfer of Litigation Trust Assets to the Litigation Trust .......... 99

K.      SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN CLAIMS ........ 99

    1.      Distributions in Discharge of Accrued Interest ........................... 99

    2.      Market Discount ....................................................................... 100

    3.      Character of Gain or Loss ......................................................... 100

    4.      Holders of Class 1 - Pre-Petition Senior Secured Lender Claims ...................................................................................... 101

    5.      Holder of the Class 2 Bond Claim ............................................ 102

    6.      Holder of the Class 3 Fagen Claim ........................................... 102

    7.      Holders of Class 5 General Unsecured Claims .......................... 103

    8.      Holders of Class 6 Convenience Claims .................................... 103

ATLANTA:5326255.1

L.    SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES OF OWNERSHIP OF NEW PREFERRED UNITS AND NEW CLASS B UNITS ................................................... 103

     1.    Equity Treatment of the New Preferred Units and New Class B Units................................................................. 104

     2.    Tax Treatment of Reorganized Debtor ...................................... 104

     3.    Tax Consequences to Members of Reorganized Debtor............ 105

M.    SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES TO HOLDERS OF INTERESTS ......................... 106

     1.    Holder of Class 7 – Equity Interest of Class A Member (FUEL) ...................................................................... 106

     2.    Holder of Class 8 – Equity Interest of Class B Member (CT Corporation Staffing) ............................................... 108

N.    SENIOR SECURED LENDERS' POSITION REGARDING INFORMATION REPORTING AND BACKUP WITHHOLDING ... 108

O.    SENIOR SECURED LENDERS' POSITION REGARDING CERTAIN TAX CONSEQUENCES TO NON-U.S. HOLDERS ........ 109

     1.    Tax Consequences to Non-U.S. Holders .................................. 109

     2.    Information Reporting and Backup Withholding ...................... 109

P.    SENIOR SECURED LENDERS' POSITION REGARDING PROFESSIONAL TAX ASSISTANCE ................................................. 110

Q.    SENIOR SECURED LENDERS' POSITION REGARDING RESERVATION OF RIGHTS ............................................................. 111

R.    SENIOR SECURED LENDERS' POSITION REGARDING TAX TREATMENT OF THE LITIGATION TRUST AND BENEFICIAL INTEREST HOLDERS ................................................. 111

     1.    Gain or Loss Recognition ......................................................... 111

     2.    Classification of the Litigation Trust ........................................ 112

     3.    General Tax Reporting by the Litigation Trust and Beneficiaries ........................................................................... 112

XVII.   CONFIRMATION AND CONSUMMATION PROCEDURE ........................ 114

A.    GENERAL INFORMATION ............................................................... 114

B.    SOLICITATION OF ACCEPTANCES ............................................... 114

C.    ACCEPTANCES NECESSARY TO CONFIRM THE PLAN ............. 114

D.    CONFIRMATION OF PLAN PURSUANT TO SECTION 1129(b) ............................................................................................... 114

ATLANTA:5326255.1

E.    CONSIDERATIONS RELEVANT TO ACCEPTANCE OF THE PLAN ................................................................................................ 115

F.    FEASIBILITY OF THE PLAN ............................................................. 115

G.    BEST INTEREST/HYPOTHETICAL LIQUIDATION ANALYSIS ......................................................................................... 115

XVIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN .................................................................................................. 116

XIX.   RECOMMENDATION .................................................................................. 117

ATLANTA:5326255.1

# I.
# INTRODUCTION

## A.     PURPOSE OF THIS DOCUMENT

Southwest Georgia Ethanol, LLC ("Southwest Georgia" or the "Debtor") hereby submits this Disclosure Statement for Debtor's Plan of Reorganization Under Chapter 11 of the Bankruptcy Code dated August 26, 2011 (the "Disclosure Statement") pursuant to section 1125(b) of Title 11, United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 3017 of the Federal Rules of Bankruptcy Procedure, in connection with the Plan of Reorganization Filed by the Debtor dated August 26, 2011 (the "Plan"). By order dated [], 2011 (the "Disclosure Statement Approval Order"), the United States Bankruptcy Court for the Middle District of Georgia, Albany Division (the "Bankruptcy Court") has found that the Disclosure Statement provides adequate information to enable holders of Claims and Interests that are impaired under the Plan to make an informed judgment in exercising their right to vote for acceptance or rejection of the Plan. A copy of the Plan is attached hereto as Exhibit A. All capitalized terms used but not defined in the Disclosure Statement shall have the respective meanings ascribed to such terms in the Plan, unless otherwise noted.

## B.     SUMMARY OF THE PLAN

On February 1, 2011 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court. On the date hereof, the Debtor filed its proposed Plan, which sets forth the manner in which Claims against and equity interests in the Debtor will be treated.

This Disclosure Statement is being submitted pursuant to section 1125 of the Bankruptcy Code for use by those entitled to vote on whether to accept or reject the Plan in connection with (a) the solicitation by the Debtor of acceptances of the Plan and (b) the hearing by the Bankruptcy Court to consider confirmation of the Plan. That hearing (the "**Confirmation Hearing**") presently is scheduled for [], 2011, at [_]:[_] [a.m.][p.m.], prevailing Eastern Time.

The Plan sets forth the manner in which Claims against the Debtor, and equity interests in the Debtor, are proposed to be treated in connection with the reorganization of the Debtor in connection with the Chapter 11 Case. This Disclosure Statement describes certain aspects of the Plan, and also provides a general description of the Debtor's business as well as information regarding various other matters relevant to the purpose for which this Disclosure Statement has been prepared. This Disclosure Statement is intended to provide sufficient information to enable those who are entitled to vote on the acceptance or rejection of the Plan, as explained below, to make an informed decision in connection with that vote. Among other things, this Disclosure Statement describes:

> ▫     an overview of how the Plan treats creditors of the Debtor, and holders of equity interests in the Debtor (Article II);

- how Chapter 11 works (Article III);
- the Debtor's business and prepetition capital structure (Article IV);
- the events leading up to the commencement of the Chapter 11 Case (Article V);
- significant events in the Chapter 11 Case (Article VI);
- summary of the Plan (Article VII);
- the means for implementation of the Plan and effects of confirmation (Article VIII);
- other Plan provisions (Article IX);
- provisions regarding distributions (Article X);
- treatment of executory contracts and unexpired leases (Article XI);
- conditions precedent to the Effective Date (Article XII);
- certain effects of confirmation (Article XIII);
- certain projections and valuations (Article XIV);
- certain risk factors to be considered before voting (Article XV);
- certain federal income tax consequences of the Plan (Article XVI);
- the procedures for confirming the Plan (Article XVII);
- alternatives to confirmation and consummation of the Plan (Article XVIII); and
- recommendation (Article XIX).

This Disclosure Statement has been carefully prepared in order to, among other things, describe the material aspects of the Plan, but it is not intended to override the Plan or any aspect of it. Accordingly, in the event there are any inconsistencies or ambiguities between the Plan itself and the descriptions of the Plan contained in this Disclosure Statement, the terms of the Plan will govern. The Plan and this Disclosure Statement, along with the other exhibits attached to this Disclosure Statement, and the exhibits attached to the Plan or to the Plan Supplement, are the only materials that those who are entitled to vote on acceptance or rejection of the Plan should use in determining how to vote.

After careful consideration of the Debtor's business and assets, and its prospects for reorganization, as well as the alternatives to reorganization, the Debtor has determined that the recoveries to creditors will be maximized by utilizing the treatment established under the Plan. The Debtor further has determined it is not possible to afford any recovery at all to the holder of the Class B Membership Interest in the Debtor, whether under the reorganization proposed in the Plan or in any liquidation alternative.

The following additional materials are or will be attached as exhibits to this Disclosure Statement:

as "**Exhibit A**", a copy of the Plan, including the exhibits thereto (excluding any exhibit included as an exhibit to the Plan Supplement);

as "**Exhibit B**", the Debtor's Pre-Petition Income Statements for the period following the commencement of ethanol production;

as "**Exhibit C**", a copy of the Debtor's Financial Projections;

ATLANTA:5326255.1

as "**Exhibit D**", a copy of the Debtor's Liquidation Analysis;

as "**Exhibit E**", a copy of the New LLC Agreement;

as "**Exhibit F**", a listing of the initial post-Effective Date officers and managers of the Reorganized Debtor;

as "**Exhibit G**", a copy of the order of the Bankruptcy Court (excluding the exhibits thereto), dated [], 2011 (the "Disclosure Statement Order"), that, among other things, approves this Disclosure Statement, establishes procedures for the solicitation and tabulation of votes to accept or reject the Plan, and schedules the hearing on confirmation of the Plan; and including a copy of the notice of the confirmation hearing (the "Confirmation Hearing Notice");

a Notice to Voting Classes;

a Ballot to be executed by holders of Class 1, 2, 3, 5, 6 and 7 Claims and Interests to accept or reject the Plan; and

other documents approved by the Bankruptcy Court to be included in the solicitation materials with respect to the Plan.

In the case of any exhibits not yet attached hereto, such exhibits will be filed with the Bankruptcy Court sufficiently in advance of the hearing to consider approval of this Disclosure Statement.

In addition to the exhibits attached to this Disclosure Statement and the exhibits attached to the Plan, the Debtor anticipates there will be certain additional materials that are necessary or appropriate to the implementation and/or confirmation of the Plan. Those additional materials are summarized in this Disclosure Statement, to the extent now known or reasonably determinable; and copies of those materials (in final or substantially final form), or summaries thereof, will be contained in the Plan Supplement. The Plan Supplement will be filed by the Debtor with the Clerk of the Bankruptcy Court no later than (A) five (5) calendar days prior to the Confirmation Hearing or (B) such later date as may be approved by the Bankruptcy Court on notice to parties in interest. Information on obtaining access to the Plan Supplement, on-line or in hard copy, is contained in Article IX(I) of this Disclosure Statement.

On [], 2011, after notice and a hearing, the Bankruptcy Court approved the Disclosure Statement Order, determining that this Disclosure Statement contains "adequate information" (as that term is defined in section 1125 of the Bankruptcy Code). Section 1125(a)(1) of the Bankruptcy Code defines "adequate information" as "information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and the history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material federal tax consequences of the plan to the Debtor, any successor to the Debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that would enable such a hypothetical investor of the relevant class to make an informed judgment about the plan, but adequate information need not include such information about any other possible or proposed plan and in determining whether a disclosure statement provides adequate information, the court shall consider the complexity of the case, the benefit

ATLANTA:5326255.1

of additional information to creditors and other parties in interest, and the cost of providing additional information...." 11 U.S.C. §1125(a)(1).

THIS DISCLOSURE STATEMENT HAS BEEN APPROVED BY ORDER OF THE BANKRUPTCY COURT AS CONTAINING INFORMATION OF A KIND, AND IN SUFFICIENT DETAIL, TO ENABLE HOLDERS OF CLAIMS AND INTERESTS TO MAKE AN INFORMED JUDGMENT IN VOTING TO ACCEPT OR REJECT THE PLAN. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION OR RECOMMENDATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR THE MERITS OF THE PLAN.

THIS DISCLOSURE STATEMENT CONTAINS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, AND CERTAIN FINANCIAL INFORMATION. ALTHOUGH THE DEBTOR BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE AND PROVIDE ADEQUATE INFORMATION WITH RESPECT TO THE DOCUMENTS SUMMARIZED, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF, OR ARE INCONSISTENT WITH, SUCH DOCUMENTS. FURTHERMORE, ALTHOUGH THE DEBTOR HAS MADE EVERY EFFORT TO BE ACCURATE, THE FINANCIAL INFORMATION CONTAINED HEREIN HAS NOT BEEN THE SUBJECT OF AN AUDIT OR OTHER REVIEW BY AN ACCOUNTING FIRM. IN THE EVENT OF ANY CONFLICT, INCONSISTENCY, OR DISCREPANCY BETWEEN THE TERMS AND PROVISIONS IN THE PLAN, THIS DISCLOSURE STATEMENT, THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT, OR THE FINANCIAL INFORMATION INCORPORATED HEREIN OR THEREIN BY REFERENCE, THE PLAN SHALL GOVERN FOR ALL PURPOSES. ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING ON THE PLAN.

ALL CREDITORS AND EQUITY INTEREST HOLDERS SHOULD READ CAREFULLY THE "RISK FACTORS" SECTION HEREOF BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. SEE ARTICLE XV BELOW, "CERTAIN RISK FACTORS TO BE CONSIDERED."

THE INFORMATION IN THIS DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR THE PURPOSE OF VOTING TO ACCEPT OR REJECT THE PLAN. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY ENTITY FOR ANY OTHER PURPOSE.

NO STATEMENTS OR INFORMATION CONCERNING THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY HAVE BEEN AUTHORIZED, OTHER THAN THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE INFORMATION ACCOMPANYING THIS DISCLOSURE STATEMENT. ALL OTHER STATEMENTS REGARDING THE PLAN AND THE TRANSACTIONS

ATLANTA:5326255.1

CONTEMPLATED THEREBY, WHETHER WRITTEN OR ORAL, ARE UNAUTHORIZED.

AS TO CONTESTED MATTERS OR POSSIBLE LITIGATION TO BE BROUGHT BY, OR AGAINST, THE DEBTOR, ADVERSARY PROCEEDINGS, AND OTHER ACTIONS OR THREATENED ACTIONS, THIS DISCLOSURE STATEMENT SHALL NOT CONSTITUTE OR BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, A STIPULATION, OR A WAIVER, BUT RATHER AS A STATEMENT MADE WITHOUT PREJUDICE SOLELY FOR SETTLEMENT PURPOSES, WITH FULL RESERVATION OF RIGHTS, AND IS NOT TO BE USED FOR ANY LITIGATION PURPOSE WHATSOEVER BY ANY PERSON, PARTY OR ENTITY. AS SUCH, THIS DISCLOSURE STATEMENT SHALL NOT BE ADMISSIBLE IN ANY NONBANKRUPTCY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY IN INTEREST, NOR SHALL IT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, FINANCIAL OR OTHER EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST OR EQUITY INTERESTS IN THE DEBTOR.

THE STATEMENTS AND FINANCIAL INFORMATION CONTAINED HEREIN HAVE BEEN MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN, UNLESS SO SPECIFIED. ALTHOUGH THE DEBTOR HAS MADE AN EFFORT TO DISCLOSE WHERE CHANGES IN PRESENT CIRCUMSTANCES COULD REASONABLY BE EXPECTED TO AFFECT MATERIALLY THE RECOVERY UNDER THE PLAN, THIS DISCLOSURE STATEMENT IS QUALIFIED TO THE EXTENT CERTAIN EVENTS DO OCCUR.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND NOT IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES OR OTHER APPLICABLE NON-BANKRUPTCY LAW. PERSONS OR ENTITIES HOLDING OR TRADING IN OR OTHERWISE PURCHASING, SELLING, OR TRANSFERRING CLAIMS AGAINST THE DEBTOR SHOULD EVALUATE THIS DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.

IN ACCORDANCE WITH THE BANKRUPTCY CODE, THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION (THE "SEC"), NOR HAS THE SEC PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.

## C.    VOTING AND CONFIRMATION PROCEDURES

To the extent this Disclosure Statement is being submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan, this Disclosure Statement also is accompanied by a Ballot to be used by such holder in connection with that vote. As further described below, holders of certain categories of Claims against, and equity

interests in, the Debtor automatically are deemed to have accepted the Plan or to have rejected it, depending on the particular category of Claims or equity interests. Holders of Claims and equity interests that are deemed to have accepted or rejected the Plan are not entitled to vote to accept or reject the Plan.

If you did not receive a Ballot in your Solicitation Package, and believe that you should have, please contact Epiq Bankruptcy Solutions, LLC (the "Voting Agent"), at Southwest Georgia Ethanol, LLC, Debtor c/o Epiq Bankruptcy Solutions, LLC, P.O. Box 5115, FDR Station, New York, NY 10150-5115; or by telephone at (800) 314-5550; or by facsimile at (464) 282-2501.

In addition, FUEL's (i) Annual Report on Form 10-K for the fiscal year ended September 30, 2010, which was filed on December 29, 2010, and Form 10-KA which was filed on January 27, 2011, (ii) Quarterly Report on Form 10-Q for the quarterly period ending December 31, 2010, which was filed on February 18, 2011 and (iii) Quarterly Report on Form 10-Q for the quarterly period ending March 31, 2011, which was filed on May 23, 2011, are available for inspection online at the SEC's website, at the following address: http://www.sec.gov/cgi-bin/browse-edgar?company=First+United+Ethanol&CIK=&filenum=&State=&SIC=&owner=include&action=getcompany.

## 1. Holders of Claims Entitled to Vote

This Disclosure Statement, the form of Ballot and the related materials delivered together herewith (collectively, the "Solicitation Package"), are being furnished, for purposes of soliciting votes on the Plan, to holders of Claims in Classes 1, 2, 3, 5, 6 and 7.

Pursuant to the provisions of the Bankruptcy Code, only holders of allowed claims or equity interests in classes of claims or equity interests that are impaired are entitled to vote to accept or reject a proposed chapter 11 plan. Classes of claims or equity interests in which the holders of claims or equity interests are unimpaired under a chapter 11 plan are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan. Classes of claims or equity interests in which the holders of claims or equity interests are impaired but are not entitled to receive or retain any property on account of such claims or equity interests are deemed to have rejected the plan and similarly are not entitled to vote to accept or reject the plan.

Classes 1 (Pre-Petition Secured Lender Claims), 2 (Bond Claim), 3 (Fagen Claim), 5 (General Unsecured Claims), 6 (Convenience Claims) and 7 (Class A Member Interest) under the Plan may be or are Impaired. To the extent Claims and Interests in Classes 1, 2, 3, 5, 6 and 7 are not the subject to an objection, the holders of such Claims or Interests are entitled to vote to accept or reject the Plan. Class 8 (Equity – Class B member Interest) will not receive or retain any interest pursuant to the Plan and, thus, pursuant to section 1126(g) of the Bankruptcy Code, such holder is deemed to reject the Plan and is not entitled to vote to accept or reject the Plan. Class 4 (Other Secured Claims) under the Plan is unimpaired. Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in Class 4 are conclusively deemed to have accepted the Plan and therefore may not vote to accept or reject the Plan.

ATLANTA:5326255.1

ACCORDINGLY, A BALLOT TO ACCEPT OR REJECT THE PLAN IS BEING PROVIDED ONLY TO HOLDERS OF CLAIMS AND INTERESTS IN CLASSES 1, 2, 3, 5, 6 and 7.

A creditor's Claim must be "allowed" for purposes of voting in order for such creditor to have the right to vote. Generally, for voting purposes a Claim is deemed "allowed" absent an objection to the Claim if (i) a proof of claim was timely filed, or (ii) if no proof of claim was filed, the claim is identified in the Debtor's Schedules as other than "contingent," "unliquidated," or "disputed," and an amount of the Claim is specified in the Schedules, in which case the Claim will be deemed allowed for the specified amount. In either case, when an objection to a Claim is filed, the creditor holding the Claim cannot vote unless the Bankruptcy Court, after notice and a hearing, either overrules the objection, or allows the Claim for voting purposes. Accordingly, if you do not receive a Ballot and believe that you are entitled to vote on the Plan, you must file a Bankruptcy Rule 3018 Motion with the Bankruptcy Court for the temporary allowance of your Claim for voting purposes by [], 2011. Otherwise, persons who do not receive a Ballot will not be entitled to vote to accept or reject the Plan.

THE DEBTOR (WITH THE CONSENT OF THE AGENTS), THE REORGANIZED DEBTOR, AND THE LITIGATION TRUSTEE, AS THE CASE MAY BE, IN ALL EVENTS RESERVE THE RIGHT THROUGH THE CLAIM RECONCILIATION PROCESS TO OBJECT TO OR SEEK TO DISALLOW ANY CLAIM FOR DISTRIBUTION PURPOSES UNDER THE PLAN.

2.      **Voting Instructions and Voting Deadline**

If you are entitled to vote to accept or reject the Plan, a Ballot is enclosed for the purpose of voting on the Plan. If you hold a Claim in more than one Class and you are entitled to vote Claims in more than one Class, you will receive separate Ballots that must be used for each separate Class of Claims. Please vote and return your Ballot(s). No votes other than ones using such Ballots will be counted, except to the extent the Bankruptcy Court orders otherwise. The Bankruptcy Court has fixed [], 2011 as the date (the "Voting Record Date") for the determination of the holders of Claims who are entitled to (a) receive a copy of this Disclosure Statement and all of the related materials and (b) vote to accept or reject the Plan. After carefully reviewing the Plan and this Disclosure Statement, including the annexed exhibits, please indicate your acceptance or rejection of the Plan on the Ballot and return such Ballot in the enclosed envelope by no later than [], 2011 to:

If by mail:

Epiq Bankruptcy Solutions, LLC
Attn: SOUTHWEST GEORGIA ETHANOL, LLC
Voting Agent
FDR STATION
P.O. Box 5115
New York, NY  10150-5115

ATLANTA:5326255.1

If by hand or overnight delivery:

> Epiq Bankruptcy Solutions, LLC
> Attn: SOUTHWEST GEORGIA ETHANOL, LLC
> Voting Agent
> 757 Third Avenue, 3rd Floor
> New York, NY 10017

BALLOTS MUST BE COMPLETED AND RECEIVED NO LATER THAN 5:00 P.M. (EASTERN TIME) ON [], 2011 (THE "VOTING DEADLINE"). ANY BALLOT THAT IS NOT EXECUTED BY A DULY AUTHORIZED PERSON SHALL NOT BE COUNTED. ANY BALLOT THAT IS EXECUTED BY THE HOLDER OF AN ALLOWED CLAIM BUT THAT DOES NOT INDICATE AN ACCEPTANCE OR REJECTION OF THE PLAN WILL BE DEEMED TO BE AN ACCEPTANCE. ANY BALLOT THAT IS FAXED WILL NOT BE COUNTED IN THE VOTING TO ACCEPT OR REJECT THE PLAN, UNLESS THAT BALLOT IS ACCEPTED IN THE DEBTOR'S DISCRETION.

DO NOT RETURN YOUR NOTES OR ANY OTHER INSTRUMENTS OR AGREEMENTS THAT YOU MAY HAVE WITH YOUR BALLOT(S).

### 3. Who to Contact for More Information

If you have any questions about the procedure for voting your Claim or the packet of materials you received, or you received a damaged Ballot or you lost your Ballot, please contact the Voting Agent at the address indicated above. If you wish to obtain additional copies of the Plan, this Disclosure Statement, or the exhibits to those documents, at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d), please contact McKenna Long & Aldridge LLP, 303 Peachtree Street, Suite 5300, Atlanta, GA 30308 Attn: Bryan E. Bates; or by facsimile at (404) 527-4198, Attn: Bryan E. Bates; or by electronic mail, at bbates@mckennalong.com.

### 4. Acceptance or Rejection of the Plan

The Bankruptcy Code defines "acceptance" of a plan by a class of claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in that class that cast ballots for acceptance or rejection of the plan. Assuming that at least one impaired Class votes to accept the Plan, the Debtor will seek to confirm the Plan under Section 1129(b) of the Bankruptcy Code due to the deemed rejection of the Plan by Class 8 Interests. Section 1129(b) of the Bankruptcy Code permits the confirmation of a plan notwithstanding the non-acceptance by one or more impaired classes of Claims or Interests. Under Section 1129(b) of the Bankruptcy Code, a plan may be confirmed if (a) the plan has been accepted by at least one impaired class of claims and (b) the Bankruptcy Court determines that the plan does not discriminate unfairly and is "fair and equitable" with respect to the non-accepting classes. A more detailed discussion of these requirements is provided in Article XV of this Disclosure Statement.

ATLANTA:5326255.1

**D. CONFIRMATION HEARING**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to hold a confirmation hearing. Section 1129(b) of the Bankruptcy Code provides that any party in interest may object to Confirmation of the Plan.

Pursuant to section 1128 of the Bankruptcy Code and Bankruptcy Rule 3017(c), the Bankruptcy Court has scheduled the Confirmation Hearing for October [], 2011 at [___ __].m. prevailing Eastern Time before the Honorable James D. Walker, United States Bankruptcy Court, C.B. King U.S. Courthouse, 201 West Broad Avenue, Second Floor, Albany, GA 31701. The Bankruptcy Court has directed that objections, if any, to Confirmation of the Plan be served and filed so that they are received on or before [] [], 2011 at 4:00 p.m., prevailing Eastern Time. The Bankruptcy Court may adjourn the Confirmation Hearing from time to time without further notice except for the announcement of the adjournment date made at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

**E. RECOMMENDATION**

The Plan was developed over several months and is the product of extensive, arm's-length negotiations among the Debtor, the Agents, and holders of a majority in amount of the Senior Secured Lender Claims. The Debtor and the Agents believe that approval of the Plan presents the best chance for the Debtor's successful emergence from chapter 11.

THE DEBTOR BELIEVES THAT THE PLAN WILL ENABLE IT TO REORGANIZE SUCCESSFULLY AND TO ACCOMPLISH THE OBJECTIVES OF CHAPTER 11, AND THAT ACCEPTANCE OF THE PLAN IS IN THE BEST INTERESTS OF THE DEBTOR AND ITS CREDITORS. THE DEBTOR RECOMMENDS THAT CREDITORS VOTE TO ACCEPT THE PLAN.

IF NO IMPAIRED CLASS OF CREDITORS VOTES TO ACCEPT THE PLAN, THIS CHAPTER 11 CASE MAY BE CONVERTED TO A CASE UNDER CHAPTER 7 OF THE BANKRUPTCY CODE. IF THIS CHAPTER 11 CASE IS CONVERTED TO A CHAPTER 7, DISTRIBUTIONS TO CREDITORS WOULD BE DELAYED SIGNIFICANTLY AND CREDITORS WOULD RECEIVE A SMALLER RECOVERY THAN THEY WILL RECEIVE UNDER THE PLAN.

**F. COMMITTEE'S STATEMENT REGARDING THE PLAN**

[RESERVED]

## II.
## OVERVIEW OF THE PLAN

The Debtor proposes to make the following distributions from the Debtor's Estate on the Effective Date or as soon thereafter as is reasonably practicable to holders of secured and unsecured claims illustrated below. The Plan classifies all Claims against and Interests in the Debtor to eight (8) separate Classes. The following table summarizes the classification and treatment afforded under the Plan as further described in Article VII of this Disclosure Statement. At this time, the Debtor cannot

ATLANTA:5326255.1

predict whether any additional distributions will be made based on recoveries of Assigned Avoidance Actions pursued after the Effective Date by the Litigation Trustee. The following table briefly summarizes how the Plan classifies and treats Allowed Claims and equity interests, and also provides the estimated Distributions to be received by the holders of Allowed Claims and equity interests in accordance with the Plan:

### SUMMARY OF CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|---|
| -- | Administrative Claims (estimated at $10,000) | No | No (deemed to accept) | With certain exceptions, each holder of an Allowed Administrative Claim shall receive either (i) Cash equal to the amount of such Allowed Claim, or (ii) such other treatment as the Debtor and such holder shall have agreed upon in writing; *provided*, *however*, that Allowed Ordinary Course Trade Claims shall be paid in the ordinary course of business of the Reorganized Debtor in accordance with the terms and subject to the conditions of any agreements governing relating thereto. | 100% |
| -- | DIP Facility Claims (estimated at $15,000,000) | No | No (deemed to accept) | On the Effective Date, each holder of a DIP Facility Claim shall receive payment in full in Cash of all obligations of the Debtor under the DIP Credit Documents. | 100% |
| -- | Professional Fee Claims (estimated at $1,500,000) | No | No (deemed to accept) | Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtor, counsel to the Reorganized Debtor, the United States Trustee, counsel to the Pre-Petition Agent, counsel to the Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, no later than sixty (60) days after the Effective Date, unless such date is otherwise modified by order of the Bankruptcy Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtor, Reorganized Debtor or its property, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served on the Reorganized Debtor, counsel for the Reorganized Debtor, counsel for the Pre-Petition Agent and the requesting party on or before twenty (20) days after the filing and service of such request. | 100% |
| -- | Priority Tax Claims (estimated at $0) | No | No (deemed to accept) | Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor, in full satisfaction, settlement and | 100% |

ATLANTA:5326255.1

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery |
|---|---|---|---|---|---|
| | | | | release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (C) at the option of the Reorganized Debtor, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code. | |
| Class 1 | Pre-Petition Senior Secured Lender Claims (estimated at $107,644,144.23) | Yes | Yes | Each Holder of an Allowed Class 1 Claim shall receive their Pro Rata Share of the New Preferred Units and the New Class B Units. | 97.5% |
| Class 2 | Bond Claim (estimated at $8,722,687.50) | Yes | Yes | The Holder of the Allowed Class 2 Bond Claim shall receive an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total amount of Allowed Claims in Classes 2, 3 and 5. | 3% |
| Class 3 | Fagen Claim (estimated at $4,293,534.20) | Yes | Yes | The Holder of the Allowed Class 3 Fagen Claim shall receive an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total amount of Allowed Claims in Classes 2, 3 and 5. | 3% |
| Class 4 | Other Secured Claims (estimated at $2,744,833.13) | No | No | Each Holder of an Allowed Class 4 Other Secured Claim shall receive, in the sole discretion of the Debtor, (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor and the Holder of such Class 4 Other Secured Claim, or (b) reinstatement of the Pre-Petition Secured Claim held by such Other Secured Creditor and cure of any Pre-Petition monetary default thereunder, or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtor. | 100% |
| Class 5 | General Unsecured Claims (estimated at $2,100,000) | Yes | Yes | Each Holder of an Allowed Class 5 General Unsecured Claim shall receive an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total Allowed Claims in Classes 2, 3 and 5. | 3% |
| Class 6 | Convenience Class (estimated at $86,971) | No | Yes | Each Holder of an Allowed Class 6 Convenience Claim shall receive Cash in an amount equal to 5% of its Allowed Claim. If Class 6 does not vote to accept the Plan, then there shall be no Distribution to the Holders of Allowed Class 6 Convenience Claims. | 5% |
| Class 7 | Equity – Class A Member Interest | Yes | Yes | The Class A Member Interest in the Debtor shall be converted to the New Class A Units; which rights are affected by the issuance of the New Preferred Units and the New Class B Units. If either Class 2, 3, or 5 does not vote as a Class to accept the Plan, then the Class 7 interest in the | *de minimus* |

ATLANTA:5326255.1

| Class | Designation | Impaired | Entitled to Vote | Treatment of Allowed Claims | Estimated Recovery |
|-------|-------------|----------|------------------|------------------------------|--------------------|
|       |             |          |                  | Debtor shall be cancelled.   |                    |
| Class 8 | Equity – Class B Member Interest | Yes | No | The Class 8 Interest in the Debtor shall be canceled. | 0% |

## III.
## OVERVIEW OF CHAPTER 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under chapter 11, a debtor is authorized to reorganize its business for the benefit of itself, its creditors and equity interest holders. In addition to permitting rehabilitation of a debtor, another goal of chapter 11 is to promote equality of treatment for similarly situated creditors and equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of the debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor in possession."

The consummation of a plan of reorganization is the principal objective of a chapter 11 reorganization case. A plan of reorganization sets forth the means for satisfying claims against and equity interests in the debtor. Confirmation of a plan of reorganization by the bankruptcy court makes the plan binding upon a debtor, any issuer of securities under the plan, any person acquiring property under the plan and any creditor or equity interest holder of a debtor. Subject to certain limited exceptions, the confirmation order discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan.

After a plan of reorganization has been filed, the holders of claims against or equity interests in a debtor are generally permitted to vote to accept or reject the plan. Before soliciting acceptances of the proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtor is submitting this Disclosure Statement to holders of Claims against the Debtor to satisfy the requirements of section 1125 of the Bankruptcy Code.

## IV.
## FORMATION, BUSINESS, DEBT STRUCTURE, AND OTHER PRE-PETITION OBLIGATIONS OF THE DEBTOR

### A.    FORMATION AND HISTORY OF THE DEBTOR

First United Ethanol, LLC ("FUEL") was formed as a Georgia limited liability company on March 9, 2005 initially under the name Mitchell County Research Group, LLC. In September 2005, Mitchell County Research Group, LLC formally changed its

name to First United Ethanol, LLC. FUEL was formed to construct and operate a 100 million gallon ethanol production facility located at 4433 Lewis B. Collins Road, Pelham, Georgia.

On November 30, 2006, FUEL closed a debt financing arrangement with Southwest Georgia Farm Credit as the lead lender. To complete project financing, FUEL's debt financing arrangement with Southwest Georgia Farm Credit provided the security for the Mitchell County Development Authority to issue $53,500,000 of taxable bonds, $29,000,000 of tax exempt bonds and $10,000,000 of revenue bonds, the proceeds of which were loaned to FUEL. FUEL also established an $11,000,000 revolving line of credit with Southwest Georgia Farm Credit to provide FUEL with additional liquidity.

On November 16, 2006, FUEL entered into a design-build contract with Fagen, Inc. of Granite Falls, Minnesota ("Fagen") for the design and construction of the ethanol plant for a total price of $125,903,700, subject to further adjustment for change orders and increases in the costs of materials. A mobilization fee of $7,200,000 was paid to Fagen on November 30, 2006, pursuant to the terms of the design-build contract. FUEL also agreed that if the plant was substantially complete within 545 days (18 months) from the date Fagen was issued and accepted FUEL's notice to proceed with construction, FUEL would pay Fagen an early completion bonus of $20,000 per day for each day that substantial completion was achieved prior to 545 days from the date construction began, up to but not to exceed $1,000,000. Fagen agreed that if the plant was not substantially complete within 545 days (18 months) from the date Fagen was issued and accepted FUEL's notice to proceed with construction, Fagen would pay FUEL a late penalty of $20,000 per day for each day that substantial completion was achieved after 545 days from the date construction began, up to but not to exceed $1,000,000.

FUEL also entered into a license agreement with ICM, Inc. of Colwich, Kansas for limited use of ICM, Inc.'s proprietary technology and information to assist it in operating, maintaining, and repairing the ethanol production facility. FUEL was not obligated to pay a fee to ICM, Inc. for use of the proprietary information and technology because its payment to Fagen for the construction of the plant under its design-build agreement was inclusive of such costs.

Based upon engineering specifications from Fagen, FUEL expected the ethanol plant, once built, to process approximately 36 million bushels of corn per year into 100 million gallons of denatured fuel grade ethanol, 321,400 tons of dried distillers grains with solubles and 220,500 tons of raw carbon dioxide gas. FUEL began construction of the ethanol plant on approximately 267 acres of real property in Mitchell County, Georgia.

On June 8, 2007, FUEL completed an equity offering, having raised $74,010,000 from over 800 investors in a public offering. In the third quarter of 2007 FUEL revised its project cost estimate by approximately $16,500,000 to a total estimated project cost of approximately $194,540,000 due to increased site improvement costs and additional costs associated with FUEL's debt financing. To fully capitalize the project based on FUEL's then anticipated uses of funds, FUEL

refinanced its debt with WestLB AG, New York Branch ("WestLB") in November 2007. On November 16, 2007, FUEL's members voted to approve the creation of a wholly owned subsidiary named Southwest Georgia Ethanol, LLC which is the Debtor in this case. Southwest Georgia was created for the special purpose of holding the property and assets of FUEL as required by the terms of the long-term debt refinancing arrangement with WestLB.

FUEL holds the Class A Member Interest in and thereby owns all of the outstanding equity in Debtor. CT Corporation Staffing holds the Class B Member Interest that has no ownership interest. The Debtor believes that the creation of the Class B Member interest was intended by WestLB to make Southwest Georgia a bankruptcy remote entity for the reason that the Class B member's affirmative vote was necessary in order for Southwest Georgia to file a voluntary petition for relief under the Bankruptcy Code.

On November 20, 2007, FUEL and Southwest Georgia entered into loan agreements with WestLB and the refinancing was substantially completed on December 6, 2007. The aggregate amount of the loan to Southwest Georgia was approximately $115,000,000.

The refinancing was used to pay off all of the Mitchell County bonds except for the $10,000,000 of revenue bonds which are now held by Regions Bank as Trustee. Mitchell County agreed to subordinate its security interest and right to payment to the Southwest Georgia Senior Credit Agreement.

As of the Petition Date, there were primary loan agreements with WestLB, the Pre-Petition Credit Agreement as amended, the Pre-Petition Accounts Agreement as amended, the Pre-Petition Working Capital Agreement, and the Pledge and Security Agreement as amended. Pursuant to the Senor Credit Agreement between Southwest Georgia and West LB, dated November 20, 2007 (the "Pre-Petition Credit Agreement"), West LB made a credit facility available to Southwest Georgia to finance the ownership, development, engineering, construction, testing and operation of the 100 million gallon per year ethanol plant to be located near Camilla, Georgia. The credit facility included construction loans, term loans and working capital loans, each of which had unique terms. The interest rates on these loans ranged from two and one-half percent over the Base Rate as defined in the loan documents and three and one-half percent over Euro Dollar Rate as defined in the loan documents. The construction/term loan facility was for a term of up to six years from the conversion of the construction loan to a term loan, which could be up to fifteen months from the date Southwest Georgia signed the Pre-Petition Credit Agreement. The working capital loan is subject to the same interest rates and matured twelve months after the conversion date and was subject to annual renewals.

The Pledge and Security Agreement among FUEL, Southwest Georgia and West LB, dated November 20, 2007, provided that FUEL, as the sole member of Southwest Georgia, pledged as collateral to West LB a continuing security interest and lien in the assets of FUEL, including its equity interest in Southwest Georgia.

As part of the conversion of the WestLB construction loan to a term loan, Southwest Georgia entered into a settlement agreement with Fagen under which

-14-

Southwest Georgia granted a subordinate security interest in its real property to Fagen to secure a debt of $4,293,534. Fagen agreed with WestLB and the Debtor to subordinate its security interest and right to payment to the Pre-Petition Credit Agreement.

FUEL entered into two agreements with Southwest Georgia at the time of the loan refinancing under which, among other things, FUEL then provided employees to Southwest Georgia to operate the ethanol production facility.

Plant operations and the production of ethanol and distillers grains commenced on October 10, 2008. As of the close of Southwest Georgia's fiscal year on September 30, 2009, Southwest Georgia completed its first year of plant operations. In the first year of plant operation Southwest Georgia processed approximately 29 million bushels of corn producing 81 million gallons of denatured fuel grade ethanol, 214,000 tons of dried distillers grains and 7,000 tons of wet distillers grains.

In its second year of plant operation Southwest Georgia processed approximately 32 million bushels of corn producing 90 million gallons of denatured fuel grade ethanol, 250,000 tons of dried distillers grains and 75,000 tons of wet distillers grains.

On June 7, 2010 Southwest Georgia amended its Pre-Petition Credit Agreement and its Pre-Petition Accounts Agreement with WestLB. Pursuant to the amended agreements, Southwest Georgia was required to maintain a certain level of working capital. In the event it was unable to meet the level of working capital required under the amended loan agreements Southwest Georgia was assessed a five percent (5%) fee on the outstanding loans for any quarter it was not in compliance. Southwest Georgia did not meet the working capital deficit requirement of ($9,000,000) as of September 30, 2010. The resulting penalty interest of approximately $1,375,000 was charged as a penalty fee as of September 30, 2010 and included as a long term liability. This fee payment was in addition to the interest Southwest Georgia was required to pay on its outstanding debt pursuant to the original loan agreements with WestLB. This additional interest fee was accrued and to be due February 2015, the final maturity date Southwest Georgia's outstanding loans with West LB. Furthermore, and regardless of whether Southwest Georgia maintained the required level of working capital, it was required to make an additional quarterly principal payment of $150,000 toward its outstanding working capital loan balance. This arrangement is distinct from the borrowing base formula and borrowing base certificates previously utilized to monitor compliance with Southwest Georgia's working capital loans. This amendment also removed the borrowing base default triggers from the terms of the loan, thereby removing the requirement for waivers. Throughout the fiscal year ended September 30, 2010, Southwest Georgia had made every payment of principal and interest due to WestLB.

In the late summer of 2010, Southwest Georgia hired an outside third party to look at the efficiency of the plant and provide suggestions and solutions to increase the operational effectiveness. These studies outlined several areas where Southwest Georgia could make improvements. Some of the improvements were immediately implemented producing positive results. Southwest Georgia recognized that its

profitability is dependent upon a number of other factors, including stable and positive crush margins. Southwest Georgia continued to explore different issues with its working capital line of credit and to secure enough funding for the debt reserve fund, including negotiating different terms with WestLB, raising additional capital or subordinated debt, finding another funding source for working capital or a combination of the above. Southwest Georgia management, through and with the directors of FUEL, reviewed its different options in order to find a solution to its liquidity issues. The goal was to solve the working capital needs in order to be able to better manage commodity risk by being able to utilize futures and options more frequently and to lock in positive crush margins.

As of December 31, 2010, the close of the last fiscal quarterly period immediately prior to the Petition Date, and as reflected in the Form 10-Q[1] filed by FUEL for the period ending December 31, 2010, the Debtor's books and records indicated approximately $162,310,040 in assets and outstanding liabilities of approximately $134,820,878 which included approximately $126,177,968 of secured debt and $8,642,910 in unsecured debt, based on the Debtor's book values.

## B. THE BUSINESS

The Debtor owns and operates a plant located in Pelham, Georgia which produces ethanol and ethanol byproducts. As of August 1, 2011, FUEL employed 65 people all of whom are involved with the day-to-day operations of the Pelham facility and who handle the Debtor's general and administrative functions.

### 1. The Debtor's Products and Production Process

Ethanol

The Debtor's primary product is ethanol. Ethanol is ethyl alcohol, a fuel component made primarily from corn and various other grains. According to the Renewable Fuels Association, approximately 85 percent of ethanol in the United States today is produced from corn, and approximately 90 percent of ethanol is produced from a corn and other input mix. The ethanol the Debtor produces is manufactured from corn. Although the ethanol industry continues to explore production technologies employing various feedstocks, such as biomass, corn-based production technologies remain the most practical and provide the lowest operating risks. Corn produces large quantities of carbohydrates, which convert into glucose more easily than most other kinds of biomass. The Renewable Fuels Association reported 2010 annual domestic ethanol production at approximately 13.23 billion gallons produced from 204 biorefineries.

---

[1] As noted in FUEL'S SEC filings, the reporting of assets and liabilities requires the Debtor to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the applicable reporting period.

ATLANTA:5326255.1

An ethanol plant is essentially a fermentation plant. Ground corn and water are mixed with enzymes and yeast to produce a substance called "beer," which contains about 10% alcohol and 90% water. The "beer" is boiled to separate the water, resulting in ethyl alcohol, which is then dehydrated to increase the alcohol content. This product is then mixed with a certified denaturant to make the product unfit for human consumption and commercially saleable.

Ethanol can be used as: (i) an octane enhancer in fuels; (ii) an oxygenated fuel additive for the purpose of reducing ozone and carbon monoxide emissions; and (iii) a non-petroleum-based gasoline substitute. Approximately 95% of all ethanol is used in its primary form for blending with unleaded gasoline and other fuel products. Used as a fuel oxygenate, ethanol provides a means to control carbon monoxide emissions in large metropolitan areas. The principal purchasers of ethanol are generally the wholesale gasoline marketer or blender. The principal markets for the Debtor's ethanol are petroleum terminals in the southeastern United States.

Distillers Grains

A principal by-product of the ethanol production process is distillers grains, a high protein, high-energy animal feed supplement the Debtor primarily markets to the dairy, poultry and beef industries. Ethanol processing creates three forms of distillers grains: (i) Distillers Wet Grains ("DWS"), (ii) Distillers Modified Wet Grains ("DMWS") and (iii) Distillers Dried Grains with Solubles ("DDGS"). DWS are processed corn mash that contains approximately 70% moisture. DWS have a shelf life of approximately three days and are sold only to farms within the immediate vicinity of the Debtor's ethanol plant. DMWS are DWS that have been dried to approximately 50% moisture. DMWS have a slightly longer shelf life of approximately ten days, and are often sold to nearby markets. DDGS are DWS that have been dried to approximately 12% moisture. DDGS have a much longer shelf life and may be sold and shipped to any market regardless of its vicinity to the Debtor's ethanol plant. Currently, 77% of the distillers grains produced by the Debtor are sold as DDGS, and 23% of the distillers grains produced by the Debtor are sold as DWS. In 2010, the Debtor derived approximately 20% of its total revenue from the sale of distillers grains.

Carbon Dioxide

Southwest Georgia entered into a carbon dioxide supply agreement with Airgas Carbonic, Inc. ("Airgas") on June 27, 2008 that was amended on May 15, 2009 and again on July 19, 2010. Pursuant to the agreement, Airgas operates a carbon dioxide facility at the Debtor's site. Airgas constructed a pipeline from the Southwest Georgia ethanol plant to its carbon dioxide facility. Southwest Georgia agreed not to sell carbon dioxide gas, liquid carbon dioxide gas, or dry ice from its ethanol plant to any person or entity, other than Airgas, for the first three years of the agreement. The initial term of the agreement was 15 years.

Ethanol and Distillers Grains Markets

As described below in "*Distribution of Principal Products*", the Debtor markets and distributes its ethanol and a portion of its distillers grains through third parties.

Whether or not ethanol or distillers grains produced by the Southwest Georgia ethanol plant are sold in local markets depends on the relative prices of the rail market and truck market for the Debtor's products. The Debtor has the option to independently market a portion of its distillers grains to local markets.

Typically a regional market is one that is outside of the local market, yet within the neighboring states. The Debtor's regional market is within a 450-mile radius of its plant and is serviced by rail and by truck. Southwest Georgia constructed a railroad loop track for its plant so that it may load unit trains allowing it to more effectively reach regional and national markets. The Debtor's regional markets include large cities that are subject to anti-smog measures such as either carbon monoxide or ozone non-attainment areas (e.g., Atlanta and Birmingham).

While the Debtor's management believes that the nationally mandated usage of renewable fuels is largely driving current demand, it also believes that an increase in voluntary usage will be necessary for the industry to continue its growth trend. In addition, a higher renewable fuels standard ("RFS") may be necessary to encourage blenders to use ethanol. The Debtor expects that voluntary usage by blenders will occur only if the price of ethanol makes increased blending economical. In addition, the Debtor believes that heightened consumer awareness and consumer demand for ethanol-blended gasoline may play an important role in growing overall ethanol demand and voluntary usage by blenders. If blenders do not voluntarily increase the amount of ethanol blended into gasoline and consumer awareness does not increase, it is possible that additional ethanol supply will outpace demand and depress ethanol prices.

### Distribution of Principal Products

The Debtor's ethanol plant is located near Camilla, Georgia in Mitchell County, in southwestern Georgia. FUEL selected the Camilla site because of its proximity to existing ethanol consumption and accessibility to road and rail transportation. It is served by OmniTrax on the Georgia and Florida Railway which provides connections to the CSX Railway and the Norfolk Southern Railway Company. The Southwest Georgia site is in close proximity to major highways that connect to major petroleum terminals such as Atlanta, Birmingham, Columbia, Jacksonville, Spartanburg, Tallahassee and Tampa. There are approximately 70 terminals within a 250 mile radius of the plant; therefore, the Debtor has a competitive advantage over some of its competitors because it is able to truck ethanol to these terminals cheaper than its competitors can transport it by rail to the same terminals.

### Ethanol Distribution

Southwest Georgia entered into an ethanol marketing agreement with Eco-Energy, Inc. ("ECO") for the purpose of marketing and distributing all of the ethanol produced at the plant and agreed to pay a fee of $0.01 per net gallon of ethanol purchased for rail and $0.012 per net gallon of ethanol purchased for outbound trucks. The initial term of the agreement commenced on the first day of ethanol production and continued until October 2010. The agreement provides for automatic renewals for additional two year terms unless otherwise terminated pursuant to the agreement.

ATLANTA:5326255.1

Under the agreement ECO is responsible for all transportation arrangements for the distribution of ethanol.

### Distillers Grains Distribution

Southwest Georgia entered into a marketing agreement with Palmetto Grain Brokerage, LLC of Ridgeland, South Carolina ("Palmetto") for the purpose of marketing and selling most of its distillers grains. Palmetto is the exclusive selling broker for any rail origin dried distillers grains the Debtor produces. The Debtor pays Palmetto one dollar ($1.00) per ton for all dried distillers grains sold through Palmetto acting as the selling broker. Palmetto is not a party to any distillers grain sales contracts between the Debtor and any third party purchaser. The Debtor's management has taken advantage of the local market for distillers grains, which market is accessible via trucks, and has entered into agreements for the sale of a significant majority of the Debtor's distillers grains with third party purchasers without Palmetto's involvement.

### Financial Risks and Results

The Debtor was and continues to be subject to significant market risk with respect to the price of ethanol, its principal product, as well as the price and availability of corn, the Debtor's principal commodity used in its ethanol production process. Ethanol prices are generally influenced by the supply and demand for gasoline, the availability of substitutes and the effect of related laws and regulations. Likewise, the availability and price of corn are subject to wide fluctuations due to unpredictable factors such as weather conditions during the corn growing season, carry-over from the previous crop year and current crop yield, governmental policies with respect to agriculture and international supply and demand. Although corn is the Debtor's most significant raw material production cost, other major costs include natural gas and transportation costs.

During the fiscal year ending September 30, 2010, the Debtor sold 89 million gallons of ethanol resulting in net sales of $168,892,332. The Debtor also realized $32,668,542 in revenue from the sale of DDGs, $1,622,821 from the sale of WDGs, and $301,826 in other income, including from the sale of carbon-dioxide, for total revenue of $203,485,521 and an EBITDA of $19,360,438.

## C. DEBTOR'S PRE-PETITION CAPITAL STRUCTURE

### 1. Secured Financing

On or about June 30, 2011, Gleacher Products Corp. ("Gleacher") became the Administrative Agent and the Collateral Agent for the Pre-Petition Credit Agreement. The Pre-Petition Credit Agreement as of the Petition Date included an interest rate swap agreement and provided the term loan.

On February 3, 2011, the Debtor and WestLB as DIP Agent entered into a $10 million DIP Financing Agreement (the "DIP Facility"). On or about July 18, 2011, Gleacher became the DIP Agent. On or about August 17, 2011 the DIP Facility was increased to $15 million.

Regions Bank, as Trustee of the Mitchell County Development Authority Revenue Bonds (First United Ethanol, LLC Project), Series 2006 (as the Second Lien Agent for the Second Lien Claimholders) holds a subordinated secured claim in the amount of $8,722,688 (the "Bond Claim"). The claim is the subject of a contractual subordination agreement between Southwest Georgia, WestLB as Administrative Agent and the Collateral Agent for the Southwest Georgia Senior Credit Agreement, and Regions Bank under which payment of the Bond Claim is subordinate to the Senior Credit Agreement.

Fagen holds a subordinated secured claim in the amount of $4,293,534. The claim is the subject of a contractual subordination agreement between Southwest Georgia, WestLB as Administrative Agent and the Collateral Agent for the Southwest Georgia Senior Credit Agreement, and Fagen under which payment of the Fagen Claim is subordinate to the Senior Credit Agreement.

Other Secured Claims regarding specific pieces of equipment are held by De Lage Landen Financial Services, Inc., Flint Equipment company, and John Deere Construction & Forestry Company. Additionally, Mitchell County has filed a secured tax claim, to which the Debtor may object, and in August 2011 issued tax bills to the Debtor for 2011 ad valorem property taxes owing. These secured claims total approximately $2,744,833.

### 2. Unsecured Debt

The Debtor also had approximately $11,186,657.19 in ordinary course unsecured trade debt that was unpaid as of the Petition Date. The Debtor obtained Bankruptcy Court approval to pay $3,235,213 of this trade debt that was entitled to priority under Bankruptcy Code Section 503(b)(9) and $1,789,663 of this trade debt as Critical Vendor payments. As of July 5, 2011, the Debtor has made payments of all authorized 503(b)(9) and critical vendor claims. The sum of $4,682,266 of the remaining ordinary course trade debt will be paid as a part of the cure of prepetition defaults in the assumption of executory contracts. In addition, Mitchell County filed a unsecured claim for $1,070,285 regarding its payment to Regions Bank. The Debtor projects that the remaining pre-petition unsecured trade debt will be approximately $2,100,000 at Plan confirmation.

### 3. Equity Interests in the Debtor.

As of February 1, 2011, FUEL held the Class A Member Interest in the Debtor and CT Corporate Staffing held the Class B Member Interest.

## D. DEBTOR'S MANAGEMENT TEAM.

As of the Petition Date, the three member Management Team of the Debtor consisted of:

(1)     Murray Campbell

(2)     Mark Glass

(3)     Rick Moss

ATLANTA:5326255.1

The Debtor's Chief Financial Officer is Larry Kamp. The Debtor's other senior managers are Brad Kusterman, Director of Marketing; Josh Edwards, Director of Operations; Andy Culpepper, Maintenance Manager; and Sandy Boone, Controller.

## V.
## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

A variety of factors contributed to the Debtor's decision to commence this Chapter 11 Case, including the volatility in commodity prices for corn, natural gas and ethanol. Corn and ethanol prices were highly volatile during 2008, 2009 and 2010 and were impacted by a number of factors beyond the Debtor's control. In addition, the costs of producing ethanol, even apart from corn, rose in the year preceding the Petition Date. Ultimately, the Chapter 11 Case was precipitated by the maturity of the Revolver, the willingness of certain of the Pre-Petition Secured Creditors to provide additional financing only in the form of the DIP Financing, and the Debtor's inability to raise additional investment capital from depressed equity markets.

The traditional measure of ethanol profitability is called the "crush margin." The crush margin is the price of a gallon of ethanol less the price of .357 bushels of corn (the amount of corn it takes to produce one gallon of ethanol). Over the last five years, the industry average crush margin has steadily decreased: $1.58 in 2006; $0.66 in 2007; $0.34 in 2008; $0.39 in 2009; and $0.30 in 2010. This reduction in profitability has resulted in financial problems at numerous ethanol producers across the nation and has led to a large number of bankruptcies.

As a result of the foregoing, given the severe financial pressures facing it and the short time within which to address them, the Debtor commenced the Chapter 11 Case to preserve and maximize the value of its assets for the benefit of all stakeholders.

## VI.
## THE CHAPTER 11 CASE

### A.    SIGNIFICANT "FIRST DAY" MOTIONS

On the Petition Date and during the first few weeks of the Chapter 11 Case, the Bankruptcy Court entered several orders authorizing the Debtor to pay various pre-petition Claims. These orders were designed to ease the strain on the Debtor's relationships with customers, employees and vendors as a consequence of the filings. The Bankruptcy Court entered orders authorizing the Debtor to, among other things: (i) pay certain pre-petition taxes and fees; (ii) pay the claims of certain shippers and warehousemen having possession of the Debtor's goods as of the Petition Date; (iii) pay pre-petition Claims to certain vendors that the Debtor deem critical to its business operations; and (iv) continue employee wage and benefit programs and pay certain amounts outstanding in connection therewith.

In addition, the Bankruptcy Court entered other orders granting the Debtor certain relief with respect to various administrative requirements under the Bankruptcy

-21-

Code, including authorization to continue its existing cash management system and to provide the Debtor's utility providers with adequate assurance of performance.

In addition, the Debtor filed several applications seeking orders authorizing the retention of certain professionals. Specifically, the Debtor filed applications, which have been approved by the Bankruptcy Court, to retain (i) McKenna Long & Aldridge, LLP, as counsel, (ii) Morgan Keegan as financial advisor and investment banker and (iii) Mauldin & Jenkins as accountants.

### 1. DIP Credit Facility and Use of Pre-Petition Secured Lenders' Cash Collateral

Immediately prior to the Petition Date, the Debtor negotiated with certain holders of the Pre-Petition Senior Loans to enter into a $10 million consensual priming first lien debtor-in-possession financing facility (the "DIP Credit Facility").which was granted first priority liens senior to the existing liens of the Pre-Petition Secured Lenders under the Pre-Petition Secured Credit Facility. On February 1, 2011, the Debtor filed a motion (the "DIP Motion") for (i) approval of the DIP Credit Facility, (ii) authorization for the Debtor to use the cash collateral ("Cash Collateral") of the Pre-Petition Secured Lenders and the lenders under the DIP Credit Facility (the "DIP Lenders"), and (iii) authorization to provide adequate protection to the Pre-Petition Secured Lenders.

At the hearing initially scheduled on the DIP Motion, the Debtor and the Agent for the Pre-Petition Secured Lenders and the DIP Lenders announced that they were in agreement regarding an interim financing order pending a final hearing on the DIP Motion, and the Pre-Petition Secured Lenders consented to the Debtor's usage of its Cash Collateral based on an agreed budget for the period until the adjourned hearing on the DIP Motion, which was scheduled for February 23, 2011 (the "Final DIP Hearing"). Following the Interim Hearing, the Bankruptcy Court approved the DIP Credit Facility on an interim basis and authorized the Debtor to draw and utilize $5 million under the DIP Credit Facility on an interim basis and scheduled the Final DIP Hearing. Following entry of the interim DIP Financing Order, the Debtor made its first draw under the DIP Credit Facility.

Following the Final DIP Hearing, the Bankruptcy Court entered the DIP Financing Order approving the DIP Motion and DIP Credit Facility, subject to certain agreed upon modifications, on a final basis, as amended by that certain Amendment to Credit Agreement and Waiver Agreement dated April 26, 2011, that certain Amendment to Financing Documents dated as of July 18, 2011, that certain Amendment to Debtor-in-Possession Credit Agreement dated July 19, 2011, and that certain Amendment to Debtor-in-Possession Credit Agreement dated August 23, 2011.

During this Chapter 11 Case, the Debtor received notice from Erste Abwicklungsanstalt of its termination of an interest swap agreement giving rise to a $425,500 increase in the Pre-Petition Secured Lender Claims.

### 2. Payment of 503(b)(9) and Critical Vendor Claims

On the Petition Date, the Debtor sought approval to pay holders of claims entitled to priority under Section 503(b)(9) of the Bankruptcy Code, and also sought

ATLANTA:5326255.1

authority to pay certain pre-petition unsecured claims as critical vendor claims. The Bankruptcy Court granted both motions and as a result the Debtor has made a total of over $4.9 million in approved payments to satisfy all of its 503(b)(9) and critical vendor claims.

## B.      COMMITTEE OF UNSECURED CREDITORS

On February 9, 2011, the United States Trustee for the Middle District of Georgia appointed the Official Committee of Unsecured Creditors Committee (the "Committee"). The Committee is currently comprised of (a) McClure & Gwimes, (b) McClure Farms and (c) Cherokee Equipment, Inc.

The Committee has, with Bankruptcy Court approval, employed and retained Fife M. Whiteside and James C. Frenzel as its bankruptcy co-counsel.

## C.      EXECUTORY CONTRACTS AND LEASES

As set forth above, one of the principal goals of this case was the elimination of unprofitable and out-of-market executory contracts and personal property leases as part of the Debtor's efforts to stabilize its business and return to profitability. The Debtor has undertaken an extensive analysis of its contract and lease portfolio, which remains ongoing, to determine which agreements are no longer necessary to the operation of the Debtor's business or contain terms that are above market or overly burdensome to the Debtor. As a result, the Debtor intends to reject several executory contracts and leases as a part of confirmation of its Plan.

The Debtor also successfully obtained an extension of the period under section 365(d)(4) of the Bankruptcy Code by which the Debtor must decide to assume or reject leases of non-residential real property (the "Assumption/Rejection Deadline") until August 30, 2011.

## D.      CLAIMS PROCESS

On March 8, 2011, the Debtor filed its Schedules and Statements. By order dated May 9, 2011, the Bankruptcy Court established (i) June 15, 2011 as the general bar date by which all creditors (other than governmental units (as defined in the Bankruptcy Code)) must file proofs of pre-petition Claims against the Debtor, and (ii) August 1, 2011 as the date by which all governmental units (as defined in the Bankruptcy Code) must file proofs of pre-petition Claims against the Debtor (collectively, the "Bar Dates").

The Debtor's claims, noticing and balloting agent, EPIQ, commenced service of notice of the Bar Dates to the holders of known claims against the Debtor, as well as other parties set forth in the creditors matrix maintained in this Chapter 11 Case. As of June 15, 2011, 100 claims have been filed in this case. The Debtor will review and reconcile the filed proofs of claim and expects to file objections (subject to the consent of the Agents) to Claims in the coming weeks and months.

## E.      STIPULATION WITH BANK GROUP AND UNSECURED COMMITTEE

On April 8, 2011, the Committee filed a stipulation regarding an extension of the time under the DIP Financing Order for the Committee only to challenge the liens of the Pre-Petition Secured Creditors. On May 19, 2011, the Committee filed its

ATLANTA:5326255.1

Response (without opposition) by the Committee of Unsecured Creditors Regarding Any Challenge Pursuant to the DIP Financing Order.

## F.   EXTENSION OF THE DEBTOR'S EXCLUSIVE PERIODS

On April 27, 2011, the Debtor filed a motion with the Bankruptcy Court requesting an extension of the exclusive periods within which the Debtor may file a chapter 11 plan and solicit acceptance of such a plan (the "Exclusive Periods") until August 1, 2011 and October 1, 2011, respectively. On May 23, 2011, the Bankruptcy Court entered a consent order approving the Debtor's requested extensions of the Exclusive Periods for a period of thirty rather than sixty days.  Accordingly, the exclusive periods were extended to July 1, 2011 and September 1, 2011.  On June 1, 2011, the Debtor filed a second request for an extension of the Exclusive Periods.  On June 28, 2011 the Bankruptcy Court entered a Consent Order granting an extension of the exclusive periods to August 3, 2011 and October 1, 2011. On July 11, 2011, the Bankruptcy Court entered a Consent Order extending the exclusive period to file a plan to August 11, 2011.  On August 8, 2011, the Bankruptcy Court entered a Consent Order extending the exclusive period to file a plan to August 26, 2011.

## G.   THE FUEL OPERATING AGREEMENTS

The Debtor has no employees and from inception has operated under two management agreements with FUEL, namely an Operating and Maintenance Agreement and a Services Agreement, both dated as of December 6, 2007. The Debtor filed a motion for authority to continue to perform under the two FUEL executory contracts while it decides whether to seek to assume or to reject them and on March 17, 2011, the Bankruptcy Court approved the Debtor's motion.  Having further considered its needs, the Debtor intends to reject these two management agreements as part of the confirmation of its Plan.  If Classes 1, 2, 3, 5 and 6 each votes as a Class to accept the Plan, then FUEL by voting as Class 7 to accept the Plan is deemed to waive, solely in connection with this Plan, any and all claims against the Debtor, specifically including, without limitation, any claims FUEL could have asserted against the Debtor, in a sum of not less than $107,734, in connection with the Debtor's rejection of its executory contracts with FUEL.  If, however, any of Classes 1, 2, 3, 5 or 6 votes as a Class to reject the Plan, then FUEL shall not be deemed to have waived any of the foregoing rights or claims, without regard to whether FUEL votes as Class 7 to accept the Plan, and any claims of FUEL against the Debtor shall be retained.

## H.   THE DEBTOR'S MARKETING EFFORTS

The Debtor, through Morgan Keegan, its financial advisor and investment banker, employed a dual track process for the solicitation of interest in the Debtor. Morgan Keegan, contacted approximately 30 parties to solicit interest in a potential transaction with the Debtor's Estate. No expressions of interest nor non-binding letters of intent to provide financing for a reorganization of the Debtor were received.  Given these marketing efforts and the facts and circumstances of the Chapter 11 Case, the Debtor determined that pursuing a chapter 11 plan of reorganization providing for a balance sheet financial restructuring maximizes the value of the Debtor's assets and the ultimate recovery to the Debtor's stakeholders. As such, the Debtor engaged in negotiations with certain of its existing creditors regarding the terms of a potential plan

-24-

of reorganization and obtaining exit financing to fund distributions under a plan and the Debtor's post-emergence business operations. The result of those negotiations is the Plan.

## VII.
## SUMMARY OF THE PLAN

### A. INTRODUCTION

THE FOLLOWING IS A SUMMARY OF SOME OF THE SIGNIFICANT ELEMENTS OF THE PLAN. THIS DISCLOSURE STATEMENT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE MORE DETAILED INFORMATION SET FORTH IN THE PLAN ITSELF. CREDITORS ARE URGED TO READ THE PLAN IN ITS ENTIRETY.

### B. CLASSIFICATION OF CLAIMS AND INTERESTS

#### 1. Introduction

All Claims and Interests in the Debtor's Chapter 11 Case are classified under the Plan except for administrative and priority tax claims which are unclassified. A Claim in a particular Class is entitled to receive Distributions pursuant to the Plan only to the extent the Claim is an Allowed Claim in that Class, and only to the extent the Claim has not been previously paid, released, or otherwise satisfied.

#### 2. Treatment Of Administrative and Priority Claims, and Classification of Claims And Equity Interests Under The Plan

a. Unclassified Claims are as follows:

Administrative Expense Claims

DIP Financing Claims

Professional Fee Claims

Priority Tax Claims

b. Classification of Claims and Interests

Class 1 - Senior Secured Lender Claims

Class 2 - Bond Claims

Class 3 - Fagen Claim

Class 4 - Other Secured Claims

Class 5 - General Unsecured Claims

Class 6 - Convenience Claims

Class 7 - Equity Interest of Class A Member

Class 8 - Equity Interest of Class B Member

-25-

Only administrative expenses, claims and equity interests that are "allowed" may receive distributions under a chapter 11 plan. An "allowed" administrative expense, claim or equity interest simply means that the Debtor agrees, or in the event of a dispute, that the Bankruptcy Court determines, that the administrative expense, claim or equity interest, including the amount thereof, is in fact a valid obligation of, or equity interest in, the Debtor. Section 502(a) of the Bankruptcy Code provides that a timely filed administrative expense, claim or equity interest is automatically "allowed" unless the debtor or another party in interest objects. However, section 502(b) of the Bankruptcy Code specifies certain claims that may not be "allowed" in a bankruptcy case even if a proof of claim is filed. These include, without limitation, claims that are unenforceable under the governing agreement or applicable non-bankruptcy law, claims for unmatured interest on unsecured and/or undersecured obligations, guaranty claims, property tax claims in excess of the debtor's equity in the property, claims for certain services that exceed its reasonable value, nonresidential real property lease and employment contract rejection damage claims in excess of specified amounts, and late-filed claims. In addition, Bankruptcy Rule 3003(c)(2) prohibits the allowance of any claim or equity interest that either is not listed on the debtor's schedules or is listed as disputed, contingent, or unliquidated if the holder has not filed a proof of claim or equity interest before the deadline to file proofs of claim and equity interests.

The Bankruptcy Code also requires that, for purposes of treatment and voting, a chapter 11 plan divide the different claims against, and equity interests in, the Debtor into separate classes based upon its legal nature. Claims of a substantially similar legal nature are usually classified together, as are equity interests of a substantially similar legal nature. Because an entity may hold multiple claims and/or equity interests which give rise to different legal rights, the holders of such claims and/or equity interests may find themselves as members of multiple classes of claims and/or equity interests.

Under a chapter 11 plan, the separate classes of claims and equity interests must be designated either as "impaired" (altered by the plan in any way) or "unimpaired" (unaltered by the plan). If a class of claims or interests is "impaired," the Bankruptcy Code affords certain rights to the holders of such claims or interests, such as the right to vote on the plan (unless the plan provides for no distribution to the holder, in which case, the holder is deemed to reject the plan), and the right to receive an amount under the chapter 11 plan that is not less than the value that the holder would receive if the debtor were liquidated under chapter 7. Under section 1124 of the Bankruptcy Code, a class of claims or interests is "impaired" unless, with respect to each claim or interest of such class, the plan (i) does not alter the legal, equitable or contractual rights of the holders of such claims or interests or (ii) irrespective of the holder's right to receive accelerated payment of such claims or interests after the occurrence of a default, cures all defaults (other than those arising from, among other things, the debtor's insolvency or the commencement of a bankruptcy case), reinstates the maturity of the claims or interests in the class, compensates the holders of such claims or interests for any damages incurred as a result of its reasonable reliance upon any acceleration rights and does not otherwise alter its legal, equitable or contractual rights. Typically, this means that the holder of an unimpaired claim will receive on the later of the effective date of the plan of reorganization or the date on which amounts owing are due and payable, payment in full, in cash, with post petition interest to the

ATLANTA:5326255.1

extent permitted and provided under the governing agreement between the parties (or, if there is no agreement, under applicable non-bankruptcy law), and the remainder of the debtor's obligations, if any, will be performed as they come due in accordance with its terms. Thus, other than its right to accelerate the debtor's obligations, the holder of an unimpaired claim will be placed in the position it would have been in had the debtor's case not been commenced.

Consistent with these requirements the Plan divides the Claims against, and equity interests in, the Debtor into the following Classes and affords the treatments described:

For purposes of computing distributions under the Plan, Allowed Claims do not include post petition interest unless otherwise specified in the Plan.

### 3. Unclassified — Administrative Claims

Administrative Claims include any right to payment constituting a cost or expense of administration of the Chapter 11 Case of a kind specified under section 503(b) of the Bankruptcy Code and entitled to priority under section 507(a)(1), 507(b) or 1114(e)(2) of the Bankruptcy Code, including, without limitation, any actual and necessary costs and expenses of preserving the Debtor's Estate, any actual and necessary costs and expenses of operating the Debtor's business, any indebtedness or obligations incurred or assumed by the Debtor in Possession in connection with the conduct of its business, including, without limitation, for the acquisition or lease of property or an interest in property or the rendition of services, any fees or charges assessed against the Debtor's Estate under section 1930 of chapter 123 of title 28 of the United States Code and Section 503(b)(9) Claims.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if an Administrative Claim is Allowed as of the Effective Date, or (ii) as soon as practicable after the date such Administrative Claim becomes an Allowed Claim, if an Administrative Claim is not Allowed as of the Effective Date, each holder of an Allowed Administrative Claim shall receive from the Debtor, in full satisfaction, settlement and release of, and in exchange for, such Allowed Administrative Claim, (a) Cash of the Debtor against which such Administrative Claim is Allowed equal to the unpaid portion of such Allowed Administrative Claim, or (b) such less favorable treatment to which the Debtor (with the consent of the Agents) or Reorganized Debtor and the holder of such Allowed Administrative Claim shall have agreed upon in writing; provided, however, that Allowed Ordinary Course Trade Claims shall be paid in the ordinary course of business of the Reorganized Debtor in accordance with the terms and subject to the conditions of any agreements governing relating thereto.

Unless a prior date has been established pursuant to the Bankruptcy Code, the Bankruptcy Rules or a prior order of the Bankruptcy Court, the Confirmation Order will establish a bar date for filing applications for allowance of Administrative Claims (except for Professional Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims), which date will be the first business day that is thirty (30) days after the Confirmation Date. Holders of Administrative Claims, except for Professional Fee Claims, Ordinary Course Administrative Claims and Section 503(b)(9) Claims, not paid prior to the Confirmation Date must submit requests for

payment by filing a proof of Administrative Expense Claim with the Clerk of the Bankruptcy Court and in accordance with the instructions set forth in the Confirmation Order or notice of entry of the Confirmation Order on or before the applicable Administrative Claims Bar Date or forever be barred from doing so. The notice of confirmation to be delivered pursuant to Bankruptcy Rules 3020(c) and 2002(f) will set forth the Administrative Claims Bar Date, the appropriate address to submit requests to the Claims Agent and constitute good and sufficient notice of the Administrative Claims Bar Date. For the avoidance of doubt, Section 503(b)(9) Claims were and continue to be subject to the Bar Dates set forth in the Pre-Petition Claims Bar Date Order, and nothing set forth in the Plan shall be deemed an extension of the Bar Dates with respect to Section 503(b)(9) Claims.

### 4. Unclassified — DIP Facility Claims

DIP Facility Claims are all Claims arising under or relating to the DIP Credit Documents and all agreements and instruments relating thereto.

On the Initial Distribution Date, each holder of a DIP Facility Claim shall receive payment in full in Cash of all obligations of the Debtor under the DIP Credit Documents.

### 5. Unclassified — Professional Fee Claims

Professional Fee Claims are Administrative Claims under section 328, 330(a), 331, 503 or 1103 of the Bankruptcy Code for compensation of a Professional or other Person for services rendered or expenses incurred in the Chapter 11 Case on or prior to the Effective Date (including reasonable expenses of the members of the Committee incurred as members of the Committee in discharge of its duties as such). For the avoidance of doubt, professional fees and expenses incurred by the Senior Secured Lenders and the DIP Lenders are not Professional Fee Claims.

Except as otherwise provided for in the Plan, all requests for compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, 503 or 1103 of the Bankruptcy Code for services rendered prior to the Effective Date shall be filed and served on the Reorganized Debtor, counsel for the Pre-Petition Agent, counsel to the Reorganized Debtor, the United States Trustee, and counsel to the Committee and such other entities who are designated by the Bankruptcy Rules, the Confirmation Order or other order of the Bankruptcy Court, no later than sixty (60) days after the Effective Date, unless such date is otherwise modified by order of the Bankruptcy Court. Holders of Professional Fee Claims that are required to file and serve applications for final allowance of its Professional Fee Claims and that do not file and serve such applications by the required deadline shall be forever barred from asserting such Claims against the Debtor, Reorganized Debtor or its property, and such Professional Fee Claims shall be deemed discharged as of the Effective Date. Objections to any Professional Fee Claims must be filed and served on the Reorganized Debtor, counsel for the Pre-Petition Agent, and counsel for the Reorganized Debtor and the requesting party on or before twenty (20) days after the filing and service of such request. Estimated professional compensation and expense reimbursement from the Petition Date through the filing of the Plan are as follows: McKenna Long & Aldridge, LLP, counsel to the Debtor, $1,050,000; Morgan Keegan

-28-

& Company, Inc., financial advisor and investment banker to the Debtor, $450,000; Epiq Bankruptcy Solutions, LLC, $125,000; Mauldin & Jenkins, LLP, accountants to the Debtor, $25,000.

### 6. Unclassified — Priority Tax Claims

Priority Tax Claims include any unsecured Claim that is entitled to a priority in right of payment under section 507(a)(8) of the Bankruptcy Code. The Debtor estimates that after accounting for Claims already paid and Claims subject to potential disallowance or reduction pursuant to objections sustained by the Bankruptcy Court, the potential amount of Allowed Priority Tax Claims will be approximately $0.

Except as otherwise provided for in the Plan, on (i) the Initial Distribution Date, if a Priority Tax Claim is Allowed as of the Effective Date, or (ii) the first Quarterly Distribution Date after the date such Priority Tax Claim becomes Allowed, each holder of an Allowed Priority Tax Claim shall receive from the Debtor, in full satisfaction, settlement and release of, and in exchange for, such Allowed Priority Tax Claim, (A) Cash of the Debtor against which such Priority Tax Claim is Allowed equal to the amount of such Allowed Priority Tax Claim, (B) such less favorable treatment as to which such Debtor (with the Consent of the Agents) or Reorganized Debtor, and the holder of such Allowed Priority Tax Claim shall have agreed upon in writing; or (C) at the option of the Reorganized Debtor, Cash of the applicable Debtor in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of not more than five (5) years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code.

### 7. Class 1 – Senior Secured Lender Claims

a. Description and Treatment

Class 1 consists of all Pre-Petition Senior Secured Lender Claims. The Pre-Petition Senior Secured Lender Claims are estimated to total approximately $107,644,144. The holders of Allowed Pre-Petition Secured Credit Facility Claims will receive in full satisfaction of their Secured and Unsecured Claims, the following treatment:

On the Effective Date, each Holder of an Allowed Class 1 Claim shall receive, in full satisfaction, settlement, release and extinguishment of such Claim, their Pro Rata Share of the New Preferred Units and the New Class B Units.

All reasonable out-of-pocket fees, costs and expenses of the Pre-Petition Agent and Senior Secured Lenders, as approved by the Pre-Petition Agent, (including, without limitation, reasonable out-of-pocket fees, costs, expenses and disbursements of legal counsel, financial advisors and third-party appraisers, advisors and consultants advising the Senior Secured Lenders) shall be paid by the Debtor or the Reorganized Debtor on demand whether or not the Plan is confirmed and the transactions contemplated hereby are consummated.

The Reorganized Debtor shall agree to indemnify and hold harmless the Prepetition Agent and the Senior Secured Lenders, each of their respective affiliates and each of their respective officers, directors, employees, agents, advisors and

ATLANTA:5326255.1

representatives (each, an "Indemnified Party") from and against any and all claims, damages, losses, liabilities and expenses (including, without limitation, fees and disbursements of counsel), that may be incurred by or asserted or awarded against any Indemnified Party (including, without limitation, in connection with any investigation, litigation or proceeding or the preparation of a defense in connection therewith), arising out of or in connection with or by reason of the transactions contemplated hereby, except to the extent arising from an Indemnified Party's gross negligence or willful misconduct.  In the case of an investigation, litigation or other proceeding to which the indemnity in this paragraph applies, such indemnity shall be effective whether or not such investigation, litigation or proceeding is brought by the Reorganized Debtor, any of its respective directors, security holders or creditors, an Indemnified Party or any other person or an Indemnified Party is otherwise a party thereto and whether or not the transactions contemplated hereby are consummated.

If Classes 2, 3, 5, 6 and 7 each votes as a Class to accept the Plan, then the Senior Secured Lenders by voting as a Class to accept the Plan are deemed to waive, solely in connection with this Plan, (i) any Adequate Protection Claims and any Secured Lender Deficiency Claims, (ii) their rights under the Pre-Petition Intercreditor Agreement to permit the Holder of the Bond Claim to receive and retain any Plan Distributions, (iii) their rights under the Subordination Agreement to permit the Holder of the Fagen Claim to receive and retain any Plan Distributions, and (iv) any Bankruptcy Code section 507(a) or (b) Claims.  Furthermore, the Senior Secured Lenders by voting for the Plan are deemed to consent to the use of their cash collateral by the Debtor to fund the General Unsecured Creditors Fund and the distribution to Holders of Class 6 Convenience Claims.  If, however, any of Classes 2, 3, 5, 6 or 7 votes as a Class to reject the Plan, then the Senior Secured Lenders shall not be deemed to have waived any of the foregoing rights or claims, without regard to whether the Senior Secured Lenders vote as a Class to accept the Plan, and any claims of the Senior Secured Lenders pursuant to such rights and claims shall be retained and deemed Administrative Claims or Claims against the Debtor in Class 5 of the Plan, as the case may be.

b.      Impairment

Class 1 is impaired under the Plan.  Each holder of an Allowed Claim in Class 1 is entitled to vote to accept or to reject the Plan.  Notwithstanding Federal Rule of Bankruptcy Procedure 3018(d), for voting purposes, both the Secured Claims and the Deficiency Claims of the Pre-Petition Senior Secured Credit Facility Lenders shall be counted in Class 1.

**8.      Class 2 – Bond Claim**

a.      Description and Treatment

Class 2 consists of the Bond Claim.  The Bond Claim is estimated at approximately $8,722,688.  The Holder of the Allowed Bond Claim shall receive, in full satisfaction, settlement, release and extinguishment of such Claim and of any lien securing such Claim, and as a condition precedent thereto, the following treatment:

ATLANTA:5326255.1

The Allowed Class 2 Claim shall receive on the Effective Date an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total amount of Allowed Claims in Classes 2, 3 and 5. The holder of the Allowed Class 2 Claim may retain Plan Distributions without regard to the Pre-petition Intercreditor Agreement. Accordingly, the Holder of an Allowed Class 2 Claim shall receive its Pro Rata Share of the General Unsecured Creditors Fund less a reserve established by the Litigation Trustee for expenses of administration of the Litigation Trust on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall continue to make pro rata Distributions to Holders of Allowed Class 2 Bond Claim, Class 3 Fagen Claim and Class 5 General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation Date. If Class 2 votes to accept the Plan, the Debtor will release any and all Claims against the Bond Trustee.

      b.      Impairment

Class 2 is impaired under the Plan. The holder of the Allowed Claim in Class 2 is entitled to vote to accept or to reject the Plan. Notwithstanding Federal Rule of Bankruptcy Procedure 3018(d), for voting purposes, both the Secured Claims and the Deficiency Claims of the Bond Claim shall be counted in Class 2.

**9.**      **Class 3 – Fagen Claim**

      a.      Description and Treatment

Class 3 consists of the Fagen Claim. The Fagen Claim is estimated at approximately $4,293,534. The Holder of the Fagen Claim shall receive, in full satisfaction, settlement, release and extinguishment of such Claim and of any lien securing such Claim, and as a condition precedent thereto, the following treatment:

The Allowed Class 3 Claim shall receive on the Effective Date an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total amount of Allowed Claims in Classes 2, 3 and 5. The holder of the Allowed Class 3 Claim may retain without regard to the Subordination Agreement. Accordingly, the Holder of the Allowed Class 3 Claim shall receive its Pro Rata Share of the General Unsecured Creditors Fund less a reserve established by the Litigation Trustee for expenses of administration of the Litigation Trust, on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall continue to make pro rata Distributions to Holders of Allowed Class 2 Bond Claim, Class 3 Fagen Claim and Class 5 General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation

ATLANTA:5326255.1

Date. If Class 3 votes to accept the Plan, the Debtor will release any and all warranty claims against Fagen that have accrued or may arise prior to the Confirmation Date.

b.    Impairment

Class 3 is impaired under the Plan. The Holder of the Allowed Claim in Class 3 is entitled to vote to accept or to reject the Plan. Notwithstanding Federal Rule of Bankruptcy Procedure 3018(d), for voting purposes, both the Secured Claims and the Deficiency Claims of the Fagen Claim shall be counted in Class 3.

**10.    Class 4 – Other Secured Claims**

a.    Description and Treatment

There are several holders of Other Secured Claims for equipment used at the Debtor's facility, Mitchell County has filed a secured tax claim, and Mitchell County has submitted invoices to the Debtor for 2011 ad valorem property taxes owing. The materialmen lien claim filed against the Debtor's property is not considered to be a Class 4 Claim, but will instead be included in the Convenience Class (Class 6).

Each Holder of an Allowed Class 4 Other Secured Claim shall receive, at the election of the Debtor (with the consent of the Agents), in full satisfaction, settlement, release, and extinguishment of such Claim: (a) Cash equal to the amount of such Allowed Other Secured Claim on or as soon as practicable after the later of (i) the Effective Date, (ii) the date that such Other Secured Claim becomes Allowed, and (iii) a date agreed to by the Debtor and the Holder of such Class 4 Other Secured Claim; or (b) reinstatement of the Pre-Petition Secured Claim held by such Other Secured Creditor and cure of any Pre-Petition monetary default thereunder; or (c) such other treatment on such other terms and conditions as may be agreed upon in writing by the Holder of such Claim and the Debtor (with the consent of the Agents).

b.    Impairment

Class 4 is Unimpaired and the Holders of Class 4 Claims are conclusively deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code. Therefore, the Holders of Claims in Class 4 are not entitled to vote to accept or reject the Plan.

**11.    Class 5 – General Unsecured Claims**

a.    Description and Treatment

Each Holder of an Allowed Class 5 General Unsecured Claim shall receive in full satisfaction, settlement, release, and extinguishment of such Claim the following treatment: each Claim shall receive on the Effective Date an interest in the Litigation Trust based on the percentage that its Allowed Claim bears to the total Allowed Claims in Classes 2, 3 and 5. Accordingly, each Holder of an Allowed Class 5 Claim shall receive its Pro Rata Share of the General Unsecured Creditors Fund less a reserve established by the Litigation Trustee for expenses of administration of the Litigation Trust, on or as soon as practicable after the later of (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been

timely filed, or (ii) the first Distribution Date after the date on which any objection to such General Unsecured Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court. On each subsequent Distribution Date or as soon thereafter as is reasonably practicable, the Litigation Trustee shall continue to make pro rata Distributions to Holders of Allowed Class 2 Bond Claim, Claim 3 Fagen Claim and Class 5 General Unsecured Claims of any available funds in the General Unsecured Creditors Fund until the Consummation Date.

b.      Impairment

Class 5 is impaired under the Plan. The holders of Allowed General Unsecured Claims in Class 5 are entitled to vote to accept or reject the Plan.

**12.      Class 6 – Convenience Claims**

a.      Description and Treatment

On either (i) the first Distribution Date after the Claims Objection Deadline has occurred, if no objection to such Claim has been timely filed, or (ii) the first Distribution Date after the date on which any objection to such Convenience Claim is settled, withdrawn or overruled pursuant to a Final Order of the Bankruptcy Court, each Holder of an Allowed Class 6 Convenience Claim shall receive, in full satisfaction, settlement, release, and extinguishment of such Claim, Cash in an amount equal to 5% of its Allowed Claim.

b.      Impairment

Class 6 is impaired under the Plan. The holders of Allowed Convenience Claims in Class 6 are entitled to vote to accept or reject the Plan.

**13.      Class 7 – Equity Interest Of Class A Member (FUEL)**

a.      Description and Treatment

If Classes 2, 3 and 5 each votes as a Class to accept the Plan, the Class A Member Interest in the Debtor shall be converted to the New Class A Units; which rights are affected by the issuance of the New Preferred Units and the New Class B Units. Prior to the Second Trigger Event, the holders of the New Class A Units will waive, to the maximum extent permitted by law, any and all rights of a member under Delaware law and will grant to the board of managers of Reorganized Debtor an irrevocable power of attorney, coupled with an interest to exercise all voting rights of the holders of the New Class A Units, other than the right to elect one director after the First Trigger Event. Upon the Second Trigger Event, the irrevocable power of attorney shall terminate and the holders of the New Class A Units shall be granted rights as members and voting rights equal to the New Class B Units (other than with respect to the designation of managers), with the New Class A Units and New Class B Units voting together as a combined class and each holder of New Class A Units and New Class B Units receiving one vote per unit, provided that holders of New Class A Units shall collectively have 75% of all voting rights and holders of New Class B Units shall collectively have 25% of all voting rights.

-33-

b. Impairment

Class 7 is impaired under the Plan. The holders of the Equity Interest Class 7 is deemed to accept the Plan and therefore its vote will not be solicited.

### 14. Class 8 – Equity Interest Of Class B Member (CT Corporation Staffing)

a. Description and Treatment

The holder of the Class B Member Interest in Class 8 shall neither receive distributions nor retain any property under the Plan on account of such Equity Interest.

b. Impairment

Class 8 is impaired under the Plan. The holders of Class 8 Equity Interest is not entitled to vote to accept or reject the Plan. The holders of Class 8 Equity Interest is presumed to reject the Plan and therefore shall not be solicited.

## C. PROVISIONS REGARDING UNCLASSIFIED PRIORITY CLAIMS

The Plan contains provisions that set forth the treatment of Claims of a kind specified in Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code. The treatment of these Unclassified Claims in the Plan is consistent with the requirements of Section 1129(a)(9) of the Bankruptcy Code, and the holders of such Claims are not entitled to vote on the Plan. Notwithstanding any other provision of the Plan, pursuant to Section 1123(a)(1) of the Bankruptcy Code, Claims under Sections 507(a)(2) and 507(a)(8) of the Bankruptcy Code are not designated as Classes of Claims for purposes of the Plan.

## VIII.
## MEANS FOR IMPLEMENTATION OF THE PLAN AND EFFECTS OF CONFIRMATION

## A. NEW LLC AGREEMENT

The Reorganized Debtor shall convert to a Delaware limited liability company which shall be governed by the New LLC Agreement, which shall, among other things, (i) authorize the issuance of New Membership Interests, and (ii) prohibit the issuance of nonvoting equity interests, only so long as, and to the extent that, the issuance of nonvoting securities is prohibited. The New LLC Agreement shall be substantially in the form set forth in the Plan Supplement and shall be acceptable in form and substance to the Agents. The Reorganized Debtor may, if required in connection with obtaining Exit Financing, create a Delaware limited liability company subsidiary and contribute all assets of the Debtor's Estate (not otherwise distributed pursuant to the Plan) to such newly formed entity in satisfaction of any Exit Financing requirements. From and after the Effective Date, the Reorganized Debtor and any subsidiary shall operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there was no pending Chapter 11 Case, except as provided in the Plan.

-34-

## B. ISSUANCE OF NEW MEMBERSHIP INTERESTS

The New Membership Interests issued by the Reorganized Debtor shall include (i) New Class A Units (if Classes 2, 3 and 5 each vote as a Class to accept the Plan), (ii) New Class B Units, and (iii) New Preferred Units, which shall rank senior to all other classes of membership interests of the Reorganized Debtor.

Except for Liquidity Event Distributions, holders of the New Class A Units shall be entitled to receive, in the aggregate, 75% of all distributions from the Reorganized Debtor (whether made pursuant to a liquidation or otherwise, and whether in cash or property) after such time as holders of the New Preferred Units have received their full Preferred Redemption Value, which is equal to the aggregate initial capital contribution of all holders and which shall be equal to $105,000,000.

Except for Liquidity Event Distributions, holders of the New Class B Units shall be entitled to receive, in the aggregate, 25% of all distributions from the Reorganized Debtor (whether made pursuant to a liquidation or otherwise, and whether in cash or property) after such time as holders of the New Preferred Units have received their full Preferred Redemption Value; provided, however, if the Class A Units are not issued pursuant to the Plan, then the New Class B Units shall be entitled to 100% of all distributions from Reorganized Debtor.

Holders of the New Preferred Units shall be entitled to receive distributions from the Reorganized Debtor (whether made pursuant to a liquidation or otherwise, and whether in cash or property) which shall be applied (i) first, to payment of any accrued and unpaid Preferred Return, and (ii) second, to the payment of any Unreturned Preferred Redemption Value. Holders of New Preferred Units will also be entitled to receive Liquidity Event Distributions. The Preferred Return is a cumulative preferred return, compounded annually, equal to 15% per annum, of the Unreturned Preferred Redemption Value, payable quarterly in cash or in kind at the discretion of the New Board of Managers. The Unreturned Preferred Redemption Value is the amount equal to the excess of Preferred Redemption Value over prior distributions made by the Company that constitute a return of such Preferred Redemption Value plus any accrued but unpaid Preferred Return.

As set forth in the Plan, a Liquidity Event means the occurrence of any of the following events: (a) the consummation of a recapitalization, reorganization, merger, consolidation or similar form of transaction involving the Reorganized Debtor and its subsidiaries, as a result of which the persons or entities that directly or indirectly beneficially owned one hundred percent (100%) of the value and voting power of the outstanding equity interests of the Reorganized Debtor and its subsidiaries (taken as a whole) immediately prior to the consummation of such transaction receive consideration in exchange for some or all of such equity interests and cease to directly or indirectly own at least fifty percent (50%) of the aggregate voting power of the entity surviving, or resulting from, such transaction; (b) the sale or other disposition of all or substantially all of the assets of the Reorganized Debtor and its subsidiaries (taken as a whole); or (c) any transaction as a result of which a person or entity (other than a person or entity who directly or indirectly beneficially owned equity interests of the Reorganized Debtor and its subsidiaries as of the date hereof) pays consideration to

ATLANTA:5326255.1

the persons or entities who were holders of equity interests of the Reorganized Debtor and its subsidiaries immediately prior to consummation of such transaction in exchange for some or all of their equity interests and thereby becomes a direct or indirect "beneficial owner" (as used in this definition, such term and terms of similar import shall have the meaning set forth in Rule 13d-3 of the Securities Exchange Act of 1934, as amended) of fifty percent (50%) or more of the aggregate value and voting power of the outstanding equity interests of the Reorganized Debtor and its subsidiaries (taken as a whole).

Distributions of proceeds from a Liquidity Event shall be made as follows: (a) in the event a Liquidity Event occurs any time prior to the payment in full of the Preferred Redemption Value *and* the Distribution Proceeds from such Liquidity Event are less than the Unreturned Preferred Redemption Value, then the Distribution Proceeds from such Liquidity Event shall be paid as follows: (i) 99% to Holders of New Preferred Units; and (ii) 1% to Holders of New Class A Units; (b) in the event a Liquidity Event occurs any time prior to the payment in full of the Preferred Redemption Value *and* the Distribution Proceeds from such Liquidity Event are greater than the Unreturned Preferred Redemption Value, then the Distribution Proceeds from such Liquidity Event shall be paid as follows: (i) first to Holders of New Preferred Units to the extent of the Unreturned Preferred Redemption Value; (ii) second, to Holders of New Class A Units in an amount equal to the greater of 1% of the Distribution Proceeds from such Liquidity Event or 90% of the remaining Distribution Proceeds after making the payment in subparagraph (i) above; and (iii) third, the balance of the Distribution Proceeds, if any, to the Holders of Class B Units; provided, however, that, notwithstanding the foregoing, in no event shall Holders of the New Class A Units receive less than 1% of the Distribution Proceeds from such Liquidity Event, and in such circumstances, the distribution otherwise payable to Holders of the New Preferred Units shall be reduced to the extent required to ensure that Holders of New Class A Units receive 1% of the Distribution Proceeds; (c) in the event a Liquidity Event occurs at any time during the period commencing immediately after the Preferred Redemption Value has been paid in full and prior to the second anniversary of the date the Preferred Redemption Value has been paid in full, the Distribution Proceeds from such Liquidity Event will be paid as follows: (i) first, 75% of such Distribution Proceeds to Holders of New Class B Units; and (ii) second, the balance of such Distribution Proceeds shall be distributed 75% to Holders of New Class A Units and 25% to Holders of New Class B Units; provided, however, that, notwithstanding the foregoing, in no event shall Holders of the New Class A Units receive less than 1% of the Distribution Proceeds from such Liquidity Event and, in such circumstances, the distribution otherwise payable to Holders of the New Class B Units shall be reduced to the extent required to ensure that Holders of New Class A Units receive 1% of the Distribution Proceeds; or (d) in the event a Liquidity Event occurs at any time after the second anniversary of the date on which the Preferred Redemption Value has been paid in full, the Distribution Proceeds from such Liquidity Event will be paid as follows: (i) first, 90% of such Distribution Proceeds to Holders of New Class A Units; and (ii) second, 10% of such Distribution Proceeds to Holders of New Class B Units. For the avoidance of doubt, if a Liquidity Event occurs as a result of action by the Reorganized Debtor before the payment in full of the Preferred Redemption Value that is closed during the period between the payment in full of the Preferred Redemption Value and the

-36-

second anniversary of the payment in full of the Preferred Redemption Value, such as by way of example and not limitation, a contract to sell or otherwise dispose of all or substantially all of the assets of the Reorganized Debtor that is executed before, and that closes after, the payment in full of the Preferred Redemption Value, then the Distribution Proceeds shall not be paid pursuant to paragraph (c), but pursuant to paragraph (a) or paragraph (b), as appropriate.

In any event, if the New Class A Units are not issued pursuant to the Plan, any distribution otherwise payable to Holders of the New Class A Units shall be paid 100% to the Holders of New Class B Units.

Distribution Proceeds are total proceeds from a Liquidity Event less the sum of (i) any outstanding unpaid Preferred Return, (ii) the principal amount of any indebtedness that is required to be repaid in connection with such Liquidity Event, (iii) the reasonable and customary out-of-pocket costs, fees (including investment banking fees), commissions, premiums and expenses incurred by the Debtor or its subsidiaries in connection with such Liquidity Event, (iv) federal, state, provincial, foreign and local taxes reasonably estimated to be actually payable within the current or the immediately succeeding tax year as a result of any gain recognized in connection therewith, (v) a reasonable reserve for current and future operating expenses, liquidation expenses, contingencies and emergencies, and (vi) a reasonable reserve for any purchase price adjustment or any indemnification payments (fixed and contingent) attributable to the seller's obligations to the purchaser undertaken by Debtor or any of its subsidiaries in connection with such Liquidity Event.

The issuance of the New Membership Interests by the Reorganized Debtor is authorized without the need for any further corporate action or without any further action by a holder of Claims or Interests. The New Membership Interests of the Reorganized Debtor shall consist of the New Preferred Units, New Class A Units and New Class B Units. At the close of business on the Effective Date, the New Preferred Units and the New Class B Units shall be issued to the Holders of the Senior Secured Lender Claims. The New Class A Units shall be issued to the holders of the Class A Membership Units. All of the New Membership Interests issued pursuant to the Plan shall be duly authorized, validly issued and, if applicable, fully paid and non-assessable. Upon the Effective Date, the New LLC Agreement shall be deemed to become valid, binding and enforceable in accordance with its terms, and each holder of New Membership Interests shall be bound thereby, in each case, without need for execution by any party thereto other than the Reorganized Debtor.

## C. LISTING OF NEW MEMBERSHIP INTERESTS

The Reorganized Debtor shall not be obligated to list the New Membership Interests on a national securities exchange. In order to ensure that the Reorganized Debtor will not become subject to the reporting requirements of the Exchange Act except in connection with a public offering, the New Membership Interests will be subject to certain trading restrictions to limit the number of record holders thereof as shall be more fully described in the Plan Supplement.

ATLANTA:5326255.1

## D. TERMINATION OF THE DIP FACILITY

On the Effective Date, the DIP Facility will be deemed to have been terminated. All amounts, if any, payable thereunder will be paid in full on the Effective Date, and all liens, mortgages, and security interests granted under the DIP Facility, or in connection thereunder, will be extinguished. All outstanding post petition fees and expenses required to be paid under the DIP Facility will be paid by the Debtor on the Effective Date, as provided further in the Plan.

## E. EXIT FINANCING

As provided in Plan Section 7.11, on the Effective Date, the Reorganized Debtor shall enter into the Exit Financing, which shall consist of a senior secured loan facility, in an aggregate principal amount not to exceed $20 million, on such material terms and conditions as contained in the Exit Financing Commitment Letter. The terms and conditions of which shall be acceptable to the Agents. Confirmation shall be deemed approval of the Exit Financing (including the transactions contemplated thereby, such as any supplementation or additional syndication of the Exit Financing, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtor in connection therewith, including the payment of all fees, indemnities, and expenses provided for therein) and authorization for the Reorganized Debtor to enter into and execute the Exit Financing, and such other documents as the Exit Financing Lenders may require, subject to such modifications as the Reorganized Debtor may deem to be reasonably necessary to consummate the Exit Financing with the consent of the Agents. The Reorganized Debtor may use the Exit Financing for any purpose permitted thereunder, including the funding of obligations under the Plan and satisfaction of ongoing working capital needs. Upon the date the Exit Financing Agreement becomes effective, (i) the Debtor and the Reorganized Debtor are authorized to execute and deliver the Exit Financing Agreement and the Exit Financing Documents and perform their obligations thereunder including, without the payment or reimbursement of any fees, expenses, losses, damages or indemnities, (ii) the Exit Financing Documents shall constitute the legal, valid and binding obligations of the Reorganized Debtor, enforceable in accordance with their respective terms, and (iii) no obligation, payment, transfer or grant of security under the Exit Financing Documents shall be stayed, restrained, voidable, or recoverable under the Bankruptcy Code or under any applicable law or subject to any defense, reduction, recoupment, setoff or counterclaim. The Debtor and the Reorganized Debtor, as applicable, are authorized to make all filings and recordings, and to obtain all governmental approvals and consents necessary or desirable to establish and further evidence of perfection of such liens and security interests under the provisions of any applicable federal, state, provincial or other law (whether domestic or foreign) (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order and any such filings, recordings, approvals and consents shall not be required), and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such liens and security interests to third parties. The Exit Financing Commitment Letter shall be filed with the clerk of the Bankruptcy Court at least ten (10) days prior to the Confirmation Hearing.

ATLANTA:5326255.1

## F. EFFECTUATING DOCUMENTS; FURTHER TRANSACTIONS

Upon the entry of the Confirmation Order, all corporate actions contemplated by the Plan shall be deemed authorized and approved in all respects, including (i) the transactions contemplated by Plan Section 7.08, (ii) the adoption of the New LLC Agreement, (iii) the conversion of the Reorganized Debtor to a Delaware limited liability company, (iv) the filing of new certificates of formation, (v) the initial selection of managers and officers for the Reorganized Debtor, (vi) the issuance of New Membership Interests, (vii) the execution and entry into the Exit Financing, (viii) if required in connection with obtaining Exit Financing, the creation of a member managed Delaware limited liability company and the contribution of all assets of the Debtor's Estate (not otherwise distributed pursuant to the Plan) to such newly formed entity in satisfaction of any Exit Financing requirements, (ix) the execution and delivery of the agreements, documents and instruments contemplated by the Plan (which shall be acceptable in form and substance to the Agents) and the Plan Supplement in the name and on behalf of the Debtor, and (x) all other actions contemplated by the Plan (whether to occur before, on, or after the Effective Date), in each case unless otherwise provided in the Plan. All matters provided for under the Plan involving the corporate structure of the Debtor and Reorganized Debtor or corporate action to be taken by or required of the Debtor or the Reorganized Debtor will be deemed to occur and be effective as of the Effective Date, if no such other date is specified in such documents, and shall be authorized, approved, adopted and, to the extent taken prior to the Effective Date, ratified and confirmed in all respects and for all purposes without any requirement of further action by holders of Claims or Interests, directors or managers of the Debtor or the Reorganized Debtor, as applicable, or any other Person, except for applicable filings necessary to convert the Debtor into a Delaware limited liability company, and to effect the filing of new certificates of formation respecting the Debtor.

The Reorganized Debtor, the Debtor, and the Litigation Trustee shall be authorized to execute, deliver, file, and record such contracts, instruments, releases, indentures, and other agreements or documents, and to take such actions as may be necessary, desirable, or appropriate to effectuate and further evidence the terms and conditions of the Plan or any securities issued under the Plan.

## G. CANCELLATION OF EXISTING SECURITIES

On the Effective Date, except as otherwise specifically provided for in the Plan: except (i) for purposes of evidencing a right to distributions under the Plan, (ii) with respect to executory contracts and unexpired leases assumed by the Debtor, or (iii) otherwise as provided herein, all the agreements and other documents evidencing the Claims, equity interests, or rights of any holder of a Claim or equity interest Impaired under the Plan shall be cancelled, provided, however, that the Pre-Petition Credit Agreement shall continue in effect solely for the purposes of (a) allowing the Pre-Petition Agent to make distributions on account of Class 1 and to perform such other necessary administrative functions with respect thereto, and (b) permitting such parties to maintain any rights or liens they may have for fees, costs, and expenses thereunder.

ATLANTA:5326255.1

## H.    EXEMPTION FROM TRANSFER TAXES

Under Plan Section 12.13, pursuant to Section 1146(c) of the Bankruptcy Code, the issuance, transfer, or exchange of notes or equity securities under the Plan, the creation of any mortgage, deed of trust, deed to secure debt, or other security interest, the making or assignment of any lease or sublease, or the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with the Plan, including any merger agreement or agreement of consolidation, deed, bill of sale, or assignment in connection with any of the transactions contemplated under the Plan, will not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax. All sale transactions consummated by the Debtor, the Reorganized Debtor, or the Litigation Trustee and approved by the Bankruptcy Court on or after the Petition Date through and including the Effective Date, including the transfers effectuated under the Plan, the sale by the Debtor or the Reorganized Debtor of property pursuant to Section 363(b) of the Bankruptcy Code, and the assumption, assignment, and sale by the Debtor of unexpired leases of non-residential real property pursuant to Section 365 of the Bankruptcy Code, shall be deemed to have been made under, in furtherance of, or in connection with the Plan and, thus, shall not be subject to any stamp, real estate transfer, mortgage recording, or other similar tax.

## I.    EXEMPTION FROM SECURITIES LAWS

Under Plan Section 12.14, pursuant to section 1145 of the Bankruptcy Code, the offering, issuance, and distribution of any New Membership Interests and interests in the Litigation Trust shall be exempt from, among other things, the registration requirements of section 5 of the Securities Act and any other applicable law requiring registration prior to the offering, issuance, distribution, or sale of the New Membership Interests.   In addition, under section 1145 of the Bankruptcy Code, any New Membership Interests and any and all settlement agreements incorporated therein will be freely tradable by the recipients thereof, subject to (1) the provisions of section 1145(b)(1) of the Bankruptcy Code relating to the definition of an underwriter in section 2(a)(11) of the Securities Act; (2) compliance with any rules and regulations of the Securities and Exchange Commission, if any, applicable at the time of any future transfer of any the New Membership Interests or instruments; (3) the restrictions, if any, on the transferability of the New Membership Interests and instruments; and (4) applicable regulatory approval.

## J.    NEW BOARD OF MANAGERS

Each member of the board of managers of the Debtor shall be deemed to have resigned on and as of the Effective Date, in each case without further notice to or order of the Bankruptcy Court, act, or action under applicable law, resolution, order or rule of the vote, consent, or authority of any Debtor.  The new board of managers of the Reorganized Debtor will have five members.  The initial five managers will be designated by the Agents (with the consent of the Required Lenders), subject to adjustment as follows:  (i) upon the occurrence of the First Trigger Event, the right of the holders of the New Preferred Units to designate five managers will be reduced to four and the holders of the New Class A Units will be permitted to designate one manager; and (ii) upon the occurrence of the Second Trigger Event, the right of the

-40-

holders of the New Preferred Units to designate managers will be eliminated and the holders of New Class B Units will have the right to designate one manager and the holders of New Class A Units will have the right to designate four managers. Prior to the Second Trigger Event, one of the members of the board of managers designated by the holders of the New Preferred Units shall be the Chief Executive Officer of the Reorganized Debtor. After the Second Trigger Event, one of the members of the board of managers designated by the holders of the New Class A Units shall be the Chief Executive Officer of the Reorganized Debtor. In the event that the New Class A Units are not issued pursuant to the Plan, the right to designate all managers will remain with the holders of the New Preferred Units and the New Class B Units, respectively.

## K. OFFICERS

The persons serving as executive officers and managers of the Debtor immediately before the Effective Date shall maintain their current positions after the Effective Date. The identities, affiliations and other information relating to the initial officers and managers of the Reorganized Debtor will be disclosed in an exhibit to the Disclosure Statement and shall be acceptable to the Agents.

## L. EMPLOYMENT AGREEMENTS

It is expected that some or all senior management employees of the Debtor will receive employment agreements in connection with their employment by the Reorganized Debtor. The basic terms of each employment agreement, including the salary to be offered to each employee, are set forth in Exhibit F hereto. Additional terms of each employment agreement, including any target bonus level, will be determined based upon negotiations between the individual employees and the New Board.

## M. OBJECTIONS TO CLAIMS AND ESTIMATION OF CLAIMS

By order entered May 9, 2011, the Bankruptcy Court established June 15, 2011 as the Bar Date by which all proofs of claim were required to be filed in the Chapter 11 Case, and August 1, 2011 as the Bar Date by which all proofs of claim by governmental entities were required to be filed in the Chapter 11 Case. The Debtor, the Reorganized Debtor, and the Litigation Trustee will review the filed proofs of claim and analyze each Claim with regard to (i) the supporting documents evidencing the Claim; (ii) the appropriateness of the characterization of each Claim; (iii) the amount of the Claim as set forth in the proof of claim; (iv) the extent to which the Debtor originally Scheduled the Claim as contingent, disputed, or unliquidated; and (v) whether the proof of claim is otherwise valid, permissible, due, and payable under the Bankruptcy Code and applicable state law. The Reorganized Debtor and the Litigation Trustee may object to any Claim permitted by the Plan or seek to have any such Claim estimated pursuant to Section 502(c) of the Bankruptcy Code.

### 1. Administrative Claims Bar Date

*Administrative Bar Date (Non-Professional Fees/Non-Ordinary Course Goods and Services).* Any person holding an Administrative Claim incurred on or after February 1, 2011, other than an Administrative Claim arising from the purchase by the Debtor of goods and services in the ordinary course of business, and who has not

ATLANTA:5326255.1

filed a proof of such Administrative Claim before the First Administrative Bar Date shall file a proof of such Administrative Claim with the Clerk of the Bankruptcy Court within thirty (30) days after the Reorganized Debtor provides notice by mail or by publication, in a form and manner approved by the Bankruptcy Court, of the entry of the Confirmation Order.

*Administrative Bar Date (Professional Fee Claims).* Any person seeking an award by the Bankruptcy Court of compensation for services rendered or reimbursement of expenses incurred through and including the Confirmation Date pursuant to Sections 503(b)(2), (b)(3), (b)(4), or (b)(5) of the Bankruptcy Code (other than ordinary course professionals) shall file a final application with the Bankruptcy Court for allowance of compensation for services rendered and reimbursement of expenses incurred through the Confirmation Date within sixty (60) days after the Effective Date or by such other deadline as may be fixed by the Bankruptcy Court.

Any such person who fails to file a timely proof of an Administrative Claim with the Bankruptcy Court will be forever barred from seeking such compensation from the Debtor, the Estate, or the Reorganized Debtor.

### 2. Objections to Claims and Administrative Claims

Any objection to a Claim or Administrative Claim must be filed within 120 days of the Effective Date, unless otherwise ordered by the Bankruptcy Court. The Bankruptcy Court may modify these provisions by specific order. Notwithstanding any prior order of the Bankruptcy Court or the provisions of Bankruptcy Rule 9019, after the Effective Date, the Reorganized Debtor or the Litigation Trustee, as the case may be, may settle or compromise any Disputed Claim without approval of the Bankruptcy Court.

### 3. Estimation of Claims

The Debtor (with the consent of the Agents) or the Litigation Trustee may at any time request that the Bankruptcy Court estimate any Disputed Claim pursuant to section 502(c) of the Bankruptcy Code or other applicable law regardless of whether the Debtor or the Reorganized Debtor has previously objected to such Claim or whether the Bankruptcy Court has ruled on any such objection. The Bankruptcy Court will retain jurisdiction to estimate any Claim at any time during the pendency of litigation concerning any objection to any Claim, including during the pendency of any appeal relating to any such objection. In the event that the Bankruptcy Court estimates any Disputed Claim, such estimated amount shall constitute either (a) the Allowed amount of such Claim, (b) the amount on which a reserve is to be calculated for purposes of any reserve requirement to the Plan or (c) a maximum limitation on such Claim, as determined by the Bankruptcy Court. If the estimated amount constitutes a maximum limitation on such Claim, the Debtor (with the consent of the Agents) or the Litigation Trustee, as applicable, may pursue supplementary proceedings to object to the allowance of such Claim. Claims may be estimated and subsequently compromised, settled, withdrawn or resolved by any mechanism approved by the Bankruptcy Court.

ATLANTA:5326255.1

THE FAILURE TO OBJECT TO ANY CLAIM, OR TO SEEK THE ESTIMATION OF ANY CLAIM, PRIOR TO THE COMMENCEMENT OF THE HEARING ON CONFIRMATION OF THE PLAN WILL NOT BE DEEMED TO BE A WAIVER OF THE RIGHT TO OBJECT THEREAFTER TO SUCH CLAIM IN WHOLE OR IN PART, OR TO THEREAFTER SEEK ESTIMATION OF SUCH CLAIM FOR THE PURPOSE OF DISTRIBUTION.

**4.      No Payments on Account of Disputed Claims**

As provided for in Plan Section 5.03, if any portion of a Claim is a Disputed Claim, no Distribution shall be made on account of that Claim unless and until the Disputed Claim becomes an Allowed Claim.

## N.      ESTABLISHMENT OF THE LITIGATION TRUST

Under Plan Section 5.04, on the Effective Date, the Reorganized Debtor will establish the Litigation Trust pursuant to the Litigation Trust Agreement for the Pro Rata benefit of the holders of Allowed Class 2, 3 and 5 Claims and other Allowed Claims that are treated as General Unsecured Claims under the Plan. The Litigation Trust shall be established to receive the General Unsecured Creditors Fund and the Assigned Avoidance Actions of the Debtor and to distribute such Cash or proceeds of the Assigned Avoidance Actions to certain Creditors in accordance with the Plan. The General Unsecured Creditors Fund will be funded in the sum of $500,000 plus net recovery of Avoidance Actions that are assigned by the Debtor to the Litigation Trust hereunder. This amount will be funded by the cash portion of the settlement between the Debtor and Tommy Dollar, Dollar Farm Products, Inc., Tamara Dollar Hader and any of their affiliates that received payments from the Debtor prior to the Petition Date that may be avoidable under state or federal law, which settlement is subject to Bankruptcy Court approval under Bankruptcy Code Section 1123(b)(3)(A), and that is to be incorporated in a written settlement agreement under which in return for a release of any and all claims the Debtor has against any member of the Dollar Family Group other than for the performance of obligations arising under the settlement agreement, the Dollar Family Group (i) shall pay to the Litigation Trustee the cash sum of $500,000 in installments of $200,000 on or before December 1, 2011, $200,000 on or before July 7, 2012 and $100,000 on or before December 1, 2012, and (ii) shall provide the following non-monetary benefits to the Debtor and Reorganized Debtor, namely: (1) each member of the Dollar Family Group shall execute a waiver and release of any and all claims any of them have or may have against the Debtor including any unsecured claim and any claim under 11 U.S.C. § 502(h), (2) each member of the Dollar Family Group will offer to sell any corn that it harvests to the Reorganized Debtor at the then current market price for a period of three years following the approval of the Settlement Agreement by the Bankruptcy Court in the Confirmation Order and the Dollar Family Group estimates they will produce 300,000 to 400,000 bushels of corn annually over the three (3) year period following the Confirmation Date, (3) the Dollar Family Group will encourage local farmers in Southwest Georgia to sell their corn to the Reorganized Debtor at the then current market price for a period of three years following the Confirmation Date, and (4) Tommy Dollar will provide at no cost to the Reorganized Debtor at least ten hours of consulting services each week for a period of three years following the Confirmation

-43-

Date. Pursuant to the settlement, if approved, the Debtor will release the members of the Dollar Family Group in accordance with to the Dollar Family Group Compromise on the Confirmation Date.

Except as otherwise expressly provided in the Plan, pursuant to sections 1123(a)(5), 1123(b)(3) and 1141(b) of the Bankruptcy Code, the General Unsecured Creditors Fund shall automatically vest in the Litigation Trust, free and clear of all Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests of Creditors and equity security holders on the Effective Date, with all such Claims, Liens, contractually-imposed restrictions, charges, encumbrances and Interests being extinguished subject to the rights of Holders of Allowed Class 2 Bond Claim, Class 3 Fagen Claim and Class 5 General Unsecured Claims to obtain distributions provided for in the Plan. In no event shall any property of any kind be returned by, or otherwise transferred from, the Litigation Trust to the Reorganized Debtor.

The Plan provides that the Litigation Trust will be treated as a liquidating trust as described in Treasury Regulation section 301.7701-4(d) and shall be treated as a grantor trust for United States federal income tax purposes. All parties will be required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust beneficiaries are the owners and grantors. The Debtor shall appoint Fife M. Whiteside to serve as Litigation Trustee. Under the supervision of the Litigation Trust Board, the Litigation Trustee shall have the authority to manage the day-to-day operations of the Litigation Trust, including, without limitation, by disposing of the assets of the Litigation Trust, appearing as a party in interest, calculating distributions, paying taxes and such other matters as more particularly described in Plan Section 5.04 and the Litigation Trust Agreement, as discussed in more detail below. Expenses of the Litigation Trust, including the expenses of the Litigation Trustee and his representatives and professionals, will be satisfied solely from the assets of the Litigation Trust and its proceeds, as set forth in the Litigation Trust Agreement. The holders of Allowed Claims in Classes 2, 3 and 5 and other Allowed Claims treated as General Unsecured Claims under the Plan will be the grantors and owners of the Litigation Trust. The Litigation Trustee will maintain, in accordance with the Litigation Trust Agreement, an escrow of any distributable amounts required to be set aside on account of any disputed claims, which disputed claims will be treated in accordance with the terms of the Litigation Trust Agreement. No Cause of Action released by the Plan shall be considered an Assigned Cause of Action. The Litigation Trust Board will determine the fair market value of each beneficial Litigation Trust interest, and the Litigation Trustee and holders of such interests will be required to use the valuation consistently for federal income tax purposes. The Litigation Trustee will file returns for the Litigation Trust as a grantor trust. All income of the Litigation Trust will be subject to federal income tax on a current basis. The Litigation Trust Agreement will provide for the allocation of the Litigation Trust's taxable income and who will be responsible for any tax liability due as a result of such income. Taxable income or loss allocated to a Litigation Trust beneficiary will be treated as income or loss with respect to such Litigation Trust beneficiary's undivided interest in the Litigation Trust assets, and not as income or loss with respect to its prior respective Claim.

-44-

Subject to the supervision of the Litigation Trust Board, the Litigation Trustee will have broad powers, without approval of the Bankruptcy Court, (a) to pursue, compromise, release, or decline to pursue any Assigned Cause of Action or Claims Litigation concerning General Unsecured Claims, based upon the Litigation Trustee's assessment of the net benefit to holders of Claims in connection therewith (taking into account the costs and expenses projected to be incurred in connection therewith, the likelihood of success on the merits, and the range of potential recoveries to be received by the Litigation Trust); (b) subject to applicable rules of professional conduct, to retain professionals in connection with the Assigned Avoidance Actions, Claims Litigation concerning General Unsecured Claims, and the pursuit and evaluation of the same; (c) to pay or cause to be paid from the Litigation Trust all costs and expenses of liquidating and administering the Litigation Trust, including the fees of the Litigation Trustee permitted by the Litigation Trust Agreement, which costs and expenses will have priority over Distributions to holders of Claims; (d) to determine the amount of Retained Proceeds and retain Cash as necessary to ensure appropriate Distributions pursuant to the Plan, and (e) to take other necessary and appropriate actions customary for a litigation trustee, claims administrator, or disbursing agent under a bankruptcy plan of reorganization. The Litigation Trust Board will consist of three members, one member each appointed by the Holder of the Bond Claim, the Holder of the Fagen Claim and the Committee.

The form of the Litigation Trust Agreement will be included as an exhibit to the Plan Supplement. The Litigation Trustee will serve as the initial trustee of the Litigation Trust, subject to the provisions of the Litigation Trust Agreement providing for the resignation or replacement of a trustee and appointment of a successor trustee, and will have the duties and powers set forth in the Trust Agreement. With respect to the assets of the Litigation Trust, the Litigation Trustee will be the representative of the Estate, *provided, however,* that the Litigation Trustee will not have the power to waive any privilege held by the Debtor, the Estate, or the Reorganized Debtor.

On the Effective Date, the Reorganized Debtor will transfer and assign to the Litigation Trust the Assigned Avoidance Actions and any portion of the General Unsecured Creditors Fund remaining after payment of the Section 507(b) Claims (unless the Section 507(b) Claims are waived by the Senior Secured Lenders as contemplated by Plan Section 3.06). Notwithstanding any law restricting the transferability or assignability of any claim or cause of action, legal title to all Assigned Avoidance Actions will vest in the Litigation Trustee on the Effective Date. All costs and expenses incurred by the Litigation Trustee after the Effective Date in connection with the prosecution of the Assigned Avoidance Actions, the pursuit of Claims Litigation concerning General Unsecured Claims, and otherwise will be paid solely from the Litigation Trust.

On each Distribution Date (or as soon thereafter as is reasonably practicable), the Litigation Trustee will make Distributions to the holders of Allowed Claims in accordance with the terms of the Plan. The Litigation Trustee will make all Distributions out of the Litigation Proceeds (and, in the case of Distributions being made on the Litigation Trust Termination Date, out of Retained Proceeds). The Litigation Trustee will have responsibility for determining pro rata Distributions (as

ATLANTA:5326255.1

necessary) and for sending such Distributions to the appropriate holders of Claims. The Litigation Trustee will continue to make Distributions until the assets in the Litigation Trust have been fully distributed to holders of Allowed Claims and in accordance with the terms of the Plan. Distributions may be deferred or delayed in the discretion of the Litigation Trustee for a reasonable time in the event that such deferral is necessary to permit investments to reach maturity, in the event that additional time is needed to make a proper Distribution, or in the event that the receipt of additional funds is necessary to make Distributions in meaningful amounts.

Interests in the Litigation Trust will not be transferable. No recourse will ever be had, directly or indirectly, against the Litigation Trustee personally, by legal or equitable proceedings, or by virtue of any statute or otherwise, nor upon any promise, contract, instrument, undertaking, obligation, covenant, or agreement whatsoever executed by the Litigation Trustee, save and except in cases of defalcation, misappropriation, fraud, or gross negligence by the Litigation Trustee, it being expressly understood and agreed that such promises, contracts, instruments, undertakings, obligations, covenants, and agreements will be enforceable only against and be satisfied only out of the assets of the Litigation Trust or will be evidence only of a right of payment from the assets of the Litigation Trust.

On the Litigation Trust Termination Date, after making the final Distribution under the Plan, the Litigation Trustee will be discharged from his duties under the Plan.

The potential recoveries from the Assigned Avoidance Actions are uncertain and were not considered by the Debtor with respect to estimated distributions to creditors as set forth herein.

UNDER PLAN SECTIONS 8.01 AND 8.02, ALL CAUSES OF ACTION (INCLUDING, WITHOUT LIMITATION, THE ASSIGNED AVOIDANCE ACTIONS) WILL SURVIVE CONFIRMATION, AND THE ASSERTION OF CAUSES OF ACTION WILL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE, OR OTHERWISE.

## IX.
## OTHER PLAN PROVISIONS

### A.    BINDING EFFECT

Under Section 1141(a) of the Bankruptcy Code, "the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan."

As provided in Plan Section 12.01, the Plan will be legally binding upon and inure to the benefit of the Debtor, the Reorganized Debtor, the Estate, the Committee, the Agents, the Litigation Trustee, the holders of Claims, the holders of Interests, all

other parties in interest in the Chapter 11 Case, and their respective successors and assigns.

## B.     RETENTION OF JURISDICTION

Article XI of the Plan generally provides that after the Confirmation Date, the Bankruptcy Court shall retain exclusive jurisdiction over the Debtor, the Reorganized Debtor, the Estate, and the Chapter 11 Case until the Chapter 11 Case is closed, for the following purposes:

a.     classify or establish the priority or secured or unsecured status of any Claim (whether Filed before or after the Effective Date and whether or not contingent, Disputed or unliquidated) or resolve any dispute as to the treatment of any Claim pursuant to the Plan;

b.     grant or deny any applications for allowance of compensation or reimbursement of expenses pursuant to sections 330, 331 or 503(b) of the Bankruptcy Code or otherwise provided for in the Plan, for periods ending on or before the Effective Date;

c.     determine and resolve any matters related to the assumption, assumption and assignment or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

d.     ensure that all payments due under the Plan and performance of the provisions of the Plan are accomplished as provided herein and resolve any issues relating to distributions to Holders of Allowed Claims pursuant to the provisions of the Plan;

e.     construe, take any action and issue such orders, prior to and following the Confirmation Date and consistent with section 1142 of the Bankruptcy Code, as may be necessary for the enforcement, implementation, execution and consummation of the Plan and all contracts, instruments, releases, indentures and other agreements or documents created in connection with the Plan, including, without limitation, the Disclosure Statement and the Confirmation Order, for the maintenance of the integrity of the Plan and protection of the Reorganized Debtor or the Litigation Trustee in accordance with sections 524 and 1141 of the Bankruptcy Code following consummation;

f.     determine and resolve any case, controversies, suits or disputes that may arise in connection with the consummation, interpretation, implementation or enforcement of the Plan (and all Exhibits to the Plan and the Plan Supplement) or the Confirmation Order, including the indemnification and injunction provisions set forth in and contemplated by the Plan or the Confirmation Order, or any Entity's rights arising under or obligations incurred in connection therewith;

g.     hear any application of the Debtor, the Reorganized Debtor, or the Litigation Trustee to modify the Plan after the Effective Date pursuant to section 1127 of the Bankruptcy Code and Section 12.04 hereof or modify the Disclosure Statement, the

ATLANTA:5326255.1

Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan, to the extent authorized by the Bankruptcy Code and the Plan;

h.     issue injunctions, enter and implement other orders or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

i.     enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked or vacated;

j.     determine any other matters that may arise in connection with or relating to the Plan, the Disclosure Statement, the Confirmation Order, the Litigation Trust, or any contract, instrument, release, indenture or other agreement or document created in connection with the Plan, the Disclosure Statement, or the Confirmation Order, except as otherwise provided in the Plan;

k.     determine such other matters and for such other purposes as may be provided in the Confirmation Order;

l.     hear and determine any other matters related hereto and not inconsistent with chapter 11 of the Bankruptcy Code;

m.     hear and determine disputes arising in connection with the interpretation, implementation or enforcement of the Plan or the Litigation Trust;

n.     enter a Final Decree closing the Chapter 11 Case;

o.     determine and resolve any and all controversies relating to the rights and obligations of the Litigation Trustee or the Disbursing Agent in connection with the Chapter 11 Case;

p.     allow, disallow, determine, liquidate or estimate any Claim, including the compromise, settlement and resolution of any request for payment of any Claim, the resolution of any Objections to the allowance of Claims and to hear and determine any other issue presented hereby or arising hereunder, including during the pendency of any appeal relating to any Objection to such Claim (to the extent permitted under applicable law);

q.     permit the Debtor or the Reorganized Debtor (and the Litigation Trustee, to the extent provided for in the Plan, or the Litigation Trust Agreement) to recover all assets of the Debtor and Property of its Estate, wherever located;

ATLANTA:5326255.1

r.     hear and determine any motions or contested matters involving taxes, tax refunds, tax attributes and tax benefits and similar or related matters with respect to the Debtor or the Debtor's Estate arising prior to the Effective Date or relating to the period of administration of the Chapter 11 Case, including, without limitation, matters concerning federal, state and local taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code;

s.     hear and determine any motions, applications, adversary proceedings, contested matters and other litigated matters pending on, Filed or commenced after the Effective Date that may be commenced by the Litigation Trustee thereafter, including Retained Actions, proceedings with respect to the rights of the Litigation Trustee to recover Property under sections 542, 543 or 553 of the Bankruptcy Code, or proceedings to otherwise collect to recover on account of any claim or Cause of Action that the Debtor may have had;

t.     to consider and act on the compromise of any Claim against, or Interest in, the Debtor, or any Cause of Action asserted on behalf of the Debtor's Estate; provided, however, that there shall be no requirement that the Reorganized Debtor or the Unsecured Claims Administrator seek Bankruptcy Court approval of compromises and settlements except as provided herein; and

u.     hear any other matter not inconsistent with the Bankruptcy Code.

## C.     DISSOLUTION OF THE COMMITTEE

Plan Section 12.08 provides that the Committee will cease to exist as of the Effective Date. Notwithstanding the foregoing, the Committee will have standing to be heard with respect to the allowance of Administrative Claims requested by the Committee's professionals and by Committee members to the extent such Administrative Claims relate to any final fee application by any party. Nothing in the Plan will preclude the members of the Committee from participating in the Chapter 11 Case, at their own expense, as they may deem necessary to protect their interests.

## D.     MODIFICATIONS TO PROPOSED PLAN

Under Plan Section 12.04, the Debtor (with the consent of the Agents) has retained the exclusive right to amend or modify the Plan, and to solicit acceptances of any amendments to, or modifications of, the Plan before or after the Confirmation Date, so long as the proposed modification does not materially affect the rights of any party in interest.

## E.     U.S. TRUSTEE FEES AND REPORTS

Under Plan Section 12.09, the Reorganized Debtor shall pay any and all fees imposed by 28 U.S.C. §1930(a)(6) as and when such fees become due until a final decree is entered closing the Chapter 11 Case. The Reorganized Debtor will continue to file operating reports until a final decree is entered closing the Chapter 11 Case.

## F.     SUBSTANTIAL CONSUMMATION

ATLANTA:5326255.1

Under Plan Section 7.12, on the Effective Date, the Plan shall be deemed to be substantially consummated under Sections 1101 and 1127(b) of the Bankruptcy Code.

## G.    POST-EFFECTIVE DATE FEES AND EXPENSES

Under Plan Section 7.13, from and after the Effective Date, the Reorganized Debtor shall, in the ordinary course of business and without the necessity for Bankruptcy Court approval, pay the reasonable fees and expenses of professional persons retained by the Debtor, the Reorganized Debtor, and the Agents and incurred after the Effective Date, including, without limitation, fees and expenses incurred in connection with the implementation and consummation of the Plan.

## H.    POST-EFFECTIVE DATE NOTICE LIMITED

Under Plan Section 7.14, from and after the Effective Date, any person seeking relief from the Bankruptcy Court in the Chapter 11 Case shall be required to provide notice only to the Reorganized Debtor, the Litigation Trustee, the Pre-Petition Agent, the United States Trustee, and their respective counsel, to any person whose rights are directly affected by the relief sought, and to other parties in interest who, after entry of the Confirmation Order, file a request for such notice with the clerk of the Bankruptcy Court and serve a copy of such notice on counsel to the Debtor, the Reorganized Debtor, the Pre-Petition Agent, and the Litigation Trustee.

## I.    PLAN SUPPLEMENT

As provided in Plan Section 7.15, operative documents relating to (i) the Litigation Trust Agreement; (ii) the Litigation Trust Documents; (iii) any amended or supplemental Schedule of Assumed Contracts, and any other appropriate documents will be contained in the Plan Supplement and filed with the Clerk of the Bankruptcy Court at least five (5) days prior to the last day on which holders of Claims may vote to accept or reject the Plan; *provided, however,* that Exit Financing Commitment Letter shall be filed with the clerk of the Court at least ten (10) days prior to the Confirmation Hearing.  The schedule of executory contracts and unexpired leases to be assumed shall be served on all parties to contracts and leases identified therein. The Plan Supplement shall be posted on the website of the Claims Agent, at www.SWGErestructuring.com, and shall be available to holders of Claims and Interests upon written request to the Debtor.  The Debtor may modify operative documents, including documents relating to the Exit Financing, prior to the Effective Date without further notice, with the consent of the Agents.

The Plan Supplement, as well as any exhibits and schedules to the Plan, are incorporated into and shall be considered a part of the Plan as if set forth therein.

## J.    GOVERNING LAW

As provided in Plan Section 12.07, unless a rule of law or procedure is supplied by federal law, including the Bankruptcy Code and the Bankruptcy Rules, the laws of the State of Georgia shall govern the construction and implementation of the Plan and any agreements, documents, and instruments executed in connection with the Plan.

ATLANTA:5326255.1

### K.    COMPUTATION OF TIME

As provided in Plan Section 12.15, in computing any period of time prescribed or allowed by the Plan, the provisions of Federal Rule of Bankruptcy Procedure 9006 shall apply unless otherwise set forth in the Plan.

### L.    NOTICES

As provided in Plan Section 12.10, any notice required or permitted to be provided to the Reorganized Debtor, the Litigation Trustee, or the Pre-Petition Agent under the Plan shall be in writing and served by overnight courier service or by certified mail, return receipt requested, addressed as follows:

**The Reorganized Debtor:**

Southwest Georgia Ethanol, LLC
P.O. Box 386
2 West Broad Street
Camilla, GA  31730

with a copy to:

McKenna Long & Aldridge LLP
303 Peachtree Street, Suite 5300
Atlanta, Georgia 30308
Attention:  J. Michael Levengood

**The Litigation Trustee:**

Fife M. Whiteside
1124 Lockwood Avenue
Columbus, Georgia  31906

**To the Pre-Petition Agent:**

Joanna W. Anderson
Gleacher Products Corp.
1290 Avenue of the Americas, 5th Floor
New York, NY 10104

with a copy to:

Scott L. Alberino
Akin Gump Strauss Hauer & Feld LLP
Robert S. Strauss Building,
1333 New Hampshire Avenue, NW
Washington, DC 20036

ATLANTA:5326255.1

# X.
## PROVISIONS REGARDING DISTRIBUTIONS

## A.    DISTRIBUTIONS ONLY ON TIMELY-FILED, ALLOWED CLAIMS

No payments of Cash or other consideration of any kind will be made on account of any Disputed Claim until such Claim becomes an Allowed Claim or is deemed to be such for purposes of distribution, and then only to the extent that the Claim becomes, or is deemed to be for distribution purposes, an Allowed Claim. Pursuant to Plan Section 5.16, except as otherwise ordered by the Bankruptcy Court, no payments shall be made on account of Claims filed after the Bar Date.

As of the close of business on the Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtor or the Agents shall be deemed closed, and there shall be no further changes made to reflect any new record holders of any Claims or equity interests occurring on or after the Record Date. The Debtor, the Reorganized Debtor, the Litigation Trustee and the Agents shall have no obligation to recognize any transfer of any Claims or equity interests occurring after the Record Date.

## B.    DATE OF DISTRIBUTIONS

On the Effective Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make Distributions with respect to Allowed Claims in Classes 1 through 4, and 6 as and to the extent provided for in the Plan or as ordered by the Bankruptcy Court. The Litigation Trustee shall make Distributions to holders of Allowed Class 5 Claims on each Distribution Date or as soon thereafter as is reasonably practicable as contemplated by and to the extent set forth in the Plan. Distributions with respect to Administrative Claims that become allowed after the Effective Date will be made as soon as reasonably practicable after the dates such Claims are Allowed. Distributions of the New Membership Interests must be made on the Effective Date. Distributions on account of Claims that become Allowed Claims after the Effective Date will be made pursuant to Plan Section 5.03.

## C.    INTEREST ON CLAIMS

Pursuant to Plan Section 5.15, except as set forth in the Plan or in a Final Order of the Bankruptcy Court entered in the Chapter 11 Case, no holder of any Claim will be entitled to interest accruing after the Petition Date on such Claim, nor to fees, costs or charges provided under any agreement under which such Claim arose and that were incurred after the Petition Date. Without limiting the generality of the foregoing, unless otherwise specifically provided for in the Plan or as otherwise required by sections 506(b), 511 or 1129(a)(9)(C)-(D) of the Bankruptcy Code, interest shall not accrue or be paid on any Disputed Claim in respect of the period from the Effective Date to the date a final Distribution is made when and if such Disputed Claim becomes and Allowed Claim

## D.    MEANS OF PAYMENT

Pursuant to Plan Section 5.06, all payments made pursuant to the Plan will be in Cash and by any means reasonably selected by the Reorganized Debtor or the

ATLANTA:5326255.1

Litigation Trustee, including check or wire transfer, and may include any endorsement or limitation as may be approved by the Reorganized Debtor or the Litigation Trustee.

## E. ROUNDING

Pursuant to Plan Section 5.10, whenever any payment of a fraction of a dollar would otherwise be called for, the actual payment shall reflect a rounding of such fraction down to the nearest whole dollar.

## F. NO CASH PAYMENTS OF $50 OR LESS ON ACCOUNT OF ALLOWED CLAIMS IN CLASS 5 PRIOR TO FINAL DISTRIBUTION DATE

Pursuant to Plan Section 5.12, if a Cash payment to be received by any holder of an Allowed Claim in Class 5 on any Distribution Date (except the final Distribution on the Litigation Trust Termination Date) would be $50 or less in the aggregate, then notwithstanding any contrary provision of the Plan, no such payment will be made to such holder, and such Cash, if applicable, shall be held for such holder until the next Distribution Date, at which time such Cash payment shall be made to the holder (unless this limitation shall again apply).

## G. UNCLAIMED PROPERTY

Pursuant to Plan Section 5.08, "Unclaimed Property" means any funds payable to holders of Allowed Claims which are unclaimed. Unclaimed Property includes: (a) checks (and the funds represented thereby) which have been returned as undeliverable without a proper forwarding address; (b) funds for checks which have not been presented and paid within sixty (60) days of their issuance; and (c) checks (and the funds represented thereby) which were not mailed or delivered because of the absence of a proper address to mail or deliver such property. Unclaimed Property will be held in an "Unpaid Claims Reserve" to be held for the benefit of the holders of Allowed Claims entitled thereto under the terms of the Plan. For a period of the later of 180 days following the first Distribution to a Class of Claims or 120 days after a Distribution is made to a claimant on account of which Unclaimed Property first results (said period being hereinafter referred to as the "Claiming Period"), Unclaimed Property will be held in the Unpaid Claims Reserve solely for the benefit of the holders of Allowed Clams which have failed to claim such property. During the Claiming Period, Unclaimed Property due the holder of an Allowed Claim will be released from the Unpaid Claims Reserve and delivered to such holder upon presentation of proper proof by such holder of its entitlement thereto. In the event that there is Unclaimed Property in the Unpaid Claims Reserve with regard to any Allowed General Unsecured Claim, the Litigation Trustee or the Reorganized Debtor, as the case may be, will, until such Unclaimed Property is claimed or the Claiming Period with regard to the holder of such Claim has expired, make all subsequent Distributions due with regard to such Claim to the Unpaid Claims Reserve. After the Claiming Period with regard to such holder has expired, no subsequent Distributions will be made on account of such Claim, and such Claim will be treated as being disallowed, waived, and satisfied, and the Unclaimed Property shall be treated as available for Distribution to Holders of Allowed Claims in the same Class as such Claim. Notwithstanding the foregoing, if there is any Unclaimed Property in the Unpaid Claims Reserve as a result of the final Distribution from the Litigation Trust and such Unclaimed Property remains in the Unpaid Claims Reserve after expiration of

ATLANTA:5326255.1

the Claiming Period, and if, in the judgment of the Litigation Trustee, the Unclaimed Property is not sufficient to make a meaningful Distribution, such Unclaimed Property will be used to satisfy any post-Confirmation expenses, and the balance will be paid to the Reorganized Debtor pursuant to Section 347(b) of the Bankruptcy Code. These provisions will apply without regard to any applicable non-bankruptcy laws with respect to unclaimed property. The Unpaid Claims Reserve may be maintained as an interest bearing account. No claimant entitled to funds from the Unpaid Claims Reserve will be entitled to interest with regard to the amounts due to such claimant.

## H. TAXES

The Reorganized Debtor and the Litigation Trustee will be entitled to deduct any federal or state withholding taxes from any Distributions made with respect to Allowed Claims, as appropriate, and will otherwise comply with Section 346 of the Bankruptcy Code. The Reorganized Debtor shall be authorized to seek a determination of the Estate's tax liabilities, as contemplated by Section 505 of the Bankruptcy Code.

## I. ALLOCATION OF PLAN DISTRIBUTIONS BETWEEN PRINCIPAL AND INTEREST

To the extent that any Claim scheduled to receive a Distribution under the Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount of the Claim (as determined for federal income tax purposes) first and then, to the extent the consideration exceeds the principal amount of the Claim, to accrued but unpaid interest.

## XI.
## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

## A. REJECTION OF CONTRACTS AND LEASES

Pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, all executory contracts and unexpired leases that exist between the Debtor and any other person or entity shall be deemed rejected by the Debtor (with the consent of the Agents) as of the Effective Date, except for any executory contract or unexpired lease that: (a) has previously been assumed, assumed and assigned, or rejected pursuant to an order of the Bankruptcy Court on or prior to the Confirmation Date, (b) is the subject of a pending motion to assume, assume and assign, or reject as of the Confirmation Date, or (c) is listed on the Schedule of Assumed Contracts set forth in Exhibit 1 to the Plan. The listing of a document on the Schedule of Assumed Contracts shall not constitute an admission by the Debtor that such document is an executory contract or unexpired lease or that the Debtor has any liability thereunder.

Pursuant to Plan Section 6.05, the entry of the Confirmation Order shall, subject to and upon the occurrence of the Effective Date, constitute the approval, pursuant to Sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the assumption and rejection of the executory contracts assumed and rejected pursuant to Article VI of the Plan.

ATLANTA:5326255.1

## B.  CURE OF DEFAULTS, REJECTION DAMAGES, AND AMENDMENT OF SCHEDULE

Pursuant to Plan Section 6.02, the Debtor has included in the Schedule of Assumed Contracts the amount necessary to cure any default under any executory contract or unexpired lease to be assumed under the Plan, which amount shall be paid in Cash by the Reorganized Debtor via twelve (12) equal monthly payments, without interest, commencing thirty (30) days after the Effective Date.  Any party to an executory contract or unexpired lease to be assumed shall have twenty (20) days after service of the Schedule of Assumed Contracts within which to file with the Bankruptcy Court an objection to the cure amount listed by the Debtor, an objection to the adequacy of assurance of future performance by the Reorganized Debtor, or any other objection to the assumption of such executory contracts or unexpired lease. Any such objection shall be resolved by the Bankruptcy Court at the Confirmation Hearing or at such other time as agreed to by the affected parties. If the Bankruptcy Court determines that the cure amount with respect to an executory contract or unexpired lease is greater than the amount listed by the Debtor, then the Debtor may elect to reject the contract or lease at issue.

Pursuant to Plan Section 6.03, any holder of a Claim arising out of the rejection of any executory contract or unexpired lease pursuant to Plan Section 6.03 shall file a proof of claim within thirty (30) days after the Confirmation Date. Any such Claim shall be treated as a General Unsecured Claim in Class 5. Any person seeking to assert such a Claim who fails to file a proof of claim within this thirty (30) day period shall be deemed to have waived said Claim, and it shall be forever barred.

The Debtor shall have the right, on or before the hearing on Plan Confirmation, to modify the Schedule of Assumed Contracts by filing a Plan Supplement, subject to the consent of the Agents, thus, by removing an executory contract or unexpired lease, providing for its rejection pursuant to this Section 6.01 or by adding any executory contract or unexpired lease, providing for its assumption and assignment pursuant to this Section 6.01.  The Debtor shall provide notice of any such modification to the parties to any executory contract or unexpired lease affected thereby and an opportunity for such parties to be heard.

## C.  SURVIVAL OF CERTAIN CORPORATE INDEMNITIES

Pursuant to Plan Section 5.18, the obligations of the Debtor pursuant to its operating agreement and other governing documents to indemnify persons serving on or after the Petition Date as officers, directors, agents, or employees of the Debtor with respect to actions, suits, and proceedings against the Debtor or such officers, directors, agents, or employees, based upon any act or omission for or on behalf of the Debtor occurring on or after the Petition Date, shall not be discharged or impaired by the confirmation of the Plan. Such obligations shall be deemed and treated as executory contracts to be assumed by the Debtor pursuant to the Plan and shall continue as obligations of the Reorganized Debtor.

ATLANTA:5326255.1

# XII.
## CONDITIONS PRECEDENT TO THE EFFECTIVE DATE

Article IX of the Plan provides that the Effective Date shall not occur unless and until the following conditions have been satisfied (provided that the Debtor may agree to waive any one or more of the following conditions without further order of the Bankruptcy Court):

a.  the Bankruptcy Court shall have approved the information contained in the Disclosure Statement as adequate;

b.  the Confirmation Order, in form and substance satisfactory to the Debtor and the Agents, shall have been entered and shall be in full force and effect and there shall not be a stay or injunction in effect with respect thereto;

c.  the Plan, the Plan Supplement and all of the schedules, documents, and exhibits contained therein shall have been filed in form and substance acceptable to the Agents, without prejudice to the Reorganized Debtor's rights under the Plan to alter, amend, or modify certain of the schedules, documents, and exhibits contained in the Plan Supplement, subject to the consent of the Agents;

d.  the Debtor shall have entered into the Exit Financing;

e.  all authorizations, consents and regulatory approvals required, if any, in connection with the Plan's effectiveness shall have been obtained;

f.  the Debtor shall have appointed the Litigation Trustee, the Litigation Trust Agreement and the other Litigation Trust Documents shall have been executed, and the Litigation Trust shall have received the General Unsecured Creditors Fund;

g.  no order of a court shall have been entered and shall remain in effect restraining the Debtor from consummating the Plan;

h.  the Bankruptcy Court shall have entered an order (contemplated to be part of the Confirmation Order) authorizing and directing the Debtor to take all actions necessary or appropriate to enter into, implement, and consummate the documents created, amended, supplemented, modified or adopted in connection with the Plan;

i.  the Debtor shall have appointed the Litigation Trustee, the Litigation Trust Agreement and the other Litigation Trust Documents shall have been executed, and the Litigation Trust shall have received the General Unsecured Creditors Fund.

ATLANTA:5326255.1

# XIII.
# CERTAIN EFFECTS OF CONFIRMATION

## A.    VESTING OF THE DEBTOR'S ASSETS

In accordance with Section 1141(b) of the Bankruptcy Code, Plan Section 10.01 provides that on the Effective Date, all property of the Debtor's Estate shall vest in the Reorganized Debtor free and clear of all Claims, liens, encumbrances and other interests of Creditors and Interest holders, except as otherwise provided in the Plan or Confirmation Order.

From and after the Effective Date, the Reorganized Debtor may operate its business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code or the Bankruptcy Rules and in all respects as if there were no pending Chapter 11 Case, except as otherwise provided in the Plan.

## B.    DISCHARGE OF DEBTOR, DISCHARGE OF CLAIMS, AND TERMINATION OF INTERESTS

Except as otherwise provided in the Plan or in the Confirmation Order, the rights afforded in the Plan and the Distributions to be made thereunder shall be in exchange for and in complete satisfaction, discharge, and release of all existing debts and Claims, and on the Effective Date shall terminate all Interests, to the extent provided in the Plan, of any kind, nature, or description whatsoever, including any interest accrued on such Claims after the Petition Date, against or in the Debtor or any of its assets or properties, to the fullest extent permitted by Section 1141 of the Bankruptcy Code. Except as provided in the Plan, upon the Effective Date, all existing Claims against the Debtor and all equity interests in the Debtor shall be, and shall be deemed to be, discharged and terminated, and all holders of such Claims and Interests shall be precluded and enjoined from asserting against the Reorganized Debtor or any of its assets or properties, any other or further Claim or Interest based on any act or omission, transaction, or other activity of any kind or nature that occurred prior to the Confirmation Date, whether or not such holder has filed a proof of claim or proof of interest or has voted to accept the Plan.

## C.    INJUNCTIONS

Pursuant to Plan Section 10.04, except as otherwise expressly provided in the Plan, the Confirmation Order, or a separate Final Order of the Bankruptcy Court, all persons who have held, hold, or may hold Claims against or Interests in the Debtor are permanently enjoined, on and after the Effective Date, from: (a) commencing or continuing in any manner any action or other proceeding of any kind against the Debtor or the Reorganized Debtor with respect to any such Claim or Interest; (b) enforcing, attaching, collecting, or recovering by any manner or means any judgment, award, decree, or order against the Debtor or the Reorganized Debtor on account of any such Claim or Interest; (c) creating, perfecting, or enforcing any encumbrance of any kind against the Debtor or the Reorganized Debtor or against the property or interests in property thereof on account of any such Claim or Interest; (d) commencing or continuing in any manner any action or other proceeding of any kind with respect to any Claim which is extinguished or released pursuant to the Plan; and (e) taking any

-57-

action to interfere with the implementation or consummation of the Plan; provided, however, provided, however, that this injunction shall not apply to (i) any claims Creditors may assert under the Plan to enforce their rights thereunder to the extent permitted by the Bankruptcy Code or (ii) any claims Creditors or other third parties may have against each other, which claims are not related to the Debtor, it being understood, however, that any defenses, offsets or counterclaims of any kind or nature whatsoever which the Debtor may have or assert in respect of any of the claims of the type described in (i) or (ii) of this proviso are fully preserved.

Any act taken in violation of this injunction shall be null and void. On and after the Effective Date, the provisions of the Plan shall be binding upon the Debtor, the Reorganized Debtor, the Estate, all holders of Claims, all holders of Interests, all other parties in interest in the Chapter 11 Case, and their respective successors and assigns, in each case whether or not such entities are impaired and whether or not such entities have accepted the Plan.

**D. RELEASE**

Pursuant to Plan Section 10.06, on the Effective Date, each of the (i) the Debtor, (ii) the Litigation Trustee, (iii) the Litigation Trust, (iv) the Releasees, and (v) the D&O Releasees, and each of their respective directors, officers, and employees shall be released from all claims, demands, causes of action, or liabilities of any and every character, kind, and nature whatsoever, in law or in equity, held by or asserted on behalf of the Debtor or the Estate, whether asserted or unasserted, arising out of or relating to the actions or omissions of each of the foregoing parties in relation to the Debtor.

**E. TERMS OF INJUNCTIONS AND STAYS**

Pursuant to Plan Section 10.08, all stays and injunctions arising under Sections 105 and 362 of the Bankruptcy Code will continue in full force and effect until the Effective Date or such other time set by order of the Bankruptcy Court.

**F. EXCULPATION**

As specified in Section 1125(e) of the Bankruptcy Code, Plan Section 10.05 provides that none of the Debtor, the Reorganized Debtor, FUEL, the Committee, the DIP Lenders, the Agents, the Senior Secured Lenders, and the Litigation Trustee, nor any of their respective members, employees, officers, directors, agents, advisors, attorneys, or financial advisers, shall have or incur any liability to any holder of a Claim or Interest or any other party in interest, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Case, the negotiation, formulation, and preparation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan, or the administration of the Estate, the distribution of property under the Plan, except for their gross negligence or willful misconduct, and in all respects they shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan. The entry of the Confirmation Order shall constitute the determination by the Bankruptcy Court that the Debtor, the Reorganized Debtor, the Committee, the DIP Lenders, the Agents, the Senior Secured Lenders, and the Litigation Trustee, and each of their respective members, employees, officers,

-58-

directors, agents, advisors, attorneys and financial advisers shall have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code pursuant to, among others, Sections 1125(e) and 1129(a)(3) of the Bankruptcy Code, with respect to the foregoing. Nothing in the Plan shall be construed, however, to relieve the Reorganized Debtor, or the Litigation Trustee, or any other party, from performing its respective obligations under the Plan.

The Debtor believes that the limited exculpation provisions in Plan Section 10.05 applicable to its officers, directors, and employees are reasonable, appropriate, and allowed by applicable law. First, the provisions are limited in scope, in that they only apply to claims or other causes of action arising after the Petition Date, and they exclude willful misconduct and gross negligence. The provisions apply to certain individuals and entities that have contributed to the Debtor's reorganization through their participation in the negotiation and formulation of the Plan, the Disclosure Statement, and the Chapter 11 Case generally. Notably, the exculpations expressly exclude conduct that constitutes gross negligence or willful misconduct.

## G.    CAUSES OF ACTIONS PRESERVED

As provided in Plan Section 10.12 and 10.13, from and after the Effective Date, the Reorganized Debtor will have the right (subject to the assignment of the Assigned Avoidance Actions to the Litigation Trustee) to prosecute any avoidance, equitable subordination or recovery Cause of Action arising under Sections 105, 502(d), 510, 542-551, and 553 of the Bankruptcy Code that belongs to the Debtor and has not been expressly compromised, settled, or released pursuant to the Plan or an order of the Bankruptcy Court entered prior to the Confirmation Date. Except for any Cause of Action that has been expressly compromised, settled, or released pursuant to the Plan or an order of the Court entered prior to the Confirmation Date, nothing contained in the Plan or the Confirmation Order will be deemed to be a waiver or relinquishment of any right or Cause of Action that the Debtor or the Reorganized Debtor may have, or which the Reorganized Debtor may choose to assert on behalf of the Estate pursuant to any provision of the Bankruptcy Code or any applicable non-bankruptcy law, including, without limitation (a) any claim against any person or entity, to the extent that such person or entity asserts a cross-claim, counterclaim, and/or Claim for setoff seeking affirmative relief against the Debtor, the Reorganized Debtor, or their officers, directors, or representatives; (b) the turnover of any property of the Estate; and (c) Causes of Action against current or former directors, shareholder, officers, professionals, and other persons relating to acts or omissions occurring on or prior to the Petition Date, provided, however, that the Assigned Avoidance Actions will be assigned to the Litigation Trustee pursuant to Plan Section 10.14.

Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any claim, Cause of Action, right of setoff, or other legal or equitable defense which the Debtor had immediately prior to the Petition Date against or with respect to any Claim left unimpaired by the Plan. The Reorganized Debtor shall have, retain, reserve, and be entitled to assert all such claims, Causes of Action, rights of setoff, and other legal or equitable defenses that they had immediately prior to the Petition Date as if the Chapter 11 Case had not been commenced, and all of the Reorganized Debtor's legal and equitable rights respecting

-59-

any Claim left unimpaired by the Plan may be asserted after the Confirmation Date to the same extent as if the Chapter 11 Case had not been commenced.

ALL CLAIMS AND CAUSES OF ACTION OF THE DEBTOR AND ITS ESTATES SHALL SURVIVE CONFIRMATION AND ALL CLAIMS AND CAUSES OF ACTION OF THE CONSOLIDATED NON-DEBTOR, AND THE ASSERTION OF CLAIMS AND CAUSES OF ACTION BY THE REORGANIZED DEBTOR OR THE LITIGATION TRUSTEE SHALL NOT BE BARRED OR LIMITED BY ANY ESTOPPEL, WHETHER JUDICIAL, EQUITABLE, OR OTHERWISE.

## XIV.
## VALUE OF REORGANIZED DEBTOR

Morgan Keegan has provided restructuring and advisory services to the Debtor in its Chapter 11 Case. In connection with Morgan Keegan's engagement, the Debtor requested that Morgan Keegan analyze the enterprise value of the Debtor. The valuation analysis was prepared for the information of the Management Committee of the Debtor in connection with its consideration of the Plan and for the purpose of determining the value available to distribute to creditors pursuant the Plan and the relative, potential recoveries to creditors thereunder. These analyses do not constitute a recommendation to any holder of Claims against the Debtor as to how to vote on the Plan. Morgan Keegan's estimate of a range of enterprise value does not constitute an opinion as to the fairness from a financial point of view of the potential consideration to be received under the Plan or of the terms and provisions of the Plan.

In arriving at its views on valuation, Morgan Keegan reviewed the Plan and certain related documents, as well as publicly available business and financial information relating to the Debtor. Morgan Keegan also reviewed other information relating to the Debtor, including the 2012 to 2016 financial projections (the "Projections"), which are attached to this Disclosure Statement as Exhibit C, which the Debtor provided to and discussed with Morgan Keegan. In addition, Morgan Keegan met with the Debtor's management to discuss the Debtor's business and prospects. Morgan Keegan also considered financial data of the Debtor and compared that data with similar data for other publicly held companies in businesses similar to the Debtor and considered, to the extent publicly available, the financial terms of restructurings and other similar transactions that have recently been effected. Morgan Keegan also considered other information, financial studies, analyses and investigations, and financial, economic, and market criteria that it deemed relevant.

In connection with its review, Morgan Keegan did not assume any responsibility for independent verification of any of the information that was provided to, or otherwise reviewed by, it and relied on that information being complete and accurate in all material respects. With respect to financial forecasts, Morgan Keegan was advised, and assumed, that the Projections were reasonably prepared on bases reflecting the best currently available estimates and judgments of the Debtor's management as to the future financial performance of the Debtor after giving effect to the proposed restructuring. No representation or warranty, express or implied, can be or is made by Morgan Keegan as to the accuracy or achievability of any such

ATLANTA:5326255.1

valuations, estimates, and/or forecasts, and Morgan Keegan expressly disclaims any and all liability relating to or resulting from the use of this material. In addition, Morgan Keegan assumed that the restructuring would be completed in accordance with the terms of the Plan without any amendments, modifications, or waivers and also assumed that, in the course of obtaining the necessary judicial, regulatory, and third-party consents for the proposed restructuring and related transactions, there will be no delays, modifications, or restrictions imposed that will have a material, adverse effect on the contemplated benefits of the proposed restructuring to the Debtor. Morgan Keegan was not requested to, and did not, make an independent evaluation or appraisal of the individual assets or liabilities, contingent or otherwise, of the Debtor, and was not furnished with any such evaluations or appraisals. Morgan Keegan's valuation analyses were based on information available to, and financial, economic, market, and other conditions as they existed and could be evaluated by, Morgan Keegan on August 1, 2011. Actual results may vary from such estimates, valuation, or forecasts and such variations may be material.

## A.    COMPARABLE PUBLIC COMPANY ANALYSIS.

A key factor to this approach is the selection of companies with relatively similar business and operational characteristics to the target company. Criteria for selecting comparable companies include, among other relevant characteristics, similar lines of businesses (in this case, ethanol production and marketing), business risks, location of ethanol facilities, growth prospects, market presence, size, and scale of operations. The selection of truly comparable companies is often difficult and subject to interpretation. However, the underlying concept is to develop a premise for relative value, which, when coupled with other approaches, presents a foundation for determining company value.

In performing the comparable public company analysis, Morgan Keegan excluded several ethanol producers that were deemed not comparable or not usable for the purposes of the valuation because (i) ethanol production makes up less than 10% of sales and/or (ii) the companies are distressed. The universe of comparable public companies was therefore very small.  Morgan Keegan used the industry standard ratio of enterprise value to annual ethanol production capacity primarily because ethanol producers often experience significant variance in EBITDA from one year to the next due to volatility in either input costs (chiefly corn and natural gas) or output pricing (ethanol and co-product). To adjust for this industry-wide volatility Morgan Keegan relied primarily upon a multiple of enterprise value to operating capacity in lieu of EBITDA. Based on extensive research, Morgan Keegan believes this methodology is consistent with common valuation practices in the ethanol industry. As such, the derived enterprise value to capacity multiples were applied to the Debtor's current operating capacity to determine a range of enterprise values.

## B.    PRECEDENT TRANSACTIONS ANALYSIS.

Precedent transactions analysis estimates value by examining publicly announced merger and acquisition transactions. An analysis of the disclosed purchase price as a multiple of various operating statistics (particularly total annual production capacity in the case of the ethanol industry) generates industry acquisition multiples

-61-

for companies in similar lines of businesses to the Debtor. These transaction multiples are calculated based on the purchase price (including any debt assumed) paid to acquire companies that are comparable to the Debtor. These multiples are then applied to the Debtor's annual production capacity to determine the total enterprise value or value to a potential buyer.

Unlike the comparable public company analysis, this valuation methodology includes a "control" premium, representing the purchase of a majority or controlling position in a company's assets. Thus, this methodology generally produces higher valuations than the comparable public company analysis. However, most of the transactions with publicly available financial data in the ethanol industry occurred during a time of extreme distress in both the ethanol industry and the capital markets more broadly and, as such, may not be indicative of attainable values in a normalized industry and capital markets environment. Other aspects of value that manifest themselves in a precedent transaction analysis include the following:

- Circumstances surrounding a sale transaction may introduce "diffusive quantitative results" into the analysis (e.g., an additional premium may be extracted from a buyer in the case of a competitive bidding contest).

- The market environment is not identical for transactions occurring at different periods of time.

- Circumstances pertaining to the financial position of a company may have an impact on the resulting purchase price (e.g., a company in financial distress may receive a lower price due to perceived risk and weakness in its bargaining leverage).

- Commodity pricing at the time of the transaction might vary widely and thus might impact transaction pricing.

As with the comparable company analysis, because no acquisition used in any analysis is identical to a target transaction, valuation conclusions cannot be based solely on quantitative results. For the purposes of this valuation, Morgan Keegan analyzed all sale transactions of ethanol facilities occurring from January 1, 2009 through June 30, 2011 for which purchase prices were publically disclosed and were not subject to extraordinary factors making them not relevant to this valuation (i.e., cold idled facilities sold for scrap value). The reasons for and circumstances surrounding each acquisition transaction are specific to such transaction, and there are inherent differences between the businesses, operations and prospects of each. Therefore, qualitative judgments must be made concerning the differences between the characteristics of these transactions and other factors and issues that could affect the price an acquirer is willing to pay in an acquisition. The number of completed transactions for which public data is available also limits this analysis.

## C. DISCOUNTED CASH FLOW APPROACH.

The discounted cash flow ("DCF") valuation methodology relates the value of an asset or business to the present value of expected future cash flows to be generated by that asset or business. The DCF methodology is a "forward looking" approach that discounts the expected future cash flows by a theoretical or observed discount rate

ATLANTA:5326255.1

determined by calculating the weighted average cost of debt and equity capital ("WACC") for publicly traded companies that are similar to the Debtor. There are too few publicly traded comparable companies to provide a sufficient sample size to be relied upon in determining an appropriate WACC for the Debtor. Therefore, in addition to analyzing the WACC of the Comparable Company, Morgan Keegan also relied on its insight and experience in the debt and equity capital markets to estimate the Debtor's WACC. The expected future cash flows have two components: the present value of the projected unlevered after-tax free cash flows for a determined period and the present value of the terminal value of cash flows (representing firm value beyond the time horizon of the Financial Projections). Morgan Keegan's discounted cash flow valuation is based on the Debtor's Financial Projections. Morgan Keegan discounted the projected cash flows from the Financial Projections using the Debtor's estimated WACC and calculated the terminal value of the Debtor using a per gallon multiple of operating capacity as is consistent with industry practice.

This approach relies on the company's ability to project future cash flows with some degree of accuracy. Because the Debtor's Financial Projections reflect significant assumptions made by the Debtor's management concerning anticipated results, the assumptions and judgments used in the Financial Projections may or may not prove correct and, therefore, no assurance can be provided that projected results are attainable or will be realized. If the assumptions for underlying commodity prices prove to be incorrect, the Debtor's actual results could differ materially than what is presented in the Financial Projections. Morgan Keegan cannot and does not make any representations or warranties as to the accuracy or completeness of the Debtor's Financial Projections.

THE ESTIMATES OF THE ENTERPRISE VALUE AND EQUITY VALUE DETERMINED BY MORGAN KEEGAN REPRESENT ESTIMATED ENTERPRISE VALUES AND DO NOT REFLECT VALUES THAT COULD BE ATTAINABLE IN PUBLIC OR PRIVATE MARKETS. THE IMPUTED ESTIMATE OF THE RANGE OF THE REORGANIZATION EQUITY VALUE OF THE REORGANIZED DEBTOR ASCRIBED IN THE ANALYSIS DOES NOT PURPORT TO BE AN ESTIMATE OF THE POST- REORGANIZATION MARKET VALUE. ANY SUCH VALUE MAY BE MATERIALLY DIFFERENT FROM THE IMPUTED ESTIMATE OF THE REORGANIZATION EQUITY VALUE RANGE FOR THE REORGANIZED DEBTOR ASSOCIATED WITH MORGAN KEEGAN'S VALUATION ANALYSIS.

The preparation of valuation analyses is a complex analytical process involving various determinations as to the most appropriate and relevant methods of financial analysis and the application of those methods to particular facts and circumstances, many of which are beyond the control of the Debtor and Morgan Keegan. The valuation range indicated by Morgan Keegan's analyses is not necessarily indicative of the prices at which the Member Units of the Reorganized Debtor, or other securities of the Reorganized Debtor may be bought or sold or predictive of future financial results or values, which may be significantly more or less favorable than those indicated by the analyses. Accordingly, Morgan Keegan's analyses and estimates are inherently subject to substantial uncertainty.

ATLANTA:5326255.1

Morgan Keegan has advised the Debtor that, based upon and subject to the foregoing, as of August 1, 2011, its analyses indicated that the enterprise value of the Reorganized Debtor would be in the range of $103 to $108 million.

The foregoing estimates of reorganization value of the Reorganized Debtor are based on a number of assumptions including the successful reorganization of the Debtor's business and finances in a timely manner, the implementation of the Debtor's business plan, the achievement of the forecasts reflected in the Projections, market conditions as of August 1, 2011 and the Plan's becoming effective in accordance with its terms, on a basis consistent with the estimates and other assumptions discussed herein.

# XV.
# CERTAIN RISK FACTORS TO BE CONSIDERED

The following disclosures are not intended to be inclusive and should be read in connection with the other disclosures contained in this Disclosure Statement and the Exhibits hereto. You should consult your legal, financial, and tax advisors regarding the risks associated with the Plan and the distributions you may receive thereunder.

HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED HEREIN BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

## A.    PROJECTED FINANCIAL INFORMATION

The Financial Projections included in this Disclosure Statement are dependent upon the successful implementation of the Reorganized Debtor's business plan and the validity of the assumptions contained therein. These projections reflect numerous assumptions, including, without limitation, confirmation and consummation of the Plan in accordance with its terms, the Reorganized Debtor's anticipated future performance, the future performance of the ethanol sector and overall fuel industry, certain assumptions with respect to the Reorganized Debtor's competitors, general business and economic conditions and other matters, many of which are beyond the control of the Reorganized Debtor. In addition, unanticipated events and circumstances occurring subsequent to the preparation of the Financial Projections may affect the Reorganized Debtor's actual financial results. Although the Reorganized Debtor believes that the Financial Projections are reasonably attainable, variations between the actual financial results and those projected may occur and be material.

## B.    RISKS RELATED TO THE DEBTOR'S BUSINESS AND OPERATIONS

### 1.    Availability and Prices of Commodities

If the Reorganized Debtor is not able to operate its ethanol facility in a manner that supports its cash flow obligations following the Effective Date, it is possible that the Reorganized Debtor will not be able to make its payment obligations under the

ATLANTA:5326255.1

plan or otherwise to comply with the terms of the Plan. If this were to happen, the holders of post-Effective Date debt obligations of the Reorganized Debtor could exercise their remedies upon default. Furthermore, it is possible that the Reorganized Debtor may experience the loss of its good will and that its business relationships with some of its customers and vendors may be irreparably damaged by the bankruptcy process, such that its efforts to operate post-confirmation as a viable business may be hampered.

The Debtor's profitability is primarily driven by the spread between corn and ethanol prices. Decreases in the spread between ethanol and corn prices will have a negative impact on the Reorganized Debtor's profitability. The price of corn is influenced by general economic, market and regulatory factors, which include weather conditions, farmer planting decisions, government policies and subsidies with respect to agriculture and international trade and global demand and supply. The significance and relative impact of these factors on the price of corn is difficult to predict. Factors such as severe weather or crop disease could have an adverse impact on the Reorganized Debtor's financial performance because they may be unable to pass on higher corn costs to customers. Increasing ethanol capacity could also boost demand for corn and result in increased prices for corn. Any event that tends to negatively impact the supply of corn will tend to increase prices and potentially harm the Reorganized Debtor's financial performance.

## 2. Operations of the Debtor's Facility

The Debtor currently operates an ethanol production facility in Pelham, Georgia. Any disruption or shut down of operations at the Reorganized Debtor's plant for any prolonged period of time will have a negative impact on financial performance. Included in the risks that the Debtor faces are: (i) breakdown, failure or substandard performance of equipment or processes; (ii) a major accident; (iii) severe weather or natural disasters; (iv) the need to comply with directives of, and maintain all necessary permits from, governmental agencies; (v) raw material supply disruptions; (vi) labor force shortages, work stoppages, or other labor difficulties; (vii) transportation disruptions; and (viii) disruptions to the network infrastructure and enterprise applications, and internal technology systems for the Reorganized Debtor's operational, marketing support and sales, and product development activities. The occurrence of any one or more of these events would likely lead to delays in production and/or failure to fulfill customer orders and, thus, a negative effect on the Reorganized Debtor's financial results. During its startup of operations, the Debtor experienced numerous operating problems.

## 3. Impact of Demand for Gasoline on Ethanol Sales

Ethanol is marketed as an oxygenate to reduce vehicle emissions from gasoline, as an octane enhancer to improve the octane rating of gasoline with which it is blended and as a fuel extender. As a result, ethanol demand has historically been influenced by the supply of and demand for gasoline. Among other things, the demand for gasoline is affected by the price of gasoline, seasonality and consumer lifestyle decisions related to the current domestic economy – all factors outside of the Debtor's control. If

ATLANTA:5326255.1

gasoline demand decreases, the Reorganized Debtor's ability to sell its product and its results of operations and financial condition may be materially adversely affected.

### 4. Future Supply and Demand of Ethanol

The supply of ethanol and development of new production facilities has increased significantly in the last ten years in response to increases in demand for ethanol over that corresponding time period. There is a risk that the recent increase in development and construction of ethanol production facilities and the attendant increase in the supply of ethanol may exceed demand levels. Additionally, there is the risk that the general demand for ethanol will decrease. Either or both of these events will likely create a surplus supply of ethanol in the market leading to a depressed price and/or excess capacity and inventories of the Reorganized Debtor's product.

### 5. Regulatory Environment; Taxes and Tariffs

Various state and federal legislation intended to increase the usage of renewable fuels, and ethanol specifically, have a direct impact on the ethanol and renewable fuels industry and the Debtor's business operations. Among these regulations are (1) the renewable fuels standard, which requires an increasing amount of renewable fuels to be used in the U.S. each year, (2) the Volumetric Ethanol Excise Tax Credit, which provides a tax credit of $0.45 per gallon on 10% ethanol blends that is set to expire in 2010, (3) the small ethanol producer tax credit, for which the Debtor's do not qualify because of the size of its ethanol plants, but which certain of its competitors do enjoy, and (4) the federal "farm bill," which establishes federal subsidies for agricultural commodities, including corn, which is the Debtor's primary feedstock. The continuation or cessation of these programs, as well as its scope and extent, will have a significant effect on the number of participants in the ethanol industry, on both the supply and demand side, and will have a direct effect on the Reorganized Debtor's financial performance.

Additionally, the federal government currently imposes a tariff on foreign produced ethanol, but certain countries in the Americas are exempted from the application of the tariff, and increased imports from those countries can have a negative impact on the Reorganized Debtor's financial results. Further, any changes in the tariff amount could increase (or decrease) foreign competition in the domestic ethanol market and, accordingly, the Reorganized Debtor's market share and financial performance.

### 6. Health, Safety and Environmental Laws

The Debtor is subject to extensive federal, state and local environmental laws, regulations and permit conditions (and interpretations thereof), including those relating to the discharge of materials into the air, water and ground, the generation, storage, handling, use, transportation and disposal of hazardous materials, and the health and safety of its employees. These laws, regulations, and permits will require the Reorganized Debtor to incur significant capital and other costs, including costs to obtain and maintain expensive pollution control equipment. They may also require the Reorganized Debtor to make operational changes to limit actual or potential impacts to the environment. A violation of these laws, regulations or permit conditions can result

ATLANTA:5326255.1

in substantial fines, natural resource damages, criminal sanctions, permit revocations and/or facility shutdowns. In addition, environmental laws and regulations (and interpretations thereof) change over time, and any such changes, more vigorous enforcement policies or the discovery of currently unknown conditions may require substantial additional environmental expenditures.

The Debtor's air emissions are subject to the federal Clean Air Act, as amended, and similar state laws which generally require them to obtain and maintain air emission permits for ongoing operations as well as for any expansion of existing facilities or any new facilities. Obtaining and maintaining those permits requires the Debtor to incur costs, and any future more stringent standards may result in increased costs and may limit or interfere with the Reorganized Debtor's operating flexibility. In addition, the permits ultimately issued may impose conditions which are more costly to implement than anticipated. These costs could have a material adverse effect on the Debtor's financial condition, and could adversely affect the Reorganized Debtor in its efforts to compete with foreign producers not subject to such stringent requirements.

The Debtor currently generates revenue from the sale of carbon dioxide, which is a byproduct of the ethanol production process. New laws or regulations relating to the production, disposal or emissions of carbon dioxide may require the Reorganized Debtor to incur significant additional costs and may also adversely affect its ability to continue generating revenue from carbon dioxide sales.

### 7.  Competitive Environment

The Debtor faces extensive competition in its industry. Certain of the Debtor's competitors are subsidiaries of larger enterprises with significant intra-enterprise financing capabilities. Other competitors are cooperatives comprised of individual farmers who have successfully competed against larger producers. Individual farmers directly involved in the ethanol production process earn their livelihood through the sale of corn, and may not be as focused on obtaining optimal value for produced ethanol. The Debtor faces the threat of consolidation in the industry, including consolidation and elimination occurring as a result of a number of bankruptcy filings by ethanol producers in the last year. Additionally, the Debtor has faced competition from foreign ethanol producers who are exempted from tariffs and duties on ethanol imports pursuant to the Caribbean Basin Initiative or North American Free Trade Agreement. Future relaxation in the barriers to entry affecting foreign producers will lead to increased competition and may reduce the Reorganized Debtor's market share.

In addition to existing ethanol producers, certain competitors are seeking to develop an alternative to ethanol, biobutonal, which purports to have significant performance and environmental benefits over ethanol. If biobutonal is successfully developed and manufactured and sold in the United States, the Reorganized Debtor could face significant competition and may see a decline in sales.

### 8.  Consumer and Industry Opposition to Ethanol

Some consumers have expressed a belief that the use of ethanol will have a negative impact on retail gasoline prices or is the reason for increases in food prices. Many also believe that ethanol adds to air pollution and harms car and truck engines.

-67-

Still other consumers believe that the process of producing ethanol actually uses more fossil energy, such as oil and natural gas, than the amount of energy produced by ethanol. These consumer beliefs could be wide-spread in the future. If consumers choose not to buy ethanol blended fuels, it would affect the demand for the ethanol produced by the Reorganized Debtor which could lower demand for its product and negatively affect profitability.

Although many trade groups, academics and governmental agencies have supported ethanol as a fuel additive that promotes a cleaner environment, others have criticized ethanol production as consuming considerably more energy and emitting more greenhouse gases than other biofuels. In particular, two 2008 studies conclude that the current production of corn- based ethanol results in more greenhouse gas emissions than conventional fuels if both direct and indirect greenhouse gas emissions, including those resulting from land use changes resulting from planting crops for ethanol feedstocks, are taken into account. Other studies have suggested that corn-based ethanol is less efficient than ethanol produced from switch grass or wheat grain. If these views gain acceptance, support for existing measures promoting use and domestic production of corn-based ethanol could decline, leading to reduction or repeal of these measures. Reductions in these subsidies and promotions would have an adverse effect on the Reorganized Debtor's financial performance.

## C. ABILITY TO REFINANCE CERTAIN INDEBTEDNESS AND RESTRICTIONS IMPOSED BY INDEBTEDNESS

As discussed above, following the Effective Date, the Reorganized Debtor's working capital and liquidity needs are anticipated to be funded by the Exit Financing. The Exit Financing will likely restrict, among other things, the Reorganized Debtor's ability to enter into various transactions. In addition, the Exit Financing may contain certain other and more restrictive covenants. A breach of any of these terms could result in a default under the Exit Facilities. It is also anticipated that substantially all of the assets of the Reorganized Debtor will be pledged as security under the Exit Financing (the relative priority of which will be set forth in the applicable loan documents for the Exit Financing).

## D. CERTAIN BANKRUPTCY LAW CONSIDERATIONS

### 1. Risk of Non-Confirmation of the Plan

Although the Debtor believes that the Plan satisfies all of the requirements necessary for confirmation by the Bankruptcy Court, there can be no certainty that the Bankruptcy Court will reach the same conclusion. Moreover, there can be no certainty that modifications of the Plan will not be required for confirmation or that such modifications would not necessitate the resolicitation of votes to accept the Plan, as modified.

### 2. Risk of Non-Occurrence of the Effective Date

Although the Debtor believes that the Effective Date should occur during the fourth calendar quarter of 2011, there can be no certainty as to such timing or that such conditions to the Effective Date contained in the Plan will ever occur.

ATLANTA:5326255.1

**E. CERTAIN RISKS RELATING TO THE EQUITY SECURITIES ISSUED UNDER THE PLAN**

**1. Preferred Units**

The holders of the Preferred Units will be entitled to all dividends until such units are redeemed at the Preferred Redemption Value.

**2. Common Units**

The issuance of the New Class B Units, the New LLC Agreement providing the Holders of the New Class B Units the ability to control the outcome of actions requiring equity holder approval until the Second Trigger Event, including the election of a majority of the managers, together with the issuance of the New Preferred Units, make it very unlikely that the Holder of the New Class A Units will recognize any value from its equity interest in the Reorganized Debtor.

**F. CERTAIN TAX RISKS**

As discussed in Disclosure Statement Article XVI, the Debtor and Senior Secured Lenders disagree on the tax consequences of the Plan. The Senior Secured Lenders will control the Reorganized Debtor immediately upon the occurrence of the Effective Date and intend to treat the Plan in a manner inconsistent with that of FUEL. This may lead to additional scrutiny of the tax consequences of the Plan by relevant tax authorities, including the IRS.

FUEL may recognize significant income as a result of the implementation of the Plan. It is uncertain whether such income will be treated as ordinary course income or capital gain.

As is explained in greater detail in Disclosure Statement Article XVI, ownership of a membership interest in a limited liability company that is a "pass-through" entity for federal income tax purposes implicates a variety of considerations that would not also apply in the case of ownership of stock in a publicly traded corporation. For example, as a partnership for tax purposes, which is a "pass-through" entity, the Reorganized Debtor will not itself pay federal income taxes on any taxable income it may earn. Rather, that income will be allocated among the holders of membership Units – initially the New Preferred Units -- who will be obligated to report that income on their own personal tax returns and then to pay any tax liability that may arise on account thereof. That tax payment liability arises out of the taxable income earned by the Reorganized Debtor, whether or not it makes any actual cash distribution to holders of the New Preferred Units (or New Class A Units or New Class B Units). Although it is expected that any borrowing by the Reorganized Debtor will permit so-called "tax distributions" (that is, cash distributions from Reorganized Debtor to holders of its membership interests in an amount roughly approximating the pass-through tax liability), those tax distributions would be made only if, and when, so determined by the board of Reorganized Debtor in its sole discretion. Holders of New Preferred Units (and, after the Second Trigger Date, which the Debtor currently believes is unlikely to occur, of New Class A Units and New Class B Units), will have to satisfy their respective "pass-through" tax liability whether or not any such "tax distributions" are made. However, unless and until the Second Trigger Date occurs,

ATLANTA:5326255.1

and under no circumstances whatsoever, will FUEL as the holder of the New Class A Units be allocated any items of income, gain, loss or deduction or Section 752 liabilities of the Reorganized Debtor.

Further, it is likely that there will be comparable "pass-through" tax liability in respect of state, local and foreign income taxes. And, in addition, holders of New Preferred Units and, possibly New Class A Units and New Class B Units, should anticipate being required to file their own personal tax return in each state, locality and foreign jurisdiction in which the Reorganized Debtor conducts its business from time to time.

# XVI.
## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U. S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Claims and Interest, is for general information purposes only, and should not be relied upon for determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. The following summary does not address the federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (*e.g.,* Allowed Administrative Claims, Professional Fee Claims, Allowed Priority Tax Claims, DIP Facility Claims, and the Class 4 Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder (the "regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. Further, FUEL will have no input, control or role whatsoever in making the tax decisions that are made by the Reorganized Debtor with respect to the tax consequences of the consummation of the Plan. Similarly, the Reorganized Debtor will have no input, control or role whatsoever on FUEL's tax decisions. In addition, this summary generally does not address foreign, state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as non-U.S. persons, foreign taxpayers, broker-dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, persons whose functional security is not the U.S. dollar, persons subject to the alternative minimum tax, regulated investment companies, real estate investment trusts, tax-exempt organizations (including, without limitation, certain pension funds), persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or

"conversion transaction" with other investments, pass-through entities and investors in pass-through entities. If a partnership (including any entity treated as a partnership for tax purposes) holds Claims or Interests, the tax treatment of a partner (or member) will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion generally does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration provided under the Plan in the secondary market.

This discussion assumes, except where otherwise indicated, that the Claims, Interests, Class A Member Interest, New Class A Units, New Preferred Units and the New Class B Units are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the IRC.

The Debtor and the Senior Secured Lenders disagree on the tax consequences of the Plan. The Senior Secured Lenders intend to treat the Plan in a manner inconsistent with the treatment the Debtor believes is appropriate. The Senior Secured Lenders position on tax matters is set forth below at Section XVII (I. through R.) below.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Interest.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims or Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot he used, by Holders of Claims or Interests for the impose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) Holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.

## A. TAX CONSEQUENCES TO THE DEBTOR

Prior to the Effective Date, the Debtor has been and continues to be treated as a "disregarded entity" for federal income tax purposes. In general, for federal income tax purposes, items of income, gain, loss or deduction of the Debtor as a disregarded entity, and the related federal income tax consequences of such items, are the responsibility of FUEL as the owner of the Debtor as the disregarded entity, not the disregarded entity itself.

Accordingly, to the extent that the transactions contemplated by the Plan would otherwise trigger federal income tax consequences to the Debtor as a disregarded entity, the Plan contemplates and the Debtor believes that the federal income tax consequences of such transactions will not be borne by the Debtor as a disregarded entity, but instead will be borne by FUEL, the owner of the Debtor, which for federal income tax purposes, is treated as a "partnership." As discussed below, since FUEL is treated as a partnership for federal income tax purposes, its owners will ultimately bear their portion of the federal income tax consequences of the transactions contemplated by the Plan. In general, for

federal income tax purposes, the partners of a partnership, and not the partnership itself, are subject to taxation annually under the IRC on their respective distributive shares of items of income, gain, loss or deduction of the partnership, whether or not they receive any distributions of cash for such year from the partnership.

### 1. Cancellation of Indebtedness Income.

A debtor generally must recognize income from the cancellation of debt ("COD Income") in the event that its debt is discharged for consideration to a creditor for an amount that is less than the amount of such debt. However, Section 108(a) of the IRC provides that COD income is not required to be recognized, and is excluded from gross income, if the debtor is under the jurisdiction of a bankruptcy court in a case under Chapter 11 and the discharge is granted or is effectuated pursuant to a plan confirmed by the court (the "Bankruptcy Exception"). If the Bankruptcy Exception applies, the debtor is required to reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards, current year NOLs capital loss carryforwards, tax credits and tax basis in assets – by the amount of COD income created pursuant to the plan (collectively, "Attribute Reduction"). For taxpayers outside bankruptcy, COD income from the cancellation of debt is not recognized by an insolvent debtor to the extent of insolvency (the "Insolvency Exception"). For this purpose "insolvency" is defined as the excess of liabilities over the fair market value (the "FMV") of assets. Whether COD income is realized and recognized in connection with a partnership debt restructuring is determined at the partnership level, but the Section 108(a) exceptions to COD income recognition (the Bankruptcy Exception and Insolvency Exception) and the corresponding Attribute Reduction are applied at the partner level.

In this regard, as discussed above, because the Debtor is disregarded from its owner (FUEL) for federal income tax purposes, the Bankruptcy Exception cannot be applied to the Debtor for federal income tax purposes even though it is the debtor in a Chapter 11 proceeding, nor can it be applied to its owner FUEL, since FUEL is not a Chapter 11 debtor. Moreover, FUEL is treated for federal income tax purposes as a "partnership," and under Section 108(d)(6) of the IRC, and the Bankruptcy Exception, Attribute Reduction and the Insolvency Exception all are to be applied at the partner level (*i.e.,* the members of FUEL who receive schedule K-1s each year) not at the partnership (*i.e.,* FUEL) level.

Accordingly, any cancellation of the debt of the Debtor which will occur by consummation of the Plan will not qualify for the Section 108(a) exceptions from COD income at either the Debtor level or the FUEL level and any COD income will be recognized for tax purposes at the FUEL level. (No analysis has been made as whether one or more members of FUEL would be eligible to qualify for any of the exceptions from COD income under Section 108 of the IRC.)

Accordingly, any COD income recognized by FUEL as a result of confirmation of the Plan will flow through to, and be reported by, each of the members of FUEL on their respective federal income tax returns. The Debtor anticipates that consummation of the Plan will result in significant COD income which will be reportable by the members of FUEL for tax purposes for its calendar 2011 tax year (if the Effective Date

ATLANTA:5326255.1

occurs by December 31, 2011), along with FUEL's other items of income, gain, loss and deduction.

Section 108(e)(8) of the IRC provides that when a partnership (which would clearly apply to the Reorganized Debtor from and after the time it has two members) issues an interest in the partnership to a creditor in satisfaction of partnership (Debtor) indebtedness, the partnership recognizes COD income as if the debt had been satisfied with cash equal to the FMV of the partnership interest issued. This COD income is to be allocated to the partners of the partnership immediately prior to the satisfaction of the partnership debt. Further, for purposes of applying Section 108(e)(8) generally, the amount of indebtedness satisfied is determined by applying the original issue discount provisions of the IRC.

However, neither the proposed regulations issued under Section 108(e)(8) (the "Section 108(e)(8) proposed regulations"), proposed regulation Section 1.721-1(d) nor any other IRS or other federal income tax authority directly addresses with the issuance of membership units by a disregarded limited liability company (i.e., the Debtor before the Reorganized Debtor has two members), which is in turn wholly owned by a second limited liability company which is treated as a partnership for federal income tax purposes (i.e., FUEL) in exchange for, in payment of, or in compromise of, indebtedness of such disregard limited liability company where such issuance of membership units simultaneously results in such disregarded entity becoming a partnership for federal income tax purposes by virtue of then having two members. Existing IRS authority under Section 108 suggests that the indebtedness of the disregarded entity be considered the debt of its sole member partnership for federal income tax purposes, consistent with the general rule under the Section 7701 regulations. Those regulations provide that the sole member treat the income, assets and operations of the disregarded entity as its own income, assets and operations for federal income tax purposes, as if the disregarded entity was an unincorporated "division" of the sole member.

There are two ways the IRS, FUEL and the Reorganized Debtor may characterize these transactions for federal income tax purposes. First, under the "partnership formation" approach (the "Partnership Formation Approach"), the parties would be treated as if (i) FUEL contributed the Debtor's assets to the new partnerships (the Reorganized Debtor with more than one member) in exchange for FUEL's partnership (the New Class A Units), and (ii) the Holders of the Senior Secured Lender Claims contributed the Outstanding Prepetition Debt to the new partnership (the Reorganized Debtor) in exchange for their partnership interests (the New Preferred Units and the Class B Units). The Debtor believes the Partnership Formation Approach is most consistent with the Section 108(e)(8) proposed regulations and Section 1.721-1(d) of the proposed regulations. Importantly, had FUEL been a Chapter 11 debtor or if the Debtor could have become a partnership for tax purposes, both the Section 108(e)(8) proposed regulations and proposed regulation Section 1.721-1(d) would be directly on point.

Under the second approach, the full assets-over approach (the "Full Assets-Over Approach"), the parties would be treated as if (i) FUEL transferred the Debtor's assets directly to the Holders of the Senior Secured Lender Claims in full satisfaction

-73-

of the Outstanding Prepetition Debt resulting in FUEL being deemed to have sold the Debtor's assets in a fully taxable sale under Section 1001 of the IRC for an amount realized in such sale of the dollar amount of the Outstanding Prepetition Debt (i.e. $107.6 million) plus the FMV of the New Class A Units (assumed to have very little FMV), and (ii) the secured debt holders and FUEL then form the new partnership (Reorganized Debtor) with the secured debt holders contributing their just-purchased Debtor assets in exchange for a capital and profits interest in the Reorganized Debtor (the New Preferred Units and the Class B Units) and with FUEL receiving a profits interest (the New Class A Units). This Full Assets-Over Approach allows the secured debt holders to get a full FMV step up in the assets of the Debtor then owned by the Reorganized Debtor and for the historic holders of the Senior Secured Lender Claims to claim a Section 166 bad debt loss on the transaction, a result expressly rejected by the IRS in the Section 108(e)(8) proposed regulations where a partnership had issued the subject nonrecourse debt. This factor supports the Debtor's belief that the Partnership Formation Approach is the most appropriate for these transactions to be reported for federal income tax purposes. As discussed under Section XVII.J. below, the Senior Secured Lenders advocate for the Full Assets Over Approach based on the disregarded tax status of the Debtor. That is, the Senior Secured Lenders assert that the Section 108(e)(8) proposed regulations only apply when there is a contribution to a tax partnership that issued the debt.

Therefore, under the Partnership Formation Approach, and under a literal application of the Section 108(e)(8) proposed regulations, Section 108(e)(8) of the IRC would provide that FUEL will recognize COD income to the extent that the $107,644,144 (the "Outstanding Prepetition Debt") of Pre-Petition Senior Secured Lender Claims exceeds the FMV of both the New Preferred Units and the New Class B Units (collectively, and hereinafter the "Secured Lenders New Equity") in satisfaction of the Class 1 – Senior Secured Lender Claims.

In this regard, the Section 108(e)(8) proposed regulations provide a "safe harbor" where the FMV of the Secured Lenders New Equity equals such new equity's "liquidation value", where such liquidation value equals the amount of cash that the creditor would receive with respect to the new partnership equity interests if, immediately after its issuance, the partnership sold all its assets for cash equal to the FMV of those assets and then liquidated.

The Reorganized Debtor can only rely on this liquidation value safe harbor if the Reorganized Debtor properly maintains capital accounts, treats this liquidation value as the FMV of such new equity for determining the tax consequences of the exchange, the exchange is an arm's length transaction and thereafter, such new equity interest is not redeemed by the Reorganized Debtor or FUEL in a transaction intended to avoid the recognition of COD income. If any of the above requirements for application of this safe harbor valuation method are not satisfied, then all of the facts and circumstances are to be considered in determining the FMV of the Secured Lenders New Equity for purposes of applying the Section 108(e)(8) provisions.

The Debtor has been advised by Morgan Keegan that as of August 1, 2011, its analysis indicated that the enterprise value of the Reorganized Debtor would be in the range of $103 million to $108 million, with a mid-point estimate of $105 million

inside that range. Based on the terms of the respective New Preferred Units and New Class B Units, the Debtor believes that these enterprise values would closely approximate the "liquidation value" and therefore, the FMV of such Secured Lenders New Equity. Specifically, if the Secured Lenders New Equity has a FMV as of the Effective Date equal to this $105 million estimate, then FUEL would recognize COD income of approximately $2.67 million. The Debtor currently expects to adopt this $105 million estimate of FMV as the liquidation value for IRS reporting purposes. The IRS may not agree, and any excess of such Outstanding Prepetition Debt over the FMV of Secured Lenders New Equity would constitute COD income reportable by FUEL for tax purposes as of the Effective Date.

Further, the Debtor anticipates that FUEL will separately generate COD income by virtue of the cancellation of indebtedness with respect to the Class 2 Bond Claim of approximately $8,722,688, the Class 3 Fagen Claims of approximately $4,293,534, the Class 5 General Unsecured Claims and certain other claims, in each case because as of the Effective Date, the adjusted issue price of such indebtedness being cancelled will exceed the sum of the cash paid by the Debtor plus the FMV of any additional consideration (interests in the Liquidation Trust) given in satisfaction of such Claims. That excess generally constitutes the amount of COD income that must be recognized for tax purposes.

Except to the extent offset by items of loss or deduction at the FUEL level for the taxable year in which the Effective Date occurs, the total amount of COD income recognized by FUEL from consummation of the Plan would flow through and be reportable by the members of FUEL in FUEL's calendar 2011 tax year in accordance with their respective distributive shares of FUEL's tax items.

For its taxable year ending December 31, 2010, FUEL reported an operating tax loss (excess of FUEL's tax deductions over taxable income) of over $48 million and the Debtor anticipates that another operating tax loss approximately $23.8 million of FUEL's taxable year ending December 31, 2011. Specifically, for the 2011 calendar tax year of FUEL in which the Effective Date may still be expected to occur, the taxable income and taxable loss and deduction items of the Debtor will be reflected and reported by FUEL for the period beginning January 1, 2011 through and including the Effective Date if it occurs before December 31, 2011 (the "2011 disregarded period"). The Debtor expects that the operating results for this 2011 disregarded tax period will also be an operating loss, just as the Debtor expects for the full 2011 calendar tax year as well. Further, any COD income recognized by FUEL as a result of the consummation of the Plan would also be reported by FUEL from this 2011 disregarded tax period.

The Debtor currently believes that this expected operating tax loss for the 2011 disregarded period would substantially offset the anticipated amount of COD income reportable by FUEL from consummation of the Plan such that no significant amounts of net taxable income would be reportable by FUEL on its partnership tax return for December 31, 2011, and thereby flow through and be reportable by the FUEL members on their 2011 calendar year personal federal income tax returns. (This is important since the Debtor does not expect that the FUEL members would receive any cash distributions in connection with consummation of the Plan with which to pay any

ATLANTA:5326255.1

federal income tax liabilities resulting from their reporting their distributive shares of FUEL's taxable income for 2011, including all of the COD income resulting from consummation of the Plan.)

After the Effective Date, and assuming that FUEL does receive New Class A Units under the Plan, which is uncertain, FUEL, as the holder of the New Class A Units pursuant to consummation of the Plan should not be required to report any items of taxable income or gain, nor likely be allocated any taxable loss or deduction items with respect to the Reorganized Debtor for the remainder of the 2011 calendar year or in 2012 and thereafter, until the occurrence of the Second Trigger Event. *See* Section XVI. D.1., "*Holder of Class 7 – Equity Interest of Class A Member (FUEL)*," below.

### 2. Transfer of Litigation Trust Assets to the Litigation Trust.

Pursuant to the Plan, on the Effective Date, the Debtor will transfer certain assets to the Litigation Trust on behalf of the respective claimants comprising the Litigation Trust beneficiaries. *See* Section VII. N., "*Establishment of the Litigation Trust*," above. The transfer of assets by the Debtor to the Litigation Trust pursuant to the Plan may result in the recognition of gain or income by the Debtor, depending in part on the FMV of such assets on the Effective Date and the Debtor's tax basis in such assets.

Although not free from doubt, the Debtor currently also anticipates that FUEL's expected operating tax loss for the 2011 disregarded period should substantially offset the gain or income, if any, recognized by FUEL for tax purposes upon the transfer by the Debtor to the Litigation Trust of assets pursuant to the Plan.

## B. TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN CLAIMS

The federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the Holder's method of tax accounting; and (7) whether the Claim is an installment obligation for federal income tax purposes.

### 1. Distributions in Discharge of Accrued Interest.

In general, to the extent that any consideration received pursuant to the Plan (whether in cash or other property including without limitation, interests in the Litigation Trust, New Preferred Units, New Class A Units, or New Class B Units) by a Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent of any accrued interest or amortized original discount ("OID") was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" for federal income tax purposes of a corporate issuer, in an otherwise tax-free exchange, could not claim a

ATLANTA:5326255.1

current deduction with respect to any unpaid OID. Because the Debtor is disregarded for tax purposes, and FUEL is a "partnership" not a "corporate" issuer for tax purposes, this ruling may not be applicable to the Claims. It is also unclear whether, by analogy, a Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim for accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for federal income tax purposes.

Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for federal income tax purposes.

### 2. Definition of Security.

The term "security" is not defined in the IRC or in the Regulations. Whether an instrument constitutes a "security" for federal income tax purposes is determined based on all of the facts and circumstances. Certain authorities have held that one factor to be considered is the length of the initial term of the debt instrument. These authorities have indicated that an initial term of less than five years is evidence that the instrument is not a security, whereas an initial term of ten years or more is evidence that it is a security. Treatment of an instrument with an initial term between five and ten years is generally unsettled. Numerous factors other than the term of an instrument could be taken into account in determining whether a debt instrument is a security, including, but not limited to, whether repayment is secured, the level of creditworthiness of the obligor, whether or not the instrument is subordinated, whether the holders have the right to vote or otherwise participate in the management of the obligor, whether the instrument is convertible into an equity interest, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or are accrued.

### 3. Market Discount.

The "market discount" provisions of Sections 1276 through 1278 of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if the debt obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the Holder's hands immediately after the Holder's acquisition of the debt obligation. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for cash or property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market

discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

### 4. Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount (discussed in Section XVI.B.3., above), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. For Holders that are financial institutions (as defined under Section 582(c) of the IRC), the gain or loss on the exchange of their Claims will be treated as ordinary income or loss. Each Holder of a Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Claim.

Individual Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to the IRC limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five (5) taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three (3) taxable years preceding the capital loss year.

### 5. Holders of Class 1 - Pre-Petition Senior Secured Lender Claims.

Pursuant to the Plan, Holders of the Class 1 Claims will receive their Pro Rata Share of the New Preferred Units and the New Class B Units. The following discussion assumes that the Reorganized Debtor is treated as a "partnership" for federal income tax purposes, and therefore, that its income, gain, loss and deduction will flow through to, and be reported by, its members for tax purposes.

As discussed in Section XVI. A.1., above, neither Section 108(e)(8) proposed regulations, proposed regulation Section 1.721-1(d) nor any other IRS or other tax authorities directly address the issuance of membership units by a disregarded limited liability company (Debtor) (in turn wholly owned by a partnership for tax purposes, FUEL) in exchange for indebtedness of such disregarded limited liability company, where such membership units issuance results in the disregarded entity becoming a partnership for tax purposes by virtue of then having two members. However, IRS Revenue Ruling 99-5 addresses the general tax treatment of conversion of a disregarded entity into a partnership when a limited liability company issues an additional membership unit to a new member.

As discussed under Section XVI. A.1, above, and notwithstanding the fact that the Senior Secured Lenders and the Reorganized Debtor will take an inconsistent position for tax purposes, the Debtor currently believes that the Partnership Formation

-78-

Approach is the most appropriate federal income tax characterization of these transactions, and, applied literally to either the Reorganized Debtor or to FUEL, the Section 108(e)(8) proposed regulations and proposed regulation Section 1.721-1(d) would provide that the creditor's contribution of debt to the partnership (Reorganized Debtor or FUEL) in exchange for a partnership interest (Secured Lenders New Equity) is tax free under Section 721 of the IRC. Additional support for this tax characterization comes from situation 2 of IRS Revenue Ruling 99-5, discussed below at Section XVI.D.1., "*Holder of Class 7 – Equity Interest of Class A Member (FUEL)*." Thus, under the Section 1.721-1(d) of the proposed regulations, as currently written, the Holders of the Class 1 Claims would recognize neither gain nor loss on the exchange and thereby, would not recognize an immediate bad debt loss under Section 166(a) of the IRC from this debt-for-equity interest exchange in an amount that corresponds to the amount of COD income, if any, that FUEL is required to recognize on such exchange. However, under the proposed regulations, the nonrecognition rule of Section 721 would not apply to the transfer of a partnership interest in satisfaction of a partnership interest for unpaid rent, royalties, or interest. Therefore, the Holders of the Senior Secured Lender Claims may be required to report interest income as a result of receiving the New Preferred Units and the New Class B Units. *See* Section XVI. B.1., "*Distributions in Discharge of Accrued Interest*," above.

Each Holder of the Senior Secured Lender Claims would obtain a tax basis in its New Preferred Units and New Class B Units that would include its full adjusted tax basis in the Outstanding Prepetition Debt as well as its share of the Reorganized Debtor's liabilities under Section 752 of the IRC and such Holder's capital account in the Reorganized Debtor would be increased by the FMV of the New Preferred Units and New Class B Units received by such holder. The Holder's holding period in the new equity interests would include the holding period of the transferred debt.

Under regulations yet to be issued by the IRS under Section 108(e)(7)(E), the New Preferred Units and the New Class B Units received by Holders of the Senior Secured Lender Claims may constitute so-called "Section 1245 property" and is deemed to have been subject to depreciation deductions equal to the sum of any bad-debt deductions claimed by the former Holders of Class 1 Claims with respect to the Outstanding Prepetition Debt, plus any ordinary loss recognized on the exchange (which would be zero under the Section 108(e)(8) proposed regulations). Accordingly, upon a subsequent disposition of the New Preferred Units and the New Class B Units received by Holders of the Senior Secured Lender Claims at a gain, those Holders may be required to recapture some or all of their respective prior bad-debt deductions as ordinary income.

Notwithstanding the discussion set forth above, the Debtor understands that the Senior Secured Lenders believe that the Full Assets-Over Approach, not the Partnership Formation Approach, is the most appropriate federal income tax characterization in these transactions. *See* Section XVI. A.1. "*Cancellation of Indebtedness Income*" above, which describes both the Partnership Formation Approach and the Full Assets-Over Approach, and Section XVI.J. below for the Senior Secured Lenders position. Accordingly, the Debtor currently expects the Reorganized Debtor to apply the Full Assets-Over Approach (and not the Partnership Formation

-79-

Approach) with respect to the tax consequences of its issuance of the New Preferred Units and the New Class B Units to the Holders of the Senior Secured Lender Claims in exchange for the Outstanding Prepetition Debt pursuant to consummation of the Plan. That being said, the Debtor currently plans to apply the Partnership Formation Approach to determine the federal income tax consequences to FUEL from the treatment of the Outstanding Prepetition Debt under the Plan. The Debtor will have no role whatsoever nor any responsibility for the tax decisions that the Reorganized Debtor may choose to make, including without limitation, the decision to adopt the Full Assets-Over Approach.

Due to the lack of direct IRS or other authority with respect to these proposed transactions, Holders of the Senior Secured Lenders Claims are particularly urged to consult with their tax advisors as to the federal income tax consequences or this proposed debt-for-equity exchange by the Holders of the Senior Secured Lender Claims with the Reorganized Debtor.

### 6. Holder of the Class 2 Bond Claim.

The Holder of the Class 2 Bond Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives.

As discussed below in Section XVI.H.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* the Holder of the Class 2 Bond Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trustee will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

The Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

The Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 7. Holder of the Class 3 Fagen Claim.

The Holder of the Class 3 Fagen Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives.

ATLANTA:5326255.1

As discussed below in Section XVI.H.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* the Holder of the Class 3 Fagen Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trust Board will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

The Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

The Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 8. Holders of Class 5 General Unsecured Claims.

A Holder of a Class 5 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives. A Holder of such a Claim will recognize the full amount of its gain or loss realized on the exchange.

As discussed below in Section XVI.H.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* each Holder of a Class 5 Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trust Board will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

A Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

A Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 9. Holders of Class 6 Convenience Claims.

A Holder of a Class 6 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the

Effective Date, and (ii) the amount of Cash it receives. A Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange.

## C. TAX CONSEQUENCES OF OWNERSHIP OF NEW PREFERRED UNITS AND NEW CLASS B UNITS

Under current Treasury regulations, a domestic entity that has two or more members and that is not organized as a corporation under federal or state law will generally be classified as a partnership for federal income tax purposes, unless it elects to be treated as a corporation. The Debtor has no plans to elect to have the Reorganized Debtor be classified as a corporation for federal income tax purposes. Therefore, it is assumed, and the following discussion assumes, that the Reorganized Debtor will be treated as a partnership for federal income tax purposes.

It is reasonable to assume that the New Preferred Units and the New Class B Units should be treated as equity interests in the Reorganized Debtor for federal income tax purposes, even though the New Preferred Units do have several "debt" like rather than "equity" like characteristics for federal income tax purposes. The Debtor assumes that the Reorganized Debtor will take the position that the New Class B Units are also "equity" and further, that the New Class A Units issued to FUEL are also "equity" for federal income tax purposes, although the Debtor will seek no tax opinion or IRS ruling to that effect, and will have no input whatsoever at any time regarding the tax decisions made at any time by the Reorganized Debtor. No assurance can be provided that the IRS will agree with such "equity" characterizations made by the Reorganized Debtor. The following discussion assumes that both the New Preferred Units and the New Class B Units (as well as the New Class A Units) are "equity" of the Reorganized Debtor, and that the Holders of such New Preferred Units and the New Class B Units are "members" in the Reorganized Debtor with respect to both classes of units for federal income tax purposes. The following discussion would be materially different if the New Preferred Units were treated as "debt" rather than "equity" for federal income tax purposes.

As a partnership, the Reorganized Debtor itself will not be subject to federal income tax. Instead, the Reorganized Debtor will file an annual partnership information return with the IRS which will report the results of Reorganized Debtor's operations. Each Reorganized Debtor member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Debtor's income, gain, loss, deduction and credit for each taxable year of Reorganized Debtor ending with or within the member's taxable year. Each item generally will have the same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Debtor for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Debtor.

A member is allowed to deduct its allocable share of the Reorganized Debtor losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a member's

ATLANTA:5326255.1

ability to deduct its allocable share of deductions and losses of Reorganized Debtor against other income.

The Reorganized Debtor will provide each member with the necessary information to report its allocable share of the Reorganized Debtor's tax items for federal income tax purposes. However, no assurance can be given that the Reorganized Debtor will be able to provide such information prior to the initial due date of the members' federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of the Reorganized Debtor will decide how items will be reported on the Reorganized Debtor's federal income tax returns, and all members will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of the Reorganized Debtor are audited by the IRS, the tax treatment of the Reorganized Debtor income and deductions generally will be determined at the Reorganized Debtor level in a single proceeding, rather than in individual audits of the members. The Tax Matters Partner will have considerable authority under the IRC and the limited liability company agreement to make decisions affecting the tax treatment and procedural rights of all members.

A member generally will not recognize gain or loss on the receipt of a distribution of cash (either as the 15% preferred return on the New Preferred Units or with respect to the New Class B Units or property from the Reorganized Debtor (provided that the member is not treated as exchanging such member's share of the Reorganized Debtor's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in Section 751 of the IRC, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from the Reorganized Debtor (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of the Reorganized Debtor) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below. For this purpose, a member would generally be treated by the IRS as having a single unitary tax basis in its New Preferred Units and the New Class B Units.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from the Reorganized Debtor generally will be capital gain, but may be taxable as ordinary income to the extent of previously allowed bad debt or ordinary loss deductions (as discussed above at Section XVI.B.5.), and under certain other circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

ATLANTA:5326255.1

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (that single unitary basis in both the New Preferred Units and the New Class B Units (discussed above)), increased by the sum of (i) any additional capital contribution such member makes to the Reorganized Debtor, (ii) the member's allocable share of the income of the Reorganized Debtor, and (iii) increases in the member's allocable share of the IRC Section 752 liabilities of the Reorganized Debtor, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of the Reorganized Debtor, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of the Reorganized Debtor.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted single unitary tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of the Reorganized Debtor and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (as discussed above under Section XVI. B. 5.). A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the IRC.

Holders of the Senior Secured Lender Claims who receive the New Preferred Units and the New Class B Units are urged to consult their tax advisors regarding the tax consequences of owning and disposing of the Secured Lenders New Equity in the Reorganized Debtor.

## D. TAX CONSEQUENCES TO HOLDERS OF INTERESTS

### 1. Holder of Class 7 – Equity Interest of Class A Member (FUEL).

Pursuant to the Plan, and if and only if, Classes 2, 3 and 5 each vote as a Class to accept the Plan, then FUEL as the Holder of the currently outstanding Class A Member Interest in the Debtor will have such interest converted into the New Class A Units in the Reorganized Debtor, but its economic rights to current distributions in the Reorganized Debtor and all other rights as a member will, for all practical purposes, be eliminated by the issuance by the Reorganized Debtor of the New Preferred Units and the New Class B Units.

Except for very limited Liquidity Event Distributions, the New Class A Units will continue to have no rights to current distributions from the Reorganized Debtor until and unless the occurrence of the Second Trigger Event, when the holders of the New Preferred Units have previously received in cash distributions the full "Preferred Redemption Value" and such New Preferred Units have been retired. At that time, and only at that time, will the New Class A Units again have the right to share in current distributions 75%/25% with the New Class B Units of the Reorganized Debtor. *See*

ATLANTA:5326255.1

*Section* VI.A.7. and 13., "*Class 1 Senior Secured Lenders Claims,*" and "*Class 7 Equity Interest of Class A Member (FUEL),*" above.

The extremely limited economic rights of the New Class A Units raise issues as to whether the IRS would respect FUEL as the holder of a membership interest treated as a "partner" for federal income tax purposes. Nevertheless, the Debtor expects to take, and assumes but cannot currently confirm or ensure that the Reorganized Debtor will take, the tax reporting position that FUEL remains a "partner" in the Reorganized Debtor for federal income tax purposes by virtue of holding the New Class A Units.

If Classes 2, 3 and 5 <u>do</u> <u>not</u> each vote as a Class to accept the Plan, then FUEL's current Class A Member Interest in the Debtor will be completely extinguished as of the Effective Date. *See* Section VII.B.7. and 13., "*Class 1 - Senior Secured Lender Claims,*" and "*Class 7 – Equity Interest of Class A Member (FUEL),*" above.

Based on the foregoing, the Debtor expects that the New LLC Agreement of the Reorganized Debtor will contain an express provision that FUEL as the Holder of the New Class A Units in the Reorganized Debtor, and except as required by the IRS or other taxing authority in connection with the settlement of an IRS audit (or state income tax audit) and with the prior written consent of such Holder, FUEL would not be allocated any Section 752 liabilities nor any income or, gain, loss or deduction items of the Reorganized Debtor for federal income tax purposes in any taxable year of the Reorganized Debtor, beginning with the Reorganized Debtor's first taxable year ending December 31, 2011 (if the Effective Date occurs prior to December 31, 2011), <u>unless</u> any such tax allocation of income or gain items is contemporaneously accompanied with a tax distribution in a cash amount calculated at the then highest marginal federal income tax rate plus the then Georgia income tax rate.

Inclusion of such an express provision in the New LLC Agreement would be designed to ensure that prior to the Second Trigger Event, FUEL would not have any tax risk that it would be allocated taxable income attributable to its New Class A Units of the Reorganized Debtor it has to report for federal income tax purposes without a corresponding cash tax distribution sufficient to fully discharge its federal and state income taxes attributable to such taxable income.

As mentioned above (*see* Section XVI. A.1., "*Cancellation of Indebtedness Income,*" above), there is no direct IRS or other tax authority with respect to the specific transactions whereby Holders of Senior Secured Lenders Claims receive the New Preferred Units and the New Class B Units in exchange for cancellation of the Outstanding Prepetition Debt, and the Debtor becomes a partnership for federal income tax purposes upon admitting all those Holders of debt as its "second" member (and successive members) and FUEL, as the Holder of the Class 7 Interests (the currently outstanding Class A Member Interest) has such interest converted into the New Class A Units, albeit economically extinguished for all practical purposes (except for the Liquidity Event Distributions), by the issuance of the New Preferred Units and the Class B Units. The most analogous authority would appear to be IRS Revenue Ruling 99-5, which addresses the general tax treatment of a disregarded entity into a

ATLANTA:5326255.1

partnership when a limited liability company issues an additional membership unit to a new member.

In situation 2 in that revenue ruling, a new member contributes cash or property to the disregarded limited liability company, which thereby becomes a partnership for tax purposes. Here, the IRS treats the transaction as the formation of a new partnership for tax purposes by both the continuing member (FUEL), who is deemed to contribute the assets of the existing disregarded limited liability company (the Debtor) to the new partnership (the Reorganized Debtor) in a tax-free transaction under Section 721 of the IRC, and the new member (here, all the Holders of the Senior Secured Lender Claims), who together contribute cash, other property or both (in this case, one hundred percent of the Outstanding Prepetition Debt), again in a nonrecognition transaction under Section 721. Neither situation 2 or any other aspect of the Revenue Ruling 99-5 discusses the aspects of a debt-for-equity exchange under Section 108(e)(8) as discussed above.

As discussed above, under Section XVI. A.1., the Debtor currently intends to apply the Partnership Formation Approach. As applied to the Debtor, this would mean that FUEL would recognize no gain or loss with respect to the deemed transfer of the Debtor's assets to the Reorganized Debtor (new partnership) in exchange for the New Class A Units, but would recognize COD income to the extent that the Outstanding Prepetition Debt exceeded the FMV of the New Preferred Units and New Class B Units on the Effective Date. FUEL members would also have a deemed cash distribution under Section 752 of the IRC equal to the amount of the Outstanding Prepetition Debt.

Under the Partnership Formation Approach, the Debtor expects to report these transactions as described above consistent with the authority set forth in situation 2 of Revenue Ruling 99-5, combined with the Section 108(e)(8) proposed regulations and proposed regulation Section 1.721-1(d) with respect to the COD income recognition rules in the context of a debt-for-equity exchange by FUEL as a partnership for federal income tax purposes. However, there is no assurance that the IRS will respect such proposed tax treatment for federal income tax purposes. Further, the Reorganized Debtor is expected to instead adopt the Full Assets-Over Approach to these transactions under the Plan.

Under this Section 721 nonrecognition transaction, FUEL would obtain a tax basis in its New Class A Units which would include its adjusted tax basis in the assets of the Debtor as of the Effective Date, plus FUEL's share of the Reorganized Debtor's liabilities under Section 752 of the IRC. FUEL's capital account in the Reorganized Debtor would increase by the FMV of the Debtor's assets deemed transferred to the Reorganized Debtor. FUEL's holding period for its New Class A Units would include its holding period for the Debtor's transferred assets.

If notwithstanding the foregoing, the IRS were to instead treat FUEL as having sold the Debtor's assets to the new partnership (Reorganized Debtor) in a fully taxable transaction rather than contributing them to the new partnership in a Section 721 nonrecognition transaction, the Debtor anticipates that it would have an amount realized of $107.6 million plus the FMV of the New Class A Units (assumed to have

-86-

very little FMV) less approximately $80 million in tax basis (which will vary significantly depending on whether the Effective Date occurs in 2011 or 2012), which would result in FUEL having to report a taxable gain of around $27.6 million, substantially all of which would be ordinary income. Again, the FUEL members would have a deemed cash distribution under Section 752 of the IRC equal to the amount of the Outstanding Prepetition Debt.

### 2. Holder of Class 8 – Equity Interest of Class B Member (CT Corporation Staffing).

Pursuant to the Plan, the currently outstanding Class B membership interest in the Debtor will be extinguished on the Effective Date. Because this currently outstanding Class B Member Interest was a non-economic interest in the Debtor, the Holder of such interest should not recognize either gain or loss for federal income tax purposes as a result of consummation of the Plan.

### E. INFORMATION REPORTING AND BACKUP WITHHOLDING

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments of interest. The Reorganized Debtor will comply with all applicable reporting requirements of the IRC.

### F. PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S.

ATLANTA:5326255.1

FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST AND IS NOT A SUBSTITUTE FOR TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

## G.    RESERVATION OF RIGHTS

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtor and its advisors reserve the right to further modify, revise or supplement this discussion and the other tax related sections of the Plan in accordance with the terms of the Plan and the Bankruptcy Code.

## H.    TAX TREATMENT OF THE LITIGATION TRUST AND BENEFICIAL INTEREST HOLDERS

### 1.    Gain or Loss Recognition.

Each Holder of an Allowed Class 2, 3 or 5 Claim who receives an interest in the Litigation Trust will recognize gain or loss in an amount equal to the difference between (i) the amount realized by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such Holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). The amount realized by a holder of a Claim will equal the FMV as of the Effective Date of the beneficial interest in the Litigation Trust received by such Holder pursuant to the Plan.

Because the holders of Disputed Class 2, 3 and 5 Claims will not receive a beneficial interest in the Litigation Trust until such time, if any, as their Claims become Allowed Claims, the full value of the assets transferred to the Litigation Trust should be deemed to have been received by those holders whose Claims are Allowed Claims as of the end of the year in which the Litigation Trust is formed. As a result, the FMV of the beneficial interests that such holders would be deemed to have received upon the formation of the Litigation Trust may exceed the amount that such holders eventually receive from the Litigation Trust. If this occurs, any gain recognized by such holders would be overstated and any loss recognized by such holders would be understated for the taxable year in which the Litigation Trust is formed. Although such holders would recognize additional losses in subsequent years (as additional Claims become Allowed Claims and/or when the Litigation Trust makes a final distribution) that would offset the amount by which the gain (or loss) was overstated (or understated), such holders would lose the benefit of the time value of the additional money paid in taxes with respect to the taxable year in which the Litigation Trust is formed. Characterization differences also are possible, and holders should note that capital losses generally are deductible only against capital gains. Holders should consult their tax advisors regarding the possible alternative treatments and

ATLANTA:5326255.1

characterizations of these transactions, including the possible treatment of the amount realized by a holder in a manner that takes into account the subsequent allowance of Disputed Claims.

Any holder of a Disputed Claim whose claim becomes an Allowed Claim after implementation of the Plan will be taxed on the receipt of the beneficial interest in the Litigation Trust in the manner set forth above in the year in which such holder's Claim is allowed. Specifically, such holder would be deemed to have received a beneficial interest in the Litigation Trust in such year and would recognize gain or loss equal to the difference between the fair market value of such holder's beneficial interest in the Litigation Trust and such holder's basis in its Claim. To the extent that other Disputed Claims become Allowed Claims in subsequent years, such holder's gain (or loss) may be overstated (or understated) for the year in which the holder receives its initial beneficial interest in the Litigation Trust, subject to possible offsetting losses in subsequent years.

### 2. Classification of the Litigation Trust.

The Litigation Trust created pursuant to the Plan is intended to qualify as a "liquidating trust" for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through type entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The Litigation Trust will be structured to comply with the general criteria set forth in IRS Revenue Procedure 94-45. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties will be required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes. However, no opinion of counsel has been requested, and neither the Debtor, the Reorganized Debtor nor the Litigation Trustee will seek a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Litigation Trust, the federal income tax consequences to the Litigation Trust, the Litigation Trust beneficiaries and the Debtor could vary from those discussed herein (including the potential for an entity-level tax on income of the Litigation Trust).

### 3. General Tax Reporting by the Litigation Trust and Beneficiaries.

For all federal income tax purposes, all parties must treat the transfer of the Litigation Trust assets to the Litigation Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Litigation Trust assets are treated, for federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Allowed Class 2, 3 and 5 Claims receiving an interest in the Litigation Trust (with each holder receiving in a taxable transaction an undivided interest in such assets in accordance with its economic interests in such assets) as of the Effective Date, followed by the transfer by the holders to the Litigation Trust of such assets in exchange for the interest in the Litigation Trust.

ATLANTA:5326255.1

Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of interests in the Litigation Trust are the owners and grantors, and treat the Litigation Trust beneficiaries as the direct owners of an undivided interest in the Litigation Trust assets, consistent with their economic interests therein, for all federal income tax purposes.

Allocations of taxable income or loss of the Litigation Trust will be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust assets. The tax book value of the Litigation Trust assets for purpose of this paragraph shall equal their FMV on the date the Litigation Trust assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Litigation Trust assets to the Litigation Trust, the Litigation Trust Board shall make a good faith valuation of the Litigation Trust assets, and shall inform the Litigation Trustee of its determination. The Litigation Trustee shall notify the holders of interests in the Litigation Trust of the FMV determination in writing. All parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Litigation Trust beneficiary will be treated as income or loss with respect to such Litigation Trust beneficiary's undivided interest in the Litigation Trust assets, and not as income or loss with respect to its prior respective Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Litigation Trust beneficiary. The interests in the Litigation Trust will not be transferable.

Subject to the satisfaction of certain dollar thresholds to making such distributions, the Litigation Trust is generally obligated to make annual cash distributions to the holders of interests in the Litigation Trust. However, the federal income tax obligations of a holder with respect to its interest in the Litigation Trust are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a holder may incur a federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the holder. In general, a distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust). Further, the Litigation Trust Agreement will provide for the distribution of the available Litigation Proceeds to the holders on each Distribution Date. The Litigation Trustee will determine proportionate shares of the Litigation Trust's income and distributable Litigation Proceeds by treating any holder of a Disputed Claim as a current holder of an Allowed Claim. The Litigation Trustee will maintain an escrow of any amounts required to be set aside on account of Disputed Claims. Taxes on the income of the Litigation Trust attributable to this escrow will be paid by the escrow.

ATLANTA:5326255.1

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Litigation Trustee also will annually send to each holder of an interest in the Litigation Trust a separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for federal income tax purposes and will instruct all such holders to use such information in preparing their federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their federal income tax returns.

*The Debtor and the Senior Secured Lenders disagree regarding the Tax Treatment of the Plan. Accordingly, the Debtor includes in the following Disclosure Statement subsection, the contentions of the Senior Secured Lenders in the interest of full disclosure.*

# I. SENIOR SECURED LENDERS' POSITION REGARDING TAX TREATMENT

The following discussion summarizes certain U. S. federal income tax consequences of the implementation of the Plan to the Debtor and to certain Holders of Claims and Interest, is for general information purposes only, and should not be relied upon for determining the specific tax consequences of the Plan with respect to a particular Holder of a Claim or Interest. The following summary does not address the federal income tax consequences to Holders whose Claims are unimpaired or otherwise entitled to payment in full in cash under the Plan (*e.g.,* Allowed Administrative Claims, Professional Fee Claims, Allowed Priority Tax Claims, DIP Facility Claims, and the Class 4 Claims).

The following summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), Treasury Regulations promulgated thereunder (the "regulations"), judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service (the "IRS"), all as in effect on the date hereof. Changes in such rules or new interpretations thereof may have retroactive effect and could significantly affect the federal income tax consequences described below.

The federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtor has not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this summary generally does not address state or local tax consequences of the Plan, nor does it address the federal income tax consequences of the Plan to special classes of taxpayers (such as broker-dealers, traders that mark-to-market their securities, banks, mutual funds, insurance companies, other financial institutions, small business investment companies, persons whose functional security is not the U.S. dollar, persons subject to the alternative minimum tax, regulated investment companies, real estate investment trusts, tax-exempt organizations (including, without limitation, certain pension funds), persons holding Claims or Interests as part of a "straddle," "hedge," "constructive sale" or "conversion transaction" with other investments, pass-through entities and investors in pass-through entities. If a partnership (including any entity treated as a partnership for tax

-91-

purposes) holds Claims or Interests, the tax treatment of a partner (or member) will generally depend upon the status of the partner and upon the activities of the partnership. Moreover, the following discussion generally does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires any of the consideration provided under the Plan in the secondary market.

This discussion assumes, except where otherwise indicated, that the Claims, Interests, Class A Member Interest, New Class A Units, New Preferred Units and the New Class B Units are held as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the IRC.

For purposes of this discussion, a "U.S. Holder" is a Holder that is: (1) an individual citizen or resident of the U.S. for U.S. federal income tax purposes; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized under the laws of the U.S. or any state thereof or the District of Columbia; (3) an estate the income of which is subject to U.S. federal income taxation regardless of its source; or (4) a trust (A) if a court within the U.S. is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all substantial decisions of the trust or (B) that has a valid election in effect under applicable Treasury regulations to be treated as a U.S. person.

For purposes of this discussion, a "Non-U.S. Holder" is a Holder that is: (1) a nonresident alien individual; (2) a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) that is not created or organized under the laws of the United States or any state thereof or the District of Columbia; or (3) a trust or estate other than a trust or estate described in the immediately preceding paragraph.

Accordingly, the following summary of certain federal income tax consequences is for informational purposes only and is not a substitute for careful tax planning and advice based upon the individual circumstances pertaining to a Holder of a Claim or Interest.

IRS Circular 230 Notice: To ensure compliance with IRS Circular 230, Holders of Claims or Interests are hereby notified that: (a) any discussion of federal tax issues contained or referred to in this Disclosure Statement is not intended or written to be used, and cannot he used, by Holders of Claims or Interests for the impose of avoiding penalties that may be imposed on them under the IRC; (b) such discussion is written in connection with the promotion or marketing by the Debtor of the transactions or matters addressed herein; and (c) Holders of Claims or Interests should seek advice based on their particular circumstances from an independent tax advisor.

## J.  SENIOR SECURED LENDERS POSITION REGARDING TAX CONSEQUENCES TO THE DEBTOR

### 1.  Current Structure

Prior to the Effective Date, the Debtor has been and continues to be treated as a "disregarded entity" for federal income tax purposes. In general, for federal income tax purposes, items of income, gain, loss or deduction of the Debtor as a disregarded entity, and the related federal income tax consequences of such items, are the

ATLANTA:5326255.1

responsibility of FUEL as the owner of the Debtor as the disregarded entity, not the disregarded entity itself.

Accordingly, to the extent that the transactions contemplated by the Plan would otherwise trigger federal income tax consequences to the Debtor as a disregarded entity, the Plan contemplates and the Debtor believes that the federal income tax consequences of such transactions will not be borne by the Debtor as a disregarded entity, but instead will be borne by FUEL, the owner of the Debtor, which for federal income tax purposes, is treated as a "partnership." As discussed below, since FUEL is treated as a partnership for federal income tax purposes, its owners will ultimately bear their portion of the federal income tax consequences of the transactions contemplated by the Plan. In general, for federal income tax purposes, the partners of a partnership, and not the partnership itself, are subject to taxation annually under the IRC on their respective distributive shares of items of income, gain, loss or deduction of the partnership, whether or not they receive any distributions of cash for such year from the partnership.

In prior years, Debtor has generated significant operating losses for federal income tax purposes. Debtor's losses flowed to and were reported by FUEL (because FUEL is deemed to have incurred those losses for tax purposes), and were then allocated by FUEL to its members. For most members of FUEL, such prior year losses generally would have been suspended in whole or in part due to the application of the at-risk rules and/or passive activity loss rules of the IRC. As discussed below, to the extent not previously used to offset other income, such suspended prior year losses may be available to offset any income recognized by FUEL members as a result of the Plan

## 2. Cancellation of Indebtedness Income.

General Rules. A debtor generally must recognize income from the cancellation of debt ("COD Income") in the event that its debt is discharged for consideration to a creditor for an amount that is less than the amount of such debt. However, Section 108(a) of the IRC provides that COD income is not required to be recognized, and is excluded from gross income, if the debtor is under the jurisdiction of a bankruptcy court in a case under Chapter 11 and the discharge is granted or is effectuated pursuant to a plan confirmed by the court (the "Bankruptcy Exception"). If the Bankruptcy Exception applies, the debtor is required to reduce certain of its tax attributes – such as net operating loss ("NOL") carryforwards, current year NOLs capital loss carryforwards, tax credits and tax basis in assets – by the amount of COD income created pursuant to the plan (collectively, "Attribute Reduction"). For taxpayers outside bankruptcy, COD income from the cancellation of debt is not recognized by an insolvent debtor to the extent of insolvency (the "Insolvency Exception"). For this purpose "insolvency" is defined as the excess of liabilities over the fair market value (the "FMV") of assets.

Application of COD Rules to Partnerships. Whether COD income is realized and recognized in connection with a partnership debt restructuring is determined at the partnership level, but the Section 108(a) exceptions to COD income recognition (the Bankruptcy Exception and Insolvency Exception) and the corresponding Attribute Reduction are applied at the partner level.

ATLANTA:5326255.1

The Bankruptcy Exception cannot be applied to the Debtor for federal income tax purposes (even though it is the debtor in a Chapter 11 proceeding) because the Debtor is disregarded and not treated as an entity separate from its owner (FUEL) for federal income tax purposes. Moreover, the Bankruptcy Exception cannot be applied to its FUEL (the sole member of Debtor) because FUEL is not a Chapter 11 debtor. Furthermore, FUEL is treated for federal income tax purposes as a "partnership," and, and the Bankruptcy Exception, Attribute Reduction and the Insolvency Exception all are to be applied at the partner level under Section 108(d)(6) of the IRC rather than at the partnership level, *i.e.,* they apply to the members of FUEL who receive schedule K-1s each year rather than to FUEL itself.

Accordingly, any cancellation of the debt of the Debtor which will occur by consummation of the Plan will not qualify for the Section 108(a) exceptions from COD income at either the Debtor level or the FUEL level and any COD income will be recognized for tax purposes at the FUEL level. A member of FUEL would be able to avoid recognition of COD income under the Bankruptcy Exception or Insolvency Exception only if such member were insolvent or in bankruptcy proceedings.

Moreover, there is a question whether the debt of a disregarded entity is considered to be recourse debt or nonrecourse debt for its member. If it is treated as nonrecourse debt, it will cause the member to recognize gain on the exchange of the property securing the debt, rather than cancellation of debt income. Such gain would not qualify for the section 108 exclusions. Whether such gain constitutes ordinary income or capital gain depends on the nature of the exchange and whether some form of recapture of tax items changes the character of the gain t ordinary income.

Accordingly, any COD income or gain recognized by FUEL as a result of confirmation of the Plan will flow through to, and be reported by, each of the members of FUEL on their respective federal income tax returns. The Debtor anticipates that consummation of the Plan will result in COD income or taxable gain which will be reportable by the members of FUEL for tax purposes for its calendar 2011 tax year (if the Effective Date occurs by December 31, 2011), along with FUEL's other items of income, gain, loss and deduction for such year.

Section 108(e)(8) of the IRC provides that when a partnership issues an interest in the partnership to a creditor in satisfaction of that partnership's indebtedness, the partnership recognizes COD income as if the debt had been satisfied with cash equal to the FMV of the partnership interest issued. This COD income is to be allocated to the partners of the partnership immediately prior to the satisfaction of the partnership debt. Further, for purposes of applying Section 108(e)(8) generally, the amount of indebtedness satisfied is determined by applying the original issue discount provisions of the IRC.

The Treasury Department issued proposed regulations under Section 108(e)(8) (the "Section 108(e)(8) proposed regulations"), and proposed regulation Section 1.721-1(d) to deal with issuance of interests by a partnership in satisfaction of its debt. These proposed regulations do not address how to treat the issuance of new partnership interests by an entity that that was previously disregarded in exchange for, in payment of, or in compromise of, indebtedness of such disregarded entity, when the owner of

-94-

the previously disregarded entity was treated as a partnership for tax purposes. As a result of the exchange, such disregarded entity becomes a partnership for federal income tax purposes by virtue of then having two members. In this case, (x) Debtor is the disregarded entity and issuer of the debt; (y) FUEL, its sole member, is treated as a partnership for tax purposes; and (z) Reorganized Debtor is the new partnership (for tax purposes), issuing equity interests to holders of the Pre-Petition Senior Secured Lender Claims and to FUEL.

Application of these rules to the discharge of debt of a disregarded entity owned by an entity which is a partnership for tax purposes. Had FUEL issued the Senior Secured Loans and the holders of such claims exchanged them for interests in FUEL, the proposed regulations under Section 108(e)(8) and proposed regulation Section 1.721-1(d) would be directly on point. The facts presented here differ from that situation and have led to a difference in opinion on the correct interpretation of the tax consequences of the Plan. The issue is whether this rule applies when the debt being forgiven is debt of a disregarded entity (which is likely to be treated as nonrecourse debt of its sole member, FUEL, which is a partnership for tax purposes), while the debt is being satisfied by the issuance of an interest in a different partnership (Reorganized Debtor). Here, if the Pre-Petition Senior Secured Lender Claims were considered debt of the Debtor for tax purposes, they are being exchanged for interests in a different partnership in which FUEL has a very small profits interest (the New Class A Units).

There are two ways the IRS, the Debtor and the Reorganized Debtor may characterize these transactions for federal income tax purposes. By way of introduction, under the "partnership formation" approach (the "Partnership Formation Approach") advocated by Debtor, the parties would be treated as if (i) FUEL contributed the Debtor's assets to the new partnership (the Reorganized Debtor with more than one member) in exchange for FUEL's interest in Reorganized Debtor (the New Class A Units), and (ii) the Holders of the Pre-Petition Senior Secured Lender Claims contributed such claims to the new partnership (the Reorganized Debtor) in exchange for their partnership interests (the New Preferred Units and the Class B Units). This method treats the deemed contributions to form Reorganized Debtor in the same way as if the contributions had been made to FUEL itself under the proposed regulations, *i.e.*, as a non-taxable contribution to capital by both FUEL and by the Pre-Petition Secured Lenders, although FUEL members will recognize gain to the extent the amount of the Pre-Petition Secured Lender Claims exceeds their bases in their Class A Interests in FUEL. The Reorganized Debtor will have a carryover basis in its assets under this approach.

In contrast, under the full assets-over approach (the "Full Assets-Over Approach"), advocated by the Senior Secured Lenders, the parties would be treated as if (i) FUEL transferred the Debtor's assets directly to the Holders of the Pre-Petition Senior Secured Lender Claims in full satisfaction of the Pre-Petition Senior Lender Note Claims, and (ii) the secured debt holders and FUEL then form the new partnership (Reorganized Debtor) with the secured debt holders contributing their just-purchased Debtor assets in exchange for a capital and profits interest in the Reorganized Debtor (the New Preferred Units and the Class B Units) and with FUEL

receiving a profits interest (the New Class A Units). This is based on the partnership interest being issued to satisfy the debt being issued by an entity that is treated for tax purposes as a different entity. The tax consequences are that FUEL would be deemed to have sold the Debtor's assets in a fully taxable sale for the amount of the Pre-Petition Senior Secured Lender Claims, possibly plus the FMV of the New Class A Units (assumed to have very little FMV). Reorganized Debtor would have a FMV basis in its assets.

Both the Debtor and the Pre-Petition Senior Secured Lenders believe the most analogous authority appears to be IRS Revenue Ruling 99-5, which addresses the general tax treatment of a disregarded entity into a partnership when a limited liability company issues an additional membership unit to a new member. However, Debtor believes that situation 2 in that ruling controls, under which a contribution is made to a disregarded entity by a new member for an equity interest, turning the disregarded entity into a partnership and it is treated as a tax-free transaction under Section 721 of the IRC. Debtor acknowledges that neither situation 2 or any other aspect of the Revenue Ruling 99-5 discusses the aspects of a debt-for-equity exchange under Section 108(e)(8). Debtor distinguishes situation 1 of Revenue Ruling 99-5, which holds that when a new member acquires an interest in a disregarded entity from its member, it is treated as a sale of assets followed by capital contribution by both parties to a new partnership, by concluding that no acquisition occurs. It maintains that no acquisition has occurred based on the assertion that the proposed regulations under Sections 108(e)(8) and 721 would control over Treasury regulation Section 1.1001-2(a). The Pre-Petition Senior Secured Lenders would assert, however, that those proposed regulations apply only when there is a contribution to the partnership that issued the debt, rather than the situation covered by situation 1 of Revenue Ruling 99-5 (which is the creation of a new partnership from a disregarded entity. That predicate for application of the Section 108(e)(8) and 721 proposed regulations does not apply here.

Irrespective of whether the Partnership Formation Approach or the Full Assets Over Approach were to apply to the Pre-Petition Senior Secured Lender Claims, there is no dispute on the treatment of the other debt claims. FUEL will separately generate COD income by virtue of the cancellation of indebtedness with respect to the Class 2 Bond Claim of approximately $8,722,688, the Class 3 Fagen Claims of approximately $4,293,534, the Class 5 General Unsecured Claims and certain other claims, in each case because as of the Effective Date, to the extent that the adjusted issue price of such indebtedness being cancelled will exceed the sum of the cash paid by the Debtor plus the FMV of any additional consideration (interests in the Liquidation Trust) given in satisfaction of such Claims. That excess generally constitutes the amount of COD income that must be recognized for tax purposes.

Except to the extent offset by items of loss or deduction at the FUEL level for the taxable year in which the Effective Date occurs, the total amount of COD income recognized by FUEL from consummation of the Plan would flow through and be reportable by the members of FUEL in FUEL's calendar 2011 tax year in accordance with their respective distributive shares of FUEL's tax items.

<u>Consequences of Partnership Formation Approach</u>

If the Partnership Formation Approach were to apply, FUEL will recognize COD income to the extent that the Pre-Petition Senior Secured Lender Claims exceeds the FMV of both the New Preferred Units and the New Class B Units (collectively, and hereinafter the "Secured Lenders New Equity") in satisfaction of the Pre-Petition Senior Secured Lender Claims. The Debtor has been advised by Morgan Keegan that as of August 1, 2011, its analysis indicated that the enterprise value of the Reorganized Debtor would be in the range of $103 million to $108 million, with a mid-point estimate of $105 million inside that range. The enterprise value would be reduced by the amount of debt to be outstanding in determining the value of the New Preferred Units and New Class B Units. If the Secured Lenders New Equity has a FMV as of the Effective Date equal to this $105 million enterprise value, then FUEL would recognize COD income of approximately $2.67 million under the Partnership Formation Approach. The Debtor currently expects to adopt this $105 million estimate (to be reduced by any debt outstanding on the Effective Date) as the FMV of the Secured Lenders New Equity for IRS reporting purposes. The IRS may not agree, and any excess of such Pre-Petition Senior Secured Lender Claims over the FMV of Secured Lenders New Equity would constitute COD income reportable by FUEL for tax purposes as of the Effective Date.

For its taxable year ending December 31, 2010, FUEL reported an operating tax loss (excess of FUEL's tax deductions over taxable income) of over $48 million and the Debtor anticipates that another operating tax loss approximately $23.8 million of FUEL's taxable year ending December 31, 2011. Specifically, for the 2011 calendar tax year of FUEL in which the Effective Date may still be expected to occur, under the Partnership Formation Approach, the taxable income and taxable loss and deduction items of the Debtor would be reflected and reported by FUEL for the period beginning January 1, 2011 through and including the Effective Date if it occurs before December 31, 2011 (the "2011 disregarded period"). The Debtor expects that the operating results for this 2011 disregarded tax period will also be an operating loss, just as the Debtor expects for the full 2011 calendar tax year as well. Further, any COD income recognized by FUEL as a result of the consummation of the Plan would also be reported by FUEL from this 2011 disregarded tax period.

The Debtor currently believes that this expected operating tax loss for the 2011 disregarded period would substantially offset the anticipated amount of COD income reportable by FUEL from consummation of the Plan such that no significant amounts of net taxable income would be reportable by FUEL on its partnership tax return for December 31, 2011, and thereby flow through and be reportable by the FUEL members on their 2011 calendar year personal federal income tax returns. It would also preserve prior years losses, if successful. This is important since the Debtor does not expect that the FUEL members would receive any cash distributions in connection with consummation of the Plan with which to pay any federal income tax liabilities resulting from their reporting their distributive shares of FUEL's taxable income for 2011, including all of the COD income resulting from consummation of the Plan.

ATLANTA:5326255.1

### Consequences of the Full Assets-Over Approach

If the Full Assets-Over Approach were to apply, FUEL will recognize gain on the deemed disposition of Debtor's assets equal to the excess of the Pre-Petition Senior Notes Claim over Debtor's basis in its assets. As with the Partnership Formation Approach, such income will flow through FUEL to its members. It is based on Treasury regulation Section 1.1001-2(a), which provides that the amount realized from a sale or other disposition of property includes the amount of liabilities from which the transferor is discharged as a result of the sale or disposition. It further provides that the sale or other disposition of property that secures a nonrecourse liability discharges the transferor from the liability. Moreover, it is also consistent with situation 1 of Revenue Ruling 99-5, which holds that when a new member acquires an interest in a disregarded entity from its member, it is treated as a sale of assets followed by capital contribution by both parties to a new partnership.

Accordingly, the Full Assets-Over Approach is consistent with the tax treatment of a taxpayer satisfying nonrecourse debt with the assets securing the debt. In this case, rather than retaining the assets, the Pre-Petition Senior Secured Lenders are contributing them to a new partnership, the Reorganized Debtor. Since they are deemed for tax purposes to have paid FUEL an amount equal to FUEL's "nonrecourse debt", (and that amount did not exceed the FMV of such assets), the Full Assets-Over Approach provides that Reorganized Debtor's basis in the assets is equal to the FMV of the assets.

To the extent the FMV of the New Preferred Units and the New Class B Units is less than the basis of the holder in its a Pre-Petition Senior Secured Lender Claim, it would recognize a loss under the Full Assets-Over Approach. No such loss is recognized under the Partnership Formation Approach.

Another consequence of the deemed sale on the Effective Date of the Plan will reduce FUEL's ability to take cost recovery/depreciation deductions for the current year. That will have the effect of reducing FUEL's losses in 2011, but also reducing the gain on the deemed sale because it will have a higher basis in its assets. It would also limit the portion of current losses available to offset other COD income, although prior year suspended losses generally should be available to offset such income. To the extent those losses were previously properly used by FUEL members to offset other income, they have had the benefit of deferral of taxes on such income and will now be required to pay such amounts, even though they will not receive any cash distributions to fund such taxes.

If the FUEL members' bases in their interests are approximately the same as Debtor's basis in its assets, the tax consequences of the two approaches to the holder of the Class A Member Interests should be similar, although that the basis of the assets to Reorganized Debtor will be based on their FMV on the Effective Date and will not carryover from Debtor's/FUEL's old basis.

Reorganized Debtor will report the transaction consistently with the Full Assets-Over Approach.

### 3. Transfer of Litigation Trust Assets to the Litigation Trust.

Pursuant to the Plan, on the Effective Date, the Debtor will transfer certain assets to the Litigation Trust on behalf of the respective claimants comprising the Litigation Trust beneficiaries. *See* Section VII. N., "*Establishment of the Litigation Trust*," above. The transfer of assets by the Debtor to the Litigation Trust pursuant to the Plan may result in the recognition of gain or income by the Debtor, depending in part on the FMV of such assets on the Effective Date and the Debtor's tax basis in such assets.

Although not free from doubt, the Debtor currently also anticipates that FUEL's expected operating tax loss for the 2011 disregarded period should substantially offset the gain or income, if any recognized by FUEL for tax purposes upon the transfer by the Debtor to the Litigation Trust of assets pursuant to the Plan.

### K. SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES TO U.S. HOLDERS OF CERTAIN CLAIMS

The federal income tax consequences to U.S. Holders of Claims and the character and amount of income, gain or loss recognized as a consequence of the Plan and the distributions provided for thereby will depend upon, among other things, (1) the manner in which a Holder acquired a Claim; (2) the length of time the Claim has been held; (3) whether the Claim was acquired at a discount; (4) whether the Holder has taken a bad debt deduction with respect to the Claim (or any portion thereof) in the current or any prior year; (5) whether the Holder has previously included in income accrued but unpaid interest with respect to the Claim; (6) the Holder's method of tax accounting; and (7) whether the Claim is an installment obligation for federal income tax purposes.

### 1. Distributions in Discharge of Accrued Interest.

In general, to the extent that any consideration received pursuant to the Plan (whether in cash or other property including without limitation, interests in the Litigation Trust, New Preferred Units, New Class A Units, or New Class B Units) by a Holder of a Claim is received in satisfaction of interest accrued during its holding period, such amount will be taxable to the Holder as interest income (if not previously included in the Holder's gross income). Conversely, a Holder generally recognizes a deductible loss to the extent of any accrued interest or amortized original discount ("OID") was previously included in its gross income and is not paid in full. However, the IRS has privately ruled that a holder of a "security" for federal income tax purposes of a corporate issuer, in an otherwise tax-free exchange, could not claim a current deduction with respect to any unpaid OID. Because the Debtor is disregarded for tax purposes, and FUEL is a "partnership" not a "corporate" issuer for tax purposes, this ruling may not be applicable to the Claims. It is also unclear whether, by analogy, a Holder of a Claim that does not constitute a security would be required to recognize a capital loss, rather than ordinary loss, with respect to previously included OID that is not paid in full.

The Plan provides that consideration received in respect of a Claim is allocable first to the principal amount of the Claim (as determined for federal income tax purposes) and then, to the extent of any excess, to the remainder of the Claim for

ATLANTA:5326255.1

accrued but unpaid interest. There is no assurance that the IRS will respect such allocation for federal income tax purposes.

Each Holder of a Claim is urged to consult its tax advisor regarding the allocation of consideration received under the Plan, as well as the deductibility of accrued but unpaid interest and the character of any loss claimed with respect to accrued but unpaid interest previously included in gross income for federal income tax purposes.

## 2. Market Discount.

The "market discount" provisions of Sections 1276 through 1278 of the IRC may apply to Holders of certain Claims. In general, a debt obligation that is acquired by a holder in the secondary market is a "market discount bond" as to that holder if the debt obligation's stated redemption price at maturity (or, in the case of a debt obligation having original issue discount, its adjusted issue price) exceeds, by more than a statutory de minimis amount, the tax basis of the debt obligation in the Holder's hands immediately after the Holder's acquisition of the debt obligation. If a Holder has accrued market discount with respect to its Claims and such Holder realizes gain upon the exchange of its Claims for cash or property pursuant to the Plan, such Holder may be required to include as ordinary income the amount of such accrued market discount to the extent of such realized gain. Holders who have accrued market discount with respect to their Claims should consult their tax advisors as to the application of the market discount rules to them in view of their particular circumstances.

## 3. Character of Gain or Loss.

Where gain or loss is recognized by a Holder of a Claim upon the exchange of its Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including, among others, the tax status of the Holder, whether the Claim constitutes a capital asset in the hands of the Holder and how long it has been held, whether the Claim was acquired at a market discount (discussed in Section XVI.B.3., above), whether and to what extent the Holder previously had claimed a bad debt deduction, and the nature and tax treatment of any fees, costs or expense reimbursements to which consideration is allocated. For Holders that are financial institutions (as defined under Section 582(c) of the IRC), the gain or loss on the exchange of their Claims will be treated as ordinary income or loss. Each Holder of a Claim is urged to consult its tax advisor to determine the character of any gain or loss recognized with respect to the satisfaction of its Claim.

Individual Holders of Claims who recognize capital losses as a result of the distributions under the Plan will be subject to the IRC limits on their use of capital losses. For corporate Holders, losses from the sale or exchange of capital assets may only be used to offset capital gains. Corporate Holders who have more capital losses than can be used in a tax year may be allowed to carry over unused capital losses for the five (5) taxable years following the capital loss year and may be allowed to carry back unused capital losses to the three (3) taxable years preceding the capital loss year.

## 4. Holders of Class 1 - Pre-Petition Senior Secured Lender Claims.

Pursuant to the Plan, Holders of the Class 1 Claims will receive their Pro Rata Share of the New Preferred Units and the New Class B Units. The following discussion assumes that the Reorganized Debtor is treated as a "partnership" for federal income tax purposes, and therefore, that its income, gain, loss and deduction will flow through to, and be reported by, its members for tax purposes.

As discussed in Section XVI. A.1., above, although Debtor currently believes that the Partnership Formation Approach applies, the Reorganized Debtor and Pre-Petition Senior Secured Lenders intend to treat the transaction consistent with the Full Assets-Over Approach. Notwithstanding the discussion set forth above, the Debtor understands that the Holders of the Pre-Petition Senior Secured Lender Claims believe that the Full Assets-Over Approach, not the Partnership Formation Approach, is the most appropriate federal income tax characterization in these transactions. *See* Section XVI. A.1. "*Cancellation of Indebtedness Income*" above, which describes both the Partnership Formation Approach and the Full Assets-Over Approach. Accordingly, Reorganized Debtor and Pre-Petition Senior Secured Lenders expect to apply the Full Assets-Over Approach with respect to the tax consequences of its issuance of the New Preferred Units and the New Class B Units to the Holders of the Pre-Petition Senior Secured Lender Claims in exchange for the Pre-Petition Senior Secured Lender Claims pursuant to consummation of the Plan. The Full Assets-Over Approach would result in a fully taxable sale under Section 1001 of the IRC. The amount realized in such sale would be the dollar amount of the Outstanding Prepetition Debt (i.e. $107.6 million) plus the FMV of the New Class A Units (assumed to have very little FMV). The basis in the assets would equal the full FMV of such equity. Since the enterprise value of the Reorganized Debtor is currently appraised by Morgan Keegan to be $105 million, the equity value of the New Preferred Units and New Class B Units would be approximately the same. To the extent a Pre-Petition Senior Secured Lender has a basis in its claim that is greater (less) than its pro rata share of the FMV of the New Preferred Units and New Class B Units it is entitled to receive under the Plan, it will recognize a loss (gain) in that amount. The holding period for the New Preferred Units and New Class B Units would commence the day after the Effective Date.

The holder's capital account in its interest would be the FMV of the equity, and its basis would be the sum of such amount, plus its share of any debt of Reorganized Debtor.

If, however, Debtor is correct and the Partnership Formation Approach applied instead, the Holders of the Class 1 Claims would recognize neither gain nor loss on the exchange, and would have a basis in their New Preferred Units and New Class B Units equal to its adjusted tax basis in the Pre-Petition Senior Secured Lender Claims, as well as its share of the Reorganized Debtor's liabilities under Section 752 of the IRC. The Holder's holding period in the new equity interests would include the holding period of the transferred debt. Moreover, under regulations yet to be issued by the IRS under Section 108(e)(7)(E), the New Preferred Units and the New Class B Units received by Holders of the Pre-Petition Senior Secured Lender Claims may constitute so-called "Section 1245 property" and is deemed to have been subject to depreciation deductions equal to the sum of any bad-debt deductions claimed by the former Holders

-101-

of Class 1 Claims with respect to the Outstanding Prepetition Debt, plus any ordinary loss recognized on the exchange (which would be zero under the Section 108(e)(8) proposed regulations). Accordingly, upon a subsequent disposition of the New Preferred Units and the New Class B Units received by Holders of the Pre-Petition Senior Secured Lender Claims at a gain, those Holders may be required to recapture some or all of their respective prior bad-debt deductions as ordinary income.

### 5. Holder of the Class 2 Bond Claim.

The Holder of the Class 2 Bond Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives.

As discussed below in Section XVI.R.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* the Holder of the Class 2 Bond Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trustee will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

The Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

The Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 6. Holder of the Class 3 Fagen Claim.

The Holder of the Class 3 Fagen Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives.

As discussed below in Section XVI.R.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* the Holder of the Class 3 Fagen Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trust Board will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

ATLANTA:5326255.1

The Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

The Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 7. Holders of Class 5 General Unsecured Claims.

A Holder of a Class 5 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the FMV of the interest in the Litigation Trust it receives. A Holder of such a Claim will recognize the full amount of its gain or loss realized on the exchange.

As discussed below in Section XVI.R.3., *"Tax Treatment of Litigation Trust and Beneficial Interests Holders,"* each Holder of a Class 5 Claim that receives a beneficial interest in the Litigation Trust will be treated for federal income tax purposes as directly receiving, and as a direct owner of, its respective share of the Litigation Trust assets (consistent with its economic rights in the trust) in a taxable transaction. Pursuant to the Plan, the Litigation Trust Board will in good faith value the Debtor's assets transferred to the Litigation Trust, and all parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes.

A Holder's share of any cash proceeds subsequently received from the Litigation Trust should not be included, for federal income tax purposes, in the Holder's amount realized in respect of its respective Claim, but should be separately treated as amounts realized in respect of such Holder's ownership interest in the underlying assets of the Litigation Trust.

A Holder's tax basis in its respective share of the Litigation Trust assets will equal the FMV of such interest on the Effective Date, and the Holder's holding period generally will begin the day following the establishment of the Litigation Trust.

### 8. Holders of Class 6 Convenience Claims.

A Holder of a Class 6 Claim will realize gain or loss for federal income tax purposes as a result of the consummation of the Plan equal to the difference between (i) the Holder's adjusted tax basis in its Claim determined immediately prior to the Effective Date, and (ii) the amount of Cash it receives. A Holder of such Claim will recognize the full amount of its gain or loss realized on the exchange.

## L. SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES OF OWNERSHIP OF NEW PREFERRED UNITS AND NEW CLASS B UNITS

Under current Treasury regulations, a domestic entity that has two or more members and that is not organized as a corporation under federal or state law will

generally be classified as a partnership for federal income tax purposes, unless it elects to be treated as a corporation. There are no plans to elect to have the Reorganized Debtor be classified as a corporation for federal income tax purposes. Therefore, it is assumed, and the following discussion assumes, that the Reorganized Debtor will be treated as a partnership for federal income tax purposes.

### 1. Equity Treatment of the New Preferred Units and New Class B Units

The New Preferred Units and the New Class B Units should be treated as equity interests in the Reorganized Debtor for federal income tax purposes, even though the New Preferred Units do have several "debt" like rather than "equity" like characteristics for federal income tax purposes. It is expected that the New Class B Units will also be treated as" equity" and further, that the New Class A Units issued to FUEL are also "equity" for federal income tax purposes, although the Debtor will seek no tax opinion or IRS ruling to that effect. No assurance can be provided that the IRS will agree that these Units are "equity. The following discussion assumes that both the New Preferred Units and the New Class B Units (as well as the New Class A Units) are "equity" of the Reorganized Debtor, and that the Holders of such New Preferred Units and the New Class B Units are "members" in the Reorganized Debtor with respect to both classes of units for federal income tax purposes. The following discussion would be materially different if the New Preferred Units were treated as "debt" rather than "equity" for federal income tax purposes.

### 2. Tax Treatment of Reorganized Debtor

As a partnership, the Reorganized Debtor itself will not be subject to federal income tax. Instead, the Reorganized Debtor will file an annual partnership information return with the IRS which will report the results of Reorganized Debtor's operations. Each Reorganized Debtor member will be required to report on its U.S. federal income tax return, and will be subject to tax in respect of, its distributive share of each item of Reorganized Debtor's income, gain, loss, deduction and credit for each taxable year of Reorganized Debtor ending with or within the member's taxable year. Each item generally will have the same character as if the member had realized the item directly. Members will be required to report these items regardless of the extent to which, or whether, they receive cash distributions from Reorganized Debtor for such taxable year, and thus may incur income tax liabilities in excess of any distributions from Reorganized Debtor.

A member is allowed to deduct its allocable share of the Reorganized Debtor losses (if any) only to the extent of such member's adjusted tax basis (discussed below) in its membership interest at the end of the taxable year in which the losses occur. In addition, various other limitations in the IRC may significantly limit a member's ability to deduct its allocable share of deductions and losses of Reorganized Debtor against other income.

The Reorganized Debtor will provide each member with the necessary information to report its allocable share of the Reorganized Debtor's tax items for federal income tax purposes. However, no assurance can be given that the Reorganized Debtor will be able to provide such information prior to the initial due

-104-

date of the members' federal income tax return and the members may therefore be required to apply to the IRS for an extension of time to file their tax returns.

The board of the Reorganized Debtor will decide how items will be reported on the Reorganized Debtor's federal income tax returns, and all members will be required under the IRC to treat the items consistently on their own returns, unless they file a statement with the IRS disclosing the inconsistency. In the event that the income tax returns of the Reorganized Debtor are audited by the IRS, the tax treatment of the Reorganized Debtor income and deductions generally will be determined at the Reorganized Debtor level in a single proceeding, rather than in individual audits of the members. The Tax Matters Partner will have considerable authority under the IRC and the limited liability company agreement to make decisions affecting the tax treatment and procedural rights of all members.

Members who are tax-exempt entities are required to pay federal income tax on their unrelated business taxable income. The income from the Reorganized Debtor is expected to consist largely of unrelated business taxable income.

### 3.     Tax Consequences to Members of Reorganized Debtor

A member generally will not recognize gain or loss on the receipt of a distribution of cash (either as the 15% preferred return on the New Preferred Units or with respect to the New Class B Units or property from the Reorganized Debtor (provided that the member is not treated as exchanging such member's share of the Reorganized Debtor's "unrealized receivables" and/or certain "inventory items" (as those terms are defined in Section 751 of the IRC, and together "ordinary income items") for other partnership property). A member, however, will recognize gain on the receipt of a distribution of money and, in some cases, marketable securities, from the Reorganized Debtor (including any constructive distribution of money resulting from a reduction of the member's share of the indebtedness of the Reorganized Debtor) to the extent such cash distribution or the fair market value of such marketable securities distributed exceeds such member's adjusted tax basis in its membership interest. Such distribution would be treated as gain from the sale or exchange of a membership interest, which is described below. For this purpose, a member would generally be treated by the IRS as having a single unitary tax basis in its New Preferred Units and the New Class B Units.

A member will recognize gain on the complete liquidation of its membership interest only to the extent the amount of money received exceeds its adjusted tax basis in its interest. Distributions of certain marketable securities are treated as distributions of money for purposes of determining gain. Any gain recognized by a member on the receipt of a distribution from the Reorganized Debtor generally will be capital gain, but may be taxable as ordinary income to the extent of previously allowed bad debt or ordinary loss deductions (as discussed above at Section XVI.B.5.), and under certain other circumstances. No loss can be recognized on a distribution in liquidation of a membership interest, unless the member receives no property other than money and ordinary income items.

A member's adjusted tax basis in its membership interest generally will be equal to such member's initial tax basis (that single unitary basis in both the New

-105-

Preferred Units and the New Class B Units (discussed above)), increased by the sum of (i) any additional capital contribution such member makes to the Reorganized Debtor, (ii) the member's allocable share of the income of the Reorganized Debtor, and (iii) increases in the member's allocable share of the IRC Section 752 liabilities of the Reorganized Debtor, and reduced, but not below zero, by the sum of (iv) the member's allocable share of the losses of the Reorganized Debtor, and (v) the amount of money or the adjusted tax basis of property distributed to such member, including constructive distributions of money resulting from reductions in such member's allocable share of the indebtedness of the Reorganized Debtor.

A sale of all or part of a member's interest will result in the recognition of gain or loss in an amount equal to the difference between the amount of the sales proceeds or distribution (including any constructive distribution) and such member's adjusted single unitary tax basis for the portion of the interest disposed of. Any gain or loss recognized with respect to such a sale generally will be treated as capital gain or loss, and will be long-term capital gain or loss if the interest has been held for more than one year, except to the extent (i) that the proceeds of the sale are attributable to a member's allocable share of certain ordinary income items of the Reorganized Debtor and such proceeds exceed the member's adjusted tax basis attributable to such ordinary income items and (ii) of previously allowed bad debt or ordinary loss deductions (as discussed above under Section XVI. B. 5.). A member's ability to deduct any loss recognized on the sale of its membership interest will depend on the member's own circumstances and may be restricted under the IRC.

Members generally will be required to pay taxes in each jurisdiction in which the Reorganized Debtor conducts business. This is expected to be limited to Georgia.

## M. SENIOR SECURED LENDERS' POSITION REGARDING TAX CONSEQUENCES TO HOLDERS OF INTERESTS

### 1. Holder of Class 7 – Equity Interest of Class A Member (FUEL).

Pursuant to the Plan, and if and only if, Classes 2, 3 and 5 each vote as a Class to accept the Plan, then FUEL as the Holder of the currently outstanding Class A Member Interest in the Debtor will have such interest converted into the New Class A Units in the Reorganized Debtor, but its economic rights to current distributions in the Reorganized Debtor and all other rights as a member will, for all practical purposes, be eliminated by the issuance by the Reorganized Debtor of the New Preferred Units and the New Class B Units.

Except for very limited Liquidity Event Distributions, the New Class A Units will continue to have no rights to current distributions from the Reorganized Debtor until and unless the occurrence of the Second Trigger Event, when the holders of the New Preferred Units have previously received in cash distributions the full "Preferred Redemption Value" and such New Preferred Units have been retired. At that time, and only at that time, will the New Class A Units again have the right to share in current distributions 75%/25% with the New Class B Units of the Reorganized Debtor.

The extremely limited economic rights of the New Class A Units raise issues as to whether the IRS would respect FUEL as the holder of a membership interest treated

ATLANTA:5326255.1

as a "partner" for federal income tax purposes. Nevertheless, the Debtor expects to take, and assumes but cannot currently confirm or ensure that the Reorganized Debtor will take, the tax reporting position that FUEL remains a "partner" in the Reorganized Debtor for federal income tax purposes by virtue of holding the New Class A Units.

If Classes 2, 3 and 5 <u>do</u> <u>not</u> each vote as a Class to accept the Plan, then FUEL's current Class A Member Interest in the Debtor will be completely extinguished as of Effective Date. *See* Section VII.B.7. and 13., "*Class 1 - Senior Secured Lender Claims*," and "*Class 7 – Equity Interest of Class A Member (FUEL)*," above.

Based on the foregoing, the Debtor expects that prior to the Second Trigger Event, FUEL should not be allocated taxable income attributable to its New Class A Units of the Reorganized Debtor it has to report for federal income tax purposes without a corresponding cash tax distribution sufficient to fully discharge its federal and state income taxes attributable to such taxable .

As discussed above, under Section XVI. A.1., the Debtor currently intends to apply the Partnership Formation Approach. If Debtor is correct, FUEL would recognize no gain or loss with respect to the deemed transfer of the Debtor's assets to the Reorganized Debtor (new partnership) in exchange for the New Class A Units, but would recognize COD income to the extent that the Outstanding Prepetition Debt exceeded the FMV of the New Preferred Units and New Class B Units on the Effective Date. FUEL members would also have a deemed cash distribution under Section 752 of the IRC equal to the excess of the amount of the sum of the Class 1, 2, 3, 5 and 6 Claims over the sum of their (i) bases in FUEL and (ii) the cash and FMV of other assets (including Litigation Trust Interests) to be distributed to holders of the Class 1, 2, 3, 5 and 6 Claims.

Under this approach, FUEL would obtain a tax basis in its New Class A Units which would include its adjusted tax basis in the assets of the Debtor as of the Effective Date, plus FUEL's share of the Reorganized Debtor's liabilities under Section 752 of the IRC. FUEL's capital account in the Reorganized Debtor would increase by the FMV of the Debtor's assets deemed transferred to the Reorganized Debtor, but reduced by deemed distributions, netting out to zero. FUEL's holding period for its New Class A Units would include its holding period for the Debtor's transferred assets.

However, there is no assurance that the IRS will respect such proposed tax treatment for federal income tax purposes. Further, the Reorganized Debtor is expected to instead adopt the Full Assets-Over Approach to these transactions under the Plan.

If instead, the IRS were to treat FUEL in accordance with the Full Assets-Over Approach as having sold the Debtor's assets to the new partnership (Reorganized Debtor) in a fully taxable transaction rather than contributing them to the new partnership in a Section 721 nonrecognition transaction, the Debtor anticipates that it would have an amount realized of $107.6 million plus the FMV of the New Class A Units (assumed to have very little FMV) less approximately $80 million in tax basis (which will vary significantly depending on whether the Effective Date occurs in 2011

or 2012), which would result in FUEL having to report a taxable gain of around $27.6 million, substantially all of which would be ordinary income, in addition to the COD income from the Class 2 3, 5 and 6 Claims, some or all of which may be sheltered by current losses of FUEL or losses from prior years allocated to members of FUEL. Again, the FUEL members would have a deemed cash distribution under Section 752 of the IRC equal to the amount of the Class 1, 2, 3, 5 and 6 Claims.

Finally, restrictions on transferability similar to those previously in effect may apply to members of FUEL to ensure that Reorganized Debtor is not treated as a publicly traded partnership under Section 7704 of the IRC due to trading in one of its partners/members. No final determination has been made on whether these restrictions must be continued.

      **2.**      **Holder of Class 8 – Equity Interest of Class B Member (CT Corporation Staffing).**

Pursuant to the Plan, the currently outstanding Class B membership interest in the Debtor will be extinguished on the Effective Date. Because this currently outstanding Class B Member Interest was a non-economic interest in the Debtor, the Holder of such interest should not recognize either gain or loss for federal income tax purposes as a result of consummation of the Plan.

**N.**      **SENIOR SECURED LENDERS' POSITION REGARDING INFORMATION REPORTING AND BACKUP WITHHOLDING**

All distributions to holders of Claims under the Plan are subject to any applicable tax withholding, including employment tax withholding. Under federal income tax law, interest, dividends, and other reportable payments may, under certain circumstances, be subject to "backup withholding" at the then applicable withholding rate (currently 28%). Backup withholding generally applies if the holder (a) fails to furnish its social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is a United States person that is not subject to backup withholding. Backup withholding is not an additional tax but merely an advance payment, which may be refunded to the extent it results in an overpayment of tax and the appropriate information is supplied to the IRS. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

In addition, from an information reporting perspective, Treasury regulations generally require disclosure by a taxpayer on its federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the holders' tax returns.

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments of interest. The Reorganized Debtor will comply with all applicable reporting requirements of the IRC.

## O. SENIOR SECURED LENDERS' POSITION REGARDING CERTAIN TAX CONSEQUENCES TO NON-U.S. HOLDERS

The rules governing U.S. federal income taxation of a Non-U.S. Holder are complex. Each Non-U.S. Holder should consult with its own tax advisor to determine the effect of U.S. federal, state, local and foreign income tax laws, as well as treaties, with regard to its participation in the transactions contemplated by the Plan, and its ownership of Claims, New Preferred Units and New Class B Units

### 1. Tax Consequences to Non-U.S. Holders of the Plan

a. *Tax Consequences of Non-U.S. Holders under the Plan*

A Non-U.S. Holder generally will not be subject to U.S. federal income tax with respect to any New Preferred Units, New Class B Units, interests in the Litigation Trust, and Cash received in the Plan, unless (i) such Non-U.S. Holder is engaged in a trade or business in the United States to which income, gain or loss from the exchange is "effectively connected" for U.S. federal income tax purposes or (ii) such Non-U.S. Holder is an individual and is present in the United States for 183 days or more during the taxable year of the exchange and certain other requirements are met.

b. *Tax Consequences to non-U.S. Holders of New Preferred Units and/or New Class B Units*

Non-U.S. Holders who are not citizens or residents of the United States or otherwise U.S. persons for U.S. federal income tax purposes and who are engaged in a U.S. trade or business generally will be subject to United States federal income tax on their distributive share of the Reorganized Debtor's income and gain that is "effectively connected" with the conduct of that U.S. trade or business ("*ECI*"), unless an applicable income tax treaty provides otherwise. Non-U.S. Holders who are allocated ECI will be required to file U.S. income tax returns. Those Non-U.S. Holders that are corporations could also be subject to a branch profits tax on earnings and profits effectively connected with such U.S. trade or business (subject to certain adjustments) at a rate of 30%, unless the branch profits tax is reduced or eliminated by an applicable income tax treaty. Non-U.S. Holders should discuss the applicability of the "effectively connected" rules and branch profits tax with their tax advisors.

In addition, a Non-U.S. Holder who is an individual will be subject to U.S. federal income tax on his or her share of the Reorganized Debtor's income if the individual is present in the United States for 183 or more days in the year and certain other requirements are met.

### 2. Information Reporting and Backup Withholding

Non-U.S. Holders generally will be subject to withholding of U.S. federal income tax at a 30% rate on their distributive share of dividends and certain types of interest that the Reorganized Debtor may derive from U.S. sources and that is not ECI.

ATLANTA:5326255.1

A Non-U.S. Holder of an interest in the Litigation Trust may be subject to up to 30% withholding, depending on, among other things, the particular type of income and whether the type of income is subject to a lower treaty rate.

Unless certain exceptions apply, the Reorganized Debtor must report annually to the IRS and to each Non-U.S. Holder the amount of any dividends paid to the Non-U.S. Holder (whether such dividend income is subject to U.S. withholding tax or is exempt from such tax pursuant to an income tax treaty). Copies of these information returns may also be made available under the provisions of a specific treaty or other agreement to the tax authorities of the country in which a Non-U.S. Holder resides.

Under current U.S. federal income tax law, backup withholding tax will not apply to payments of dividends or interest by the Reorganized Debtor or its paying agent if the Non-U.S. Holder provides a properly executed IRS Form W-8BEN (or successor form), or otherwise establishes its eligibility for an exemption, provided that the Reorganized Debtor or its paying agent, as the case may be, does not have actual knowledge or reason to know that the payee Non-U.S. Holder is a U.S. person.

Backup withholding is not an additional tax. Any amounts withheld from a payment to a Non-U.S. Holder under the backup withholding rules will be allowed as a credit against such holder's U.S. federal income tax liability and may entitle the holder to a refund, provided that the holder furnishes the required information to the IRS. A Non-U.S. Holder should consult its tax advisor regarding the application of information reporting and backup withholding in such holder's particular situation, the availability of an exemption from backup withholding and the procedure for obtaining such an exemption, if available.

Certain payments made after December 31, 2012 to certain foreign entities (including foreign accounts or foreign intermediaries) would be subject to a 30% withholding tax unless various U.S. information reporting and due diligence requirements have been satisfied. Payments subject to such requirements include dividends on and the gross proceeds of dispositions of New Preferred Units, New Class A Units and New Class B Units, and likely include distributions by the Litigation Trust. These requirements are different from, and in addition to, the withholding tax requirements described in the immediately preceding paragraphs. Non-U.S. holders should consult their tax advisor concerning the application of this legislation to their particular circumstances.

## P.    SENIOR    SECURED    LENDERS'    POSITION    REGARDING PROFESSIONAL TAX ASSISTANCE

THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN INCOME TAX CONSEQUENCES OF THE PLAN. THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING DISCUSSION DOES NOT ADDRESS ALL ASPECTS OF U.S. FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR INTEREST AND IS NOT A SUBSTITUTE FOR TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES ARE IN MANY CASES

UNCERTAIN AND MAY VARY DEPENDING ON A CLAIM OR INTEREST HOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIM AND INTEREST HOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE U.S. FEDERAL, STATE, LOCAL, AND APPLICABLE FOREIGN INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.

**Q.     SENIOR     SECURED     LENDERS'     POSITION     REGARDING RESERVATION OF RIGHTS**

This tax section is subject to change (possibly substantially) based on subsequent changes to other provisions of the Plan. The Debtor and its advisors reserve the right to further modify, revise or supplement this discussion and the other tax related sections of the Plan in accordance with the terms of the Plan and the Bankruptcy Code.

**R.     SENIOR     SECURED     LENDERS'     POSITION     REGARDING     TAX TREATMENT OF THE LITIGATION TRUST AND BENEFICIAL INTEREST HOLDERS**

**1.     Gain or Loss Recognition.**

Each Holder of an Allowed Class 2, 3 or 5 Claim who receives an interest in the Litigation Trust will recognize gain or loss in an amount equal to the difference between (i) the amount realized by such Holder in satisfaction of its Claim (other than any Claim for accrued but unpaid interest) and (ii) such Holder's adjusted tax basis in such Claim (other than any Claim for accrued but unpaid interest). The amount realized by a holder of a Claim will equal the FMV as of the Effective Date of the beneficial interest in the Litigation Trust received by such Holder pursuant to the Plan.

Because the holders of Disputed Class 2, 3 and 5 Claims will not receive a beneficial interest in the Litigation Trust until such time, if any, as their Claims become Allowed Claims, the full value of the assets transferred to the Litigation Trust should be deemed to have been received by those holders whose Claims are Allowed Claims as of the end of the year in which the Litigation Trust is formed. As a result, the fair market value of the beneficial interests that such holders would be deemed to have received upon the formation of the Litigation Trust may exceed the amount that such holders eventually receive from the Litigation Trust. If this occurs, any gain recognized by such holders would be overstated and any loss recognized by such holders would be understated for the taxable year in which the Litigation Trust is formed. Although such holders would recognize additional losses in subsequent years (as additional Claims become Allowed Claims and/or when the Litigation Trust makes a final distribution) that would offset the amount by which the gain (or loss) was overstated (or understated), such holders would lose the benefit of the time value of the additional money paid in taxes with respect to the taxable year in which the Litigation Trust is formed. Characterization differences also are possible, and holders should note that capital losses generally are deductible only against capital gains. Holders should consult their tax advisors regarding the possible alternative treatments and characterizations of these transactions, including the possible treatment of the amount realized by a holder in a manner that takes into account the subsequent allowance of Disputed Claims.

ATLANTA:5326255.1

Any holder of a Disputed Claim whose claim becomes an Allowed Claim after implementation of the Plan will be taxed on the receipt of the beneficial interest in the Litigation Trust in the manner set forth above in the year in which such holder's Claim is allowed. Specifically, such holder would be deemed to have received a beneficial interest in the Litigation Trust in such year and would recognize gain or loss equal to the difference between the fair market value of such holder's beneficial interest in the Litigation Trust and such holder's basis in its Claim. To the extent that other Disputed Claims become Allowed Claims in subsequent years, such holder's gain (or loss) may be overstated (or understated) for the year in which the holder receives its initial beneficial interest in the Litigation Trust, subject to possible offsetting losses in subsequent years.

### 2. Classification of the Litigation Trust.

The Litigation Trust created pursuant to the Plan is intended to qualify as a "liquidating trust" for federal income tax purposes. In general, a liquidating trust is not a separate taxable entity, but rather is treated for federal income tax purposes as a "grantor trust" (*i.e.*, a pass-through type entity). However, merely establishing a trust as a liquidating trust does not ensure that it will be treated as a grantor trust for federal income tax purposes. The Litigation Trust will be structured to comply with the general criteria set forth in IRS Revenue Procedure 94-45. Pursuant to the Plan, and in conformity with Revenue Procedure 94-45, all parties will be required to treat, for federal income tax purposes, the Litigation Trust as a grantor trust of which the Litigation Trust beneficiaries are the owners and grantors. The following discussion assumes that the Litigation Trust will be so respected for federal income tax purposes. However, no opinion of counsel has been requested, and neither the Debtor, the Reorganized Debtor nor the Litigation Trustee will seek a ruling from the IRS, concerning the tax status of the Litigation Trust as a grantor trust. Accordingly, there can be no assurance that the IRS would not take a contrary position. If the IRS were to challenge successfully the classification of a Litigation Trust, the federal income tax consequences to the Litigation Trust, the Litigation Trust beneficiaries and the Debtor could vary from those discussed herein (including the potential for an entity-level tax on income of the Litigation Trust).

### 3. General Tax Reporting by the Litigation Trust and Beneficiaries.

For all federal income tax purposes, all parties must treat the transfer of the Litigation Trust assets to the Litigation Trust in accordance with the terms of the Plan. Pursuant to the Plan, the Litigation Trust assets are treated, for federal income tax purposes, as having been transferred, subject to any obligations relating to those assets, directly to the holders of the respective Allowed Class 2, 3 and 5 Claims receiving an interest in the Litigation Trust (with each holder receiving in a taxable transaction an undivided interest in such assets in accordance with its economic interests in such assets) as of the Effective Date, followed by the transfer by the holders to the Litigation Trust of such assets in exchange for the interest in the Litigation Trust. Accordingly, all parties must treat the Litigation Trust as a grantor trust of which the holders of interests in the Litigation Trust are the owners and grantors, and treat the Litigation Trust beneficiaries as the direct owners of an undivided interest in the

-112-

ATLANTA:5326255.1

Litigation Trust assets, consistent with their economic interests therein, for all federal income tax purposes.

Allocations of taxable income or loss of the Litigation Trust will be allocated by reference to the manner in which an economic gain or loss would be borne immediately after a hypothetical liquidating distribution of the remaining Litigation Trust assets. The tax book value of the Litigation Trust assets for purpose of this paragraph shall equal their fair market value on the date the Litigation Trust assets are transferred to the Litigation Trust, adjusted in accordance with tax accounting principles prescribed by the IRC, the applicable Treasury regulations, and other applicable administrative and judicial authorities and pronouncements.

As soon as reasonably practicable after the transfer of the Litigation Trust assets to the Litigation Trust, the Litigation Trust Board shall make a good faith valuation of the Litigation Trust assets, and shall inform the Litigation Trustee of its determination. The Litigation Trustee shall notify the holders of interests in the Litigation Trust of the FMV determination in writing. All parties to the Litigation Trust must consistently use such valuation for all federal income tax purposes. The valuation will be made available, from time to time, as relevant for tax reporting purposes.

Taxable income or loss allocated to a Litigation Trust beneficiary will be treated as income or loss with respect to such Litigation Trust beneficiary's undivided interest in the Litigation Trust assets, and not as income or loss with respect to its prior respective Claim. The character of any income and the character and ability to use any loss will depend on the particular situation of the Litigation Trust beneficiary. The interests in the Litigation Trust will not be transferable.

Subject to the satisfaction of certain dollar thresholds to making such distributions, the Litigation Trust is generally obligated to make annual cash distributions to the holders of interests in the Litigation Trust. However, the federal income tax obligations of a holder with respect to its interest in the Litigation Trust are not dependent on the Litigation Trust distributing any cash or other proceeds. Thus, a holder may incur a federal income tax liability with respect to its allocable share of Litigation Trust income even if the Litigation Trust does not make a concurrent distribution to the holder. In general, a distribution of cash by the Litigation Trust will not be separately taxable to a Litigation Trust beneficiary since the beneficiary is already regarded for federal income tax purposes as owning the underlying assets (and was taxed at the time the cash was earned or received by the Litigation Trust). Further, the Litigation Trust Agreement will provide for the distribution of the available Litigation Proceeds to the holders on each Distribution Date. The Litigation Trustee will determine proportionate shares of the Litigation Trust's income and distributable Litigation Proceeds by treating any holder of a Disputed Claim as a current holder of an Allowed Claim. The Litigation Trustee will maintain an escrow of any amounts required to be set aside on account of Disputed Claims. Taxes on the income of the Litigation Trust attributable to this escrow will be paid by the escrow.

The Litigation Trustee will file with the IRS returns for the Litigation Trust as a grantor trust pursuant to Treasury Regulation Section 1.671-4(a). The Litigation Trustee also will annually send to each holder of an interest in the Litigation Trust a

separate statement regarding the receipts and expenditures of the Litigation Trust as relevant for federal income tax purposes and will instruct all such holders to use such information in preparing their federal income tax returns or to forward the appropriate information to such holder's underlying beneficial holders with instructions to utilize such information in preparing their federal income tax returns.

# XVII.
## CONFIRMATION AND CONSUMMATION PROCEDURE

### A.     GENERAL INFORMATION

All creditors whose Claims are impaired by the Plan (except the Class 8 Interests, which are deemed to have rejected the Plan) may cast their votes for or against the Plan. As a condition to confirmation of the Plan, the Bankruptcy Code requires that one Class of impaired Claims votes to accept the Plan. Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a Class of impaired Claims as acceptance by holders of at least two-thirds of the dollar amount of the class and by more than one-half in number of Claims. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan. Voting is accomplished by completing, dating, signing and returning the ballot form (the "Ballot") by the Voting Deadline. Ballots will be distributed to all creditors entitled to vote on the Plan. The Ballot will indicate (i) where the Ballot is to be filed and (ii) the deadline by which creditors must return their Ballots.

### B.     SOLICITATION OF ACCEPTANCES

This Disclosure Statement has been approved by the Bankruptcy Court as containing "adequate information" to permit creditors and equity interest holders to make an informed decision whether to accept or reject the Plan. The Bankruptcy Court's approval of this Disclosure Statement does not constitute an endorsement of any of the representations contained in either this Disclosure Statement or the Plan. Under the Bankruptcy Code, your acceptance of the Plan may not be solicited unless you receive a copy of this Disclosure Statement prior to, or concurrently with, such solicitation.

### C.     ACCEPTANCES NECESSARY TO CONFIRM THE PLAN

At the Confirmation Hearing, the Bankruptcy Court shall determine, among other things, whether the Plan has been accepted by the Debtor's creditors. Classes 1-3, 5 and 6 will be deemed to accept the Plan if at least two-thirds in amount and more than one-half in number of the Claims in each class vote to accept the Plan. Furthermore, unless there is unanimous acceptance of the Plan by Classes 1-3, 5, 6, and 7 the Bankruptcy Court must also determine that any non-accepting Class members will receive property with a value, as of the Effective Date of the Plan, that is not less than the amount that such Class member would receive or retain if the Debtor were liquidated as of the Effective Date of the Plan under Chapter 7 of the Bankruptcy Code.

### D.     CONFIRMATION OF PLAN PURSUANT TO SECTION 1129(B)

The Bankruptcy Code provides that the Plan may be confirmed even if it is not accepted by all impaired classes. To confirm the Plan without the requisite number of

-114-

acceptances of each impaired Class, the Bankruptcy Court must find that at least one impaired Class has accepted the Plan without regard to the acceptances of insiders, and the Plan does not discriminate unfairly against, and is otherwise fair and equitable, to any impaired Class that does not accept the Plan. Class 8 is deemed to reject the Plan. Accordingly, if any impaired Class votes to accept the Plan, the Debtor will seek to confirm the Plan under the "cramdown" provisions of Section 1129(b) of the Bankruptcy Code.

## E.    CONSIDERATIONS RELEVANT TO ACCEPTANCE OF THE PLAN

The Debtor's recommendation that all Creditors should vote to accept the Plan is premised upon the Debtor's view that the Plan is preferable to other alternatives for liquidation of the Debtor's Estate. It appears unlikely to the Debtor that an alternate plan of reorganization or liquidation can be proposed that would provide for payments in an amount equal or greater than the amounts proposed under the Plan. If the Plan is not accepted, it is likely that the interests of all creditors will be further diminished.

## F.    FEASIBILITY OF THE PLAN

The Bankruptcy Code requires that, for the Plan to be confirmed, the Debtor must demonstrate that consummation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor.

For purposes of determining whether the Plan meets the feasibility requirement, the Debtor has analyzed its ability to meet its obligations under the Plan. Based upon (a) amounts to be received through Exit Financing, (b) Cash on hand, and (c) future revenues as described in the Projections, the Debtor believes that the Plan is feasible and that it will be able to make all payments required to be made pursuant to the Plan.

HOLDERS OF CLAIMS AND INTERESTS ARE ADVISED TO REVIEW CAREFULLY THE RISK FACTORS INCLUDED IN SECTION *XII* OF THIS DISCLOSURE STATEMENT AND THE ASSUMPTIONS INCLUDED IN THE PROJECTIONS IN CONNECTION WITH THEIR REVIEW OF THE SAME. AS NOTED THEREIN, ACTUAL RESULTS MAY DIFFER MATERIALLY FROM THOSE PROJECTED.

## G.    BEST INTEREST/HYPOTHETICAL LIQUIDATION ANALYSIS

In certain circumstances, to be confirmed, the Plan must pass the "Best Interest Test" or "Hypothetical Liquidation Test" incorporated in Section 1129(a)(7) of the Bankruptcy Code. The test applies to individual creditors and Interest holders (stockholders) that are both (i) in impaired Classes under the Plan, and (ii) do not vote to accept the Plan. Section 1129(a)(7) Bankruptcy Code requires that such Creditors and Interest holders receive or retain an amount under the Plan not less than the amount that such holders would receive or retain if the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code.

The Debtor does not intend that its Chapter 11 Case actually will be converted to a Chapter 7 liquidation. However, to apply the Best Interest Test, the Debtor has prepared the "Hypothetical Liquidation Analysis" attached to this Disclosure Statement as Exhibit D. The Hypothetical Liquidation Analysis projects an estimate of

ATLANTA:5326255.1

what creditors and stockholders might receive in the event the Debtor's Chapter 11 Case were to be converted to a Chapter 7 case and the Debtor's assets subsequently liquidated. **The Debtor's Hypothetical Liquidation Analysis is based upon assumptions that the Debtor believes to be reasonable. However, multiple uncertainties could dramatically change the anticipated result in an actual liquidation. Thus, there can be no guarantee that an actual liquidation of the Debtor would result in the projected recoveries for creditors and Interest holders.**

In a typical Chapter 7 case, a trustee is elected or appointed to liquidate the debtor's assets for distribution to creditors in accordance with the priorities set forth in the Bankruptcy Code. Secured creditors generally are paid first from the sales proceeds of properties securing their liens. If any assets are remaining in the bankruptcy estates after the satisfaction of secured creditors' claims from their collateral, Administrative Claims generally are next to receive payment. Unsecured creditors are paid from any remaining sales proceeds, according to their respective priorities. Unsecured creditors with the same priority share in proportion to the amount of their allowed claims in relationship to the total amount of allowed claims held by all unsecured creditors with the same priority. Finally, equity interest holders receive the balance that remains, if any, after all creditors are paid.

The Hypothetical Liquidation Analysis included in Exhibit D to this Disclosure Statement projects that general unsecured creditors and existing Interest holders would receive no consideration whatsoever in the event the Debtor were to be liquidated under Chapter 7 of the Bankruptcy Code. Moreover, it is projected that holders of Administrative Claims, priority Claims, Priority Tax Claims, and most Secured Claims would receive far less than payment in full, or no consideration at all. By contrast, under the Plan, priority creditors will receive payment in full, and general unsecured creditors will receive distributions. Thus, the Debtor believes that all creditors will receive at least as favorable treatment under the Plan as they would in a hypothetical liquidation, and in fact, most creditors will receive far better treatment under the Plan. Holders of Subordinated Claims and Interests will neither receive nor retain any consideration under either the Plan or in a hypothetical liquidation, and thus would not be better off in a liquidation.

# XVIII.
## ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtor has analyzed whether a liquidation of its remaining assets by a Chapter 7 trustee, who is unfamiliar with the Debtor, its business, and the industry, would result in a higher return to the creditors of the Estate than an orderly liquidation by the Debtor and a Chapter 7 trustee. An analysis of the recovery that would likely result upon liquidation under Chapter 7 of the Bankruptcy Code is set forth as Exhibit D to this Disclosure Statement. That analysis reflects a net return to creditors that is lower than the net return to creditors that can realistically be realized through the Plan. The Debtor believes that liquidation would result in substantial diminution in the value to be realized by holders of Claims because:

ATLANTA:5326255.1

a.	any successor Chapter 7 Trustee will not have the relevant knowledge of the Debtor's operations that will be necessary to maximize the proceeds of the Debtor's assets, including receivables and causes of action; and

b.	the substantial additional Administrative Claims that will be required in order for a Chapter 7 Trustee to retain new attorneys, accountants, and other professionals who are unfamiliar with the case and who will also have to learn about the Debtor and its business; and

Consequently, the Debtor believes that the Plan, which provides for the reorganization of the Debtor's remaining assets by individuals familiar with the Debtor and the industry, provides a substantially greater return to holders of Claims than would liquidation by a new Chapter 7 Trustee who is unfamiliar with this Chapter 11 Case, the Debtor or the relevant industry.

Underlying the liquidation analysis set forth in Exhibit D are a number of estimates and assumptions that, although developed and considered reasonable by the Debtor, are inherently subject to significant economic uncertainties and contingencies beyond the control of the Debtor. The liquidation analysis is also based upon assumptions with regard to liquidation decisions that are subject to change.

## XIX.
## RECOMMENDATION

Based on the foregoing analysis of the Debtor, its remaining assets and the Plan, the Debtor believes that the best interests of all parties would be served through confirmation of the Plan. **ALL CREDITORS ARE URGED TO VOTE TO "ACCEPT" THE PLAN.**

[signature follows]

ATLANTA:5326255.1

Dated: August 26, 2011

SOUTHWEST GEORGIA ETHANOL, LLC,
Debtor in Possession

By: _____

Lawrence Kamp
Chief Financial Officer